**IN THE UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF GEORGIA
NEWNAN DIVISION**

| | |
|---|---|
| In re: | Chapter 11 |
| AFH AIR PROS, LLC, *et al.*,[1] | Case No. 25-10356 (PMB) |
| Debtors. | (Jointly Administered) |

**DECLARATION OF ANDREW D.J. HEDE IN SUPPORT OF
CHAPTER 11 PETITIONS AND FIRST DAY PLEADINGS**

I, Andrew D.J. Hede, pursuant to 28 U.S.C. § 1746 and under penalty of perjury, declare the following to the best of my knowledge, information, and belief:

1.  I am a Senior Managing Director of Accordion Partners, LLC ("Accordion") and Head of Accordion's Turnaround & Restructuring Practice. I have over 30 years of financial and operational transformation and restructuring experience in both the United States and Australia. I specialize in advising companies, creditors, and equity sponsors in distressed and non-distressed situations, focusing on financial and operational reviews, liquidity management, performance improvement, business and asset divestment, business plan preparation and review, recapitalization strategies, and negotiation of reorganization plans. I have regularly served in an interim management capacity, including as Chief Executive Officer, President, Chief Restructuring Officer, and Chief Transformation Officer. My experience covers a broad range of

---

[1] The last four digits of AFH Air Pros, LLC's tax identification number are 1228. Due to the large number of debtor entities in these chapter 11 cases, a complete list of the debtor entities and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the proposed claims and noticing agent at https://www.veritaglobal.net/AirPros. The mailing address for the debtor entities for purposes of these chapter 11 cases is: 150 S. Pine Island Road, Plantation, Florida 33020.

sectors with extensive experience in consumer products and retail, real estate and construction, media and telecom, and transportation and distribution.

2.    Accordion has been retained by the above-captioned debtors and debtors in possession (collectively, "Air Pros", the "Company" or the "Debtors") as financial advisors since March 2024. In addition, I have been retained to serve as the Chief Restructuring Officer ("CRO") of the Debtors in the above-captioned chapter 11 cases (the "Chapter 11 Cases") beginning in September 2024. I am authorized to submit this declaration on behalf of the Debtors.

3.    Based on my review of public and non-public documents and my discussions with, and information provided by, other members of the Debtors' management team, employees, agents, and advisors, and certain members of my engagement team, I am generally familiar with the Debtors' business, financial condition, policies and procedures, day-to-day operations, and books and records. Except as otherwise noted, I have personal knowledge of the matters set forth herein or have gained knowledge of such matters from other members of my engagement team or from the Debtors' employees, agents, attorneys, and advisors, the accuracy and completeness of which information I relied upon to provide this declaration. If called upon to testify, I would testify competently to the facts set forth in this declaration.

4.    On the date hereof (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code"), in the United States Bankruptcy Court for the Northern District of Georgia (the "Court"), thereby commencing the Chapter 11 Cases. The Debtors will continue in possession of their properties and will operate and manage their businesses as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

ACTIVE 704896970

5.     I submit this First Day Declaration on behalf of the Debtors in support of the Debtors' (i) voluntary petitions for relief that were filed under chapter 11 of the Bankruptcy Code and (ii) "first day" pleadings, which are being filed concurrently herewith (collectively, the "<u>First Day Pleadings</u>").[2] The Debtors seek the relief set forth in the First Day Pleadings to minimize the adverse effects of the commencement of the Chapter 11 Cases on business operations and to maximize the value of their assets. I have reviewed the Debtors' petitions and the First Day Pleadings and it is my belief that the relief sought therein is essential to ensure the uninterrupted operation of the Debtors' business and to successfully maximize the value of the Debtors' estates.

6.     To familiarize the Court with the Debtors, their business units, the circumstances leading up to these Chapter 11 Cases, and the relief the Debtors seek in the First Day Pleadings, this declaration is organized as follows:

- **Part I** provides an overview of the Debtors' corporate history, corporate structure, and business units;

- **Part II** describes the Debtors' prepetition secured credit facility;

- **Part III** describes the Debtors' prepetition unsecured debt;

- **Part IV** describes the events leading up to the filing of these Chapter 11 Cases; and

- **Part V** provides evidentiary support for the First Day Pleadings.

## I.    THE DEBTORS' BUSINESS, HISTORY, AND CORPORATE STRUCTURE

### A.  Overview of the Debtors' Business

7.     Air Pros is a professional home services provider offering a wide range of solutions for residential and commercial clients, specializing in HVAC (heating, ventilation, and air conditioning) installation, repair, maintenance, and air quality solutions, ensuring optimal comfort

---

[2] Capitalized terms used but not otherwise defined herein have the meanings ascribed to such terms in the applicable First Day Pleadings.

ACTIVE 704896970

and efficiency for its customers. Certain of the Debtors' business units and locations offer additional services that complement the HVAC business, including plumbing and electrical services, as well as home warranties.

8.      Air Pros was founded in 2017 in Fort Lauderdale, Florida, by Anthony Perera, with a mission to deliver high-quality, affordable, and reliable HVAC services. Starting with a single vehicle and two employees, Air Pros has grown to over 600 vehicles, more than 700 employees, and hundreds of thousands of customers across eight states – Florida, Georgia, Alabama, Mississippi, Louisiana, Texas, Colorado, and Washington, establishing Air Pros and its affiliated business units as a well-known name in the industry. The Debtors' teams of licensed and trained technicians are available for routine maintenance, emergency repairs, system upgrades, and complete system replacement, ensuring customers receive reliable and timely service.

**B.  Operational Structure**

9.      The Debtors began with the formation of Air Pros, LLC in Fort Lauderdale in 2017. Since their founding, the Debtors have expanded their business through a series of acquisitions in Florida, Georgia, Louisiana, Washington, Colorado, and Texas. The Debtors operate through a network of nine business units, which has allowed the company to expand its footprint across the country and provide localized services in various regions. By partnering with or acquiring established HVAC and home service businesses (as discussed below), the Debtors retain local expertise while also providing corporate resources and standards of service. This strategy enabled the company to maintain a balance of community-focused operations and broad industry capabilities.

10.     An overview of the history and operations of each of the Debtors' business units is set forth in the following table.

4

| Business Unit | History and Overview of Operations |
|---|---|
| *Air Pros (Legacy)*  | Service Areas. The original Air Pros business ("Air Pros (Legacy)") serves the Florida market and operates across seven offices, including Davie, Boca, Orlando, Fort Meyers, Tampa, and Ocala. The Air Pros (Legacy) business unit also includes the "Personalized Power and Air" and "Personalized Power Systems" brand in Boca Raton, Florida; the "Jack Rabbit Air Conditioning" brand in Tampa, Florida; and the "Drain Genie" brand in Miami, Florida. <br><br> Services. Air Pros (Legacy) provides installation, maintenance, and repair services, with a focus on HVAC. HVAC services comprise more than 75% of the business. The Boca Raton location also provides electrical services and residential generator solutions, including installation, repair, and maintenance. <br><br> Call Center. All locations under the Air Pros (Legacy) business unit, other than Boca Raton, utilize a call center in Orlando to manage the customer experience and interactions. <br><br> Founding and Acquisitions. The Air Pros (Legacy) business unit is the founding business unit of the Debtors, which began in 2017 in Fort Lauderdale, Florida. Air Pros (Legacy) subsequently expanded its operations by opening additional locations and by acquiring the assets of Florida-based HVAC businesses, including (a) Blue Star Heating & Air, LLC (August 2019), (b) Louis Bruno, LLC (December 2019), (c) Promaster Air Conditioning, LLC (March 2020), (d) A&D Electrical & HVAC-R (March 2020), (e) Summers Heating and Cooling, Inc. (May 2020), and (f) Universal Restoration, Inc. (October 2022). |

ACTIVE 704896970

| Business Unit | History and Overview of Operations |
|---|---|
| ***One Source Home Service***  | Service Areas. One Source Home Service ("One Source") is based in Colorado Springs, Colorado and serves Colorado Springs, Pueblo, and surrounding areas.<br><br>Services. One Source specializes in HVAC services, which comprises approximately 85% of the business, as well as plumbing and electrical services.<br><br>Call Center. One Source utilizes a local call center to support operations and enhance customer experience.<br><br>Founding and Acquisitions. One Source was founded in 2012 and acquired by the Debtors in September 2020 through the acquisition of the assets of One Source Home Services, LLC. The Debtors previously acquired the assets of Climate Solutions, Co. in January 2020 and operated in Colorado under Air Pros Colorado. After acquiring One Source, all of the Debtors' business in Colorado is conducted under One Source. |
| ***Hansen Super Techs***  | Service Areas. Hansen Super Techs ("Hansen") is based in Mobile, Alabama and serves the surrounding Gulf Coast areas of Alabama, Mississippi, and Florida.<br><br>Services. Hansen specializes in HVAC services, which comprises approximately 75% of the business, as well as plumbing and electrical services.<br><br>Call Center. Hansen utilizes a local call center to support operations and enhance customer experience.<br><br>Founding and Acquisitions. Hansen was founded in 2006 and acquired by the Debtors in November 2021 through the acquisition of the assets of C&P Hansen Heating and Cooling, Inc. |
| ***Doug's Service Company***  | Service Areas. Doug's Service ("Doug's") is based in Houma, Louisiana serving Thibodaux, Houma, and surrounding areas.<br><br>Services. Doug's provides HVAC, electrical, and plumbing services, with HVAC accounting for approximately 62% of the business.<br><br>Call Center. Doug's utilizes a regional call center to support operations and enhance customer experience.<br><br>Founding and Acquisitions. Doug's was founded in 1988 and acquired by the Debtors in February 2022 through the acquisition of the assets of Doug's Service Company. |

6

| Business Unit | History and Overview of Operations |
|---|---|
| *Air Force Heating & Air*  | Service Areas. Air Force Heating and Air ("Air Force"), operated through AFH Air Pros, LLC, is based in LaGrange, Georgia with six locations across LaGrange, Columbus, and Marietta, Georgia as well as Auburn and Opelika, Alabama. Approximately 68% of the Air Force business is attributable to the main office at 100 Corporate Park E. Drive, LaGrange, Georgia, which is the principal place of business for AFH Air Pros, LLC.<br><br>Services. Air Force offers a mix of HVAC and plumbing services, with HVAC services accounting for approximately 92% of the business.<br><br>Call Center. Air Force utilizes a regional call center to support operations and enhance customer experience.<br><br>Founding and Acquisitions. Air Force was founded in 2000 and acquired by the Debtors in July 2022 through the acquisition of the assets of LaGrange Airforce Heating and Air, LLC and West Georgia Indoor Comfort, LLC. |
| *Dallas Plumbing & Air Conditioning*  | Service Areas. Dallas Plumbing and Air Conditioning ("Dallas Plumbing") is based in Dallas, Texas and provides services to the Dallas-Fort Worth region and throughout the North Texas area.<br><br>Services. Dallas Plumbing provides both HVAC and plumbing services, with each comprising approximately 50% of the business.<br><br>Call Center. Dallas Plumbing utilizes the Orlando call center to support operations and enhance customer experience.<br><br>Founding and Acquisitions. Dallas Plumbing was founded in 1903 and acquired by the Debtors in July 2022 through the acquisition of the assets of Dallas Plumbing Company. |
| *Dream Team Heating & Air*  | Service Areas. Dream Team Heating & Air ("Dream Team") is based in in Denham Springs, Louisiana and serves Baton Rouge and surrounding areas.<br><br>Services. Dream Team offers HVAC and electrical services, with HVAC accounting for approximately 92% of the business.<br><br>Call Center. Dream Team utilizes a regional call center to support operations and enhance customer experience.<br><br>Founding and Acquisitions. Dream Team was founded in 2019 and acquired by the Debtors in July 2022. |

7

| Business Unit | History and Overview of Operations |
|---|---|
| **CM Heating & Cooling** | Service Areas. CM Heating & Cooling ("CM") is based in Everett, Washington and serves the greater Everett area, extending to the perimeter of Seattle, from its main office in Everett, Washington and additional locations in Lynwood, Washington and Vernon, Washington.<br><br>Services. CM offers installation and maintenance services for HVAC, plumbing, and electrical, with HVAC comprising approximately 85% of the business.<br><br>Call Center. CM utilizes a local call center to support operations and enhance customer experience.<br><br>Founding and Acquisitions. CM was founded in 1983 and acquired by the Debtors in August 2022 through the acquisition of the assets of C.M. Heating Inc. |
| **East Coast Mechanical Air Conditioning & Plumbing** | Service Areas. East Coast Mechanical ("ECM") has one location in Boynton Beach, Florida from which it serves the South Florida area, including Palm Beach County, Broward County, Martin County, and St. Lucie County.<br><br>Services. ECM's focus is on HVAC installation, repair, and maintenance, which accounts for approximately 59% of ECM's business. ECM also offers whole home warranties to consumers under its Home Services Program, which accounts for approximately 30–40% of ECM's business.[3]<br><br>Call Center. ECM utilizes a local call center to support operations and enhance customer experience.<br><br>Founding and Acquisitions. ECM was founded in 1985 and acquired by the Debtors in December 2022 through the acquisition of 100% of the membership interests in East Coast Mechanical, LLC. |

---

[3] Additional information regarding the ECM Home Services Program is set forth in the *Motion of the Debtors For Entry of an Order Authorizing the Debtors to Honor Prepetition Obligations to Customers and Otherwise Continue Customer Programs in The Ordinary Course of Business*, filed contemporaneously herewith.

ACTIVE 704896970

### C. Corporate Structure

11.    Air Pros Solutions Holdings, LLC ("Holdings"), the Debtors' ultimate parent company, owns 100% of the membership interests in Air Pros Solutions, LLC ("Solutions"), which is also a Delaware limited liability company. Solutions, in turn, owns 100% of the membership interests in each of the Debtors' subsidiary affiliates, except for Air Pros Washington, LLP ("AP Washington"), which is a limited liability partnership in which Solutions is the 99.9% partner and Air Pros, LLC is a .1% partner.

12.    In addition, all the subsidiaries of Solutions that are limited liability companies are member-managed LLCs with the exceptions of Air Pros West, LLC ("AP West") and Air Pros Texas LLC ("AP Texas"), which are manager-managed. Although AP West and AP Texas are manager-managed, Solutions is the sole manager of each. Additionally, Solutions is the Administrative Partner of AP Washington.

13.    As set forth in the Corporate Disclosure Statement and List of Equity Holders for Holdings, the Debtors' ultimate parent entity, the membership interests in Holdings are owned and controlled as follows:

| Member of Holdings | Membership Interest |
|---|---|
| Capital Finance Opportunities 1901C, LLC | 9.74% |
| C.M. Heating Inc. | 3.40% |
| West Georgia Indoor Comfort, LLC | 0.88% |
| C&P Hansen Heating and Cooling, Inc. | 8.50% |
| AKAA Family, LLLP | 75.19% |
| Doug's Service Company | 1.07% |
| Robert Daniel Blalock | 0.73% |
| Dream Team Services, LLC | 0.26% |
| Universal Restoration, Inc. | 0.23% |
| **TOTAL** | **100.00%** |

ACTIVE 704896970

14.    The corporate organizational structure of the Debtors, including the jurisdiction of formation of each Debtor and their respective members and managers, as applicable, is depicted on the chart attached hereto as **Exhibit A**.

### D.  Corporate Governance and Management

15.    The Debtors have a centralized corporate office located in Plantation, Florida that houses its accounting, billing and collections, corporate compliance, information technology, legal, and centralized marketing functions. In addition, each business unit has a general manager responsible for overseeing the operations of their respective business unit.

16.    In March 2022, the Debtors' founder and then-CEO, Anthony Perera, transitioned to the role of Chief Growth Officer, overseeing the Company's strategy and operations management teams to facilitate market expansion and sales goals, including a focus on growth and acquisition strategies. As of the Petition Date, the day-to-day operations of the Company are overseen by the Chief Operating Officer, Brian Smith.

17.    As described in greater detail in Section III herein, in January 2024, Lawrence Hirsh was appointed as an independent manager on the board of managers of Solutions effective as of January 31, 2024. As of the Petition Date, Mr. Hirsh is the sole manager of Solutions and Holdings.

## II.  PREPETITION SECURED CREDIT FACILITY

18.    As discussed more fully below, as of the Petition Date, the Debtors were indebted to the Prepetition Secured Parties (as defined below) in an amount not less than $250,394,360.17, including principal, accrued and unpaid interest, and certain fees owing under the Prepetition Loan Documents, but excluding certain other fees, expenses and other amounts owing under the Prepetition Loan Documents.

19.    Pursuant to that certain Credit Agreement, dated as of October 31, 2022 (as amended, restated, supplemented or otherwise modified from time to time prior to the Petition

10

Date, the "Prepetition Credit Agreement" and, collectively with any other agreements executed or delivered in connection therewith, and all other "Loan Documents" as defined therein, each as may be amended, restated, supplemented, or otherwise modified from time to time, the "Prepetition Loan Documents"), among Air Pros Solutions Holdings, LLC ("Holdings"), Air Pros Solutions, LLC ("Borrower") and the Subsidiary Guarantors (as defined in the Prepetition Credit Agreement, together with Holdings and the Borrower, the "Prepetition Loan Parties"), the Lenders (as defined in the Prepetition Credit Agreement, the "Prepetition Lenders"), and Alter Domus (US) LLC, as disbursing agent and collateral agent (in such capacity, the "Prepetition Agent" and, together with the Prepetition Lenders, the "Prepetition Secured Parties"), the Prepetition Lenders agreed to extend certain loans and make other financial accommodations to the Prepetition Loan Parties. The Prepetition Credit Agreement provides for a senior secured term loan facility with an aggregate outstanding principal balance, as of the Petition Date, of approximately $196,906,883 million (the "Prepetition Term Loan Facility") and a revolving credit facility with an aggregate outstanding principal balance, as of the Petition Date, of approximately $23.5 million (the "Prepetition Revolving Facility", and together with the Prepetition Term Loan Facility, the "Prepetition Credit Facility").   The Prepetition Revolving Facility includes an additional $11 million of prepetition revolving loans funded under that certain Second Amendment to Credit Agreement, dated as of November 25, 2024, and a further $2.5 million of prepetition revolving loans funded during the week leading up the Petition Date under that certain Third Amendment to Credit Agreement, dated as of March 13, 2025 (such additional financing, the "Prepetition Bridge Financing"). All liabilities and other obligations of the Debtors arising under the Prepetition Loan Documents and applicable law and all other "Obligations" (as defined in the Prepetition Credit Agreement) shall collectively be referred to herein as the "Prepetition Obligations". As of the

ACTIVE 704896970

Petition Date, the Prepetition Obligations were not less than approximately $250,394,360, including principal, accrued and unpaid interest and certain additional fees due under the Prepetition Loan Documents, but excluding certain other fees and expenses (including reasonable attorneys', accountants', appraisers', and financial advisors' fees and expenses that are chargeable or reimbursable under the Prepetition Loan Documents) and other amounts then due under the Prepetition Loan Documents and applicable law.

20.     Pursuant to that certain Guarantee and Collateral Agreement dated as of October 31, 2022 (the "Prepetition Guarantee and Collateral Agreement") and other Security Documents (as defined in the Prepetition Credit Agreement, and as amended, restated, supplemented or otherwise modified from time to time prior to the Petition Date, the "Prepetition Security Documents"), by and among each of the Prepetition Loan Parties and the Prepetition Agent, each Prepetition Loan Party granted to the Prepetition Agent, in its capacity as collateral agent, for the benefit of itself and the other Prepetition Secured Parties, to secure the Prepetition Obligations, a security interest in and continuing lien (the "Prepetition Liens") on substantially all of the Prepetition Loan Parties' assets and properties (including Cash Collateral).  All "Collateral," as defined in the Prepetition Credit Agreement, granted or pledged by the Prepetition Loan Parties pursuant to any Prepetition Security Document or any other Prepetition Loan Document shall collectively be referred to herein as the "Prepetition Collateral".[4]

---

[4] All of the Debtors are Grantors under the Prepetition Guarantee and Collateral Agreement. As contemplated and required by the Prepetition Loan Documents, Debtor East Coast Mechanical, LLC, which was acquired by Solutions pursuant to that certain membership Interest Purchase Agreement dated December 1, 2022, guaranteed the obligations under the Prepetition Loan Documents pursuant to an Assumption Agreement dated August 1, 2023, in favor of the Prepetition Agent, and ECM became a Guarantor and Grantor under the Prepetition Guarantee and Collateral Agreement.

ACTIVE 704896970

### III.    PREPETITION UNSECURED DEBT

21.    As of the Petition Date, the Debtors have estimated aggregate general unsecured debt in the approximate amount of $45 million, including $17.1 million in aggregate amount on account of contingent, unliquidated, and disputed obligations in connection with the Company's acquisition of additional business units pursuant to the terms of the applicable acquisition agreements and ancillary documents (the "Seller Liabilities"). The Seller Liabilities include approximately $9.1 million on account of principal and interest under seller notes, net working capital adjustments, and holdbacks, and an additional approximately $8 million on account of potential earnouts. The Debtors dispute certain of the amounts of the Seller Liabilities.

### IV.    EVENTS LEADING TO THE CHAPTER 11 FILINGS

#### 1.    *Operational and Integration Challenges*

22.    Since completing multiple acquisitions, the business has experienced a series of ongoing operational and integration challenges that have negatively impacted operations and financial performance. After acquiring several new business units in an approximately 15-month period, the Debtors have not been able to fully integrate its various business units. Many of the operating practices of the legacy Air Pros business have not been applied to acquired business units. Combined with other challenges, the businesses have underperformed. For example, each business unit has an individualized operating model, which leads to lack of controls, different operating philosophies and margins, and a lack of economies of scale.

23.    Additionally, the Debtors' level of indebtedness has made it more difficult to satisfy the Debtors' obligations, resulting in defaults on, and acceleration of, such indebtedness. In addition, dedicating a substantial portion of its cash flows from operations to debt service obligations has reduced the availability of such cash flows to complete various initiatives to fully

13

integrate the acquired business units, fund working capital, capital expenditures, and other general corporate requirements and to carry out other aspects of its business.

### 2. 2023 Enterprise Marketing Process

24.     As a result of the operational and integration challenges, in July 2023, the Debtors retained Jefferies LLC ("Jefferies") to assist with exploring strategic transactions, including by marketing the Company for sale as a going concern enterprise. I understand that, as a part of that process, Jefferies launched a sale process in August 2023 and approached potential strategic buyers and sponsors. Although several parties expressed initial interest, the marketing process for the Debtors' businesses at that time did not result in any viable transactions.

### 3. Changes in Corporate Management

25.     On January 31, 2024, the Prepetition Agent delivered to the Debtors notice that (i) certain events of default had occurred under the Prepetition Loan Documents and were continuing, and (ii) the Prepetition Agent exercised the voting rights granted to it under the Prepetition Loan Documents to remove Anthony Perera as manager of Solutions and appoint Lawrence Hirsh as the sole manager of Solutions. Mr. Perera initially remained as the manager of Holdings.

26.     Additionally, as previously referenced herein, the Debtors retained Accordion as financial advisors in March 2024, and I was retained as Chief Restructuring Officer of each of the Debtors in September 2024.

27.     In October 2024, Mr. Perera resigned from his role as sole manager of Holdings and from all positions with the Debtors. Upon his resignation, the Debtors retained Mr. Perera as a consultant pursuant to a Consulting Agreement to assist the Debtors in preparing these chapter 11 cases and facilitating the marketing and sale process. Contemporaneous with Mr. Perera's resignation, the majority member of Holdings appointed Mr. Hirsh as the sole manager of

14

Holdings. The Consulting Agreement with Mr. Perera expired by its terms prior to the Petition Date. Accordingly, as of the Petition Date, Mr. Hirsh is the sole manager of Holdings and Solutions, and Mr. Perera is no longer an officer, director, manager, or employee of the Debtors.

### 4. Evaluation of Strategic Alternatives and the Break-Up Marketing Process

28.     Following the appointment of Mr. Hirsh and the retention of Accordion, the Debtors, together with their advisors, considered several strategic alternatives to address the Debtors continued operations and integrational challenges. Among other things, the Debtors evaluated a long-term operational and financial turnaround, additional capital investment form strategic investors and restructuring of existing debt, and a break-up sale of the Debtors' businesses to market business units on an individual basis. After evaluating the alternatives, the Debtors concluded that the best path forward to maximize the value of the Debtors' assets was a break-up sale of the businesses.

29.     Accordingly, in October 2024, with the support of the Debtors Prepetition Secured Lenders, the Debtors re-engaged Jefferies to assist the Debtors in pursuing and evaluating value maximizing transactions, including a potential break-up sale of the Debtors. Through this process, Jefferies has marketed the Debtors' business and solicited interest from parties for one or more of the Debtors' business units. Through this most recent and ongoing process, the Debtors have received several formal offers that will serve as baseline, stalking horse bids for the Debtors' assets, subject to higher and better bids pursuant to court-approved bidding procedures. The Debtors intend to file a motion seeking approval of proposed bidding and auction procedures within the first several days of these Chapter 11 Cases, which will, among other things, identify the stalking horse bidders and set forth the material terms of the stalking horse bids, including the specific assets being acquired.

ACTIVE 704896970

### E. Postpetition Financing and Use of Cash Collateral[5]

30.     The Debtors commenced these chapter 11 cases with the support of the Prepetition Lenders with the goal of consummating the sale of the Debtors' assets. To that end, the Prepetition Lenders have agreed to provide a senior secured priming and superpriority debtor-in-possession credit facility (the "DIP Facility") in an aggregate principal amount not to exceed $20 million composed of (a) a "new money" multiple delayed draw term loan facility in an aggregate principal amount of $10,000,000 (the "New Money Loans"), of which (x) $4,000,000 (the "Initial DIP Loans") will be made available to be drawn upon entry of this Interim Order, and (y) an additional amount of up to $6,000,000 (the "Final DIP Loans") will be made available upon entry of the Final Order, and (b) a "rollup" (or conversion) of $10,000,000 of Prepetition Obligations (the "Rollup Loans" and, together with the New Money Loans, the "DIP Loans"), of which (x) up to $4,000,000 will be rolled up on a dollar-for-dollar basis immediately upon each funding of the Initial DIP Loans following entry of the Interim Order and (y) the remainder will be rolled up immediately upon the first funding of Final DIP Loans following entry of the Final Order. The transactions discussed herein, including the DIP Facility, will allow the Debtors to maximize the value of their estates for the benefit of all stakeholders.

31.     The Debtors have an urgent and necessary need to use cash collateral on an interim basis and to obtain loans under the DIP Facility on an interim basis to avoid immediate and irreparable harm to the Debtors, their estates, their creditors, and other parties-in-interest, and to

---

[5] Capitalized terms used in this section but not otherwise defined herein have the meanings ascribed to such terms in the *Emergency Motion of the Debtors for Entry of Interim and Final Orders (A) Authorizing the Debtors to Obtain Postpetition Financing and to Use Cash Collateral, (B) Granting Liens and Superpriority Claims, (C) Granting Adequate Protection, (D) Modifying the Automatic Stay, (E) Scheduling Final Hearing, and (F) Granting Related Relief* (the "DIP Motion"), filed contemporaneously herewith.

ACTIVE 704896970

enable the Debtors to administer and preserve the value of their estates. The ability of the Debtors to maintain business relationships with their vendors and customers, pay their employees, and otherwise finance their operations at this critical stage of the restructuring requires the availability of working capital from the DIP Facility and the use of cash collateral. Without the DIP Facility and authority to use cash collateral, the Debtors do not have sufficient available sources of working capital and financing to operate their businesses or maintain their properties in the ordinary course of business.

32.    Absent interim approval of the DIP Facility, the Debtors will suffer immediate and irreparable harm and would likely have no choice but to cease operations and liquidate their assets for a fraction of what could be garnered through a competitive sale process as proposed in these Chapter 11 Cases. Such a liquidation would result in a deterioration of value for creditor constituencies. In addition, after exploring alternate debtor-in-possession financing options with the assistance of their advisors, the Debtors believe that the proposed DIP Facility is the only postpetition financing alternative available under the circumstances. The proposed DIP Facility provides the best path forward to address the Debtors' immediate liquidity needs, to fund these Chapter 11 Cases, and to provide a clear path toward a competitive sale process or restructuring that preserves value for the estate.

33.    Given the size of the proposed facility, and the Debtors' current financial condition, financing arrangements, and prepetition capital structure, the Debtors are unable to obtain financing from sources other than the DIP Lenders on terms more favorable than those provided under the DIP Facility and the DIP Loan Documents. The Debtors have been unable to obtain unsecured credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code. The Debtors also have been unable to obtain sufficient credit (a) having priority over

ACTIVE 704896970

administrative expenses of the kind specified in sections 503(b), 507(a), and 507(b) of the Bankruptcy Code, (b) secured by a lien on property of the Debtors and their estates that is not otherwise subject to a lien, or (c) secured solely by a junior lien on property of the Debtors and their estates that is subject to a lien. Accordingly, postpetition financing is not otherwise available without granting the DIP Lenders: (1) perfected priming security interests in and liens on all of the Debtors' existing and after-acquired assets as more fully described in the DIP Motion; (2) superpriority administrative claims; and (3) all other protections set forth and described in the DIP Motion and the Interim DIP Order attached thereto.

34.     After considering all alternatives, I believe that the DIP Facility represents the best financing available to the Debtors and that it is in the best interests of the Debtors and their estates to enter into the DIP Facility.

35.     I understand that the Debtors' investment banker, Jefferies LLC, sought potential financing from alternative sources but did not receive any proposals to provide an alternative financing facility to the Debtors. Consequently, I firmly believe that no other lender is willing and able to provide financing to the Debtors on more favorable terms than the DIP Facility. Only the DIP Lenders were able to provide a facility which was adequate, reasonable, and fair under the circumstances.

36.     I submit that it is within the Debtors' sound and prudent business judgment to obtain the postpetition financing set forth in the DIP Motion. The Debtors have exercised their sound business judgment by entering into the DIP Facility and executing the DIP Loan Documents, which will allow the Debtors to access up to $10 million, including $4 million on an interim basis, to fund these Chapter 11 Cases. Further, the DIP Loans benefit the Debtors by allowing the use of Cash Collateral, thereby reducing the amount which must be borrowed.

18

37.     The terms and conditions of the DIP Loan Documents were negotiated by the parties in good faith and at arm's length. I have determined, in the exercise of my business judgment, based upon analysis and the recommendations of the Debtors' professionals, that the DIP Loan Documents provide the best opportunity for postpetition financing on the most favorable terms available. I believe the DIP Facility is necessary to preserve the Debtors' estates and to administer the Chapter 11 Cases and therefore will benefit all creditors. The DIP Loans allow the Debtors to continue operations and maintain the value of the estates for an anticipated sale of all or substantially all of their assets.

38.     Additionally, the Prepetition Adequate Protection offered to the Prepetition Secured Parties is fair and reasonable. The Prepetition Adequate Protection proposed in the Interim Order is consistent with customary protections, including replacement liens, superpriority claims, current pay interest, and professional fees. The Prepetition Adequate Protection properly protects the Prepetition Secured Parties from any diminution in value of their interests in the use of the Prepetition Collateral, including Cash Collateral, during the Chapter 11 Cases. These provisions were negotiated in good faith and at arm's-length with the Prepetition Secured Parties, who have consented to the use of Cash Collateral subject to the Debtors' providing the Prepetition Adequate Protection. Without these protections, the Debtors would not be able to use Cash Collateral or obtain the DIP Loans.

39.     I believe the modification of the automatic stay in the DIP Motion is ordinary and a standard feature of debtor-in-possession financing facilities, and, in my business judgment, reasonable and fair under the current circumstances.

40.    I believe that the Debtors will face immediate and irreparable harm without entry of the Interim Order authorizing the Debtors to obtain the interim funding under the DIP Facility and to use Cash Collateral.

## V.    FIRST DAY PLEADINGS

41.    Contemporaneously with the filing of this declaration, the Debtors filed or will file the First Day Pleadings requesting various forms of relief to facilitate the efficient administration of these Chapter 11 Cases, minimize the disruption and adverse effects of the commencement of the Chapter 11 Cases on the Debtors' operations, and preserve value for their estates and all stakeholders.

42.    The First Day Pleadings include the following:

- **Joint Administration Motion**. *Emergency Motion of the Debtors for Entry of an Order Authorizing and Directing the Joint Administration of the Debtors' Chapter 11 Cases for Procedural Purposes Only*.

- **Creditor Matrix and Customer Noticing Motion**. *Emergency Motion of the Debtors for Entry of an Order Authorizing the Debtors (A) to Prepare and Maintain a Consolidated Master List of Creditors in Lieu of Submitting a Formatted Mailing Matrix for Each Debtor, (B) to Redact Personally Identifiable Information for Individual Creditors and Parties in Interest, and (C) to Provide Electronic Notice to Individual Customers and Maintain a Confidential Customer Service List*.

- **Schedules and Statements Extension Motion**. *Emergency Motion of the Debtors for Entry of an Order Extending Time to File Schedules of Assets and Liabilities and Statements of Financial Affairs*.

- **Application to Retain Claims, Noticing, Solicitation, and Administrative Agent**. *Debtors' Emergency Application for Entry of an Order Authorizing the Retention and Employment of Kurtzman Carson Consultants, LLC dba Verita Global as Claims, Noticing, Solicitation, and Administrative Agent Effective as of the Petition Date*.

- **Employee and Wages Motion**. *Emergency Motion of the Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to Pay (A) All Prepetition Employee Obligations and Dues and (B) Prepetition Withholding Obligations, and (II) Directing Banks to Honor Related Transfers*.

20

- **Insurance and Surety Bond Motion**. *Emergency Motion of the Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Maintain Existing Insurance Policies, Pay all Policy Premiums, and Renew or Enter Into New Policies, and (B) Continue Insurance Premium Financing Program, Pay Insurance Premium Financing Obligations Arising in Connection Therewith, and Renew Such Premium Financing Arrangements; (II) Authorizing the Debtors to Maintain Their Surety Bond Program, Pay Obligations in Connection Therewith, and Renew or Obtain New Surety Bonds; and (III) Authorizing Banks to Honor and Process Checks and Electronic Transfer Requests Related Thereto.*

- **Tax Motion**. *Emergency Motion of the Debtors for Entry of an Order Authorizing (I) the Debtors to Pay Prepetition Taxes and Regulatory Fees in the Ordinary Course of Business and (II) Banks and Financial Institutions to Honor and Process Checks and Transfers Related Thereto.*

- **Cash Management Motion**. *Emergency Motion of the Debtors for Entry of Interim and Final Orders (I) Authorizing the Maintenance of Bank Accounts and Continued Use of Existing Business Forms and Checks, (II) Authorizing the Continued Use of Cash Management System, (III) Waiving Certain Investment and Deposit Guidelines, (IV) Authorizing the Debtors to Maintain Purchasing Card Program and Honor Prepetition Obligations Related Thereto, and (V) Granting Administrative Expense Status to Postpetition Intercompany Claims.*

- **Customer Programs Motion**. *Emergency Motion of the Debtors for Entry of an Order Authorizing the Debtors to Honor Prepetition Obligations to Customers and Otherwise Continue Customer Programs in The Ordinary Course of Business.*

- **Utilities Motion**. *Emergency Motion of the Debtors for Entry of Interim and Final Orders (I) Prohibiting Utility Providers from Altering, Refusing or Discontinuing Service, (II) Deeming Utility Providers Adequately Assured of Future Performance, and (III) Establishing Procedures for Determining Adequate Assurance of Payment.*

- **DIP Motion**. *Emergency Motion of the Debtors for Entry of Interim and Final Orders (A) Authorizing the Debtors to Obtain Postpetition Financing and to Use Cash Collateral, (B) Granting Liens and Superpriority Claims, (C) Granting Adequate Protection, (D) Modifying the Automatic Stay, (E) Scheduling Final Hearing, and (F) Granting Related Relief.*

43.    The First Day Pleadings request authority to, among other things, honor workforce-related compensation and benefits obligations, continue to honor certain customer programs, and continue the Debtors' cash management system and other operations in the ordinary course of

business to ensure minimal disruption of the Debtors' business operations during these Chapter 11

Cases. For the avoidance of doubt, the Debtors request authority, but not direction, to incur

indebtedness, pay amounts or satisfy obligations with respect to the relief requested in the First

Day Pleadings, as more specifically set forth in each of the First Day Pleadings.

44.     I am familiar with each First Day Pleading, and I believe that the relief sought in

each First Day Pleading (i) is necessary to minimize disruption due to the commencement of the

Chapter 11 Cases and to permit the Debtors to administer the Chapter 11 Cases smoothly,

(ii) constitutes a critical element in the Debtors' achievement of their goals in this chapter 11

process, and (iii) best serves the Debtors' estates and their stakeholders' interests. I have reviewed

each First Day Pleading, and the facts and descriptions of the relief set forth therein are true and

correct to the best of my information and belief with appropriate reliance on the Debtors' relevant

advisors and are incorporated herein in their entirety by reference. If asked to testify as to the facts

supporting each of the First Day Pleadings, I would testify as to such facts.

45.     It is my belief that the relief sought in each of the First Day Pleadings is necessary

to the success of the Debtors' chapter 11 efforts and the maximization of the value of the Debtors'

estates through a sale process. It is my further belief that, with respect to those First Day Pleadings

requesting the authority to pay specific prepetition claims, the relief requested is essential to the

Debtors' chapter 11 efforts and necessary to avoid immediate and irreparable harm to the Debtors'

estates.

46.     Moreover, in accordance with the *Second Amended and Restated General Order*

*26-2019, Procedures for Complex Chapter 11 Cases*, dated February 6, 2023, I believe that these

Chapter 11 Cases should be designated as Complex Chapter 11 Cases, because, among other

things, (a) the Debtors have total debt of more than $25 million, excluding claims of insiders (as

ACTIVE 704896970

defined in 11 U.S.C. § 101), (b) there are more than 500 parties in interest in these cases, excluding former and current employees, (c) the Debtors are not individuals, and (d) the Debtors do not own single asset real estate.

## **CONCLUSION**

47.    The Debtors' goal in these Chapter 11 Cases is the maximization of estate value through a sale of the businesses as going concerns preserving value for the Debtors' creditors, employees, and other parties-in-interest. In the near term, the Debtors' immediate objective is to continue operating their businesses during the early stages of these Chapter 11 Cases with as little interruption or disruption to the Debtors' operations as possible. I believe that if the Court grants the relief requested in each of the First Day Pleadings, the prospect for achieving these objectives and a sale of the Debtors' assets will be substantially enhanced.

48.    I therefore respectfully request that all relief requested in the First Day Pleadings be granted together with such other and further relief as is just.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Dated: March 16, 2025                          */s/ Andrew D.J. Hede*_____
                                               Andrew D.J. Hede
                                               Chief Restructuring Officer
                                               AFH Air Pros, LLC, *et al.*

ACTIVE 704896970