## IN THE UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF GEORGIA
## NEWNAN DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| AFH AIR PROS, LLC, *et al.*,[1] | Case No. 25-10356 (PMB) |
| Debtors. | (Jointly Administered) |

## EMERGENCY MOTION OF THE DEBTORS FOR ENTRY OF INTERIM AND FINAL ORDERS (A) AUTHORIZING THE DEBTORS TO OBTAIN POSTPETITION FINANCING AND TO USE CASH COLLATERAL, (B) GRANTING LIENS AND SUPERPRIORITY CLAIMS, (C) GRANTING ADEQUATE PROTECTION, (D) MODIFYING THE AUTOMATIC STAY, (E) SCHEDULING FINAL HEARING, AND (F) GRANTING RELATED RELIEF

The above-captioned debtors and debtors in possession (collectively, the "Debtors")

hereby move this Court (the "Motion"), for entry of an interim order, substantially in the form

attached hereto as **Exhibit A** (the "Interim Order"), and a final order (the "Final Order" and,

together with the Interim Order, the "DIP Orders"):

     i.    authorizing Debtor Air Pros Solutions, LLC (the "DIP Borrower") to obtain, and
the other Debtors, as guarantors (each, a "Guarantor"), to guarantee on a joint and
several basis, a senior secured priming and superpriority postpetition financing
(the "DIP Facility") in the aggregate principal amount of $20,000,000, composed
of (a) a "new money" multiple delayed draw term loan facility in an aggregate
principal amount of $10,000,000 (the "New Money Loans"), of which
(x) $4,000,000 (the "Initial DIP Loans") will be made available to be drawn upon
entry of this Interim Order, and (y) an additional amount of up to $6,000,000 (the
"Final DIP Loans") will be made available upon entry of the Final Order, and (b) a
"rollup" (or conversion) of $10,000,000 of Prepetition Obligations (as defined
below) (the "Rollup Loans" and, together with the New Money Loans, the "DIP
Loans"), of which (x) up to $4,000,000 will be rolled up on a dollar-for-dollar basis
immediately upon each funding of the Initial DIP Loans following entry of the

---

[1] The last four digits of AFH Air Pros, LLC's tax identification number are 1228. Due to the large number of debtor entities in these chapter 11 cases, a complete list of the debtor entities and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the proposed claims and noticing agent at https://www.veritaglobal.net/AirPros. The mailing address for the debtor entities for purposes of these chapter 11 cases is: 150 S. Pine Island Road, Plantation, Florida 33020.

Interim Order and (y) the remainder will be rolled up immediately upon the first funding of Final DIP Loans following entry of the Final Order, in each case of the foregoing clauses (a) and (b), subject to the terms and conditions of that certain *Senior Secured Priming and Superpriority Debtor-in-Possession Credit Agreement*, among the DIP Borrower, Air Pros Solutions Holdings, LLC (as Holdings), the Guarantors, Alter Domus (US) LLC, as disbursing agent and collateral agent (the "<u>DIP Agent</u>"), and financial institutions from time to time party thereto as lenders (the "<u>DIP Lenders</u>" and, together with the DIP Agent, the "<u>DIP Secured Parties</u>") substantially in the form attached to the Interim Order as **<u>Exhibit B</u>** (as such agreement may be amended, restated, amended and restated, supplemented, or otherwise modified from time to time in accordance with its terms and the terms of the DIP Orders, the "<u>DIP Credit Agreement</u>"[2] and, together with the schedules and exhibits attached thereto and all agreements, documents, instruments, and amendments executed and delivered in connection therewith, including the "Loan Documents" as defined in the DIP Credit Agreement, the "<u>DIP Documents</u>");

ii.    authorizing the Debtors to execute and deliver the DIP Documents and to perform such other acts as may be necessary, advisable, or appropriate in connection therewith and to incur, guarantee, pay, comply with, and perform all obligations owing thereunder to the DIP Secured Parties and granting the DIP Secured Parties allowed superpriority administrative expense claims in an amount of the DIP Obligations (as defined below) in each of the Chapter 11 Cases and in any Successor Case (as defined below), subject to the Carve-Out (as defined below);

iii.    granting to the DIP Agent, for the benefit of itself and the other DIP Secured Parties, (x) liens on all of the DIP Collateral (as defined below) pursuant to sections 364(c)(2), (c)(3), and (d) of the Bankruptcy Code, which liens shall be senior to the Primed Liens (as defined below) and shall be junior solely to any valid, enforceable, and non-avoidable liens that are (A) in existence on the Petition Date, (B) either perfected as of the Petition Date or perfected subsequent to the Petition Date solely to the extent permitted by section 546(b) of the Bankruptcy Code, and (C) senior in priority to the Prepetition Liens (as defined below) after giving effect to any intercreditor or subordination agreement, each as amended, restated, supplemented or otherwise modified from time to time prior to the Petition Date (all such liens, collectively, the "<u>Prepetition Prior Liens</u>"); <u>provided</u>, <u>however</u>, that the term "Prepetition Prior Liens" as used herein shall exclude the Prepetition Liens (as defined below); <u>provided</u>, <u>further</u>, for the avoidance of doubt, the term "Prepetition Prior Liens" shall include the valid, perfected, first priority security interest of American Express Travel Related Services Company, Inc. in that certain Certificate of Deposit account in the amount of $460,000 obtained by Debtor East Coast Mechanical, LLC from American Express National Bank; and (y) pursuant to section 364(c)(1) of the Bankruptcy Code, superpriority administrative expense claims having recourse to all prepetition and postpetition property of the Debtors'

---

[2]  Capitalized terms used but not defined herein have the meanings given to them in the DIP Credit Agreement.

2

estates, now owned or hereafter acquired, including, upon entry of the Final Order, any Debtors' rights under section 506(c) of the Bankruptcy Code and the proceeds thereof;

iv.    authorizing the Debtors to use "cash collateral," as such term is defined in section 363 of the Bankruptcy Code (the "Cash Collateral"), including Cash Collateral in which the Prepetition Secured Parties (as defined below) and/or the DIP Secured Parties have a lien or other interest, in each case whether existing on the Petition Date, arising pursuant to this Interim Order or otherwise;

v.    authorizing the Debtors to provide the Prepetition Secured Parties (as defined below) the Prepetition Adequate Protection (as defined below) as set forth in the Interim Order;

vi.    approving certain stipulations by the Debtors with respect to the Prepetition Loan Documents and the Prepetition Collateral (each as defined herein);

vii.    modifying the automatic stay imposed by section 362 of the Bankruptcy Code solely to the extent necessary to implement and effectuate the terms and provisions of the DIP Loan Documents and the DIP Orders;

viii.    scheduling a final hearing (the "Final Hearing") on the Motion to be held on or prior to the Interim Period Outside Date (as defined in the Interim DIP Order) to consider entry of the Final Order granting all of the relief requested in the Motion on a final basis and which Final Order shall be in form and substance (including with respect to any subsequent modifications to the form or substance made in response to objections of other creditors or the Court) acceptable to (a) the Required DIP Lenders, (b) the Required Prepetition Lenders (as defined below), (c) to the extent that any modifications to the form and substance of the Final Order shall affect the rights or duties of the Prepetition Agent, the Prepetition Agent, and (d) to the extent that any modification to the form and substance of the Final Order shall affect the rights or duties of the DIP Agent, the DIP Agent; and

ix.    waiving any applicable stay (including under Bankruptcy Rule 6004) and provides for immediate effectiveness of this Interim Order.

In support of this Motion, the Debtors rely upon (a) the *Declaration of Jeffrey Finger in Support of the Emergency Motion of the Debtors for Entry of Interim and Final Orders (A) Authorizing the Debtors to Obtain Postpetition Financing and to Use Cash Collateral, (B) Granting Liens and Superpriority Claims, (C) Granting Adequate Protection, (D) Modifying the Automatic Stay, (E) Scheduling Final Hearing, and (F) Granting Related Relief* (the "Finger Declaration") and (b) the *Declaration of Andrew D.J. Hede in Support of Chapter 11 Petitions and*

3

*First Day Pleadings* (the "First Day Declaration"), each filed contemporaneously herewith. In further support of this Motion, the Debtors respectfully state as follows:

**JURISDICTION AND VENUE**

1.     The United States Bankruptcy Court for the Northern District of Georgia (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). Venue is proper in the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

2.     The statutory bases for the relief requested herein are sections 105, 361, 362, 363(b), 363(c)(2), 363(e), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), 364(e), 507 and 552 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "Bankruptcy Code"), Rules 7007-1, 9013-1, 9013-4, and 9014-2 of the Local Rules of the United States Bankruptcy Court for the Northern District of Georgia (the "Local Rules"), and Section G of the *Second Amended and Restated General Order 26-2019, Procedures for Complex Chapter 11 Cases*, dated February 6, 2023 (the "Complex Case Procedures").

**BACKGROUND**

**A. The Chapter 11 Cases**

3.     On March 16, 2025 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code with this Court.

4.     The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

5.     No official committee has been appointed in the above-captioned chapter 11 cases (the "Chapter 11 Cases"), and no request has been made for the appointment of a trustee or an examiner.

ACTIVE 707673467

6.      Additional information regarding the Debtors' businesses, capital structure, and the circumstances leading to the filing of these Chapter 11 Cases is set forth in the First Day Declaration.

**B. The Debtors' Prepetition Secured Credit Facility**

7.      As discussed more fully below, as of the Petition Date, the Debtors were indebted to the Prepetition Secured Parties (as defined below) in an amount not less than $250,394,360.17, including principal, accrued and unpaid interest, and certain fees owing under the Prepetition Loan Documents, but excluding certain other fees, expenses and other amounts owing under the Prepetition Loan Documents.

8.      Pursuant to that certain Credit Agreement, dated as of October 31, 2022 (as amended, restated, supplemented or otherwise modified from time to time prior to the Petition Date, the "Prepetition Credit Agreement" and, collectively with any other agreements executed or delivered in connection therewith, and all other "Loan Documents" as defined therein, each as may be amended, restated, supplemented, or otherwise modified from time to time, the "Prepetition Loan Documents"), among Air Pros Solutions Holdings, LLC ("Holdings"), Air Pros Solutions, LLC ("Borrower") and the Subsidiary Guarantors (as defined in the Prepetition Credit Agreement, together with Holdings and the Borrower, the "Prepetition Loan Parties"), the Lenders (as defined in the Prepetition Credit Agreement, the "Prepetition Lenders"), and Alter Domus (US) LLC, as disbursing agent and collateral agent (in such capacity, the "Prepetition Agent" and, together with the Prepetition Lenders, the "Prepetition Secured Parties"), the Prepetition Lenders agreed to extend certain loans and make other financial accommodations to the Prepetition Loan Parties. The Prepetition Credit Agreement provides for a senior secured term loan facility with an aggregate outstanding principal balance, as of the Petition Date, of  approximately $196,906,883 million (the "Prepetition Term Loan Facility") and a revolving credit facility with an aggregate

5

outstanding principal balance, as of the Petition Date, of approximately $23.5 million (the "Prepetition Revolving Facility", and together with the Prepetition Term Loan Facility, the "Prepetition Credit Facility"). The Prepetition Revolving Facility includes an additional $11 million of prepetition revolving loans funded under that certain Second Amendment to Credit Agreement, dated as of November 25, 2024, and a further $2.5 million of prepetition revolving loans funded during the week leading up the Petition Date under that certain Third Amendment to Credit Agreement, dated as of March 13, 2025 (such additional financing, the "Prepetition Bridge Financing"). All liabilities and other obligations of the Debtors arising under the Prepetition Loan Documents and applicable law and all other "Obligations" (as defined in the Prepetition Credit Agreement) shall collectively be referred to herein as the "Prepetition Obligations". As of the Petition Date, the Prepetition Obligations were not less than approximately $250,394,360, including principal, accrued and unpaid interest and certain additional fees due under the Prepetition Loan Documents, but excluding certain other fees and expenses (including reasonable attorneys', accountants', appraisers', and financial advisors' fees and expenses that are chargeable or reimbursable under the Prepetition Loan Documents) and other amounts then due under the Prepetition Loan Documents and applicable law.

9.     Pursuant to that certain Guarantee and Collateral Agreement dated as of October 31, 2022 (the "Prepetition Guarantee and Collateral Agreement") and other Security Documents (as defined in the Prepetition Credit Agreement, and as amended, restated, supplemented or otherwise modified from time to time prior to the Petition Date, the "Prepetition Security Documents"), by and among each of the Prepetition Loan Parties and the Prepetition Agent, each Prepetition Loan Party granted to the Prepetition Agent, in its capacity as collateral agent, for the benefit of itself and the other Prepetition Secured Parties, to secure the Prepetition Obligations, a

security interest in and continuing lien (the "Prepetition Liens") on substantially all of the
Prepetition Loan Parties' assets and properties (including Cash Collateral). All "Collateral," as
defined in the Prepetition Credit Agreement, granted or pledged by the Prepetition Loan Parties
pursuant to any Prepetition Security Document or any other Prepetition Loan Document shall
collectively be referred to herein as the "Prepetition Collateral."[3]

### C. The DIP Financing

#### i. *Summary of the DIP Facility and Salient Terms*

10.     The DIP Facility to be provided by the DIP Lenders will provide the Debtors with
up to $10 million of New Money Loans to support their operations and liquidity needs in these
Chapter 11 Cases. The DIP Facility represents the best source of financing available to the Debtors
under the circumstances, resulting in terms that the Debtors submit are necessary and appropriate
to meet the Debtors' financing needs during these Chapter 11 Cases and will provide the Debtors
with sufficient liquidity to fund these Chapter 11 Cases.

11.     The proposed DIP Facility is a senior secured priming and superpriority debtor-in-
possession credit facility (the "DIP Facility") in an aggregate principal amount not to exceed $20
million composed of (i) a "new money" multiple delayed draw term loan facility in an aggregate
principal amount of $10,000,000, of which (x) $4,000,000 will be made available to be drawn
upon entry of the Interim Order, and (y) an additional amount of up to $6,000,000 will be made
available upon entry of the Final Order, and (b) a "rollup" (or conversion) of $10,000,000 of
Prepetition Obligations, of which (x) up to $4,000,000 of the Prepetition Bridge Financing will be

---

[3] All of the Debtors are Grantors under the Prepetition Guarantee and Collateral Agreement. As contemplated and
required by the Prepetition Loan Documents, Debtor East Coast Mechanical, LLC, which was acquired by Solutions
pursuant to that certain membership Interest Purchase Agreement dated December 1, 2022, guaranteed the obligations
under the Prepetition Loan Documents pursuant to an Assumption Agreement dated August 1, 2023, in favor of the
Prepetition Agent, and ECM became a Guarantor and Grantor under the Prepetition Guarantee and Collateral
Agreement.

ACTIVE 707673467

rolled up on a dollar-for-dollar basis immediately upon each funding of the New Money DIP Loans after entry of the Interim Order and (y) the remainder (including the remainder of the Prepetition Bridge Financing) will be rolled up immediately upon the first funding of New Money DIP Loans after entry of the Final Order (as defined below).

### ii.    The Debtors' Immediate Liquidity Needs

12.    The Debtors have an urgent and necessary need to use Cash Collateral on an interim basis and to obtain the DIP Loans pursuant to the DIP Facility on an interim basis to avoid immediate and irreparable harm to the Debtors, their estates, their creditors, and other parties-in-interest, and to enable the Debtors to administer and preserve the value of their estates. The ability of the Debtors to maintain business relationships with their vendors, pay their employees, and otherwise finance their operations (as well as the value-maximizing sale transactions that are detailed in the First Day Declaration) at this stage of these Chapter 11 Cases requires access to the DIP Loans and Cash Collateral. Without the DIP Facility and authority to use Cash Collateral, the Debtors will not have sufficient available sources of funds both to administer the Chapter 11 Cases, operate their businesses in the ordinary course, and consummate the proposed sales of the Debtors' business units.

13.    Absent interim approval of the DIP Facility, the Debtors would likely have to cease operations and liquidate their assets for a fraction of what could be garnered through the competitive sale process as proposed in these Chapter 11 Cases. Such a liquidation would result in a deterioration of value for the estates and their stakeholders. On the other hand, based on the Debtors' financial forecasts and the Approved Budget, the funds provided under the DIP Facility will enable the Debtors to access the liquidity necessary to successfully transition into chapter 11, effectuate a robust and competitive sale process, and ultimately consummate a chapter 11 plan.

ACTIVE 707673467

14.     In addition, and as discussed more fully below, after exploring alternate DIP financing options with the assistance of their advisors, the Debtors believe that the proposed DIP Facility is the only viable postpetition financing alternative available under the circumstances. The proposed DIP Facility provides the best path forward to address the Debtors' immediate liquidity needs, to fund these Chapter 11 Cases, and to provide a clear path toward a competitive sale process that preserves and maximizes value of the estates.

### iii.   *Alternative Sources of Financing Not Available*

15.     After considering all alternatives, the Debtors have concluded, in the exercise of their sound business judgment, that the DIP Facility represents the best financing available, and it is in the best interests of the Debtors and their estates to enter into the DIP Facility. As set forth in the Finger Declaration, the Debtors, through their investment banker, Jefferies, LLC ("Jefferies"), sought potential financing from various alternative sources beginning in February 2025. Specifically, with the assistance of their advisors, the Debtors contacted approximately 11 third-party financing sources to evaluate their willingness to provide financing to the Debtors during these Chapter 11 Cases. Each of these potential financing sources declined the opportunity to provide an alternative postpetition financing facility, whether on a priming or junior basis to the Prepetition Credit Facility. Among other things, these parties expressed an unwillingness to lend on a junior basis and/or engage in a priming fight with the Prepetition Secured Parties, as the Debtors believe that they have few, if any, unencumbered assets that could otherwise be used to secure any such postpetition financing. Additionally, during discussions with the Prepetition Lenders about the Debtors' financing needs leading up to the Chapter 11 Cases, the Prepetition Lenders indicated that they would not consent to the Debtors' incurrence of financing by any other party having priming or *pari passu* liens on the Prepetition Collateral.

16.     Thus, following the foregoing marketing process and hard-fought, arm's length negotiations with the Prepetition Secured Parties in which the Debtors obtained several material concessions, the Debtors have determined in the exercise of their business judgment that the DIP Facility is fair, reasonable, and appropriate, meets the Debtors' business and financing needs for these Chapter 11 Cases, presents the best and most expeditious option to finance the Debtors through these Chapter 11 Cases and allow them to maximize the value of their estates through consummation of the proposed sale transactions. The Debtors do not believe any other postpetition financing, on any better terms, is reasonably available given the realities imposed by the Debtors' current circumstances.

## **RELIEF REQUESTED**

17.     The Debtors seek entry of the Interim Order and, pending the Final Hearing, the Final Order, in each case: (i) authorizing the Debtors to borrow all New Money Loans under the DIP Facility; (ii) authorizing the Debtors to execute, deliver, and perform under the DIP Documents; (iii) granting to the DIP Agent, for the benefit of itself and the other DIP Secured Parties, subject to the Carve-Out, DIP Liens on all DIP Collateral and allowed superpriority administrative expense claims; (iv) authorizing the Debtors' use of Cash Collateral and providing adequate protection to the Prepetition Secured Parties; (v) approving certain stipulations by the Debtors with respect to the Prepetition Loan Documents and the Prepetition Collateral as set forth in the Interim Order; (vi) modifying the automatic stay to the extent necessary to effectuate the terms of the Interim Order and the DIP Loan Documents; (vii) scheduling the Final Hearing to consider entry of the Final DIP Order; and (vii) waiving any applicable stay and providing for immediate effectiveness of the Interim Order.

## Highlighted Provisions Under Bankruptcy Rule 4001 and
## Section G of the Complex Case Procedures

18.     The following chart contains a summary of the essential terms of the proposed DIP

Facility, together with references to the applicable sections of the relevant source documents, in

accordance with Bankruptcy Rule 4001(b)(1)(B) and (c)(1)(B) and Section G.1.b of the Complex

Case Procedures.[4]

| BANKRUPTCY RULE / COMPLEX CASE PROCEDURES | SUMMARY OF MATERIAL TERMS |
|---|---|
| ***DIP Loan Parties***<br><br>**Bankruptcy Rule 4001(c)(1)(B)** | Air Pros Solutions, LLC, as DIP Borrower, and each of the above-captioned Debtors and debtors in possession, as Guarantors.<br><br>*See* Interim Order, Preamble; DIP Credit Agreement, Preamble |
| ***DIP Agent*** | Alter Domus (US) LLC, as the disbursing agent and collateral agent<br><br>*See* Interim Order, Preamble; DIP Credit Agreement, Preamble |
| ***DIP Lenders***<br><br>**Bankruptcy Rule 4001(c)(1)(B)** | Each of the Lenders identified in the DIP Credit Agreement and such other entities that may become Lenders in accordance with the terms of the DIP Documents.<br><br>*See* Interim Order, Preamble; DIP Credit Agreement, Preamble |
| ***Credit Facility***<br><br>**Bankruptcy Rule 4001(c)(1)(B)** | The DIP Facility shall include senior secured priming and superpriority postpetition financing in the aggregate principal amount of $20,000,000, composed of (a) a "new money" multiple delayed draw term loan facility in an aggregate principal amount of $10,000,000, of which (x) $4,000,000 will be made available to be drawn upon entry of the Interim Order, and (y) an additional amount of up to $6,000,000 will be made available upon entry of the Final Order, plus (b) the portion of Prepetition Obligations rolled up into the DIP Facility.<br><br>*See* Interim Order, Preamble, ¶ 2(c); DIP Credit Agreement, Preamble |
| ***Roll-Up*** | The DIP Facility shall include a "rollup" (or conversion) of $10,000,000 of Prepetition Obligations, of which (x) up to $4,000,000 will be rolled up on a dollar-for-dollar basis immediately upon each funding of the Initial DIP |

---

[4] The summaries contained in this Motion are qualified in their entirety by the provisions of the documents referenced. To the extent anything in this Motion is inconsistent with such documents, the terms of the applicable documents shall control. Capitalized terms used in this summary chart but not otherwise defined herein shall have the meanings ascribed to them in the DIP Documents.

ACTIVE 707673467

| BANKRUPTCY RULE / COMPLEX CASE PROCEDURES | SUMMARY OF MATERIAL TERMS |
|---|---|
| | Loans following entry of the Interim Order and (y) the remainder will be rolled up immediately upon the first funding of Final DIP Loans following entry of the Final Order.<br><br>*See* Interim Order, Preamble, ¶ 2(d); DIP Credit Agreement § 2.29 |
| *Maturity Date*<br><br>**Bankruptcy Rule 4001(c)(1)(B)** | The earliest to occur of: (a) June 16, 2025; (b) the effective date of a plan of reorganization in the Chapter 11 Cases and (c) the date of the consummation of the sale of all or substantially all of the assets or Equity Interests of the Loan Parties pursuant to Section 363 of the Bankruptcy Code.<br><br>*See* DIP Credit Agreement § 1.01 |
| *Use of DIP Facility and Cash Collateral*<br><br>**Bankruptcy Rule 4001(b)(1)(B)(ii)** | Proceeds of the DIP Facility will be used only for : (i) transaction costs, fees and expenses incurred in connection with the Credit Facilities, (ii) working capital (excluding capital expenditures) and general corporate purposes to the extent set forth in, and in accordance with, the Approved Budget and the DIP Orders, (iii) maintenance capital expenditures to the extent set forth in, and in accordance with, the Approved Budget and the DIP Orders, (iv) payment of costs of administration of the Chapter 11 Cases to the extent set forth in, and in accordance with, the Approved Budget and the DIP Orders, (v) Permitted Expenses, (vi) the unpaid fees, costs, and disbursements of professionals in the Chapter 11 Cases as set forth in the definition of the term "Carve-Out" in the DIP Orders, (vii) fees, costs, expenses and claims required to confirm a plan of reorganization or liquidation, (viii) such Prepetition Obligations as the Required Lenders consent to and the Bankruptcy Court approves, in each case in a manner consistent with the terms and conditions contained herein and in the DIP Orders, and to the extent set forth, and in accordance with, the Approved Budget, or as otherwise expressly permitted under this Agreement and (ix) the roll-up of the Prepetition Obligations upon entry of the Final DIP Order as contemplated in the DIP Credit Agreement and in the DIP Orders.<br><br>*See* Interim Order ¶¶ 2(h), 14; DIP Credit Agreement, §§ 3.21; 5.11 |
| *Fees*<br>**Bankruptcy Rule 4001(c)(1)(B)** | <u>Closing Fee</u>: An upfront fully earned and nonrefundable closing fee of 3.0% of the aggregate principal amount of the new money DIP Loans, which will be payable in kind.<br><br><u>Expense Reimbursement</u>:  The Debtors shall reimburse the DIP Agent and DIP Lenders for all reasonable costs and expenses, including legal fees, financial advisor fees, and other similar fees, costs and expenses incurred in connection with the DIP Facility and the bankruptcy cases of the Debtors.<br><br>The Borrowers shall pay or reimburse currently the Prepetition Secured Parties for all their accrued and past-due fees, costs, expenses, and charges to the extent, and at the times, payable under the Prepetition Loan Documents.<br><br>*See* Interim Order ¶¶ 2(g); DIP Credit Agreement, § 2.07(b); 9.05(a). |

ACTIVE 707673467

| **BANKRUPTCY RULE / COMPLEX CASE PROCEDURES** | **SUMMARY OF MATERIAL TERMS** |
|---|---|
| **_Interest Rates_**<br><br>**Bankruptcy Rule 4001(c)(1)(B)** | SOFR + 11.50 % (default rate of additional 2.0%)<br><br>_See_ Interim Order ¶ 2(g); DIP Credit Agreement, § 2.12 |
| **_Conditions of Borrowing_**<br><br>**Bankruptcy Rule 4001(c)(1)(B)** | On each date of a draw, (a) on such date and immediately after giving effect to the draw, no event of default under the DIP Documents shall have occurred and be continuing, (b) each of the representations and warranties set forth in the DIP Documents shall be true and correct in all material respects on and as of the date of the draw with the same effect as though made on and as of such date, except to the extent such representations and warranties expressly relate to an earlier date (in which case such representations and warranties shall be true and correct in all material respects on and as of such earlier date); _provided_ that any representation and warranty that is qualified as to "materiality", "Material Adverse Effect" or similar language shall be true and correct (after giving effect to any qualification therein) in all respects, (c) the Interim Order or the Final Order shall have been entered by the Bankruptcy Court and shall be in full force and effect and shall not have been vacated, reversed, modified, amended or stayed in any respect without the consent of the DIP Lender, and (d) the DIP Agent shall have received a borrowing notice.<br><br>_See_ Interim Order ¶ 2(i); DIP Credit Agreement, § 4.02 |
| **_Budget_**<br><br>**Bankruptcy Rule 4001(c)(1)(B)** | Every fourth Wednesday (i.e., every four weeks), the Debtors shall prepare and deliver to the DIP Agent, DIP Lenders, and the Prepetition Agent an updated "rolling" 13-week cash flow budget, substantially in the form of the Initial Approved Budget, that sets forth projected cash receipts and operating disbursements (by line item) on a weekly basis, which, once approved in writing by the DIP Lenders constituting Required Lenders under, and as defined in, the DIP Credit Agreement (the "Required DIP Lenders"), the Required Prepetition Lenders, each in their respective sole discretion, shall supplement and replace the Initial Approved Budget or Supplemental Approved Budget, as applicable, then in effect (each such updated budget that has been approved in writing by the Required DIP Lenders and the Required Prepetition Lenders, a "Supplemental Approved Budget") without further notice, motion, or Court order; _provided_, however, that unless and until the Required DIP Lenders and the Required Prepetition Lenders have approved such updated budget in writing, the Debtors shall remain subject to and be governed by the terms of the Initial Approved Budget or Supplemental Approved Budget, as applicable, then in effect, and none of the DIP Secured Parties and Prepetition Secured Parties shall, as applicable, have any obligation to fund such updated "rolling budget" or permit the use of Cash Collateral with respect thereto, as applicable.<br><br>_See_ Interim Order ¶ 2(e); DIP Credit Agreement, § 5.2 |

13

| BANKRUPTCY RULE / COMPLEX CASE PROCEDURES | SUMMARY OF MATERIAL TERMS |
|---|---|
| **Security and Priority**<br><br>**Bankruptcy Rule 4001(c)(1)(B)(i)** | The Debtors grant the DIP Agent, for the benefit of the DIP Secured Parties, a perfected security interest in and lien on all their respective assets other than avoidance actions arising under Chapter 5 of the Bankruptcy Code, but subject to entry of the Final Order, including the proceeds of such avoidance actions.<br><br>The DIP Liens securing the DIP Obligations shall be senior in priority to the liens securing the Prepetition Obligations and all indebtedness junior in priority to the Prepetition Obligations, subject to the Carve-Out.<br><br>The DIP Obligation shall also have superpriority administrative expense status senior to all other administrative expenses, but subject to the Carve-Out.<br><br>*See* Interim Order ¶¶ 2(j), (k), (m); DIP Credit Agreement § 2.22(a) |
| **Carve Out**<br>**Bankruptcy Rule 4001(c)(1)(B)** | "Carve-Out" means (i) all unpaid fees required to be paid in these Cases to the clerk of the Court (including any noticing agent appointed by the Court) and to the U.S. Trustee under 28 U.S.C. § 1930(a); (ii) all reasonable fees and expenses up to $10,000 incurred by a trustee and payable under section 726(b) of the Bankruptcy Code; (iii) subject to the terms and conditions of the Interim Order and the Approved Budget, the unpaid fees, costs, and disbursements of professionals retained by the Debtors in these Cases and the Debtors' ordinary course professionals (collectively, the "Debtors' Professionals"), including, when earned, any monthly, restructuring, sale, or other transaction fees of any investment banker retained by the Debtors in these Cases, that are incurred prior to the delivery by the DIP Agent (at the direction of the Required DIP Lenders) of a Carve-Out Trigger Notice (as defined below) (the date on which any such Carve-Out Trigger Notice is delivered, the "Carve-Out Trigger Date") and that are allowed at any time pursuant to an order of the Court under sections 327, 328, 330, or 363 of the Bankruptcy Code, whether allowed before or after the Carve-Out Trigger Date (and solely to the extent allowed by the Court), and remain unpaid after application of any retainers being held by such professionals, provided that the Debtors' Professionals may carry forward and carry backward budgeted but unused disbursements set forth in the Approved Budget for such Debtors' Professionals for any week for use in any prior or subsequent week; provided further, that notwithstanding anything herein to the contrary, for purposes of the foregoing, prior to the Carve-Out Trigger Date, all fees and expenses of Jefferies LLC, solely to the extent (1) provided in its engagement letter with the Debtors and approved by this Court and (2) allowed by the Court at any time (whether allowed before or after the Carve-Out Trigger Date), shall be deemed included as part of the Approved Budget; (iv) subject to the terms and conditions of the Interim Order and the Approved Budget, the reasonable unpaid fees, costs, and disbursements of professionals retained by the Committee in these Cases (collectively, the "Committee's Professionals") and all reasonable unpaid out-of-pocket expenses of the members of any Committee ("Committee Members") that are incurred prior to the Carve-Out Trigger Date and that are allowed by the |

| BANKRUPTCY RULE / COMPLEX CASE PROCEDURES | SUMMARY OF MATERIAL TERMS |
|---|---|
| | Court under sections 328, 330, or 1103 of the Bankruptcy Code, in an aggregate amount (for both Committee Members and the Committee's Professionals); (v) the reasonable unpaid fees, costs, and disbursements of the Debtors' Professionals that are incurred after the Carve-Out Trigger Date, that are allowed by the Court under sections 327, 328, 330 or 363 of the Bankruptcy Code, in an aggregate amount not to exceed $650,000 (inclusive of any unused prepetition retainers held by such professionals) (the "Debtors' Professionals Carve-Out Cap"); and (vi) the reasonable fees, costs, and disbursements of the Committee Professionals and the reasonable expenses of Committee Members that are incurred at any time after the Carve-Out Trigger Date, that are allowed by the Court under sections 328 or 1103 of the Bankruptcy Code, in an aggregate amount (for both Committee Members and the Committee's Professionals) not to exceed $[75,000] (the "Committee Carve-Out Cap" and, together with the Debtors' Professionals Carve-Out Cap, the "Post-Default Carve-Out Cap") (clauses (i), (ii), (iii), (iv), (v), and (vi) collectively, the "Carve-Out"). The term "Carve-Out Trigger Notice" shall mean a written notice delivered by the DIP Agent (at the direction of the Required DIP Lenders) to the Debtors' counsel, the U.S. Trustee, and lead counsel to any Committee appointed in these Cases, which notice may only be delivered following the occurrence and during the continuation of any Termination Event. After the Carve-Out Trigger Date, upon the later of five (5) Business Days following (x) the liquidation or sale of any DIP Collateral and (y) any order of the Court allowing for payment of unpaid fees, costs and disbursements of the Debtors' Professionals, the Committees' Professionals or the Committee Members that are incurred after the Carve-Out Trigger Date, all such allowed amounts (including any fees, costs, and disbursements of the Case Professionals incurred prior to the Carve-Out Trigger Date, subject in each case to the Approved Budget) shall be paid from the net proceeds of such DIP Collateral to the applicable Debtors' Professional, Committee Professional or Committee Member, provided, however, that in no circumstance shall the aggregate amounts paid on account of such fees, costs and disbursements incurred after the Carve-Out Trigger Date exceed, as applicable, the Debtors' Professionals Carve-Out Cap or the Committee Carve-Out Cap. No amounts set forth in this subparagraph (a) with respect to the Post-Default Carve-Out Cap may be modified without the prior written consent of the Required DIP Lenders and the Required Prepetition Lenders. <br><br>*See* Interim Order ¶ 8(a) |

ACTIVE 707673467

| BANKRUPTCY RULE / COMPLEX CASE PROCEDURES | SUMMARY OF MATERIAL TERMS |
|---|---|
| *Stipulations to Prepetition Liens and Claims and Investigative Budget*<br><br>**Bankruptcy Rule 4001(c)(1)(B)(iii)** | The DIP Orders include customary stipulations by the Debtors that, subject to the Challenge Period for the creditors' committee and other parties in interest, shall become findings of the bankruptcy court, including, without limitation, stipulations and bankruptcy court findings that (a) the claims in respect of the Prepetition Loan Documents constitute legal, valid and binding obligations of the Debtors, enforceable in accordance with their terms and not subject to avoidance, recharacterization, recovery, attack, off-set, counterclaim, defenses or claims of any kind pursuant to the Bankruptcy Code or other applicable law, and (b) the Prepetition Liens are legal, valid, perfected, enforceable and non-avoidable.<br><br>No more than $75,000 in the aggregate of the DIP Collateral, the Carve-Out, proceeds from the borrowings under the DIP Facility or any other amounts may be used by any official committee of unsecured creditors to investigate claims and/or liens of the Prepetition Secured Parties under the Prepetition Loan Documents.<br><br>*See* Interim Order ¶¶ D, 14 |
| *Case Milestones*<br><br>**Bankruptcy Rule 4001(c)(1)(B)(vi)** | The Debtors shall run in parallel 363-sale processes and a plan process and otherwise comply with certain Milestones.<br><br>*See* Interim Order ¶ 2(f)(ii), 4(c), Ex. C; DIP Credit Agreement § 5.19 |
| *Adequate Protection*<br><br>**Bankruptcy Rules 4001(b)(1)(B)(iv), 4001(c)(1)(B)(ii)** | As adequate protection for any diminution in the value of the interests of the Prepetition Secured Parties in the Prepetition Collateral resulting from the use of Cash Collateral or otherwise, the Debtors grant to the Prepetition Agent (a) replacement liens on all assets of the Debtors, (b) superpriority administrative expense claims, (c) payment in kind of postpetition interest on the Prepetition Secured Obligations, and (d) payment of reasonable postpetition fees and expenses of the Prepetition Secured Parties under the Prepetition Loan Documents, including reasonable and documented fees and expenses of counsel and other advisors thereof, which shall be reimbursed in cash on a current basis.<br><br>*See* Interim Order ¶ 4 |
| *Events of Default*<br><br>**Bankruptcy Rule 4001(c)(1)(B)** | The Interim Order and DIP Credit Agreement contain Termination Events, defaults, and events of default (each, an "<u>Event of Default</u>"), including, without limitation:<br><br>1.  the failure of the Debtors to comply with any of the Budget Covenants that has not been waived in writing by the Required DIP Lenders or the Required Prepetition Lenders after two days;<br><br>2.  the failure of the Debtors to meet any of the Milestones (as the same may be extended by the Required DIP Lenders and the Required Prepetition Lenders in writing) or the filing of any motion by the Debtors seeking relief inconsistent with the Milestones; |

16

| BANKRUPTCY RULE / COMPLEX CASE PROCEDURES | SUMMARY OF MATERIAL TERMS |
|---|---|
| | 3. obtaining, after the Petition Date, credit or incurring indebtedness that is (A) secured by a security interest, mortgage or other lien on all or any portion of the Prepetition Collateral which is equal or senior to any security interest, mortgage or other lien of the DIP Agent and/or the Prepetition Agent, as applicable, or (B) entitled to priority administrative status which is equal or senior to that granted to the DIP Agent and/or the Prepetition Agent, as applicable, pursuant to this Interim Order, unless used to indefeasibly repay the DIP Obligations and/or the Prepetition Obligations, as applicable; <br><br> 4. the bringing of a motion, taking of any action or the filing of any plan of reorganization or disclosure statement attendant thereto by the Debtors in the Chapter 11 Cases, or the entry of an order (A) to obtain additional financing under Section 364(c) or Section 364(d) of the Bankruptcy Code from any person other than the DIP Lenders not otherwise permitted by this this Interim Order or the DIP Loan Documents, or (B) except as provided in this Interim Order, to grant any lien other than Permitted Encumbrances (as defined in the DIP Credit Agreement) upon or affecting any DIP Collateral or Prepetition Collateral; <br><br> 5. the dismissal of any of the Chapter 11 Cases or the conversion of any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code; <br><br> 6. any failure by the Debtors to make adequate protection payments or other payments to the Prepetition Agent, and/or the Prepetition Secured Parties, as applicable, as set forth in this Interim Order when due; <br><br> 7. the entry of an order which has not been withdrawn, dismissed or reversed (A) appointing an interim or permanent trustee in the Chapter 11 Cases or the appointment of an examiner or other responsible person with expanded powers in the Chapter 11 Cases, (B) granting relief from or modifying the automatic stay of Section 362 of the Bankruptcy Code (x) to allow any creditor to execute upon or enforce a lien on or security interest in any DIP Collateral and/or Prepetition Collateral in excess of $100,000 or (y) with respect to any lien of or the granting of any lien on any DIP Collateral and/or Prepetition Collateral to any state or local environmental or regulatory agency or authority, (in each case with a value in excess of $250,000), or (C) amending, supplementing, staying, reversing, vacating or otherwise modifying any of this Interim Order, or the DIP Agent's or the DIP Lenders', the Prepetition Agents', and/or the Prepetition Secured Parties' rights, benefits, privileges or remedies under this Interim Order, as applicable; <br><br> 8. the Debtors consolidating or combining with any other person except pursuant to a confirmed plan of reorganization; |

17

| BANKRUPTCY RULE / COMPLEX CASE PROCEDURES | SUMMARY OF MATERIAL TERMS |
|---|---|
| | 9. the reversal, vacatur, or modification (without the express prior written consent of the Required DIP Lenders and the Required Prepetition Lenders) of the Interim Order or any provision thereof, or reversal, vacatur, or modification (without the express prior written consent of the DIP Agent and the DIP Lenders, the Prepetition Agent and the Prepetition Lenders) of any provision of the Interim Order directly and adversely affecting the rights of the DIP Secured Parties or Prepetition Secured Parties; <br><br> 10. the use, remittance or the application of the Prepetition Collateral or proceeds of the Prepetition Collateral in contravention of the terms of the Interim Order; <br><br> 11. without the prior written consent of the Required DIP Lenders and/or Required Prepetition Lenders, as applicable, the Debtors incurring, creating, assuming, suffering to exist or permitting any superpriority claim in the Chapter 11 Cases that is pari passu with or senior to the claims of the DIP Secured Parties and/or Prepetition Secured Parties, as applicable, other than the Carve-Out; or <br><br> 12. the termination or modification of each Debtors' exclusivity as to the proposal or reorganization or liquidation. <br><br> *See* Interim Order ¶ 2(f); DIP Credit Agreement § 7.01 |
| ***Waiver/Modification of the Automatic Stay*** <br><br> **Bankruptcy Rule 4001(c)(1)(B)(iv)** | Upon the occurrence of any Event of Default (following the expiration of any applicable grace period), and following the giving of five business days' prior written notice to counsel for the Debtors, the Office of the United States Trustee (and counsel to any appointed statutory committee), the DIP Agent shall have relief from the automatic stay to foreclose on any or all of the Collateral and otherwise enforce the DIP Liens thereon. During such five-business day notice period, the Debtors and any appointed statutory committee shall be entitled to any emergency hearing with the bankruptcy court for the sole purpose of contesting whether an Event of Default has occurred and is continuing. Unless during such period the Bankruptcy Court determines that an Event of Default has not occurred or is not continuing, then (i) the automatic stay, as to the DIP Agent, shall be automatically terminated at the end of such notice period, without further notice, hearing or order, (ii) neither Section 105 nor any other provision of the Bankruptcy Code shall be used to preclude or restrict the DIP Agent from exercising its default-related rights and remedies, and (iii) the Debtors shall cooperate with the DIP Agent to effect an orderly liquidation of its collateral on terms and conditions acceptable to the DIP Agent. <br><br> *See* Interim Order ¶ 13(b); DIP Credit Agreement § 7.02 |
| ***Waiver/Modification of Applicability of Nonbankruptcy Law Relating to Perfection*** | The Interim Order shall be sufficient and conclusive evidence of the validity, enforceability, perfection, priority and non-avoidability of the DIP Liens and the Adequate Protection Liens without the necessity of (a) filing or recording any financing statement, deed of trust, mortgage, control |

18

| BANKRUPTCY RULE / COMPLEX CASE PROCEDURES | SUMMARY OF MATERIAL TERMS |
|---|---|
| *or Enforceability of Liens*<br><br>**Bankruptcy Rule 4001(c)(1)(B)(vii)** | agreement, or other instrument or document which may otherwise be required under the law of any jurisdiction or (b) taking any other action to validate or perfect the DIP Liens and the Adequate Protection Liens or to entitle the DIP Liens and the Adequate Protection Liens to the priorities granted herein<br><br>*See* Interim Order ¶ 5 |
| *Waivers and Releases*<br><br>**Bankruptcy Rule 4001(c)(1)(B)(viii)** | Subject to entry of the Final Order, and to the Challenge Period, the Interim Order stipulates to the validity, perfection, enforceability, and binding nature of the Prepetition Obligations and the Prepetition Liens and releases any and all claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness, or obligations related to or arising out of the Prepetition Loan Documents, the Prepetition Obligations, the Prepetition Liens, or the debtor-creditor relationship between any of the Prepetition Secured Parties, on the one hand, and any of the Prepetition Loan Parties and/or their affiliates, on the other hand.<br><br>*See* Interim Order ¶ D(iv) |
| *Liens on Avoidance Actions*<br><br>**Bankruptcy Rule 4001(c)(1)(B)(xi)** | The DIP Collateral includes, subject to entry of the Final Order, any proceeds or property recovered, unencumbered or otherwise, from Avoidance Actions, whether by judgment, settlement or otherwise.<br><br>*See* Interim Order ¶ 2(j); Credit Agreement § 1.01 |
| *Sections 506(c) and Section 552(b) Equities of the Case Waiver*<br><br>**Bankruptcy Rule 4001(c)(1)(B)(iv), (x)** | Subject to entry of the Final Order, (i) no costs or expenses of administration of the Chapter 11 Cases or any Successor Cases shall be charged against or recovered from or against any or all of the Prepetition Secured Parties, the Prepetition Collateral, and the Cash Collateral pursuant to section 506(c) of the Bankruptcy Code or otherwise, and (ii) each of the DIP Secured Parties and the respective Prepetition Secured Parties is entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code, and the "equities of the case" exception shall not apply.<br><br>*See* Interim Order ¶¶ G, 9 |
| *Credit Bid Rights*<br><br>**Bankruptcy Rule 4001(c)(1)(B)** | Subject to section 363(k) of the Bankruptcy Code, the DIP Agent (directly or via one or more acquisition vehicles) may, at the direction of the Required DIP Lenders, credit bid all or any portion of the outstanding DIP Obligations including any accrued interest and expenses, in any sale of DIP Collateral, and the Prepetition Agent (directly or via one or more acquisition vehicles) may, at the direction of the Required Prepetition Lenders, credit bid all or any portion of the Prepetition Obligations in any sale of Prepetition Collateral.<br><br>*See* Interim Order ¶ 17; DIP Credit Agreement § 9.25 |

19

19.     In accordance with the Section G.1.a of the Complex Case Procedures, the Debtors

make the following disclosures regarding the proposed DIP Facility:

i.      <u>Cross Collateralization</u>. The DIP Facility does not provide for cross-collateralization protection to the Senior Secured Parties.

ii.     <u>Findings of Fact Regarding Prepetition Liens</u>. Subject to the "Challenge Period" as described in paragraph 7 of the Interim Order, paragraph D of the Interim Order provides for (a) the Debtors' stipulations regarding, among other things, the validity, priority, and extent of the Prepetition Obligations and the Prepetition Liens, and (b) the release and indemnification in favor of the Senior Secured Parties. As provided in paragraph 7 of the Interim Order, the Challenge Period ends at the earliest of (x) with respect to the Committee, if appointed, 60 calendar days from the formation of the Committee, (y) with respect to all parties in interest with standing other than the Debtors, 75 calendar days following the date of entry of the Interim Order.

iii.    <u>Section 506(c) Waiver</u>. Paragraph 9 of the Interim Order provides that all rights to surcharge collateral under section 506(c) of the Bankruptcy Code are waived effective upon entry of the Final Order.

iv.     <u>Liens on Chapter 5 Causes of Action</u>. Paragraph 2(j) of the Interim Order proposes to grant liens on the proceeds of Avoidance Actions subject to entry of the Final Order.

v.      <u>Roll Up of Prepetition Debt</u>. The DIP Credit Agreement and Interim Order provide that $10 million of the Prepetition Obligations will be rolled up and converted into DIP Loans, including the up to $4 million on a dollar-for-dollar basis upon each funding of the Interim DIP Loans and the remainder upon the first funding of the Final DIP Loans.

vi.     <u>Disparate Treatment Under Professional Fee Carve Out</u>. Paragraph 8(a) of the Interim Order provides that the Carve Out includes, among other things, all fees of the professionals retained by the Debtors and the Committee that are allowed or become allowed at any time, that are incurred after the business day first succeeding the date of delivery of a Carve-Out Trigger Notice, subject to an aggregate cap of $650,000 for the Debtors' professionals and $75,000 for professionals of the creditors' committee.

vii.    <u>Non-Consensual Priming</u>. As provided under paragraph 4(e) of the Interim Order, the Prepetition Agent, on behalf of the Prepetition Secured Parties, consents to the priming provided for in the Interim Order.

viii.   <u>Section 552(b) Waiver</u>. The Interim Order provides that, subject to entry of the Final Order, the equities of the case exception under section 552(b) of the

ACTIVE 707673467

Bankruptcy Code shall not apply to the Senior Secured Parties, the DIP Liens, or the Adequate Protection Liens. (Interim Order ¶¶ G, 2(k), 4(a).)

## BASIS FOR RELIEF

### A. Entering into the DIP Documents is an Exercise of the Debtors' Sound Business Judgment.

20.     The Court should authorize the Debtors, as an exercise of their sound business judgment, to enter into the DIP Documents and obtain access to the DIP Facility. Courts grant a debtor in possession considerable deference in acting in accordance with its business judgment in obtaining postpetition secured credit, so long as the agreement to obtain such credit does not run afoul of the provisions of, and policies underlying, the Bankruptcy Code. *See, e.g.*, *In re L.A. Dodgers LLC*, 457 B.R. 308, 313 (Bankr. D. Del. 2011) (noting that "courts will almost always defer to the business judgment of a debtor in the selection of the lender"); *In re Trans World Airlines, Inc.*, 163 B.R. 964, 974 (Bankr. D. Del. 1994) (noting the court's prior approval of a postpetition loan and receivables facility where such facility "reflect[ed] sound and prudent business judgment").

21.     To determine whether the business judgment standard is met, a court need only "examine whether a reasonable business person would make a similar decision under similar circumstances." *In re Exide Techs.*, 340 B.R. 222, 239 (Bankr. D. Del. 2006); *see also In re Dura Auto. Sys. Inc.*, Case No. 06-11202 (KJC), 2007 Bankr. LEXIS 2764, at *272 (Bankr. D. Del. Aug. 15, 2007); *In re Curlew Valley Assocs.*, 14 B.R. 506, 513-14 (Bankr. D. Utah 1981) (noting that courts should not second guess a Debtors' business decision when that decision involves "a business judgment made in good faith, upon a reasonable basis, and within the scope of [the Debtors'] authority under the [Bankruptcy] Code").

22.     Furthermore, in considering whether the terms of postpetition financing are fair and reasonable, courts consider the terms in light of the relative circumstances of both the debtor and

21

the potential lender. *In re Farmland Indus., Inc.*, 294 B.R. 855, 886 (Bankr. W.D. Mo. 2003); *see also Unsecured Creditors' Comm. Mobil Oil Corp. v. First Nat'l Bank & Trust Co.* (*In re Elingsen McLean Oil Co., Inc.*), 65 B.R. 358, 365 (W.D. Mich. 1986) (recognizing a debtor may have to enter into "hard bargains" to acquire funds for its reorganization). The Court may also appropriately take into consideration non-economic benefits to the Debtors offered by a proposed postpetition facility. For example, in *In re ION Media Networks. Inc.*, the court recognized that:

> Although all parties, including the Debtors and the Committee, are naturally motivated to obtain financing on the best possible terms, a business decision to obtain credit from a particular lender is almost never based purely on economic terms. Relevant features of the financing must be evaluated, including non-economic elements such as the timing and certainty of closing, the impact on creditor constituencies and the likelihood of a successful reorganization. This is particularly true in a bankruptcy setting where cooperation and establishing alliances with creditor groups can be a vital part of building support for a restructuring that ultimately may lead to a confirmable reorganization plan. That which helps to foster consensus may be preferable to a notionally better transaction that carries the risk of promoting unwanted conflict.

No. 09-13125, 2009 WL 2902568, at *4 (Bankr. S.D.N.Y. July 6, 2009) (emphasis added).

23.     The Debtors' determination to move forward with the DIP Facility is an exercise of the Debtors' sound business judgment following careful evaluation of alternatives. Specifically, and in the face of limited cash on hand, the Debtors and their advisors determined that the Debtors would require postpetition financing to support themselves during these Chapter 11 Cases and to exit these Chapter 11 Cases efficiently and with sufficient liquidity to maintain operations.

24.     Additionally, the Rollup Loans – a common feature in debtor-in-possession financing arrangements – was a necessary inducement for the Prepetition Secured Lenders to provide a DIP Facility with this tenor, and in a sufficient amount, and consent to use of Cash Collateral, both of which are necessary to the viability of the Debtors' Chapter 11 Cases and the Debtors' ultimate reorganization. The Prepetition Secured Lenders' willingness to extend the

Debtors' runway prior to the filing of the Chapter 11 Cases via their agreement to advance critical Prepetition Bridge Financing (totaling approximately $13.5 million) to the Debtors since November 2024, enabled the Debtors to continue operations while pursuing a prepetition sale process. The Rollup Loans are effectively a "pre-DIP" facility and the conversion of $10 million of that Prepetition Bridge Financing to DIP Loans ensures that the Prepetition Secured Lenders will not be penalized for advancing funds they had no obligation to provide outside of bankruptcy instead of forcing the Debtors to prematurely file for chapter 11. Simply put, the Rollup Loans were a necessary provision of the DIP Facility and should be approved.

25.     Accordingly, after having negotiated the DIP Documents with the DIP Lenders at arm's length and in good faith, a process that yielded material concessions from the DIP Lenders, the Debtors believe that, under the circumstances, they have obtained the best financing available and the DIP Facility is otherwise fair and reasonable.

**B. The Debtors Should be Authorized to Obtain Postpetition Financing on a Secured, Superpriority, and Priming Basis**

26.     The Debtors propose to obtain financing under the DIP Facility by providing security interests and liens as set forth above pursuant to sections 364(c) and (d) of the Bankruptcy Code. The statutory requirement for obtaining postpetition credit under section 364(c) is a finding, made after notice and hearing, that a debtor is "unable to obtain unsecured credit allowable under section 503(b)(1) of [the Bankruptcy Code]." 11 U.S.C. § 364(c). *See In re Crouse Grp.*, *Inc.*, 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987) (secured credit under section 364(c) of the Bankruptcy Code is authorized, after notice and hearing, upon showing that unsecured credit cannot be obtained).

27.     Courts have articulated a test to determine whether a debtor is entitled to financing under section 364(c) of the Bankruptcy Code. Specifically, courts evaluate whether (a) the credit transaction is necessary to preserve the assets of the estate and (b) the terms of the transaction are

ACTIVE 707673467

fair, reasonable, and adequate, under the circumstances. *In re Ames Dep't Stores*, 115 B.R. at 37–39 (Bankr. S.D.N.Y. 1990); *see also In re St. Mary Hosp.*, 86 B.R. 393, 401-02 (Bankr. E.D. Pa. 1988); *Crouse Grp.*, 71 B.R. at 549.

28.     Based on current capital market conditions, after consultation with their advisors, the Debtors determined that postpetition financing on an unsecured basis would be unobtainable. Without postpetition financing, the Debtors will not be able to preserve their business and maximize the value of their estates. Absent sufficient financing to continue operating their businesses during these Chapter 11 Cases, the value of the Debtors' estates would be substantially impaired to the detriment of all stakeholders. Under these circumstances, the Debtors believe that the terms of the DIP Facility, as set forth in the DIP Documents, are fair, reasonable, and adequate.

29.     Furthermore, if a debtor is unable to obtain unsecured credit, section 364(c)(1) of the Bankruptcy Code provides that the debtor may obtain credit that is secured by an administrative expense claim having priority "over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of [the Bankruptcy Code]." As described above, the Debtors are unable to obtain unsecured credit or credit on terms better than the DIP Facility. Therefore, approving the superpriority claim in favor of the DIP Secured Parties is reasonable and appropriate. In addition, section 364(c)(2) of the Bankruptcy Code provides that a debtor may obtain credit that is secured by a lien on property of the estate that is not otherwise subject to a lien. Finally, section 364(d)(1) of the Bankruptcy Code governs the incurrence of senior secured debt or "priming" loans, provided that the debtor is otherwise unable to obtain credit and the primed creditor's interests are adequately protected. As the Debtors are unable to obtain the critical financing they need to administer these Chapter 11 Cases from any other source, and because, as set forth below, the

24

Prepetition Secured Parties' interests are adequately protected, the Debtors respectfully represent that granting priming DIP Liens to the DIP Secured Parties is warranted under the circumstances.

### C. No Comparable Alternative to the DIP Facility is Reasonably Available

30.     In satisfying the standards of section 364(c) and (d) of the Bankruptcy Code, a debtor need not seek credit from every available source but should make a reasonable effort to seek other sources of credit available of the type set forth in sections 364(a) and (b) of the Bankruptcy Code. A debtor need only demonstrate "by a good faith effort that credit was not available without" the protections afforded to potential lenders by sections 364(c) of the Bankruptcy Code. *See In re Snowshoe Co.*, 789 F.2d 1085, 1088 (4th Cir. 1986) ("[t]he statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable"); *see also In re Plabell Rubber Prods., Inc.*, 137 B.R. 897, 900 (Bankr. N.D. Ohio 1992). Moreover, in circumstances where only a few lenders likely can or will extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing." *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd sub nom. Anchor Say. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 120 n.4 (N.D. Ga. 1989); *see also In re Snowshoe Co.*, 789 F.2d 1085 at 1088 (demonstrating that credit was unavailable absent the senior lien by establishment of unsuccessful contact with other financial institutions in the geographic area); *In re Stanley Hotel, Inc.*, 15 B.R. 660, 663 (D. Colo. 1981) (bankruptcy court's finding that two national banks refused to grant unsecured loans was sufficient to support conclusion that section 364 requirement was met); *In re Ames Dep't Stores*, 115 B.R. at 37-39 (debtor must show that it made reasonable efforts to seek other sources of financing under section 364(a) and (b); finding that debtor demonstrated the unavailability of unsecured financing where debtor approached several lending institutions); *In re 495 Cent. Park Ave. Corp.*, 136 B.R. 626, 631 (Bankr. S.D.N.Y. 1992) (element satisfied where "specialist in commercial lending

25

practices . . . explained that most banks lend money only in return for a senior secured position. The debtor cannot obtain financing secured by a lien on unencumbered property . . . because there is no property in the estate which is not already subject to a lien."). Generally, the debtor's efforts are to be considered on a case-by-case basis, particularly "[g]iven the 'time is of the essence' nature of this type of financing." *In Reading Tube Indus.*, 72 B.R. 329, 332 (Bankr. E.D. Pa. 1987). *See also In re Sky Valley, Inc.*, 100 B.R. at 112-13 (exhaustive search not required where the business suffered from financial stress, had little or no unencumbered property, and primary property was subject to numerous liens, and thus debtors' approach of only four lenders was sufficient under such circumstances).

31.     As noted above and as detailed in the Finger Declaration, after consulting with their advisors, the Debtors do not believe that alternative sources of financing on as favorable, or more favorable, terms are reasonably available. Specifically, the Debtors' investment banker, Jefferies, LLC, contacted approximately 11 parties in an effort to obtain alternative financing. Of the potential sources of postpetition financing contacted by Jefferies, all of them declined the opportunity to provide an alternative postpetition financing facility, whether on a priming or junior basis. Thus, the Debtors have determined that the DIP Facility provides the best – and only – option forward under the circumstances to fund these Chapter 11 Cases, and the Debtors submit that the requirements of sections 364 of the Bankruptcy Code that alternative credit on more favorable terms was unavailable to the Debtors is satisfied.

**D.  The Proposed Adequate Protection Is Appropriate**

32.     To the extent a secured creditor's interests in collateral constitute valid and perfected security interests and liens as of the Petition Date, section 364(d)(1)(B) of the Bankruptcy Code requires that the Debtors provide adequate protection to such secured creditor where a debtor-in-possession financing facility primes the liens of such secured creditor.

33.     Section 361 of the Bankruptcy Code sets forth non-exclusive examples of forms of adequate protection, including granting replacement liens or administrative expenses, though courts should determine on a case-by-case basis what constitutes adequate protection. *See In re Swedeland Dev. Grp., Inc.*, 16 F.3d 552, 564 (3d Cir. 1994); *In re Satcon Tech. Corp.*, No. 12-12869 (KG), 2012 WL 6091160, at \*6 (Bankr. D. Del. Dec. 7, 2012); *In re N.J. Affordable Homes Corp.*, No. 05-60442 (DHS), 2006 WL 2128624, at \*14 (Bankr. D.N.J. June 29, 2006); *In re Columbia Gas Sys., Inc.*, Nos. 91-803, 91-804, 1992 WL 79323, at \*2 (Bankr. D. Del. Feb. 18, 1992); *see also In re Dynaco Corp.*, 162 B.R. 389, 394 (Bankr. D.N.H. 1993) (*citing* 2 Collier on Bankruptcy ¶ 361.01[1] at 361–66 (15th ed. 1993) (explaining that adequate protection "must be determined based upon equitable considerations arising from the particular facts of each proceeding")).

34.     As outlined herein and set forth in the Interim Order, the Debtors propose to provide adequate protection to the Prepetition Secured Parties against the diminution in value of the interests of the Prepetition Secured Parties in the Prepetition Collateral (including Cash Collateral) from and after the Petition Date (the "Diminution in Value of the Prepetition Collateral"). The proposed adequate protection includes: (a) replacement liens on all DIP Collateral, (b) superpriority administrative expense claims, (c) payment in kind of postpetition interest on the Prepetition Obligations, and (e) payment of reasonable postpetition fees and expenses of the Prepetition Secured Parties, including reasonable and documented fees and expenses of counsel and other advisors thereof.

35.     The Debtors submit – and the Prepetition Secured Parties agree – that the proposed adequate protection, which was bargained for at arm's length and includes terms that are commonplace in consensual DIP financing and cash collateral arrangements – is sufficient to

ACTIVE 707673467

protect the Prepetition Secured Parties from any Diminution in Value of the Prepetition Collateral. Thus, the proposed adequate protection as set forth in the Interim Order is necessary and appropriate under the circumstances to ensure that the Debtors have access to the DIP Facility on the terms and conditions provided for under the DIP Documents and the Interim Order.

**E.  The Debtors Should be Authorized to Use Cash Collateral**

36.    Section 363(c)(2)(A) of the Bankruptcy Code allows a debtor in possession to use cash collateral if each entity that has an interest in such cash collateral consents. Section 363(e) provides for adequate protection of interests in property when a debtor uses cash collateral. Here, the Prepetition Secured Parties consent to the Debtors' use of Cash Collateral on the terms and conditions set forth in the Interim Order.

37.    The Debtors have an urgent need for the immediate use of the Cash Collateral and seek to use all Cash Collateral existing on or after the Petition Date pursuant to the terms of the Interim Order. The Debtors need Cash Collateral to pay operating expenses, including essential vendors and employees, to ensure a continued supply of goods and services essential to the Debtors' business so that the Debtors can maintain operations, provide uninterrupted service to customers, and work to effectuate value-maximizing sale transactions.

38.    The Debtors believe that the terms and conditions of their use of Cash Collateral (including the provision of adequate protection described above and provided in the Interim Order) are appropriate and reasonable and, as described above, that such adequate protection is sufficient to secure any adequate protection obligations under the circumstances. As described above, the Debtors propose to use Cash Collateral to fund the orderly administration of the Chapter 11 Cases and operate their businesses. The Prepetition Secured Parties consent to the use of Cash Collateral in light of the adequate protection provided, which, as noted above, the Debtors believe is

ACTIVE 707673467

necessary and sufficient. For the reasons set forth herein, the Debtors submit that they should be authorized to use Cash Collateral on the terms set forth in the Interim Order.

**F.  The DIP Secured Parties Should be Deemed Good-Faith Lenders Under Section 364(e)**

39.    Section 364(e) of the Bankruptcy Code protects a good-faith lender's right to collect on loans extended to a debtor, and its right in any lien securing those loans, even if the authority of the debtor to obtain such loans or grant such liens is later reversed or modified on appeal. Section 364(e) of the Bankruptcy Code provides that:

> The reversal or modification on appeal of an authorization under this section [364 of the Bankruptcy Code] to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

40.    As explained herein and in the First Day Declaration, the DIP Facility is the result of the Debtors' reasonable and informed determination that, after arm's-length and good-faith negotiations between the Debtors and the DIP Lenders, the DIP Lenders offered the most favorable terms on which to obtain needed postpetition financing. The terms and conditions of the DIP Facility are reasonable and appropriate under the circumstances, and the proceeds of the DIP Facility will be used only for purposes that are permissible under the Bankruptcy Code. Accordingly, the Court should find that the DIP Lenders are "good faith" lenders within the meaning of section 364(e) of the Bankruptcy Code and entitled to all of the protections afforded by that section.

**G.  The Automatic Stay Should be Modified on a Limited Basis**

41.    The Debtors request that automatic stay imposed by section 362 of the Bankruptcy Code be modified to the extent necessary to implement and effectuate the terms and provisions of

ACTIVE 707673467

the Interim Order or the Final Order, as applicable. Among other things, the proposed Interim Order provides that the automatic stay provisions of section 362 of the Bankruptcy Code will be modified to allow the DIP Secured Parties, to the extent necessary, to collect and apply payments and proceeds in respect of the DIP Collateral, as applicable, in accordance with the terms and provisions of the Interim Order and the DIP Documents.

**H. Failure to Obtain the Immediate Interim Access to the DIP Facility and Cash Collateral Would Cause Immediate and Irreparable Harm.**

42.     Bankruptcy Rules 4001(b) and 4001(c) provide that a final hearing on a motion to obtain credit pursuant to section 364 of the Bankruptcy Code or to use cash collateral pursuant to section 363 of the Bankruptcy Code may not be commenced earlier than 14 days after the service of such motion. Upon request, however, the Court is empowered to conduct a preliminary expedited hearing on the motion and authorize the obtaining of credit and use of cash collateral to the extent necessary to avoid immediate and irreparable harm to a Debtors' estates.

43.     The Debtors request that the Court hold and conduct a hearing to consider entry of the Interim Order authorizing the Debtors from and after entry of the Interim Order until the Final Hearing to receive advances contemplated by the DIP Facility. The Debtors require these advances prior to the Final Hearing and entry of the Final Order to be able to continue to operate and pay administrative expenses. This relief will enable the Debtors to preserve and maximize value and, therefore, avoid immediate and irreparable harm and prejudice to the estates and all parties in interest, pending the Final Hearing.

## REQUEST FOR FINAL HEARING

44.     Pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), the Debtors request that the Court set a date for the Final Hearing that is as soon as practicable and fix the time and date prior to the Final Hearing for parties to file objections to this Motion.

30

**REQUEST FOR IMMEDIATE RELIEF AND WAIVER OF STAY**
**TO AVOID IMMEDIATE AND IRREPARABLE HARM**

45.     To implement the foregoing successfully, the Debtors request that the Court enter an order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) and that the Debtors have established cause to exclude such relief from the 14-day stay period under Bankruptcy Rule 6004(h).

**NOTICE**

46.     Notice of this Motion has been given to the following parties or, in lieu thereof, to their counsel, if known:  (a) the Office of the United States Trustee for the Northern District of Georgia; (b) counsel to the Prepetition Lenders and the DIP Lenders; (c) counsel to the Prepetition Agent and DIP Agent; (c) creditors holding the 30 largest unsecured claims against the Debtors; (d) the United States Attorney for the Northern District of Georgia; (e) the Georgia Department of Revenue; (f) the Internal Revenue Service; (g) the Securities & Exchange Commission; (h) the Georgia Secretary of State; (i) the states attorneys general for states in which the Debtors conduct business; and (j) any party that has requested notice pursuant to Bankruptcy Rule 2002. The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

**NO PRIOR REQUEST**

47.     No prior Motion for the relief requested herein has been made to this or any other court.

*[Remainder of Page Intentionally Left Blank]*

## **CONCLUSION**

WHEREFORE, the Debtors respectfully request that this Court enter the Interim Order

attached hereto as **Exhibit A** and a Final Order and grant such other and further relief as is just

and proper.

Dated: March 16, 2025                          Respectfully submitted,

                                        **GREENBERG TRAURIG, LLP**

                                        */s/ David B. Kurzweil*
                                        David B. Kurzweil (Ga. Bar No. 430492)
                                        Matthew A. Petrie (Ga. Bar No. 227556)
                                        Terminus 200
                                        3333 Piedmont Road, NE, Suite 2500
                                        Atlanta, Georgia 30305
                                        Telephone: (678) 553-2100
                                        Email: kurzweild@gtlaw.com
                                                petriem@gtlaw.com

                                        *Proposed Counsel for the Debtors and
                                        Debtors in Possession*

ACTIVE 707673467