**<u>Exhibit B</u>**

**DIP Credit Agreement**

(see attached)

*EXECUTION VERSION*

U.S. $20,000,000

SENIOR SECURED PRIMING AND SUPERPRIORITY DEBTOR-IN-POSSESSION
CREDIT AGREEMENT,

dated as of March 18, 2025,

among

AIR PROS SOLUTIONS HOLDINGS, LLC,
as a Debtor, a Debtor-in-Possession and Holdings,

AIR PROS SOLUTIONS, LLC,
as a Debtor, a Debtor-in-Possession and the Borrower,

CERTAIN OTHER SUBSIDIARIES OF HOLDINGS,
each as a Debtor, a Debtor-in-Possession and a Loan Party,

THE LENDERS PARTY HERETO FROM TIME TO TIME

and

ALTER DOMUS (US) LLC,
as Disbursing Agent and Collateral Agent

# TABLE OF CONTENTS

Page

ARTICLE I DEFINITIONS ....................................................................................................... 2

    Section 1.01    Defined Terms ................................................................................... 2
    Section 1.02    Other Interpretive Provisions .......................................................... 29
    Section 1.03    Accounting Terms ............................................................................ 29
    Section 1.04    Rounding.......................................................................................... 30
    Section 1.05    Times of Day ................................................................................... 30
    Section 1.06    Pro Forma Calculations ................................................................... 30
    Section 1.07    Rates ................................................................................................ 30
    Section 1.08    Cashless Rolls .................................................................................. 31
    Section 1.09    Divisions ......................................................................................... 31

ARTICLE II LOANS.................................................................................................................. 31

    Section 2.01    DIP Loan Commitments .................................................................. 31
    Section 2.02    Procedure for DIP Loan Borrowing................................................ 31
    Section 2.03    [Reserved]........................................................................................ 32
    Section 2.04    [Reserved]........................................................................................ 32
    Section 2.05    [Reserved]........................................................................................ 32
    Section 2.06    Repayment of Loans; Lenders' Evidence of Debt; Register; Notes ................... 32
    Section 2.07    Fees ................................................................................................. 33
    Section 2.08    Voluntary Prepayments and Commitment Reductions; Call Protection............ 34
    Section 2.09    Mandatory Prepayments .................................................................. 35
    Section 2.10    Application of Prepayments/Reductions........................................... 35
    Section 2.11    Conversion and Continuation Options ............................................ 36
    Section 2.12    Interest Rates and Payment Dates.................................................... 36
    Section 2.13    Illegality.......................................................................................... 37
    Section 2.14    Inability to Determine Interest Rate; Benchmark Replacement Setting ............ 38
    Section 2.15    Payments Generally ........................................................................ 40
    Section 2.16    Increased Costs; Capital Adequacy ................................................ 40
    Section 2.17    Taxes ............................................................................................... 41
    Section 2.18    Breakage Payments......................................................................... 45
    Section 2.19    Pro Rata Treatment ......................................................................... 45
    Section 2.20    Defaulting Lenders ......................................................................... 46
    Section 2.21    Mitigation Obligations; Replacement of Lenders........................... 47
    Section 2.22    Grant of Lien; Super Priority Nature of Obligations and Lenders' Liens........... 48
    Section 2.23    Guaranty ......................................................................................... 48
    Section 2.24    Contribution .................................................................................... 49
    Section 2.25    Authorization; Other Agreement ..................................................... 49
    Section 2.26    Guaranty Absolute and Unconditional............................................ 49
    Section 2.27    Waivers ........................................................................................... 50
    Section 2.28    Reliance .......................................................................................... 50
    Section 2.29    Roll-Up ........................................................................................... 50

ARTICLE III REPRESENTATIONS AND WARRANTIES.................................................. 51

    Section 3.01    Existence, Qualification and Power................................................. 51

i

Section 3.02    Authorization; Enforceability ................................................................. 51
Section 3.03    No Conflicts ......................................................................................... 51
Section 3.04    Financial Statements; No Material Adverse Effect ............................... 52
Section 3.05    Intellectual Property ............................................................................. 53
Section 3.06    Properties ............................................................................................. 54
Section 3.07    Equity Interests and Subsidiaries .......................................................... 55
Section 3.08    Compliance with Laws and Contracts .................................................. 55
Section 3.09    Litigation .............................................................................................. 55
Section 3.10    Investment Company Act ..................................................................... 56
Section 3.11    Federal Reserve Regulations ................................................................ 56
Section 3.12    Taxes .................................................................................................... 56
Section 3.13    No Material Misstatements ................................................................... 56
Section 3.14    Labor Matters ....................................................................................... 56
Section 3.15    ERISA ................................................................................................... 57
Section 3.16    Environmental Matters ......................................................................... 57
Section 3.17    Insurance .............................................................................................. 58
Section 3.18    Security Documents .............................................................................. 58
Section 3.19    Anti-Money Laundering and Anti-Corruption ..................................... 59
Section 3.20    International Trade Laws ....................................................................... 59
Section 3.21    Use of Proceeds ................................................................................... 59
Section 3.22    Bankruptcy Matters .............................................................................. 60

ARTICLE IV CONDITIONS PRECEDENT ...................................................................... 60

Section 4.01    Conditions to Initial Credit Extension .................................................. 60
Section 4.02    Conditions to Each Credit Extension .................................................... 64

ARTICLE V AFFIRMATIVE COVENANTS ...................................................................... 65

Section 5.01    Financial Statements ............................................................................. 65
Section 5.02    Certificates; Other Information ............................................................ 66
Section 5.03    Notices ................................................................................................. 68
Section 5.04    Payment of Tax Obligations ................................................................. 69
Section 5.05    Preservation of Existence, Etc. ............................................................. 70
Section 5.06    Maintenance of Property ...................................................................... 70
Section 5.07    Maintenance of Insurance .................................................................... 70
Section 5.08    Books and Records; Inspection Rights .................................................. 70
Section 5.09    Compliance with Laws ......................................................................... 70
Section 5.10    Compliance with Environmental Laws; Preparation of Environmental
                Reports ................................................................................................. 71
Section 5.11    Use of Proceeds ................................................................................... 71
Section 5.12    Covenant to Guarantee Obligations and Give Security ........................ 72
Section 5.13    Further Assurances ............................................................................... 72
Section 5.14    Lender Calls ......................................................................................... 73
Section 5.15    [Reserved] ............................................................................................ 73
Section 5.16    Bankruptcy Court Filings ..................................................................... 73
Section 5.17    Bankruptcy Covenants ......................................................................... 74
Section 5.18    Chapter 11 Cases ................................................................................. 74
Section 5.19    Sales Process Timeline ......................................................................... 74
Section 5.20    Budget Compliance .............................................................................. 74
Section 5.21    Cash Management ................................................................................ 74

ii

ARTICLE VI NEGATIVE COVENANTS ................................................................................. 75

    Section 6.01    Limitation on Indebtedness............................................................. 75
    Section 6.02    Limitation on Liens........................................................................ 76
    Section 6.03    Limitation on Fundamental Changes............................................. 78
    Section 6.04    Limitation on Dispositions............................................................ 78
    Section 6.05    Limitation on Restricted Payments................................................ 79
    Section 6.06    Limitation on Investments............................................................. 80
    Section 6.07    Limitation on Prepayments; Modifications of Certain Documents ..... 81
    Section 6.08    Limitation on Transactions with Affiliates................................... 82
    Section 6.09    Limitation on Sale and Leasebacks............................................... 82
    Section 6.10    Limitation on Changes in Fiscal Periods ...................................... 83
    Section 6.11    Limitation on Burdensome Agreements ........................................ 83
    Section 6.12    Limitation on Lines of Business ................................................... 84
    Section 6.13    Limitation on Activities of Holdings ............................................ 84
    Section 6.14    KEIP Plan ..................................................................................... 84
    Section 6.15    Chapter 11 Claims ........................................................................ 84
    Section 6.16    The DIP Orders ............................................................................. 84
    Section 6.17    Critical Vendor and Other Payments ............................................ 84

ARTICLE VII EVENTS OF DEFAULT AND REMEDIES ..................................................... 85

    Section 7.01    Events of Default .......................................................................... 85
    Section 7.02    Remedies Upon Event of Default ................................................. 89
    Section 7.03    Application of Funds .................................................................... 90

ARTICLE VIII THE DISBURSING AGENT AND THE COLLATERAL AGENT............................. 91

    Section 8.01    Appointment and Authority ......................................................... 91
    Section 8.02    Rights as a Lender........................................................................ 92
    Section 8.03    Exculpatory Provisions ................................................................ 92
    Section 8.04    Reliance by Agents ...................................................................... 95
    Section 8.05    Delegation of Duties .................................................................... 96
    Section 8.06    Resignation of the Disbursing Agent or the Collateral Agent ........... 96
    Section 8.07    Non-Reliance on Disbursing Agent and Other Lenders ..................... 97
    Section 8.08    No Other Duties, Etc..................................................................... 97
    Section 8.09    Disbursing Agent May File Proofs of Claim ................................ 97
    Section 8.10    Collateral and Guaranty Matters.................................................. 98
    Section 8.11    Withholding Tax ........................................................................ 100
    Section 8.12    No Reliance on Agents' Customer Identification Program ............... 100
    Section 8.13    Erroneous Payments .................................................................. 101

ARTICLE IX MISCELLANEOUS ......................................................................................... 102

    Section 9.01    Amendments and Waivers .......................................................... 102
    Section 9.02    Notices ....................................................................................... 103
    Section 9.03    No Waiver by Course of Conduct; Cumulative Remedies ............... 106
    Section 9.04    Survival of Representations, Warranties, Covenants and Agreements............. 106
    Section 9.05    Payment of Expenses; Indemnity ............................................... 107
    Section 9.06    Successors and Assigns; Participations and Assignments ............... 108
    Section 9.07    Sharing of Payments by Lenders; Set-off ................................... 113

Section 9.08    Counterparts; Electronic Signatures ........................................................ 114
Section 9.09    Severability ........................................................................................... 115
Section 9.10    Section Headings ................................................................................... 115
Section 9.11    Integration ............................................................................................. 115
Section 9.12    Governing Law ...................................................................................... 115
Section 9.13    Submission to Jurisdiction; Waivers ..................................................... 115
Section 9.14    Acknowledgments ................................................................................. 116
Section 9.15    Confidentiality ...................................................................................... 116
Section 9.16    Waiver of Jury Trial .............................................................................. 117
Section 9.17    PATRIOT Act Notice ............................................................................ 117
Section 9.18    Usury Savings Clause ........................................................................... 118
Section 9.19    Payments Set Aside .............................................................................. 118
Section 9.20    No Advisory or Fiduciary Responsibility ............................................. 118
Section 9.21    No Publicity ........................................................................................... 119
Section 9.22    Acknowledgement and Consent to Bail-In of Affected Financial Institutions ............................................................................................ 119
Section 9.23    Parties Including Trustees; Bankruptcy Court Proceedings .............................. 119
Section 9.24    Inconsistency ........................................................................................ 120
Section 9.25    Lender Consent to Credit Bid ............................................................... 120

ANNEXES:

Annex A            DIP Loan Commitments

SCHEDULES:

Schedule 3.06       Owned and Leased Real Property
Schedule 3.07       Equity Interests
Schedule 3.09       Existing Litigation
Schedule 3.17       Insurance
Schedule 3.18(a)    UCC Filing Jurisdictions
Schedule 4.01(a)    Closing Date Security Documents
Schedule 6.08       Existing Affiliate Transactions
Schedule 6.11       Existing Restrictive Agreements

EXHIBITS:

Exhibit A          Form of Compliance Certificate
Exhibit B          [Reserved]
Exhibit C          Form of Assignment and Assumption
Exhibit D          Form of Note
Exhibit E-1        Form of U.S. Tax Compliance Certificate
Exhibit E-2        Form of U.S. Tax Compliance Certificate
Exhibit E-3        Form of U.S. Tax Compliance Certificate
Exhibit E-4        Form of U.S. Tax Compliance Certificate
Exhibit F          Form of Borrowing Notice
Exhibit G          Form of Interim DIP Order
Exhibit H          Form of Interest Election Request

**SENIOR SECURED PRIMING AND SUPERPRIORITY DEBTOR-IN-POSSESSION CREDIT AGREEMENT**, dated as of March 18, 2025 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, this "Agreement"), among Air Pros Solutions Holdings, LLC, a Delaware limited liability company, as a debtor and a debtor-in-possession ("Holdings"), Air Pros Solutions, LLC, a Delaware limited liability company, as the borrower, a debtor and a debtor-in-possession (the "Borrower"), certain other Subsidiaries of Holdings, as Subsidiary Guarantors, debtors and debtors-in-possession, the several banks and other financial institutions or entities from time to time parties hereto (the "Lenders") and Alter Domus (US) LLC, as disbursing agent for the Lenders (together with its permitted successors and assigns in such capacity, the "Disbursing Agent") and as collateral agent for the Secured Parties (together with its successors and permitted assigns in such capacity, the "Collateral Agent").

### W I T N E S S E T H :

**WHEREAS**, on March 16, 2025 (the "Petition Date"), Holdings, the Borrower and all of the other Guarantors filed voluntary petitions in the United States Bankruptcy Court for the Northern District of Georgia (the "Bankruptcy Court") commencing cases (each, a "Chapter 11 Case" and collectively, the "Chapter 11 Cases") for relief under the Bankruptcy Code, which are consolidated and jointly administered under Case No. 25-10356 (PMB);

**WHEREAS**, from and after the Petition Date, the Loan Parties are continuing to operate their business and manage their properties as debtors-in-possession under Sections 1107 and 1108 of the Bankruptcy Code;

**WHEREAS**, the Borrower has requested, and the Lenders have agreed to provide to the Borrower, a $20,000,000 senior secured priming and superpriority debtor-in-possession credit facility, consisting of (a) $10,000,000 of "new money" multi-draw term loans that will be made available to the Borrower subject to the terms and conditions set forth in this Agreement and the DIP Orders; and (b) certain of the Prepetition Obligations that will be deemed "rolled up" as term loans hereunder pursuant to the terms and subject to the conditions set forth in this Agreement and the DIP Orders;

**WHEREAS**, *inter alia*, the Borrower, Alter Domus (US) LLC, as the disbursing agent and the collateral agent (in such capacities, the "Prepetition Agent"), and the Prepetition Lenders (as defined below) are parties to that certain Credit Agreement, dated as of October 31, 2022 (as amended, amended and restated, supplemented or otherwise modified from time to time on or prior to the Petition Date, the "Prepetition Credit Agreement");

**WHEREAS**, the Borrower and each other Loan Party desire to secure all of the Obligations by granting to the Collateral Agent, for the benefit of the Secured Parties, a senior secured priming security interest in and Lien upon substantially all of the property and assets of the Borrower and the other Loan Parties, subject to the limitations described herein (including the Carve-Out), in the other Loan Documents and the DIP Orders; and

**WHEREAS**, the Lenders are willing to extend such credit to the Borrower on the terms and subject to the conditions set forth herein.

**NOW, THEREFORE**, in consideration of the premises and the agreements hereinafter set forth, the parties hereto hereby agree as follows:

1

# ARTICLE I
## DEFINITIONS

Section 1.01    <u>Defined Terms</u>. As used in this Agreement, the terms listed in this <u>Section 1.01</u> shall have the respective meanings set forth in this <u>Section 1.01</u>.

"<u>Account Control Agreement</u>" shall mean, with respect to any Deposit Account of any Loan Party, an account control agreement in form and substance acceptable to the Collateral Agent.

"<u>Accounting Change</u>" shall mean any change in accounting principles required by the promulgation of any rule, regulation, pronouncement or opinion by the Financial Accounting Standards Board of the American Institute of Certified Public Accountants or, if applicable, the SEC.

"<u>Administrative Questionnaire</u>" shall mean an administrative questionnaire in a form supplied by the Disbursing Agent.

"<u>Affected Financial Institution</u>" shall mean (a) any EEA Financial Institution or (b) any UK Financial Institution.

"<u>Affiliate</u>" shall mean, with respect to a specified Person, another Person that directly or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified; *provided*, *however*, that, the term "Affiliate" shall also include any Person that directly or indirectly owns 10% or more of any class of Equity Interests of the Person specified or that is an officer or director of the Person specified.

"<u>Agents</u>" shall mean the collective reference to the Disbursing Agent and the Collateral Agent.

"<u>Agreement</u>" shall have the meaning set forth in the preamble hereto.

"<u>Anti-Corruption Laws</u>" shall mean all laws, rules, and regulations of any jurisdiction applicable to Holdings, the Borrower or any of its Affiliates from time to time concerning or relating to bribery or corruption, including without limitation the United States Foreign Corrupt Practices Act of 1977, as amended, the UK Bribery Act 2010 and other similar legislation in any other jurisdictions.

"<u>Anti-Money Laundering Laws</u>" shall mean all applicable financial recordkeeping and reporting requirements and the money laundering statutes and the rules and regulations thereunder and any related or similar rules, regulations or guidelines, which in each case are issued, administered or enforced by any Governmental Authority having jurisdiction over the Borrower or any other Loan Party. For the avoidance of doubt, the term "Anti-Money Laundering Laws" shall include, but shall not be limited to, all laws, rules and regulations of the United States, the United Nations Security Council, the European Union or its Member States, the United Kingdom and Her Majesty's Treasury, and Germany, relating to bribery, corruption, money laundering or terrorist financing, including, without limitation, the Bank Secrecy Act, 31 U.S.C. section 5311 et seq.; Title III of the PATRIOT Act; 18 U.S.C. section 1956; 18 U.S.C. section 1957; the Financial Recordkeeping and Reporting of Currency and Foreign Transactions Regulations, 31 C.F.R. Part 103; the United Kingdom Proceeds of Crime Act 2002; and the United Kingdom Money Laundering, Terrorist Financing and Transfer of Funds (Information on the Payer) Regulations 2017.

"<u>Applicable Margin</u>" shall mean a percentage *per annum* equal to (a) for SOFR Loans, 11.50%, and (b) for Base Rate Loans, 10.50%.

"Approved Budget" shall mean the aggregate, without duplication, of all items that are set forth in the Initial Approved Budget, as of the Closing Date, and, thereafter, any Supplemental Approved Budget.

"Approved Electronic Communications" shall mean, collectively, any notice, demand, communication, information, document or other material provided by or on behalf of any Loan Party pursuant to any Loan Document or the transactions contemplated therein which is distributed to any Agent or Lender by means of electronic communications pursuant to Section 9.02(b) or Section 9.02(d), including through the Platform.

"Approved Fund" shall mean any Person that is engaged in making, purchasing, holding or investing in loans and similar extensions of credit in the ordinary course of its business and that is administered or managed by (a) a Lender, (b) an Affiliate of a Lender or (c) an entity or an Affiliate of an entity that administers or manages a Lender.

"Asset Sale" shall mean any Disposition of Property or series of related Dispositions of Property outside of the ordinary course of business which yields gross proceeds (valued at the initial principal amount thereof in the case of non-cash proceeds consisting of notes or other debt securities and valued at fair market value in the case of other non-cash proceeds) in excess of $100,000 with respect to any Disposition or series of related Dispositions.

"Assignment and Assumption" shall mean an assignment and assumption entered into by a Lender and an Eligible Assignee (with the consent of any party whose consent is required by Section 9.06(a)), and acknowledged by the Disbursing Agent, in substantially the form of Exhibit C or any other form approved by the Disbursing Agent.

"Available Tenor" shall mean, as of any date of determination and with respect to the then-current Benchmark, as applicable, (x) if such Benchmark is a term rate, any tenor for such Benchmark (or component thereof) that is or may be used for determining the length of an interest period pursuant to this Agreement or (y) otherwise, any payment period for interest calculated with reference to such Benchmark (or component thereof) that is or may be used for determining any frequency of making payments of interest calculated with reference to such Benchmark pursuant to this Agreement, in each case, as of such date and not including, for the avoidance of doubt, any tenor for such Benchmark that is then-removed from the definition of "Interest Period" pursuant to Section 2.14(b).

"Avoidance Actions" shall have the meaning set forth in the DIP Orders.

"Bail-In Action" shall mean the exercise of any Write-Down and Conversion Powers by the applicable Resolution Authority in respect of any liability of an Affected Financial Institution.

"Bail-In Legislation" shall mean (a) with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing law, regulation, rule or requirement for such EEA Member Country from time to time that is described in the EU Bail-In Legislation Schedule and (b) with respect to the United Kingdom, Part I of the United Kingdom Banking Act 2009 (as amended from time to time) and any other law, regulation or rule applicable in the United Kingdom relating to the resolution of unsound or failing banks, investment firms or other financial institutions or their affiliates (other than through liquidation, administration or other insolvency proceedings).

"Bankruptcy Code" shall mean Title 11 of the United States Code entitled "Bankruptcy", as now and hereafter in effect, or any successor statute.

3

"Bankruptcy Court" shall have the meaning set forth in the recitals hereto.

"Base Rate" shall mean, for any day, a *per annum* rate of interest equal to the greatest of (a) the Prime Rate in effect on such day, (b) the Federal Funds Effective Rate in effect on such day <u>plus</u> 0.50%, (c) Term SOFR for a one-month tenor in effect on such day <u>plus</u> 1.00% and (d) 2.50%. Any change in the Base Rate due to a change in the Prime Rate, the Federal Funds Effective Rate or Term SOFR shall be effective from and including the effective date of such change in the Prime Rate, the Federal Funds Effective Rate or Term SOFR, respectively.

"Base Rate Loan" shall mean a Loan bearing interest at a rate determined by reference to the Base Rate.

"Base Rate Term SOFR Determination Day" has the meaning specified in the definition of "Term SOFR".

"Benchmark" shall mean, initially, the Term SOFR Reference Rate; *provided* that if a Benchmark Transition Event has occurred with respect to the Term SOFR Reference Rate or the then-current Benchmark, then "Benchmark" means the applicable Benchmark Replacement to the extent that such Benchmark Replacement has replaced such prior benchmark rate pursuant to <u>Section 2.14(b)</u>.

"Benchmark Replacement" shall mean, with respect to any Benchmark Transition Event, the first alternative set forth in the order below that can be determined by the Disbursing Agent for the applicable Benchmark Replacement Date:

(a)        Daily Simple SOFR for an Available Tenor of one-month's duration, or

(b)        the sum of: (i) the alternate benchmark rate that has been selected by the Disbursing Agent and the Required Lenders (in consultation with the Borrower) giving due consideration to (A) any selection or recommendation of a replacement benchmark rate or the mechanism for determining such a rate by the Relevant Governmental Body or (B) any evolving or then-prevailing market convention for determining a benchmark rate as a replacement to the then-current Benchmark for U.S. dollar-denominated syndicated credit facilities and (ii) the related Benchmark Replacement Adjustment;

*provided* that in each case, such rate, or the underlying rates component thereof, is or are displayed on a screen or other information service that publishes such rate or rates from time to time as selected by the Disbursing Agent (in consultation with the Required Lenders) in its reasonable discretion. If the Benchmark Replacement as determined pursuant to clause (a) or (b) above would be less than the Floor, the Benchmark Replacement will be deemed to be the Floor for the purposes of this Agreement and the other Loan Documents.

"Benchmark Replacement Adjustment" shall mean, with respect to any replacement of the then-current Benchmark with an Unadjusted Benchmark Replacement, the spread adjustment, or method for calculating or determining such spread adjustment (which may be a positive or negative value or zero), that has been selected by the Disbursing Agent and the Required Lenders (in consultation with the Borrower) giving due consideration to (a) any selection or recommendation of a spread adjustment, or method for calculating or determining such spread adjustment, for the replacement of such Benchmark with the applicable Unadjusted Benchmark Replacement by the Relevant Governmental Body or (b) any evolving or then-prevailing market convention for determining a spread adjustment, or method for calculating or determining such spread adjustment, for the replacement of such Benchmark with the applicable Unadjusted Benchmark Replacement for U.S. dollar-denominated syndicated credit facilities at such time in the United States.

"Benchmark Replacement Date" shall mean the earliest to occur of the following events with respect to the then-current Benchmark: (a) in the case of clause (a) or (b) of the definition of "Benchmark Transition Event", the later of (i) the date of the public statement or publication of information referenced therein and (ii) the date on which the administrator of such Benchmark (or the published component used in the calculation thereof) permanently or indefinitely ceases to provide all Available Tenors of such Benchmark (or such component thereof); or (b) in the case of clause (c) of the definition of "Benchmark Transition Event", the first date on which such Benchmark (or the published component used in the calculation thereof) has been determined and announced by the regulatory supervisor for the administrator of such Benchmark (or such component thereof) to be non-representative; *provided* that such non-representativeness will be determined by reference to the most recent statement or publication referenced in such clause (c) and even if any Available Tenor of such Benchmark (or such component thereof) continues to be provided on such date. For the avoidance of doubt, the "Benchmark Replacement Date" will be deemed to have occurred in the case of clause (a) or (b) with respect to any Benchmark upon the occurrence of the applicable event or events set forth therein with respect to all then-current Available Tenors of such Benchmark (or the published component used in the calculation thereof).

"Benchmark Transition Event" shall mean the occurrence of one or more of the following events with respect to the then-current Benchmark: (a) a public statement or publication of information by or on behalf of the administrator of such Benchmark (or the published component used in the calculation thereof) announcing that such administrator has ceased or will cease to provide all Available Tenors of such Benchmark (or such component thereof), permanently or indefinitely; *provided* that, at the time of such statement or publication, there is no successor administrator that will continue to provide any Available Tenor of such Benchmark (or such component thereof); (b) a public statement or publication of information by the regulatory supervisor for the administrator of such Benchmark (or the published component used in the calculation thereof), the Board of Governors, the Federal Reserve Bank of New York, an insolvency official with jurisdiction over the administrator for such Benchmark (or such component), a resolution authority with jurisdiction over the administrator for such Benchmark (or such component) or a court or an entity with similar insolvency or resolution authority over the administrator for such Benchmark (or such component), which states that the administrator of such Benchmark (or such component) has ceased or will cease to provide all Available Tenors of such Benchmark (or such component thereof) permanently or indefinitely; *provided* that, at the time of such statement or publication, there is no successor administrator that will continue to provide any Available Tenor of such Benchmark (or such component thereof); or (c) a public statement or publication of information by the regulatory supervisor for the administrator of such Benchmark (or the published component used in the calculation thereof) announcing that all Available Tenors of such Benchmark (or such component thereof) are not, or as of a specified future date will not be, representative. For the avoidance of doubt, a "Benchmark Transition Event" will be deemed to have occurred with respect to any Benchmark if a public statement or publication of information set forth above has occurred with respect to each then-current Available Tenor of such Benchmark (or the published component used in the calculation thereof).

"Benchmark Unavailability Period" shall mean the period (if any) (a) beginning at the time that a Benchmark Replacement Date has occurred if, at such time, no Benchmark Replacement has replaced the then-current Benchmark for all purposes hereunder and under any Loan Document in accordance with Section 2.14(b) and (b) ending at the time that a Benchmark Replacement has replaced the then-current Benchmark for all purposes hereunder and under any Loan Document in accordance with Section 2.14(b).

"Beneficial Ownership Certification" shall mean a certificate regarding beneficial ownership as required by the Beneficial Ownership Regulation.

"Beneficial Ownership Regulation" shall mean 31 C.F.R. § 1010.230.

"Board Observer" shall have the meaning set forth in Section 5.15.

"Board of Directors" shall mean, with respect to any Person, (a) in the case of any corporation, the board of directors of such corporation, (b) in the case of any limited liability company, the board of managers, board of governors, managing members or other applicable governing body of such limited liability company, (c) in the case of any partnership, the general partners of such partnership (or the board of directors of the general partner of such partnership, if any) and (d) in any other case, the functional equivalent of the foregoing.

"Board of Governors" shall mean the Board of Governors of the Federal Reserve System of the United States of America, or any successor thereto.

"Borrower" shall have the meaning set forth in the preamble hereto.

"Borrowing" shall mean a borrowing consisting of simultaneous Loans of the same Type and, in the case of a SOFR Borrowing, having the same Interest Period made by the Lenders.

"Borrowing Date" shall mean any Business Day specified by the Borrower in a Borrowing Notice as a date on which the relevant Lenders are requested to make Loans hereunder.

"Borrowing Notice" shall mean, with respect to any request for borrowing of Loans hereunder, a written notice from the Borrower, substantially in the form of, and containing the information prescribed by, Exhibit F, or any other form approved by the Disbursing Agent, delivered to the Disbursing Agent.

"Business Day" shall mean any day excluding Saturday, Sunday and any day which is a legal holiday under the laws of the State of New York or is a day on which banking institutions located in such state are authorized or required by law or other governmental action to close; *provided* that, in relation to SOFR Loans and any interest rate settings, fundings, disbursements, settlements or payments of any SOFR Loan, or any other dealings with respect to such SOFR Loan, such day shall also be a U.S. Government Securities Business Day.

"Capital Lease" shall mean, with respect to any Person, any lease of, or other arrangement conveying the right to use, any property by such Person as lessee that has been or should be accounted for as a capital lease on a balance sheet of such person prepared in accordance with GAAP, subject to Section 1.03(a).

"Capital Lease Obligations" shall mean, with respect to any Person, the obligations of such Person to pay rent or other amounts under any Capital Lease or any Synthetic Lease, or a combination thereof, which obligations are (or would be, if such Synthetic Lease or other lease were accounted for as a Capital Lease) required to be classified and accounted for as Capital Leases on a balance sheet of such person under GAAP, and the amount of such obligations shall be the capitalized amount thereof (or the amount that would be capitalized, if such Synthetic Lease or other lease were accounted for as a Capital Lease) determined in accordance with GAAP, subject to Section 1.03(a).

"Carve-Out" shall have the meaning set forth in the DIP Orders.

"Cash Collateral" shall have the meaning set forth in the DIP Orders.

"Cash Equivalents" shall mean, as at any date of determination, any of the following: (a) marketable securities (i) issued or directly and unconditionally guaranteed as to interest and principal by the government of the United States of America or (ii) issued by any agency of the United States of

6

America and the obligations of which are backed by the full faith and credit of the United States of America, in each case maturing within one year from the date of acquisition; (b) marketable direct obligations issued by any state of the United States of America or any political subdivision of any such state or any public instrumentality thereof, in each case maturing within one year after the date of acquisition and having a rating of at least A-1 from S&P or at least P-1 from Moody's; (c) certificates of deposit, time deposits, or overnight bank deposits having maturities of six months or less from the date of acquisition issued by any Lender or by any commercial bank organized under the laws of the United States of America or any state thereof or the District of Columbia that (i) is at least "adequately capitalized" (as defined in the regulations of its primary Federal banking regulator), (ii) has Tier 1 capital (as defined in such regulations) of not less than $1,000,000,000 and (iii) has a rating of at least AA-from S&P and Aa3 from Moody's; (d) commercial paper of an issuer rated at least A-1 by S&P or P-1 by Moody's, or carrying an equivalent rating by a nationally recognized rating agency, if both of the two named rating agencies cease publishing ratings of commercial paper issuers generally, and maturing within six months from the date of acquisition; (e) securities with maturities of one year or less from the date of acquisition issued or fully guaranteed by any state, commonwealth or territory of the United States of America, by any political subdivision or taxing authority of any such state, commonwealth or territory or by any foreign government, the securities of which state, commonwealth, territory, political subdivision, taxing authority or foreign government (as the case may be) are rated at least A by S&P or A by Moody's; (f) securities with maturities of six months or less from the date of acquisition backed by standby letters of credit issued by any Lender or any commercial bank satisfying the requirements of clause (c) of this definition; and (g) shares of money market, mutual or similar funds which (i) invest exclusively in assets satisfying the requirements of clauses (a) through (f) of this definition; (ii) has net assets of not less than $500,000,000 and (iii) has the highest rating obtainable from either S&P or Moody's.

"Cash Management Order" has the meaning specified in Section 4.01.

"Change in Law" shall mean the occurrence, after the Closing Date, of any of the following: (a) the adoption or taking effect of any law, rule, regulation or treaty, (b) any change in any law, rule, regulation or treaty or in the administration, interpretation, implementation or application thereof by any Governmental Authority or (c) the making or issuance of any request, rule, guideline or directive (whether or not having the force of law) by any Governmental Authority; provided that, notwithstanding anything herein to the contrary, (x) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith and (y) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or United States or foreign regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to be a "Change in Law", regardless of the date enacted, adopted or issued.

"Change of Control" shall mean the occurrence of any of the following events:

(a)       the Permitted Investors shall cease to beneficially own and control at least 51% on a fully diluted basis of the economic and voting interests in the Equity Interests of Holdings;

(b)       Holdings shall cease to beneficially own and control 100% on a fully diluted basis of each class of outstanding Equity Interests of the Borrower free and clear of all Liens (other than Permitted Equity Liens);

(c)       the majority of the seats (other than vacant seats) on the board of managers (or similar governing body) of Holdings shall cease to be occupied by Continuing Managers; or

7

(d)      any "change of control" or similar event (however denominated) shall occur under any indenture or other agreement with respect to Material Indebtedness of any Loan Party.

"Chapter 11 Case" shall have the meaning set forth in the recitals hereto.

"Chapter 11 Events and Circumstances" shall mean, collectively, (i) the filing of the Chapter 11 Cases (and any defaults under prepetition agreements, so long as the exercise of remedies as a result of such defaults are stayed under the Bankruptcy Code or such agreements are voided or invalidated by the Bankruptcy Court), (ii) any other event specifically described in that certain Declaration of Jaspinder S. Kanwal in Support of the Emergency Motion of the Debtors for Entry of Interim and Final Orders (A) Authorizing the Debtors to Obtain Postpetition Financing and to Use Cash Collateral, (B) Granting Liens and Superpriority Claims, (C) Granting Adequate Protection, (D) Modifying the Automatic Stay, (E) Scheduling Final Hearing, and (F) Granting Related Relief (as may be amended, supplemented or otherwise modified) filed with the Bankruptcy Count on March 16, 2025, or any other declaration in support of the Chapter 11 petition and "first-day" motions, and (iii) the existence of any claim or liability that is prepetition, unsecured and junior in priority to the Obligations.

"Closing Date" shall mean the date on which the conditions precedent set forth in Section 4.01 shall have been satisfied or waived, which date is March 18, 2025.

"Code" shall mean the Internal Revenue Code of 1986, as amended (unless otherwise provided herein).

"Collateral" shall mean any and all assets and other property owned, leased or operated by any Loan Party and any and all other property of any Loan Party, in all cases, now existing or hereafter acquired, that may at any time be or become subject to a security interest or Lien in favor of Collateral Agent, on behalf of the Secured Parties, to secure the Obligations. Without limiting the generality of the foregoing, "Collateral" shall include all rights of a Loan Party under section 506(c) of the Bankruptcy Code (solely upon entry of the Final DIP Order), all "property of the estate" (within the meaning of the Bankruptcy Code) of a Loan Party of any kind or nature, real or personal, tangible, intangible or mixed, and all rents, products, substitutions, accessions, profits, replacements and cash and non-cash proceeds of all of the foregoing and all cash and non-cash proceeds of the Avoidance Actions (it being understood that the proceeds of the Avoidance Actions shall only be included as Collateral upon entry of the Final DIP Order).

"Collateral Agent" shall have the meaning set forth in the preamble hereto.

"Compliance Certificate" shall mean a certificate duly executed by a Responsible Officer of Holdings, substantially in the form of Exhibit A.

"Conforming Changes" shall mean, with respect to either the use or administration of Term SOFR or the use, administration, adoption or implementation of any Benchmark Replacement, any technical, administrative or operational changes (including changes to the definition of "Base Rate", the definition of "Business Day", the definition of "U.S. Government Securities Business Day", the definition of "Interest Period" or any similar or analogous definition (or the addition of a concept of "interest period"), timing and frequency of determining rates and making payments of interest, timing of borrowing requests or prepayment, conversion or continuation notices, the applicability and length of lookback periods, the applicability of Section 2.18 and other technical, administrative or operational matters) that the Required Lenders (in consultation with the Disbursing Agent and the Borrower) decide may be appropriate to reflect the adoption and implementation of any such rate or to permit the use and administration thereof by the Disbursing Agent in a manner substantially consistent with market practice (or, if the Required Lenders are informed by the Disbursing Agent that adoption of any portion of such market practice is not

8

administratively feasible or if the Required Lenders determine that no market practice for the administration of any such rate exists, in such other manner of administration as the Required Lenders (in consultation with the Disbursing Agent) decide is reasonably necessary in connection with the administration of this Agreement and the other Loan Documents and that is administratively feasible for the Disbursing Agent).

"Connection Income Taxes" shall mean Other Connection Taxes that are imposed on or measured by net income (however denominated) or that are franchise Taxes or branch profits Taxes.

"Continuing Managers" shall mean (a) the managers of Holdings on the Closing Date and (b) each other manager of Holdings if, in each case, such other manager's nomination for election to the board of managers of Holdings is recommended by at least 66-2/3% of the votes of the then Continuing Managers or such other manager receives the vote of the Permitted Investors in his or her election by the members of Holdings.

"Contractual Obligation" shall mean, with respect to any Person, any provision of any security issued by such Person or of any agreement, instrument or other undertaking to which such Person is a party or by which it or any of its Property is bound.

"Control" shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ownership of voting securities or by contract or otherwise. "Controlling" and "Controlled" have meanings correlative thereto.

"Credit Bid Transaction" has the meaning assigned to such term in Section 9.25.

"Credit Extension" shall mean the making of a Loan.

"Credit Facilities" shall mean the DIP Loan Commitments and the DIP Loans made thereunder.

"Daily Simple SOFR" shall mean, for any day, SOFR, with the conventions for this rate (which will include a lookback) being established by the Required Lenders in accordance with the conventions for this rate recommended by the Relevant Governmental Body for determining "Daily Simple SOFR" for syndicated business loans; *provided* that if the Disbursing Agent decides that any such convention is not administratively feasible for the Disbursing Agent, then the Disbursing Agent (in consultation with the Required Lenders) may establish another convention in its reasonable discretion.

"Debtor Relief Laws" shall mean the Bankruptcy Code, and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization or similar debtor relief laws of the United States of America or other applicable jurisdictions from time to time in effect.

"Default" shall mean any event, occurrence or condition which is, or upon notice, lapse of time or both would constitute, an Event of Default.

"Defaulting Lender" shall mean, subject to Section 2.20(b), any Lender that (a) has failed to (i) fund all or any portion of its Loans within two Business Days of the date such Loans were required to be funded hereunder unless such Lender notifies the Disbursing Agent and the Borrower in writing that such failure is the result of such Lender's determination that one or more conditions precedent to funding (each of which conditions precedent, together with any applicable default, shall be specifically identified in such writing) has not been satisfied, or (ii) pay to the Disbursing Agent or any other Lender any other amount required to be paid by it hereunder within two Business Days of the date when due, (b) has notified the Borrower or the Disbursing Agent in writing that it does not intend to comply with its funding obligations

hereunder, or has made a public statement to that effect (unless such writing or public statement relates to such Lender's obligation to fund a Loan hereunder and states that such position is based on such Lender's determination that a condition precedent to funding (which condition precedent, together with any applicable default, shall be specifically identified in such writing or public statement) cannot be satisfied), (c) has failed, within three Business Days after written request by the Disbursing Agent or the Borrower, to confirm in writing to the Disbursing Agent and the Borrower that it will comply with its prospective funding obligations hereunder (*provided* that such Lender shall cease to be a Defaulting Lender pursuant to this clause (c) upon receipt of such written confirmation by the Disbursing Agent and the Borrower) or (d) has, or has a direct or indirect parent company that has, (i) become the subject of a proceeding under any Debtor Relief Law, or (ii) had appointed for it a receiver, custodian, conservator, trustee, administrator, assignee for the benefit of creditors or similar Person charged with reorganization or liquidation of its business or assets, including the Federal Deposit Insurance Corporation or any other state or federal regulatory authority acting in such a capacity; *provided* that a Lender shall not be a Defaulting Lender solely by virtue of the ownership or acquisition of any equity interest in that Lender or any direct or indirect parent company thereof by a Governmental Authority so long as such ownership interest does not result in or provide such Lender with immunity from the jurisdiction of courts within the United States of America or from the enforcement of judgments or writs of attachment on its assets or permit such Lender (or such Governmental Authority) to reject, repudiate, disavow or disaffirm any contracts or agreements made with such Lender. The Disbursing Agent shall not be deemed to have knowledge or notice of designation of any Lender as a "Defaulting Lender" hereunder unless the Disbursing Agent has received written notice as set forth above from such Lender or from the Borrower referring to this Agreement and notifying the Disbursing Agent of the identity and designation of such Lender as a "Defaulting Lender" which the Disbursing Agent may conclusively rely upon without incurring liability therefor, and absent receipt of such notice from such Lender or the Borrower, the Disbursing Agent may conclusively assume that no Lender under this Agreement has been designated as a "Defaulting Lender".

"Deposit Account" shall have the meaning set forth in Article 9 of the UCC.

"DIP Commitment Period" shall mean the period beginning on the Closing Date and ending on the date that is the three-month anniversary of the Closing Date.

"DIP Loan Commitment" shall mean, as to any Lender, the obligation of such Lender to make a Loan to the Borrower hereunder in a principal amount not to exceed the amount set forth under the heading "DIP Loan Commitment" opposite such Lender's name on Annex A or, as the case may be, in the Assignment and Assumption pursuant to which such Lender became a party hereto, as the same may be changed from time to time pursuant to the terms hereof. The aggregate principal amount of the DIP Loan Commitments on the Closing Date is $10,000,000; *provided* that up to $4,000,000 shall be available upon the entry of the Interim DIP Order, with the remainder available only upon entry of the Final DIP Order.

"DIP Loans" shall mean the term loans made by the Lenders to the Borrower pursuant to Section 2.01 on the Closing Date and each Borrowing Date thereafter (including the Roll-Up Loans).

"DIP Orders" shall mean the Interim DIP Order and the Final DIP Order, as applicable, based on which such order is then in effect.

"Disbursing Agent" shall have the meaning set forth in the preamble hereto.

"Disinterested Manager" shall have the meaning set forth in Section 6.08.

"Disposition" shall mean, with respect to any Property, any sale, lease, sublease, assignment, conveyance, transfer, exclusive license or other disposition thereof (including (i) by way of merger or

10

consolidation, (ii) any Sale and Leaseback and (iii) any Synthetic Lease); and the terms "Dispose" and "Disposed of" shall have correlative meanings.

"Disqualified Equity Interests" shall mean any Equity Interests that, by their terms (or by the terms of any security or other Equity Interests into which they are convertible or for which they are exchangeable), or upon the happening of any event or condition, (a) require the payment of any dividends (other than dividends payable solely in shares of Qualified Equity Interests), (b) mature or are mandatorily redeemable or subject to mandatory repurchase or redemption or repurchase at the option of the holders thereof (other than solely for Qualified Equity Interests), in each case in whole or in part and whether upon the occurrence of any event, pursuant to a sinking fund obligation on a fixed date or otherwise (including as the result of a failure to maintain or achieve any financial performance standards) or (c) are or become convertible into or exchangeable for, automatically or at the option of any holder thereof, any Indebtedness, Equity Interests or other assets other than Qualified Equity Interests, in the case of each of clauses (a), (b) and (c), prior to the date that is 91 days after the latest Maturity Date at the time of issuance of such Equity Interests (other than (i) following Payment in Full or (ii) upon a "change in control"; provided that any payment required pursuant to this clause (ii) is subject to the prior Payment in Full); provided, however, that if such Equity Interests are issued to any employee or to any plan for the benefit of employees of Holdings, the Borrower or any of the Subsidiaries or by any such plan to such employees, such Equity Interests shall not constitute Disqualified Equity Interests solely because they may be required to be repurchased by a Group Member in order to satisfy applicable statutory or regulatory obligations or as a result of such employee's termination, death or disability.

"Dollars" or "$" shall mean lawful money of the United States of America.

"EEA Financial Institution" shall mean (a) any credit institution or investment firm established in any EEA Member Country that is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country that is a parent of an institution described in clause (a) of this definition, or (c) any financial institution established in an EEA Member Country that is a subsidiary of an institution described in clauses (a) or (b) of this definition and is subject to consolidated supervision with its parent.

"EEA Member Country" shall mean any of the member states of the European Union, Iceland, Liechtenstein, and Norway.

"EEA Resolution Authority" shall mean any public administrative authority or any person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

"Eligible Assignee" shall mean any Person that meets the requirements to be an assignee under Section 9.06(b).

"Environmental Laws" shall mean any and all laws, rules, orders, regulations, statutes, ordinances, guidelines, codes, decrees, or other legally binding requirements (including, without limitation, principles of common law) of any Governmental Authority, regulating, relating to or imposing liability or standards of conduct concerning pollution, the preservation or protection of the environment, natural resources or human health (including employee health and safety), or the generation, manufacture, use, labeling, treatment, storage, handling, transportation or release of, or exposure to, Materials of Environmental Concern, as has been, is now, or may at any time hereafter be, in effect.

"Environmental Liability" shall mean any liability, contingent or otherwise (including any liability for damages, costs of environmental remediation, fines, penalties, attorney or consultant fees or

indemnities) resulting from or based upon (a) non-compliance with any Environmental Law or any Environmental Permit, (b) exposure to any Materials of Environmental Concern, (c) Release or threatened Release of any Materials of Environmental Concern, (d) any investigation, remediation, removal, clean-up or monitoring required under Environmental Laws or required by a Governmental Authority (including without limitation Governmental Authority oversight costs that the party conducting the investigation, remediation, removal, clean-up or monitoring is required to reimburse) or (e) any contract, agreement or other consensual arrangement pursuant to which liability is assumed or imposed with respect to any of the foregoing.

"<u>Environmental Permits</u>" shall mean any and all Permits required under any Environmental Law.

"<u>Equity Interest</u>" shall mean, with respect to any Person, any and all shares, interests, rights to purchase, warrants, options, participations or other equivalents, including membership interests (however designated, whether voting or nonvoting), of equity of such Person, including, if such Person is a partnership, partnership interests (whether general or limited), if such Person is a limited liability company, membership interests, and any other interest or participation that confers on a Person the right to receive a share of the profits and losses of, or distributions of property of, such partnership, whether outstanding on the Closing Date or issued on or after the Closing Date, but excluding debt securities convertible or exchangeable into such equity interests.

"<u>Equity Plan</u>" shall mean the "Equity Plan" as such term is defined in the operating agreement of Holdings as in effect on the Closing Date.

"<u>ERISA</u>" shall mean the Employee Retirement Income Security Act of 1974, as amended from time to time, the regulations promulgated thereunder and any successor thereto.

"<u>ERISA Affiliate</u>" shall mean any trade or business (whether or not incorporated) that, together with any Group Member, is treated as a single employer under Section 414(b) or (c) of the Code, or solely for purposes of Section 302 or 303 of ERISA or Section 412 or 430 of the Code, is treated as a single employer under Section 414 of the Code. Any former ERISA Affiliate of the Group Members shall continue to be considered an ERISA Affiliate of the Group Members within the meaning of this definition with respect to the period such entity was an ERISA Affiliate of any Group Member and with respect to liabilities arising after such period for which any Group Member could be liable under the Code or ERISA.

"<u>ERISA Event</u>" shall mean (a) a "reportable event" within the meaning of Section 4043 of ERISA and the regulations issued thereunder with respect to any Single Employer Plan (excluding those for which the provision for 30 day notice to the PBGC has been waived by regulation in effect on the Closing Date); (b) the failure to meet the minimum funding standard of Sections 412 or 430 of the Code or Sections 302 or 303 of ERISA with respect to any Single Employer Plan, whether or not waived; (c) the filing pursuant to Section 412(c) of the Code or Section 302(c) of ERISA of an application for a waiver of the minimum funding standard with respect to any Single Employer Plan; (d) the termination of any Single Employer Plan or the withdrawal or partial withdrawal of any Group Member from any Single Employer Plan or Multiemployer Plan that results in any Withdrawal Liability; (e) a determination that any Single Employer Plan is, or is expected to be, in "at risk" status (as defined in Section 430 of the Code or Section 303 of ERISA); (f) a determination that any Multiemployer Plan is, or is expected to be, in "critical" or "endangered" status under Section 432 of the Code or Section 305 of ERISA; (g) the receipt by any Group Member or any of their respective ERISA Affiliates from the PBGC or a plan administrator of any notice relating to an intention to terminate any Single Employer Plan or to appoint a trustee to administer any Single Employer Plan; (h) the adoption of any amendment to a Single Employer Plan that would require the provision of security pursuant to Section 436(f) of the Code; (i) the receipt by any Group Member or any of their respective ERISA Affiliates of any notice, or the receipt by any Multiemployer Plan from any

Group Member or any of their respective ERISA Affiliates of any notice, concerning the imposition of Withdrawal Liability or a determination that a Multiemployer Plan is, or is expected to be, insolvent, within the meaning of Title IV of ERISA; (j) the failure by any Group Member or any of their respective ERISA Affiliates to make a required contribution to a Multiemployer Plan; (k) the occurrence of a nonexempt prohibited transaction (within the meaning of Section 4975 of the Code or Section 406 of ERISA) with respect to any Single Employer Plan or Multiemployer Plan which could reasonably be expected to result in material liability to any Group Member; (l) the receipt from the IRS of notice of disqualification of any Single Employer Plan intended to qualify under Section 401(a) of the Code, or the disqualification of any trust forming part of any Single Employer Plan intended to qualify for exemption from taxation under Section 501(a) of the Code; (m) the imposition of a lien pursuant to Section 430(k) of the Code or Section 303(k) of ERISA or a violation of Section 436 of the Code with respect to any Single Employer Plan; (n) the assertion of a claim (other than routine claims for benefits) against any Plan other than a Multiemployer Plan or the assets thereof, or against any Group Member in connection with any Plan, in each case which would reasonably be expected to result in a material liability to any Group Member; or (o) the occurrence of an act or omission which could reasonably be expected to give rise to the imposition on any Group Member of any material fine, penalty, tax or related charge under Section 409 or Section 4071 of ERISA in respect of any Plan.

"Erroneous Payment" shall have the meaning set forth in Section 8.13.

"EU Bail-In Legislation Schedule" shall mean the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor person), as in effect from time to time.

"Event of Default" shall mean any of the events specified in Section 7.01; *provided* that any requirement for the giving of notice, the lapse of time, or both, has been satisfied.

"Exchange Act" shall mean the Securities Exchange Act of 1934, as amended.

"Excluded Taxes" shall mean any of the following Taxes imposed on or with respect to a Recipient or required to be withheld or deducted from a payment to a Recipient: (a) Taxes imposed on or measured by net income (however denominated), franchise Taxes and branch profits Taxes, in each case, (i) imposed as a result of such Recipient being organized under the laws of, or having its principal office or, in the case of any Lender, its applicable lending office located in, the jurisdiction imposing such Tax (or any political subdivision thereof) or (ii) that are Other Connection Taxes, (b) in the case of a Lender, U.S. federal withholding Taxes imposed on amounts payable to or for the account of such Lender with respect to an applicable interest in a Loan or DIP Loan Commitment pursuant to a law in effect on the date on which (i) such Lender acquires such interest in the Loan or DIP Loan Commitment or in this Agreement (other than pursuant to an assignment request by the Borrower under Section 2.21) or (ii) such Lender changes its lending office, except in each case to the extent that, pursuant to Section 2.17, amounts with respect to such Taxes were payable either to such Lender's assignor immediately before such Lender became a party hereto or to such Lender immediately before it changed its lending office, (c) Taxes attributable to such Recipient's failure to comply with Section 2.17(g) and (d) any withholding Taxes imposed under FATCA.

"FASB ASC" shall mean the Accounting Standards Codification of the Financial Accounting Standards Board.

"FATCA" shall mean Sections 1471 through 1474 of the Code, as of the Closing Date (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof and any agreements entered into pursuant to Section 1471(b)(1) of the Code and any fiscal or regulatory legislation, rules or practices

adopted pursuant to any intergovernmental agreement, treaty or convention among Governmental Authorities and implementing such Sections of the Code.

"Federal Funds Effective Rate" shall mean, for any day, the rate *per annum* equal to the weighted average of the rates on overnight Federal funds transactions with members of the Federal Reserve System, as published by the Federal Reserve Bank of New York on the Business Day next succeeding such day; *provided* that (i) if such day is not a Business Day, the Federal Funds Effective Rate for such day shall be such rate on such transactions on the next preceding Business Day as so published on the next succeeding Business Day and (ii) if no such rate is so published on such next succeeding Business Day, the Federal Funds Effective Rate for such day shall be the average rate quoted to the Disbursing Agent on such day on such transactions by three (3) federal funds brokers of recognized standing as determined by the Disbursing Agent.

"Fee Letter" shall mean that certain fee proposal letter provided by Alter Domus (US) LLC and executed by the Borrower on the Closing Date, as it may be amended, restated, supplemented or otherwise modified.

"Final DIP Order" shall mean a final order entered by the Bankruptcy Court in the Chapter 11 Cases with respect to the Loan Parties after a final hearing, in form and substance acceptable to the Required Lenders and the Agents in their sole discretion (it being understood that an order entered by the Bankruptcy Court substantially in the form of the Interim DIP Order, granting such additional relief necessary with respect to the Roll-Up Loans and/or any Guarantee Obligation or Collateral in respect thereof, with only such other modifications as are satisfactory in form and substance to the Required Lenders (and the Agents to the extent their consent to any such modification would be required pursuant to Section 9.01) in their sole discretion shall, if entered by the Bankruptcy Court, be deemed acceptable to the Required Lenders and the Agents), which order is in effect and not stayed, together with all extensions, supplements, modifications and amendments thereto, in each case in form and substance acceptable to the Required Lenders (and the Agents to the extent their consent to any such modification would be required pursuant to Section 9.01), in their sole discretion, which, among other things, provides that the relief requested in the motions seeking approval of the Loan Documents and the Interim DIP Order and Final DIP Order and granted on an interim basis in the Interim DIP Order is granted on a final basis (including any additional relief required by the Bankruptcy Court or agreed to by the Required Lenders) and provides for the granting of the superpriority claims and Liens against the Loan Parties and the roll-up of the Prepetition Obligations as contemplated herein, all on a final basis.

"Final Roll-Up Effective Time" shall mean the moment in time that the first Credit Extension is made following entry of the Final DIP Order.

"Floor" shall mean a rate of interest equal to 1.50%.

"Foreign Lender" shall mean a Lender that is not a U.S. Person.

"Funded Debt" shall mean, with respect to any Person, all Indebtedness of such Person of the types described in clauses (a) through (e) and, solely with respect to letters of credit, bankers' acceptances and similar facilities that have been drawn but not yet reimbursed, clause (f) of the definition of "Indebtedness".

"Funding Account" shall mean the Deposit Account of the Borrower maintained at Bank of America, N.A. ending in x0457.

"GAAP" shall mean generally accepted accounting principles in the United States of America set forth in the opinions and pronouncements of the Accounting Principles Board and the American Institute

of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board or such other principles as may be approved by a significant segment of the accounting profession in the United States of America, that are applicable to the circumstances as of the date of determination, consistently applied.

"Governmental Authority" shall mean the government of the United States of America or any other nation, or of any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government (including any supra-national bodies such as the European Union or the European Central Bank).

"Grantor" shall mean any Loan Party granting security over its assets pursuant to Section 2.22.

"Group Member" shall mean each of Holdings, the Borrower and its Subsidiaries and "Group Members" shall refer to each such Person, collectively.

"Guarantee Obligation" shall mean, with respect to any Person (the "guaranteeing person"), any obligation of (a) the guaranteeing person or (b) another Person (including any bank under any letter of credit), if to induce the creation of which the guaranteeing person has issued a reimbursement, counterindemnity or similar obligation, in either case guaranteeing or in effect guaranteeing any Indebtedness, leases, dividends or other obligations (the "primary obligations") of any other third Person (the "primary obligor") in any manner, whether directly or indirectly, including, without limitation, any obligation of the guaranteeing person, whether or not contingent, (i) to purchase any such primary obligation or any Property constituting direct or indirect security therefor, (ii) to advance or supply funds (A) for the purchase or payment of any such primary obligation or (B) to maintain working capital or equity capital of the primary obligor or otherwise to maintain the net worth or solvency of the primary obligor, (iii) to purchase Property, securities or services primarily for the purpose of assuring the owner of any such primary obligation of the ability of the primary obligor to make payment of such primary obligation or (iv) otherwise to assure or hold harmless the owner of any such primary obligation against loss in respect thereof; *provided*, *however*, that the term "Guarantee Obligation" shall not include endorsements of instruments for deposit or collection in the ordinary course of business. The amount of any Guarantee Obligation of any guaranteeing person shall be deemed to be the lower of (1) an amount equal to the stated or determinable amount of the primary obligation in respect of which such Guarantee Obligation is made and (2) the maximum amount for which such guaranteeing person may be liable pursuant to the terms of the instrument embodying such Guarantee Obligation, unless such primary obligation and the maximum amount for which such guaranteeing person may be liable are not stated or determinable, in which case the amount of such Guarantee Obligation shall be such guaranteeing person's maximum reasonably anticipated liability in respect thereof as determined by the Borrower in good faith.

"Guaranteed Obligations" shall have the meaning assigned to such term in Section 2.23.

"Guarantors" shall mean the collective reference to Holdings, the Borrower and the Subsidiary Guarantors.

"Highest Lawful Rate" shall mean the maximum lawful interest rate, if any, that at any time or from time to time may be contracted for, charged, or received under the laws applicable to any Lender which are presently in effect or, to the extent allowed by law, under such applicable laws which may hereafter be in effect and which allow a higher maximum non-usurious interest rate than applicable laws now allow.

"Holdings" shall have the meaning set forth in the preamble hereto.

"Incidental Licenses" shall mean (a) sales or marketing agreements that include a license to use the trademarks of a Group Member for the purposes of promoting any Group Member products or services; and/or (b) vendor contracts that include permission for the vendor to identify a Group Member as a customer of the vendor.

"Indebtedness" shall mean, of any Person at any date, without duplication, (a) all indebtedness of such Person for borrowed money, (b) all obligations of such Person for the deferred purchase price of Property or services, including seller notes or earn-out obligations appearing on such Person's balance sheet in accordance with GAAP (other than trade payables incurred in the ordinary course of such Person's business), (c) all obligations of such Person evidenced by notes, bonds, debentures, loan agreements or other similar instruments, (d) all indebtedness created or arising under any conditional sale or other title retention agreement with respect to Property acquired by such Person (even though the rights and remedies of the seller or lender under such agreement in the event of default are limited to repossession or sale of such Property), (e) all Capital Lease Obligations or Purchase Money Obligations of such Person, (f) all obligations of such Person, contingent or otherwise, as an account party or applicant under bankers' acceptance, letter of credit or similar facilities, (g) all obligations of such Person in respect of Disqualified Equity Interests of such Person, (h) all Guarantee Obligations of such Person in respect of obligations of the kind referred to in clauses (a) through (g) above, (i) all obligations of the kind referred to in clauses (a) through (h) above secured by (or for which the holder of such obligation has an existing right, contingent or otherwise, to be secured by) any Lien on Property (including, without limitation, accounts and contract rights) owned by such Person, whether or not such Person has assumed or become liable for the payment of such obligation and (j) for the purposes of Section 6.01 and Section 7.01(e) only, all obligations of such Person in respect of Swap Contracts.

"Indemnified Liabilities" shall have the meaning set forth in Section 9.05(b).

"Indemnified Taxes" shall mean (a) Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of any Loan Party under any Loan Document and (b) to the extent not otherwise described in clause (a), Other Taxes.

"Indemnitee" shall have the meaning set forth in Section 9.05(b).

"Initial Credit Extension" shall mean the first Credit Extension made pursuant to this Agreement.

"Intellectual Property" shall mean all rights, priorities, and privileges relating to intellectual property, whether arising under United States of America, state, multinational or foreign laws or otherwise, including, without limitation, copyrights, patents, trademarks, service marks, moral rights, technology, software, source code, know-how, processes, recipes, formulas, trade secrets, confidential information, domain names, and social media accounts; all rights, licenses, and covenants relating to any of the foregoing; and all rights to sue at law or in equity for any infringement, misappropriation, or other impairment of any of the foregoing, including the right to receive all proceeds and damages therefrom.

"Interest Election Request" shall mean a request by the Borrower to convert or continue a Borrowing in accordance with Section 2.11, which shall be substantially in the form of Exhibit H or any other form approved by the Disbursing Agent.

"Interest Payment Date" shall mean (a) as to any Base Rate Loan, the last Business Day of each month, the Maturity Date and the date on which all Loans shall become due and payable in full hereunder, whether by acceleration or otherwise and (b) as to any SOFR Loan, the last day of each Interest Period therefor, the Maturity Date and the date on which all Loans shall become due and payable in full hereunder, whether by acceleration or otherwise.

16

"Interest Period" shall mean, as to any SOFR Borrowing, the period commencing on the date of such Loan or Borrowing and ending on the numerically corresponding day in the calendar month that is one month thereafter (in each case, subject to the availability thereof), as specified in the applicable Borrowing Notice or Interest Election Request; *provided* that (i) if any Interest Period would end on a day other than a Business Day, such Interest Period shall be extended to the next succeeding Business Day unless such next succeeding Business Day would fall in the next calendar month, in which case such Interest Period shall end on the next preceding Business Day, (ii) any Interest Period that commences on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the last calendar month of such Interest Period) shall end on the last Business Day of the last calendar month of such Interest Period, (iii) no Interest Period shall extend beyond the Maturity Date and (iv) no tenor that has been removed from this definition pursuant to Section 2.14(b) shall be available for specification in such Borrowing Notice or Interest Election Request. For purposes hereof, the date of a Loan or Borrowing initially shall be the date on which such Loan or Borrowing is made and thereafter shall be the effective date of the most recent conversion or continuation of such Loan or Borrowing.

"Interim Credit Extension" shall mean each of (a) the Initial Credit Extension and (b) each other Credit Extension made after the Initial Credit Extension until the Final Roll-Up Effective Time.

"Interim DIP Order" shall mean the order of the Bankruptcy Court with respect to the Loan Parties, in substantially the form of Exhibit G hereto, with such extensions, amendments, modifications or supplements acceptable to the Required Lenders (and the Agents to the extent their consent to any such modification would be required pursuant to Section 9.01) in their sole discretion, which order is in effect and not stayed.

"Interim Period Outside Date" shall have the meaning set forth in the DIP Orders.

"Interim Roll-Up Effective Time" shall mean the moment in time that the Initial Credit Extension is made.

"International Trade Laws" shall mean (a) Sanctions; (b) export control and/or import laws and regulations of the United States and other jurisdictions applicable to the Borrower or any of its Affiliates, including the Arms Export Control Act (22 U.S.C. 2778), the International Traffic in Arms Regulations (ITAR) (22 CFR 120-130), the Export Administration Regulations (EAR) (15 CFR 730-774), and the laws and regulations administered by Customs and Border Protection (19 CFR Parts 1-199); and (c) Anti-Corruption Laws.

"Investment" shall mean, as to any Person, any direct or indirect acquisition or investment by such Person, whether by means of (a) the purchase or other acquisition of Equity Interests or debt or other securities of another Person, (b) a loan, advance or capital contribution to, guarantee or assumption of Indebtedness of, or purchase or other acquisition of any other debt or equity participation or interest in, another Person, including any partnership or joint venture interest in such other Person, or (c) the purchase or other acquisition (in one transaction or a series of transactions) of all or substantially all of the property and assets or business of another Person or assets constituting a business unit, line of business or division of such Person. For purposes of covenant compliance, the amount of any Investment shall be the amount actually invested, without adjustment for subsequent increases or decreases in the value of such Investment.

"IRS" shall mean the United States Internal Revenue Service.

"Junior Indebtedness" shall mean, collectively, any Indebtedness of any Group Member that is (x) secured by a Lien that is junior in priority to the Lien securing the Obligations, (y) by its terms subordinated

17

in right of payment to all or any portion of the Obligations pursuant to subordination terms reasonably satisfactory to the Required Lenders or (z) unsecured.

"Lenders" shall have the meaning set forth in the preamble hereto.

"Lien" shall mean, with respect to any property, (a) any mortgage, deed of trust, lien (statutory or other), judgment lien, pledge, encumbrance, claim, charge, assignment, hypothecation, deposit arrangement, security interest or encumbrance of any kind or any arrangement to provide priority or preference in the nature of a security interest or any filing of any financing statement under the UCC or any other similar notice of Lien under any similar notice or recording statute of any Governmental Authority, including any easement, servitude, right-of-way or other encumbrance on title to real property, in each of the foregoing cases whether voluntary or imposed or arising by operation of law, and any agreement to give any of the foregoing, (b) the interest of a vendor or a lessor under any conditional sale agreement, capital lease or title retention agreement (or any financing lease having substantially the same economic effect as any of the foregoing) and (c) in the case of securities, any purchase option, call or similar right of a third party with respect to such securities.

"Loan" shall mean any extension of credit by a Lender to the Borrower under this Agreement in the form of a DIP Loan.

"Loan Documents" shall mean, collectively, (i) this Agreement, (ii) the Notes, (iii) the Security Documents, (iv) the Fee Letter, (v) the DIP Orders and (vi) all other documents, certificates, instruments or agreements executed and delivered by or on behalf of a Loan Party for the benefit of any Agent or Lender in connection herewith on or after the Closing Date.

"Loan Parties" shall mean, collectively, the Borrower and each Guarantor.

"Margin Stock" shall have the meaning assigned to such term in Regulation U of the Board of Governors of the United States Federal Reserve System, or any successor thereto.

"Master Agreement" shall have the meaning set forth in the definition of "Swap Contract".

"Material Adverse Effect" shall mean a material adverse effect on and/or material adverse developments with respect to (a) the business, results of operations, assets or financial condition of the Group Members, in each case, taken as a whole; (b) the ability of any Loan Party to fully and timely perform its Obligations; (c) the legality, validity, binding effect or enforceability against the Loan Parties of the Loan Documents (taken as a whole); or (d) the rights and remedies the Agents and the Lenders (taken as a whole) under the Loan Documents.

"Material Agreement" shall mean any agreement, contract or instrument to which any Loan Party is a party or by which any Loan Party or any of its properties is bound (i) pursuant to which any Loan Party is required to make payments or other consideration, or will receive payments or other consideration, in excess of $250,000 in any 12-month period, (ii) governing, creating, evidencing or relating to Material Indebtedness of any Loan Party or (iii) the termination or suspension of which, or the failure of any party thereto to perform its obligations thereunder, could reasonably be expected to have a Material Adverse Effect.

"Material Indebtedness" shall mean Indebtedness (other than the Obligations) of any Group Member in an individual principal amount of $500,000 or more and any Prepetition Indebtedness.

"Materials of Environmental Concern" shall mean any material, substance or waste that is listed, regulated, or otherwise defined as hazardous, toxic, radioactive, a pollutant or a contaminant (or words of similar regulatory intent or meaning) under applicable Environmental Law, or which could give rise to liability under any Environmental Law, including but not limited to petroleum (including crude oil or any fraction thereof), petroleum by-products, toxic mold, polychlorinated biphenyls, urea-formaldehyde insulation, asbestos or asbestos-containing material, flammable or explosive substances, or pesticides.

"Maturity Date" shall mean the earlier to occur of: (a) June 16, 2025; (b) the effective date of a plan of reorganization in the Chapter 11 Cases and (c) the date of the consummation of the sale of all or substantially all of the assets or Equity Interests of the Loan Parties pursuant to Section 363 of the Bankruptcy Code.

"Moody's" shall mean Moody's Investor Service, Inc. and any successor thereto.

"Multiemployer Plan" shall mean a Plan that is a "multiemployer plan" as defined in Section 3(37) or Section 4001(a)(3) of ERISA.

"Net Cash Proceeds" shall mean with respect to any event, (a) the cash proceeds received in respect of such event including (i) any cash received in respect of any non-cash proceeds (including any cash payments received by way of deferred payment of principal pursuant to a note or installment receivable or purchase price adjustment receivable or otherwise, but excluding any interest payments), but only as and when received, (ii) in the case of a casualty, insurance proceeds and (iii) in the case of a condemnation or similar event, condemnation awards and similar payments, net of (b) the sum of (i) all reasonable fees, commissions and out-of-pocket expenses paid in connection with such event and determined acceptable by the Required Lenders, (ii) in the case of a sale, transfer or other disposition of an asset (including pursuant to a sale and leaseback transaction or a casualty or a condemnation or similar proceeding), (x) any amounts necessary to cause the Winddown Reserve to have an aggregate balance in an amount equal to the Winddown Reserve Amount, (y) any amounts necessary to satisfy any stalking horse bid protections provided to any stalking horse bidders for the applicable property or assets as approved by the Bankruptcy Court in these Chapter 11 Cases and DIP Lender and (z) the amount of all payments required to be made as a result of such event to repay Indebtedness secured by a Lien on such asset that is senior to the Lien of the Collateral Agent on such asset unless (A) there are no obligations outstanding under the documents governing such Indebtedness that are then due and payable and all such Indebtedness then due and payable shall have been paid in full in cash or (B) the lender or lenders holding such Indebtedness have waived the corresponding prepayment under and in accordance with the documents governing such Indebtedness and (iii) the amount of all taxes paid (or reasonably estimated to be payable) and the amount of any reserves established to fund contingent liabilities reasonably estimated to be payable, in each case during the year that such event occurred or the next succeeding year and that are directly attributable to such event (as determined reasonably and in good faith by a Responsible Officer).

"Non-Consenting Lender" shall mean any Lender that does not approve any consent, waiver or amendment that (i) requires the approval of each Lender or each affected Lender, in each case, in accordance with the terms of Section 9.01 and (ii) has been approved by the Required Lenders.

"Non-Defaulting Lender" shall mean, at any time, each Lender that is not a Defaulting Lender at such time.

"Non-Public Information" shall mean information which has not been disseminated in a manner making it available to investors generally, within the meaning of Regulation FD promulgated by the SEC under the Securities Act and the Exchange Act.

"<u>Note</u>" shall mean any promissory note evidencing any Loan of the applicable Lender, substantially in the form of <u>Exhibit D</u>.

"<u>Obligations</u>" shall mean the unpaid principal of and interest on (including, without limitation, interest accruing after the maturity of the Loans and interest accruing after the filing of any petition in bankruptcy, or the commencement of any proceeding under any Debtor Relief Law (including the Chapter 11 Cases), relating to any Group Member, whether or not a claim for post-filing or post-petition interest is allowed in such proceeding) the Loans and all other obligations and liabilities owed by any Group Member to any Agent or any Lender, whether direct or indirect, absolute or contingent, due or to become due, or now existing or hereafter incurred, which may arise under, out of, or in connection with, this Agreement, any other Loan Document or any other document made, delivered or given in connection herewith or therewith, whether on account of principal, interest, reimbursement obligations, fees, indemnities, costs, expenses (including, without limitation, all fees, charges and disbursements of counsel to the Agents or any Lender that are required to be paid by the Borrower pursuant hereto) or otherwise.

"<u>OFAC</u>" shall mean the Office of Foreign Assets Control of the U.S. Department of the Treasury.

"<u>Organizational Documents</u>" shall mean, collectively, with respect to any Person, (i) in the case of any corporation, the certificate of incorporation or articles of incorporation and by-laws (or similar constitutive documents) of such Person, (ii) in the case of any limited liability company, the certificate or articles of formation or organization and operating agreement or memorandum and articles of association (or similar constitutive documents) of such Person, (iii) in the case of any limited partnership, the certificate of formation and limited partnership agreement (or similar constitutive documents) of such Person (and, where applicable, the equity holders or shareholders registry of such Person), (iv) in the case of any general partnership, the partnership agreement (or similar constitutive document) of such Person, (v) in any other case, the functional equivalent of the foregoing, and (vi) any shareholder, voting trust or similar agreement between or among any holders of Equity Interests of such Person.

"<u>Other Connection Taxes</u>" shall mean, with respect to any Recipient, Taxes imposed as a result of a present or former connection between such Recipient and the jurisdiction imposing such Tax (other than connections arising from such Recipient having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced any Loan Document, or sold or assigned an interest in any Loan or Loan Document).

"<u>Other Taxes</u>" shall mean all present or future stamp, court or documentary, intangible, recording, filing or similar Taxes that arise from any payment made under, from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, any Loan Document, except any such Taxes that are Other Connection Taxes imposed with respect to an assignment (other than an assignment made pursuant to <u>Section 2.21</u>).

"<u>Participant</u>" shall have the meaning set forth in <u>Section 9.06(d)</u>.

"<u>Participant Register</u>" shall have the meaning set forth in <u>Section 9.06(d)</u>.

"<u>PATRIOT Act</u>" shall mean the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)), as the same has been, or shall hereafter be, renewed, extended, amended or replaced.

"<u>Payment in Full</u>" shall mean (a) the termination of all DIP Loan Commitments and (b) the payment in full in cash of all Loans and other amounts owing to any Lender or any Agent in respect of the Obligations (other than contingent or indemnification obligations not then due).

"<u>Payment Office</u>" shall mean the office or account specified from time to time by the Disbursing Agent as its payment office by notice to the Borrower and the Lenders.

"<u>PBGC</u>" shall mean the Pension Benefit Guaranty Corporation established pursuant to Subtitle A of Title IV of ERISA (or any successor).

"<u>Perfection Certificate</u>" shall mean a certificate in form satisfactory to the Required Lenders that provides information with respect to the assets of each Loan Party.

"<u>Periodic Term SOFR Determination Day</u>" has the meaning specified in the definition of "Term SOFR".

"<u>Permits</u>" shall mean any and all franchises, licenses, leases, permits, approvals, notifications, certifications, registrations, authorizations, exemptions, qualifications, easements, rights of way, clearances, plans, directives, markings, consent orders or consent decrees of or from any Governmental Authority or third party.

"<u>Permitted Equity Liens</u>" shall mean Liens permitted under <u>Section 6.02(a)</u>, <u>Section 6.02(c)</u>, <u>Section 6.02(j)</u>, <u>Section 6.02(t)</u>, and <u>Section 6.02(u)</u>.

"<u>Permitted Expenses</u>" shall mean reasonable legal, accounting, collateral examination, monitoring and appraisal fees, financial advisory fees, fees and expenses of other consultants, and other reasonable out-of-pocket expenses of the Agents and any Lender in connection with the Chapter 11 Cases, this Agreement, the Loan Documents, and all documents related thereto, and all costs and expenses of the Agents and any Lender (including reasonable, documented attorney expenses in accordance herewith) in connection with the enforcement of remedies under the Loan Documents to be reimbursed on a current basis by the Loan Parties from the proceeds of Loans hereunder. For the avoidance of doubt, all fees and expenses in the immediately preceding sentence shall be reimbursed without regard to the amounts set forth in the Approved Budget with respect thereto.

"<u>Permitted Investors</u>" shall mean the members of Holdings on the Closing Date.

"<u>Permitted Liens</u>" shall mean the collective reference to Liens permitted by <u>Section 6.02</u>.

"<u>Person</u>" shall mean any natural Person, corporation, limited liability company, trust, joint venture, association, company, partnership, Governmental Authority or other entity.

"<u>Petition Date</u>" shall have the meaning set forth in the recitals hereto.

"<u>Plan</u>" shall mean any "employee benefit plan" as defined in Section 3(3) of ERISA which is sponsored, maintained or contributed to by, or required to be contributed to by, Holdings, the Borrower or any of their respective ERISA Affiliates or with respect to which Holdings, the Borrower or any of their respective ERISA Affiliates has or could reasonably be expected to have liability, contingent or otherwise, under ERISA.

"<u>Platform</u>" shall mean Debt Domain, IntraLinks/IntraAgency, SyndTrak, DebtX or a substantially similar electronic transmission system.

"Post-Petition" shall mean the time period beginning immediately upon the filing of the Chapter 11 Cases and ending upon the closing of the Chapter 11 Cases.

"Prepetition Agent" shall have the meaning set forth in the recitals hereto.

"Prepetition Credit Agreement" shall have the meaning set forth in the recitals hereto.

"Prepetition Indebtedness" shall mean any and all Indebtedness of the Loan Parties incurred prior to, and outstanding as of, the Petition Date.

"Prepetition Payments" shall mean any payment (by way of adequate protection or otherwise) of principal or interest or otherwise on account of any Prepetition Indebtedness or other obligations or claims (including trade payables and payments in respect of reclamation and/or Section 503(b)(9) claims) of the Loan Parties.

"Prepetition Prior Liens" shall have the meaning set forth in the DIP Orders.

"Prepetition Lenders" shall mean the "Lenders" as defined in the Prepetition Credit Agreement.

"Prepetition Loan Documents" shall mean the "Loan Documents" under and as defined in the Prepetition Credit Agreement.

"Prepetition Obligations" shall mean, collectively, all "Obligations" outstanding under and as defined in the Prepetition Credit Agreement.

"Prepetition Secured Parties" shall mean the "Secured Parties" under and as defined in the Prepetition Loan Documents.

"Prime Rate" shall mean the rate of interest last quoted by *The Wall Street Journal* as the "Prime Rate" in the United States or, if *The Wall Street Journal* ceases to quote such rate, the highest per annum interest rate published by the Board of Governors in Federal Reserve Statistical Release H.15 (519) (Selected Interest Rates) as the "bank prime loan" rate or, if such rate is no longer quoted therein, any similar rate quoted therein (as determined by the Disbursing Agent) or any similar release by the Board of Governors (as determined by the Disbursing Agent). The Disbursing Agent or any Lender may make commercial loans or other loans at rates of interest at, above or below the Prime Rate.

"Property" shall mean any right or interest in or to property of any kind whatsoever, whether real, personal or mixed and whether tangible or intangible, including, without limitation, Equity Interests.

"Public Lender" shall mean any Lender that does not wish to receive Non-Public Information with respect to Holdings, the Borrower or its Subsidiaries or their respective securities.

"Purchase Money Obligation" shall mean, for any Person, the obligations of such Person in respect of Indebtedness (including Capital Lease Obligations) incurred for the purpose of financing all or any part of the purchase price of any fixed or capital assets or the cost of installation, construction or improvement of any fixed or capital assets; *provided*, *however*, that (i) such Indebtedness is incurred within 30 days after such acquisition, installation, construction or improvement of such fixed or capital assets by such Person and (ii) the amount of such Indebtedness does not exceed the lesser of 100% of the fair market value of such fixed or capital asset or the cost of the acquisition, installation, construction or improvement thereof, as the case may be.

"Qualified Equity Interests" shall mean Equity Interests that are not Disqualified Equity Interests.

"Qualified Purchaser" shall mean a Person (i) designated by the Required Lenders as a "Qualified Purchaser" in connection with any Credit Bid Transaction, (ii) whose Equity Interests are owned pro rata by the Lenders (based upon the obligations owing to such Lenders and utilized to consummate such Credit Bid Transaction and the obligations owing to all Lenders and utilized to consummate such Credit Bid Transaction) and (iii) whose actions are controlled by the Required Lenders.

"Real Property" shall mean all real property held or used by any Group Member, which relevant Group Member owns in fee or in which it holds a leasehold interest as a tenant, including as of the Closing Date.

"Recipient" shall mean (a) each Agent and (b) any Lender, as applicable.

"Recovery Event" shall mean the receipt by any Group Member of any cash payments or proceeds under any casualty insurance policy in respect of a covered loss thereunder or as a result of the taking of any assets of any Group Member by any Person pursuant to the power of eminent domain, condemnation or otherwise, or pursuant to a sale of any such assets to a purchaser with such power under threat of such a taking.

"Register" shall have the meaning set forth in Section 9.06(c).

"Regulation D" shall mean Regulation D of the Board of Governors as in effect from time to time.

"Regulation H" shall mean Regulation H of the Board of Governors as in effect from time to time.

"Regulation T" shall mean Regulation T of the Board of Governors as in effect from time to time.

"Regulation U" shall mean Regulation U of the Board of Governors as in effect from time to time.

"Regulation X" shall mean Regulation X of the Board of Governors as in effect from time to time.

"Related Parties" shall mean, with respect to any Person, such Person's Affiliates (including its Subsidiaries) and the shareholders, partners, directors, officers, employees, agents, trustees, administrators, managers, advisors and representatives of such Person and of such Person's Affiliates (including its Subsidiaries).

"Release" shall mean, with respect to Materials of Environmental Concern, any release, spill, emission, leaking, pumping, pouring, injection, escaping, deposit, disposal, discharge, dispersal, dumping, leaching or migration into or through the indoor or outdoor environment (including the abandonment or disposal of any barrels, containers or other closed receptacles containing any Materials of Environmental Concern).

"Relevant Governmental Body" shall mean the Board of Governors or the Federal Reserve Bank of New York, or a committee officially endorsed or convened by the Board of Governors or the Federal Reserve Bank of New York, or any successor thereto.

"Remedies Notice Period" has the meaning assigned to such term in Section 7.02.

"Required Lenders" shall mean, at any time, Lenders having Total Credit Exposures representing more than 50% of the Total Credit Exposures of all Lenders. The Total Credit Exposure of any Defaulting Lender shall be disregarded in determining Required Lenders at any time.

"Requirement of Law" shall mean, as to any Person, such Person's Organizational Documents, and any law, treaty, rule or regulation or determination of an arbitrator or a court or other Governmental Authority, in each case applicable to or binding upon such Person or any of its Property or to which such Person or any of its Property is subject.

"Resolution Authority" shall mean an EEA Resolution Authority or, with respect to any UK Financial Institution, a UK Resolution Authority.

"Responsible Officer" shall mean, as to any Person, the chief executive officer, chief restructuring officer, president or chief financial officer of such Person, but in any event, with respect to financial matters, the chief financial officer of such Person. Unless otherwise qualified, all references to a "Responsible Officer" shall refer to a Responsible Officer of the Borrower.

"Restricted Payment" shall mean any dividend or other distribution (whether in cash, securities or other property) with respect to any capital stock or other Equity Interest of any Person, or any payment (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, defeasance, acquisition, cancellation or termination of any such capital stock or other Equity Interest, or on account of any return of capital to any Person's stockholders, partners or members (or the equivalent of any thereof), or any option, warrant or other right to acquire any such dividend or other distribution or payment.

"Roll-Up Loans" has the meaning assigned to such term in Section 2.29.

"S&P" shall mean S&P Global Ratings and any successor thereto.

"Sale and Leaseback" shall have the meaning set forth in Section 6.09.

"Sale Procedures Motion" shall have the meaning set forth in Section 5.19.

"Sale Procedures Order" shall have the meaning set forth in Section 5.19.

"Sanctioned Country" shall mean, at any time, a country or territory that is subject to comprehensive Sanctions (as of the Closing Date, Cuba, Iran, North Korea, Syria, and the Crimea, Donetsk and Luhansk regions of Ukraine).

"Sanctioned Person" shall mean, at any time, (a) any Person listed in any Sanctions-related list of designated Persons maintained by OFAC, the U.S. Department of State, or the U.S. Department of Commerce (including the Specially Designated Nationals and Blocked Persons List, the Sectoral Sanctions Identifications List, the Foreign Sanctions Evaders List, the Entity List, the Denied Persons List, or the Unverified List), or by the United Nations Security Council, the European Union or any EU member state; (b) any Person domiciled, organized or resident in a Sanctioned Country; (c) any Person owned or controlled by, or acting on behalf of, any such Person; or (d) any Person that is otherwise targeted by Sanctions.

"Sanctions" shall mean economic or financial sanctions or trade embargoes imposed, administered or enforced from time to time by (a) the U.S. government, including those administered by OFAC pursuant to various statutes, the Foreign Assets Control Regulations (31 CFR Parts 500-598) and all executive orders

promulgated thereunder or the U.S. Department of State, or (b) the United Nations Security Council, the European Union or Her Majesty's Treasury of the United Kingdom.

"SEC" shall mean the Securities and Exchange Commission or any Governmental Authority succeeding to any of its principal functions.

"Secured Parties" shall mean the Agents, each Lender, each other Indemnitee and each other holder of any Obligation of a Loan Party.

"Securities Act" shall mean the Securities Act of 1933, as amended from time to time, and any successor statute.

"Security Documents" shall mean the collective reference to any security documents delivered to any Agent for the purpose of granting or perfecting a Lien on any Property of any Loan Party to secure the Obligations.

"Single Employer Plan" shall mean any Plan that is covered by Title IV of ERISA, but which is not a Multiemployer Plan.

"SOFR" shall mean a rate equal to the secured overnight financing rate as administered by the SOFR Administrator.

"SOFR Administrator" shall mean the Federal Reserve Bank of New York (or a successor administrator of the secured overnight financing rate).

"SOFR Borrowing" shall mean, as to any Borrowing, the SOFR Loans comprising such Borrowing.

"SOFR Loan" shall mean a Loan that bears interest at a rate based on Term SOFR, other than pursuant to clause (c) of the definition of "Base Rate".

"Specified Net Cash Proceeds" shall mean, with respect to any Asset Sale, an amount as elected by the Required Lenders in writing to the Borrower and the Disbursing Agent that is equal to either (a) the Net Cash Proceeds from such Asset Sale or (b) an amount of such Net Cash Proceeds from such Asset Sale that results in not less than $2,000,000 aggregate principal amount of DIP Loans remaining outstanding after giving effect to Sections 2.10(a) and 2.10(b) in connection with such Asset Sale.

"Subsidiary" shall mean, as to any Person, a corporation, partnership, limited liability company or other entity of which shares of stock or other ownership interests having ordinary voting power (other than stock or such other ownership interests having such power only by reason of the happening of a contingency) to elect a majority of the board of directors or other managers of such corporation, partnership or other entity are at the time owned, or the management of which is otherwise controlled, directly or indirectly through one or more intermediaries, or both, by such Person. Unless otherwise qualified, all references to a "Subsidiary" or to "Subsidiaries" in this Agreement shall refer to a Subsidiary or Subsidiaries of the Borrower.

"Subsidiary Guarantor" shall mean each existing and subsequently acquired or organized direct or indirect Subsidiary of the Borrower which has guaranteed the Obligations.

"Supplemental Approved Budget" shall mean, in respect of the Initial Approved Budget, supplemental or replacement cash flow forecasts delivered in accordance with Section 5.01 and approved

in writing by the Required Lenders as provided in the DIP Orders (covering any time period covered by a prior budget or covering additional time periods).

"Swap Contract" shall mean (a) any and all rate swap transactions, basis swaps, credit derivative transactions, forward rate transactions, commodity swaps, commodity options, forward commodity contracts, equity or equity index swaps or options, bond or bond price or bond index swaps or options or forward bond or forward bond price or forward bond index transactions, interest rate options, forward foreign exchange transactions, cap transactions, floor transactions, collar transactions, currency swap transactions, cross-currency rate swap transactions, currency options, spot contracts, or any other similar transactions or any combination of any of the foregoing (including any options to enter into any of the foregoing), whether or not any such transaction is governed by or subject to any master agreement, and (b) any and all transactions of any kind, and the related confirmations, which are subject to the terms and conditions of, or governed by, any form of master agreement published by the International Swaps and Derivatives Association, Inc., any International Foreign Exchange Master Agreement, or any other master agreement (any such master agreement, together with any related schedules, a "Master Agreement"), including any such obligations or liabilities under any Master Agreement, in each case for the purpose of hedging the foreign currency, interest rate or commodity risk associated with the operations of the Group Members.

"Swap Termination Value" shall mean, in respect of any one or more Swap Contracts, after taking into account the effect of any legally enforceable netting agreement relating to such Swap Contracts, (a) for any date on or after the date such Swap Contracts have been closed out and termination value(s) have been determined in accordance therewith, such termination value(s), and (b) for any date prior to the date referenced in clause (a), the amount(s) determined as the mark-to-market value(s) for such Swap Contracts, as determined based upon one or more mid-market or other readily available quotations provided by any recognized dealer in such Swap Contracts (which may include a Lender or any Affiliate of a Lender).

"Synthetic Lease" shall mean, as to any Person, (a) any lease (including leases that may be terminated by the lessee at any time) of any property (whether real, personal or mixed) (i) that is accounted for as an operating lease under GAAP and (ii) in respect of which the lessee retains or obtains ownership of the property so leased for U.S. federal income tax purposes or (b) (i) a synthetic, off-balance sheet or tax retention lease or (ii) an agreement for the use or possession of property (including a Sale and Leaseback), in each case under this clause (b), creating obligations that do not appear on the balance sheet of such person but which, upon the application of any Debtor Relief Laws to such Person, would be characterized as the indebtedness of such Person (without regard to accounting treatment).

"Taxes" shall mean all present or future taxes, levies, imposts, duties, deductions, withholdings (including backup withholding), assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"Termination Declaration Date" has the meaning assigned to such term in Section 7.02.

"Termination Event" shall have the meaning set forth in the DIP Orders.

"Term SOFR" shall mean,

(a)    for any calculation with respect to a SOFR Loan, the Term SOFR Reference Rate for a tenor comparable to the applicable Interest Period on the day (such day, the "Periodic Term SOFR Determination Day") that is two (2) U.S. Government Securities Business Days prior to the first day of such Interest Period, as such rate is published by the Term SOFR Administrator; provided, however, that if as of 5:00 p.m. (New York City time) on any Periodic Term SOFR Determination Day the Term SOFR

Reference Rate for the applicable tenor has not been published by the Term SOFR Administrator and a Benchmark Replacement Date with respect to the Term SOFR Reference Rate has not occurred, then Term SOFR will be the Term SOFR Reference Rate for such tenor as published by the Term SOFR Administrator on the first preceding U.S. Government Securities Business Day for which such Term SOFR Reference Rate for such tenor was published by the Term SOFR Administrator so long as such first preceding U.S. Government Securities Business Day is not more than three (3) U.S. Government Securities Business Days prior to such Periodic Term SOFR Determination Day, and

        (b)      for any calculation with respect to a Base Rate Loan on any day, the Term SOFR Reference Rate for a tenor of one month on the day (such day, the "<u>Base Rate Term SOFR Determination Day</u>") that is two (2) U.S. Government Securities Business Days prior to such day, as such rate is published by the Term SOFR Administrator; *provided*, *however*, that if as of 5:00 p.m. (New York City time) on any Base Rate Term SOFR Determination Day the Term SOFR Reference Rate for the applicable tenor has not been published by the Term SOFR Administrator and a Benchmark Replacement Date with respect to the Term SOFR Reference Rate has not occurred, then Term SOFR will be the Term SOFR Reference Rate for such tenor as published by the Term SOFR Administrator on the first preceding U.S. Government Securities Business Day for which such Term SOFR Reference Rate for such tenor was published by the Term SOFR Administrator so long as such first preceding U.S. Government Securities Business Day is not more than three (3) U.S. Government Securities Business Days prior to such Base Rate Term SOFR Determination Day;

*provided* that if Term SOFR as so determined shall ever be less than the Floor, then Term SOFR shall be deemed to be the Floor.

"<u>Term SOFR Administrator</u>" shall mean CME Group Benchmark Administration Limited (CBA) (or a successor administrator of the Term SOFR Reference Rate selected by the Required Lenders (in consultation with the Disbursing Agent) in their reasonable discretion).

"<u>Term SOFR Reference Rate</u>" shall mean the forward-looking term rate based on SOFR.

"<u>Total Credit Exposure</u>" shall mean, as to any Lender at any time, the unused DIP Loan Commitments and outstanding DIP Loans of such Lender at such time.

"<u>Transaction Costs</u>" shall mean fees, premiums, expenses and other transaction costs (including original issue discount or upfront fees) payable or otherwise borne by Holdings, the Borrower and its Subsidiaries in connection with the Transactions and the transactions contemplated thereby.

"<u>Transactions</u>" shall mean the execution, delivery and performance by the Borrower of this Agreement, the borrowing of Loans hereunder, the Chapter 11 Cases, the guaranteeing of the Guaranteed Obligations and the granting of the security interests and the provision of the Collateral pursuant to the terms of this Agreement and the other Loan Documents and the DIP Orders and the payment of fees and expenses in connection with the foregoing.

"<u>Type</u>", when used in reference to any Loan or Borrowing, refers to whether the rate of interest on such Loan, or on the Loans comprising such Borrowing, is determined by reference to Term SOFR or the Base Rate.

"<u>UK Financial Institution</u>" shall mean any BRRD Undertaking (as such term is defined under the PRA Rulebook (as amended from time to time) promulgated by the United Kingdom Prudential Regulation Authority) or any person falling within IFPRU 11.6 of the FCA Handbook (as amended from time to time)

promulgated by the United Kingdom Financial Conduct Authority, which includes certain credit institutions and investment firms, and certain affiliates of such credit institutions or investment firms.

"<u>UK Resolution Authority</u>" shall mean the Bank of England or any other public administrative authority having responsibility for the resolution of any UK Financial Institution.

"<u>Unadjusted Benchmark Replacement</u>" shall mean the applicable Benchmark Replacement excluding the related Benchmark Replacement Adjustment.

"<u>Uniform Commercial Code</u>" or "<u>UCC</u>" shall mean the Uniform Commercial Code, as in effect from time to time in any applicable jurisdiction.

"<u>Unrestricted Cash</u>" shall mean, as of any date of determination, the aggregate amount of all cash and Cash Equivalents on the consolidated balance sheet of the Loan Parties that are not "restricted" for purposes of GAAP and in which the Collateral Agent has a perfected first-priority security interest (subject only to Permitted Liens); *provided*, *however*, that the aggregate amount of Unrestricted Cash shall not (i) include any cash or Cash Equivalents that are subject to a Lien (other than any Permitted Lien) or (ii) include any cash or Cash Equivalents that are restricted by contract, law or material adverse tax consequences from being applied to repay any Funded Debt.

"<u>U.S. Government Securities Business Day</u>" shall mean any day except for (a) a Saturday, (b) a Sunday or (c) a day on which the Securities Industry and Financial Markets Association recommends that the fixed income departments of its members be closed for the entire day for purposes of trading in United States government securities.

"<u>U.S. Person</u>" shall mean any Person that is a "United States person" as defined in Section 7701(a)(30) of the Code.

"<u>U.S. Tax Compliance Certificate</u>" shall have the meaning set forth in <u>Section 2.17(g)</u>.

"<u>Variance Report</u>" shall have the meaning set forth in <u>Section 5.01(g)</u>.

"<u>Winddown Reserve</u>" shall mean cash held in a deposit account owned by the Loan Parties which shall (a) be utilized by the Loan Parties solely to fund fees and expenses (including, without limitation, fees and expenses of the Loan Parties' professionals) in connection with the winding down of the Loan Parties' operations and (b) be subject to the Collateral Agent's Lien in accordance with this Agreement; *provided* that (i) the aggregate amount of the Winddown Reserve shall, in any event and as of any date of determination, not exceed the Winddown Reserve Amount and (ii) to the extent that the Winddown Reserve actually contains funds in excess of the Winddown Reserve Amount, as of any date of determination, such excess shall be paid to the Disbursing Agent for application to DIP Loans and Prepetition Obligations in accordance with and subject to this Agreement and the DIP Orders.

"<u>Winddown Reserve Amount</u>" means (a) an amount sufficient to satisfy estate obligations contemplated to be paid under the Approved Budget <u>minus</u> (b) any amounts in the Case Professionals Reserve Account (as defined in the applicable DIP Order).

"<u>Withdrawal Liability</u>" shall mean any liability to a Multiemployer Plan as a result of a "complete withdrawal" or "partial withdrawal" from such Multiemployer Plan, as such terms are defined in Section 4201(b) of ERISA.

"<u>Withholding Agent</u>" shall mean any Loan Party and the Disbursing Agent.

"Write-Down and Conversion Powers" shall mean, (a) with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule, and (b) with respect to the United Kingdom, any powers of the applicable Resolution Authority under the Bail-In Legislation to cancel, reduce, modify or change the form of a liability of any UK Financial Institution or any contract or instrument under which that liability arises, to convert all or part of that liability into shares, securities or obligations of that person or any other person, to provide that any such contract or instrument is to have effect as if a right had been exercised under it or to suspend any obligation in respect of that liability or any of the powers under that Bail-In Legislation that are related to or ancillary to any of those powers.

Section 1.02    Other Interpretive Provisions. With reference to this Agreement and each other Loan Document, unless otherwise specified herein or in such other Loan Document:

(a)    The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. The words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation". The word "will" shall be construed to have the same meaning and effect as the word "shall". Unless the context requires otherwise, (i) any definition of or reference to any agreement, instrument or other document (including any Organizational Document) shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth herein or in any other Loan Document), (ii) any reference herein to any Person shall be construed to include such Person's permitted successors and assigns, (iii) the words "hereto", "herein", "hereof" and "hereunder" and words of similar import when used in any Loan Document, shall be construed to refer to such Loan Document in its entirety and not to any particular provision thereof, (iv) all references in a Loan Document to Articles, Sections, recitals, Annexes, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and recitals, Annexes, Exhibits and Schedules to, the Loan Document in which such references appear, (v) any reference to any law shall include all statutory and regulatory provisions consolidating, amending, replacing or interpreting such law and any reference to any law or regulation shall, unless otherwise specified, refer to such law or regulation as amended, modified or supplemented from time to time and (vi) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights.

(b)    In the computation of periods of time from a specified date to a later specified date, the word "from" shall mean "from and excluding", the words "to" and "until" each mean "to but excluding" and the word "through" shall mean "to and including".

(c)    Section headings herein and in the other Loan Documents are included for convenience of reference only and shall not affect the interpretation of this Agreement or any other Loan Document.

Section 1.03    Accounting Terms.

(a)    Generally. All accounting terms not specifically defined herein shall be construed in conformity with, and all financial data (including financial ratios and other financial calculations) required to be submitted pursuant to this Agreement shall be prepared in conformity with, GAAP applied on a consistent basis, as in effect from time to time. Notwithstanding the foregoing, for purposes of determining compliance with any covenant (including the computation of any financial covenant) contained herein, (i) Indebtedness of the Borrower and its Subsidiaries shall be deemed to be carried at 100% of the

29

outstanding principal amount thereof, and the effects of FASB ASC 825 and FASB ASC 470-20 on financial liabilities shall be disregarded and (ii) any lease that is recharacterized as a Capital Lease and any obligations that are recharacterized as a Capital Lease Obligation, in each case as determined in accordance with GAAP either prior to giving effect to (x) FASB ASC 842 or (y) any other changes in GAAP subsequent to the Closing Date, shall not be treated as a Capital Lease or Capital Lease Obligation, as the case may be, but shall instead be treated as it would have been in accordance with GAAP prior to giving effect to FASB ASC 842 or GAAP as in effect on the Closing Date, respectively. The explicit qualification of terms or computations by the phrase "in accordance with GAAP" shall in no way be construed to limit the foregoing.

(b)     _Accounting Change_. If at any time any Accounting Change shall occur and such change results in a change in the method of calculation of any financial covenant, standard or term in this Agreement, then upon the written request of the Borrower or the Required Lenders, the Borrower and the Lenders shall negotiate in good faith in order to amend such provisions so as to equitably reflect such Accounting Change with the desired result that the criteria for evaluating Holdings' and the Borrower's financial condition shall be the same after such Accounting Change as if such Accounting Change had not occurred; _provided_ that, until such time as an amendment shall have been executed and delivered by Holdings, the Borrower and the Required Lenders, (A) all such financial covenants, standards and terms in this Agreement shall continue to be calculated or construed as if such Accounting Change had not occurred and (B) the Borrower shall provide to the Disbursing Agent and the Lenders financial statements and other documents required under this Agreement or as reasonably requested hereunder setting forth a reconciliation between calculations of such financial covenants, standards and terms made before and after giving effect to such Accounting Change.

(c)     _Consolidation of Variable Interest Entities_. All references herein to consolidated financial statements of Holdings and its Subsidiaries or to the determination of any amount for Holdings and its Subsidiaries on a consolidated basis or any similar reference shall, in each case, be deemed to include each variable interest entity that Holdings is required to consolidate pursuant to FASB ASC 810 as if such variable interest entity were a Subsidiary as defined herein.

Section 1.04     _Rounding_. Any financial ratios determined pursuant to this Agreement shall be calculated by dividing the appropriate component by the other component, carrying the result to one place more than the number of places by which such ratio is expressed herein and rounding the result up or down to the nearest number (with a rounding-up if there is no nearest number).

Section 1.05     _Times of Day_. Unless otherwise specified, all references herein to times of day shall be references to Eastern time (daylight or standard, as applicable).

Section 1.06     _Pro Forma Calculations_. For purposes of calculating any "net" ratio test utilized in any debt incurrence test, such ratio shall be calculated after giving effect to any such incurrence on a pro forma basis, and, in each case, with respect to any multi-draw or revolving commitment, assuming a borrowing of the maximum amount of loans available thereunder, and such calculation shall be made excluding the cash proceeds of any such debt for purposes of the determination of Unrestricted Cash.

Section 1.07     _Rates_. The Disbursing Agent does not warrant, nor accept responsibility for, nor shall the Disbursing Agent have any liability with respect to (a) the continuation of, administration of, submission of, calculation of or any other matter related to the Base Rate, the Term SOFR Reference Rate or Term SOFR, or any component definition thereof or rates referred to in the definition thereof, or any alternative, successor or replacement rate thereto (including any Benchmark Replacement), including whether the composition or characteristics of any such alternative, successor or replacement rate (including any Benchmark Replacement) will be similar to, or produce the same value or economic equivalence of, or have the same volume or liquidity as, the Base Rate, the Term SOFR Reference Rate, Term SOFR or any

other Benchmark prior to its discontinuance or unavailability, or (b) the effect, implementation or composition of any Conforming Changes. The Disbursing Agent and its affiliates or other related entities may engage in transactions that affect the calculation of the Base Rate, the Term SOFR Reference Rate, Term SOFR, any alternative, successor or replacement rate (including any Benchmark Replacement) or any relevant adjustments thereto, in each case, in a manner adverse to the Borrower. The Disbursing Agent may select information sources or services in its reasonable discretion to ascertain the Base Rate, the Term SOFR Reference Rate, Term SOFR or any other Benchmark, in each case pursuant to the terms of this Agreement, and shall have no liability to the Borrower, any Lender or any other person or entity for damages of any kind, including direct or indirect, special, punitive, incidental or consequential damages, costs, losses or expenses (whether in tort, contract or otherwise and whether at law or in equity), for any error or calculation of any such rate (or component thereof) provided by any such information source or service.

Section 1.08    <u>Cashless Rolls</u>. Notwithstanding anything to the contrary contained in this Agreement or in any other Loan Document, any Lender may exchange, continue or roll over all or a portion of its Loans in connection with any refinancing, extension, loan modification or similar transaction permitted by the terms of this Agreement, pursuant to a cashless settlement mechanism approved by the Borrower and such Lender.

Section 1.09    <u>Divisions</u>. For all purposes under the Loan Documents, in connection with any division or plan of division under Delaware law (or any comparable event under a different jurisdiction's laws): (a) if any asset, right, obligation or liability of any Person becomes the asset, right, obligation or liability of a different Person, then it shall be deemed to have been transferred from the original Person to the subsequent Person, and (b) if any new Person comes into existence, such new Person shall be deemed to have been organized on the first date of its existence by the holders of its Equity Interests at such time.

## ARTICLE II
## LOANS

Section 2.01    <u>DIP Loan Commitments</u>. Subject to the terms and conditions set forth herein and in the DIP Orders, each Lender agrees, severally and not jointly, to make DIP Loans to the Borrower from time to time on any Business Day during the applicable DIP Commitment Period in an amount not to exceed the then-outstanding DIP Loan Commitment of such Lender.

The Borrower may make up to four (or such greater number as the Required Lenders may consent to in writing) borrowings under the DIP Loan Commitments. Any amount borrowed under this <u>Section 2.01</u> and subsequently repaid or prepaid may not be reborrowed. Subject to <u>Section 2.09</u> and <u>Section 2.10</u>, all amounts owed hereunder with respect to the DIP Loans shall be paid in full no later than the Maturity Date. The portion of each Lender's DIP Loan Commitment shall terminate immediately and without further action in an amount equal to the funded amount of DIP Loans on the applicable funding date. Unless previously terminated, the DIP Loan Commitments shall permanently terminate on the six-month anniversary of the Closing Date.

Section 2.02    <u>Procedure for DIP Loan Borrowing</u>.

(a)    DIP Loans that are Base Rate Loans shall be made in an aggregate minimum amount of $1,000,000 (or a lesser amount if the aggregate amount of DIP Loan Commitments is less than $1,000,000) and integral multiples of $100,000 in excess of that amount, and DIP Loans that are SOFR Loans shall be in an aggregate minimum amount of $1,000,000 (or a lesser amount if the aggregate amount of DIP Loan Commitments is less than $1,000,000) and integral multiples of $100,000 in excess of that amount. If no election as to the Type of Borrowing is specified in any such notice, then the requested borrowing shall be a Base Rate Borrowing.

(b)     Whenever the Borrower desires that Lenders make DIP Loans, the Borrower shall deliver to the Disbursing Agent a fully executed Borrowing Notice no later than 10:00 a.m. at least three Business Days (or such later time as agreed to by Disbursing Agent in writing) in advance of the proposed Borrowing Date.

(c)     Notice of receipt of each Borrowing Notice in respect of DIP Loans, together with the amount of each Lender's respective percentage of DIP Loan Commitments thereof, if any, together with the applicable interest rate, shall be provided by the Disbursing Agent to each applicable Lender in writing with reasonable promptness, but (*provided* that the Disbursing Agent shall have received such notice by 10:00 a.m.) in any event on the same day as the Disbursing Agent's receipt of such Borrowing Notice.

(d)     Upon satisfaction or waiver of the conditions precedent specified herein, each Lender shall make the amount of its DIP Loan available to the Disbursing Agent not later than 1:00 p.m. (or such later time as agreed to in writing by Disbursing Agent) on the applicable Borrowing Date by wire transfer of same day funds in Dollars, at the principal office designated by the Disbursing Agent. Upon receipt of written confirmation by the Lenders of satisfaction or waiver of the conditions precedent specified herein and receipt of all requested funds from each Lender sufficient to make the DIP Loans, the Disbursing Agent shall make the proceeds of such DIP Loans available to the Borrower on the applicable Borrowing Date by causing an amount of same day funds in Dollars equal to the proceeds of all such DIP Loans received by the Disbursing Agent from the Lenders to be wired to the Funding Account as described in the applicable Borrowing Notice or, in the case of any DIP Loans made on the Closing Date, letter of direction described in Section 4.01(m).

Notwithstanding anything to the contrary contained in this Agreement, each DIP Loan shall be funded to the Funding Account.

Section 2.03     [Reserved].

Section 2.04     [Reserved].

Section 2.05     [Reserved].

Section 2.06     Repayment of Loans; Lenders' Evidence of Debt; Register; Notes.

(a)     Repayment of Loans. The Borrower hereby unconditionally promises to pay to the Disbursing Agent, for the account of the appropriate Lender, the principal amount of each DIP Loan of such Lender on the Maturity Date (or on such earlier date on which the Loans become due and payable pursuant to Section 7.02).

(b)     Lenders' Evidence of Debt. Each Lender shall maintain in accordance with its usual practice an account or accounts evidencing the Obligations of the Borrower to such Lender, including the amounts of the Loans made by it and each repayment and prepayment in respect thereof. Any such recordation shall be conclusive and binding on the Borrower, absent manifest error; *provided* that the failure to make any such recordation, or any error in such recordation, shall not affect any Lender's DIP Loan Commitments or the Borrower's Obligations in respect of any applicable Loans; *provided*, *further*, in the event of any inconsistency between the Register and any Lender's records, the recordations in the Register shall govern.

(c)     Register. The Disbursing Agent (or its agent or sub-agent appointed by it) shall maintain the Register pursuant to Section 9.06(c), in which shall be recorded (i) the amount of each Loan made hereunder and any Note evidencing such Loan, the Type of such Loan and, in the case of SOFR

32

Loans, each Interest Period applicable thereto, (ii) the amount of any principal or interest due and payable or to become due and payable from the Borrower to each Lender hereunder and (iii) the amount of any sum received by the Disbursing Agent hereunder from the Borrower and each Lender's share thereof. The entries made in the Register shall be conclusive and binding on the Borrower and each Lender, absent manifest error, and the Disbursing Agent and Lenders may treat each Person whose name is recorded in the Register as the owner of the Loans recorded therein for the purposes of this Agreement; *provided* that failure to make any such recordation, or any error in such recordation, shall not affect any Lender's DIP Loan Commitments or the Borrower's Obligations in respect of any Loans. The Borrower hereby designates the Disbursing Agent to serve as the Borrower's non-fiduciary agent solely for purposes of maintaining the Register as provided in this <u>Section 2.06(c)</u>, and the Borrower hereby agrees that, to the extent the Disbursing Agent serves in such capacity, the Disbursing Agent and its officers, directors, employees, agents, sub-agents and affiliates shall constitute "Indemnitees".

(d)    <u>Notes</u>. The Borrower agrees that, upon request by any Lender, the Borrower will promptly execute and deliver to such Lender a Note evidencing any Loans of such Lender, with appropriate insertions as to date and principal amount; *provided* that the obligations of the Borrower in respect of each Loan shall be enforceable in accordance with the Loan Documents whether or not evidenced by any Note.

Section 2.07    <u>Fees</u>.

(a)    [Reserved].

(b)    The Borrower agrees to pay on the Closing Date to each Lender party to this Agreement as a Lender on the Closing Date, as fee compensation for the availability of such Lender's DIP Loan Commitments, an origination fee in an amount equal to 3.00% of the aggregate principal amount of such Lender's DIP Loan Commitments, payable in kind by capitalizing such amount and adding it to the principal amount of the DIP Loans extended by such Lender on the Closing Date. Such origination fee shall be in all respects fully earned, due and payable on the Closing Date and non-refundable and non-creditable thereafter.

(c)    The Borrower agrees to pay to the Agents the fees in the amounts and on the dates from time to time set forth in the Fee Letter and as otherwise agreed to in writing by the Borrower and the Agents.

Section 2.08    <u>Voluntary Prepayments and Commitment Reductions; Call Protection</u>.

(a)    <u>Voluntary Prepayments</u>.

(i)    Any time and from time to time:

(A)    the Borrower may prepay Base Rate Loans on any Business Day in whole or in part, in an aggregate minimum amount of $1,000,000 and integral multiples of $100,000 in excess of that amount; and

(B)    the Borrower may prepay SOFR Loans on any Business Day in whole or in part in an aggregate minimum amount of $1,000,000 and integral multiples of $100,000 in excess of that amount.

(ii)    All such prepayments shall be made:

(A)    upon not less than one Business Day's prior written notice in the case of Base Rate Loans; and

(B)    upon not less than three U.S. Government Securities Business Days' prior written notice in the case of SOFR Loans;

in each case given to the Disbursing Agent by 12:00 p.m. on the date required (and the Disbursing Agent will promptly notify each applicable Lender). Upon the giving of any such notice, the principal amount of the Loans specified in such notice shall become due and payable on the prepayment date specified therein. Any such voluntary prepayment shall be applied as specified in Section 2.10(a). The Borrower's notice may state that such notice is conditioned upon the effectiveness of other credit facilities or one or more other events specified therein, in which case such notice may be revoked by the Borrower (by written notice to the Disbursing Agent on or prior to the specified effective date) if such condition is not satisfied; *provided* that the Borrower shall make any payments required to be made pursuant to Section 2.18.

Notwithstanding anything in this Section 2.08(a) to the contrary, without the prior written consent of the Required Lenders, in no event shall the Borrower be permitted to make any voluntary prepayments of DIP Loans under this Agreement to the extent such voluntary prepayment would result in the remaining outstanding aggregate principal amount of DIP Loans to be less than $2,000,000 immediately after giving effect to such prepayment.

(b)    <u>Voluntary Commitment Reductions</u>.

(i)    The Borrower may, upon not less than three Business Days' prior written notice by 12:00 p.m. thereof to the Disbursing Agent (and the Disbursing Agent will promptly notify each applicable Lender), at any time and from time to time, terminate in whole or permanently reduce in part, without premium or penalty, the DIP Loan Commitments; *provided* that any such partial reduction of the DIP Loan Commitments shall be in an aggregate minimum amount of $1,000,000 and integral multiples of $1,000,000 in excess of that amount.

(ii)    The Borrower's notice to the Disbursing Agent shall designate the date (which shall be a Business Day) of such termination or reduction and the amount of any partial reduction, and such termination or reduction of the DIP Loan Commitments shall be effective on the date specified in the Borrower's notice and shall proportionately reduce the DIP Loan Commitment of each Lender in accordance with the percentage of DIP Loan Commitments held by such Lender. The Borrower's notice may state that such notice is conditioned upon the effectiveness of other credit facilities or one or more other events specified therein, in which case such notice may be revoked by the Borrower (by notice to the Disbursing Agent on or prior to the specified effective date) if such condition is not satisfied.

Section 2.09    <u>Mandatory Prepayments</u>.

(a)    <u>Asset Sales</u>. Immediately following receipt by any Group Member of any Net Cash Proceeds of any Asset Sale (or such later date as agreed to by Disbursing Agent at the direction of the Required Lenders), the Borrower shall prepay the DIP Loans as set forth in Section 2.10(b) in an aggregate amount equal to the Specified Net Cash Proceeds from such Asset Sale.

(b)    <u>Recovery Events</u>. Immediately following receipt by any Group Member, or the Collateral Agent as loss payee, of any Net Cash Proceeds of any Recovery Event (or such later date as agreed to by Disbursing Agent at the direction of the Required Lenders), the Borrower shall prepay the DIP Loans as set forth in Section 2.10(b) in an aggregate amount equal to such Net Cash Proceeds.

34

(c)    [Reserved].

(d)    Issuance of Debt. No later than the first Business Day following the date of receipt by any Group Member of any Net Cash Proceeds from the incurrence of any Indebtedness of any Group Member (other than with respect to any Indebtedness permitted to be incurred pursuant to Section 6.01), the Borrower shall prepay the DIP Loans and permanently reduce the DIP Loan Commitments as set forth in Section 2.10(b) in an aggregate amount equal to 100% of such Net Cash Proceeds.

(e)    [Reserved].

(f)    [Reserved].

(g)    [Reserved].

(h)    Prepayment Certificate. In connection with any prepayment of the Loans pursuant to Section 2.09(a), 2.09(b) or 2.09(d), the Borrower shall deliver to the Disbursing Agent and the Lenders written notice of such mandatory prepayment and a certificate of a Responsible Officer demonstrating the calculation of the amount of the applicable Net Cash Proceeds or Specified Net Cash Proceeds, as applicable. The Disbursing Agent shall not be required to disburse the proceeds of any such prepayment to the Lenders until the date which is three (3) Business Days after the Disbursing Agent has received the applicable notice and certificate. In the event that the Borrower shall subsequently determine that the actual amount received exceeded the amount set forth in such certificate, the Borrower shall promptly make an additional prepayment of the Loans in an amount equal to such excess, and the Borrower shall concurrently therewith deliver to the Disbursing Agent and the Lenders a certificate of a Responsible Officer demonstrating the derivation of such excess.

Section 2.10    Application of Prepayments/Reductions.

(a)    Application of Voluntary Prepayments. Any prepayment of any Loan pursuant to Section 2.08(a) shall be applied to prepay the DIP Loans on a pro rata basis (in accordance with the respective outstanding principal amounts thereof), applied to reduce the scheduled remaining installments of principal (if any) in direct order of maturity.

(b)    Application of Mandatory Prepayments. Any amount required to be paid pursuant to Section 2.09 shall be applied as follows:

first, to prepay the DIP Loans on a pro rata basis (in accordance with the respective outstanding principal amounts thereof), applied to reduce the scheduled remaining installments of principal (if any) in direct order of maturity;

second, in the case of any mandatory prepayment under Section 2.09(d) to prepay the DIP Loans to the full extent thereof and to permanently reduce the DIP Loan Commitments by the amount of such prepayment; and

third, in the case of any mandatory prepayment under Section 2.09(d), to permanently reduce the DIP Loan Commitments to the full extent thereof.

Section 2.11    Conversion and Continuation Options. (a) The Borrower may irrevocably elect from time to time to convert SOFR Loans to Base Rate Loans by delivering to the Disbursing Agent a written Interest Election Request by 12:00 p.m. at least one Business Day prior to such conversion. The Borrower may irrevocably elect from time to time to convert Base Rate Loans to SOFR Loans by

delivering to the Disbursing Agent a written Interest Election Request by 12:00 p.m. at least three U.S. Government Securities Business Days prior to such conversion; *provided* that no Base Rate Loan under a particular Credit Facility may be converted into a SOFR Loan (i) when any Event of Default has occurred and is continuing and the Required Lenders have determined not to permit such conversions or (ii) after the date that is one month prior to the final scheduled termination or maturity date of such Credit Facility. Upon receipt of any such notice, the Disbursing Agent shall promptly notify each relevant Lender thereof.

(a)    The Borrower may irrevocably elect to continue any SOFR Loan as such upon the expiration of the then current Interest Period with respect thereto by delivering to the Disbursing Agent a written Interest Election Request stating, in accordance with the applicable provisions of the definition of "Interest Period", the length of the next Interest Period to be applicable to such Loans; *provided* that no SOFR Loan under a particular Credit Facility may be continued as such (i) when any Event of Default has occurred and is continuing and the Required Lenders have determined not to permit such continuations or (ii) after the date that is one month prior to the final scheduled termination or maturity date of such Credit Facility; *provided*, *further*, that if the Borrower shall fail to give any required notice as described above in this Section 2.11(b) or if such continuation is not permitted pursuant to the preceding proviso, such Loans shall be converted automatically to Base Rate Loans on the last day of such then expiring Interest Period. Upon receipt of any such notice the Disbursing Agent shall promptly notify each relevant Lender thereof.

Section 2.12    Interest Rates and Payment Dates. (a) Each SOFR Loan shall bear interest at a rate *per annum* equal to Term SOFR for the Interest Period therefor plus the Applicable Margin.

(a)    Each Base Rate Loan shall bear interest at a rate *per annum* equal to the Base Rate plus the Applicable Margin.

(b)    (i) Automatically, after the occurrence and during the continuance of any Event of Default, the Borrower shall pay interest on all amounts (whether or not past due) owing by it hereunder at a rate *per annum* at all times, after as well as before judgment, equal to (x) in the case of principal, at the rate otherwise applicable to such Loan pursuant to Section 2.12(a) or Section 2.12(b), as applicable, plus 2.00% *per annum* and (y) in all other cases, at a rate *per annum* equal to the rate that would be applicable to Base Rate Loans plus 2.00% *per annum*, in each case, from the date of such Event of Default or if later, the date specified in any such notice until such Event of Default is cured or waived.

(c)    Interest shall be due and payable by the Borrower in arrears on each Interest Payment Date and at such other times as may be specified herein; *provided* that (i) interest accruing pursuant to Section 2.12(c) shall be due and payable upon demand, (ii) in the event of any repayment or prepayment of any Loan, accrued interest on the principal amount repaid or prepaid shall be payable on the date of such repayment or prepayment and (iii) in the event of any conversion of any SOFR Borrowing prior to the end of the Interest Period therefor, accrued interest on such Borrowing through the day prior to the effective date of such conversion shall be payable on the effective date of such conversion and thereafter, interest on such converted Borrowing shall accrue commencing on such effective date of conversion and shall be payable on the next Interest Payment Date. Interest hereunder shall be due and payable in accordance with the terms hereof before and after judgment, and before and after the commencement of any proceeding under any Debtor Relief Law.

(d)    Interest on the DIP Loans shall be due and payable in cash on each Interest Payment Date.

(e)    All computations of interest for Base Rate Loans determined by reference to the "Prime Rate" shall be made on the basis of a year of 365 or 366 days, as the case may be, and actual days

elapsed. All other computations of fees and interest shall be made on the basis of a 360-day year and actual days elapsed (which results in more fees or interest, as applicable, being paid than if computed on the basis of a 365-day year). Interest shall accrue on each Loan for the day on which the Loan is made, and shall not accrue on a Loan, or any portion thereof, for the day on which the Loan or such portion is paid; *provided* that any Loan that is repaid on the same day on which it is made shall, bear interest for one day. Each determination by the Disbursing Agent of an interest rate or fee hereunder shall be conclusive and binding for all purposes, absent manifest error.

(f)    In connection with the use or administration of Term SOFR, the Required Lenders, in consultation with the Disbursing Agent and the Borrower, will have the right to make Conforming Changes from time to time and, notwithstanding anything to the contrary herein or in any other Loan Document, any amendments implementing such Conforming Changes will become effective without any further action or consent of any other party to this Agreement or any other Loan Document; *provided* that no Agent shall be bound to follow or agree to any amendment or supplement to this Agreement (including, without limitation, any Conforming Changes) that would increase or materially change or affect the duties, obligations or liabilities of such Agent (including, without limitation, the imposition or expansion of discretionary authority), or reduce, eliminate, limit or otherwise change any right, privilege or protection of such Agent, or would otherwise materially and adversely affect such Agent, in each case in its reasonable judgment, without such Agent's express written consent.

Section 2.13    Illegality. If any Lender determines that any law has made it unlawful, or that any Governmental Authority has asserted that it is unlawful, for any Lender or its applicable lending office to perform any of its obligations hereunder or to make, maintain or fund Loans whose interest is determined by reference to SOFR, the Term SOFR Reference Rate or Term SOFR, or to determine or charge interest based upon SOFR, the Term SOFR Reference Rate or Term SOFR, then, on notice thereof by such Lender to the Borrower (with a copy to the Disbursing Agent), (i) any obligation of such Lender to issue, make, maintain, fund or charge interest with respect to any such SOFR Loan or continue SOFR Loans or to convert Base Rate Loans to SOFR Loans shall be suspended and (ii) if such notice asserts the illegality of such Lender making or maintaining Base Rate Loans the interest rate on which is determined by reference to clause (c) of the definition of "Base Rate", the interest rate on such Base Rate Loans of such Lender shall, if necessary to avoid such illegality, be determined by the Disbursing Agent without reference to clause (c) of the definition of "Base Rate", in each case until such Lender notifies the Disbursing Agent and the Borrower that the circumstances giving rise to such determination no longer exist. Upon receipt of such notice, (x) the Borrower shall, upon demand from such Lender (with a copy to the Disbursing Agent), prepay or, if applicable, convert all SOFR Loans of such Lender to Base Rate Loans (the interest rate on which Base Rate Loans of such Lender shall, if necessary to avoid such illegality, be determined by the Disbursing Agent without reference to clause (c) of the definition of "Base Rate"), either on the last day of the Interest Period therefor, if such Lender may lawfully continue to maintain such SOFR Loans to such day, or immediately, if such Lender may not lawfully continue to maintain such SOFR Loans and (y) if such notice asserts the illegality of such Lender determining or charging interest rates based upon SOFR, the Term SOFR Reference Rate or Term SOFR, the Disbursing Agent shall during the period of such suspension compute the Base Rate applicable to such Lender without reference to clause (c) of the definition of "Base Rate" until the Disbursing Agent is advised in writing by such Lender that it is no longer illegal for such Lender to determine or charge interest rates based upon SOFR, the Term SOFR Reference Rate or Term SOFR. Upon any such prepayment or conversion, the Borrower shall also pay accrued and unpaid interest on the amount so prepaid or converted, together with any additional amounts required pursuant to Section 2.18.

Section 2.14    Inability to Determine Interest Rate; Benchmark Replacement Setting.

(a)    <u>Inability to Determine Interest Rate</u>. Subject to <u>Section 2.14(b)</u>, if, on or prior to the first day of any Interest Period for any SOFR Loan, (i) the Disbursing Agent or the Required Lenders determine that "Term SOFR" cannot be determined pursuant to the definition thereof, or (ii) for any reason in connection with any request for a SOFR Loan or a conversion thereto or a continuation thereof that Term SOFR for any requested Interest Period with respect to a proposed SOFR Loan does not adequately and fairly reflect the cost to such Lenders of making and maintaining such Loan, the Disbursing Agent will promptly so notify the Borrower and each Lender. Thereafter, (x) the obligation of the Lenders to make or maintain SOFR Loans, and any right of the Borrower to continue SOFR Loans or to convert Base Rate Loans to SOFR Loans, shall be suspended (to the extent of the affected SOFR Loans or affected Interest Periods) until the Disbursing Agent upon the instruction of the Required Lenders revokes such notice. Upon receipt of such notice, (A) the Borrower may revoke any pending request for a borrowing of, conversion to or continuation of SOFR Loans (to the extent of the affected SOFR Loans or affected Interest Periods) or, failing that, will be deemed to have converted such request into a request for Base Rate Loans in the amount specified therein and (B) any outstanding affected SOFR Loans will be deemed to have been converted into Base Rate Loans at the end of the applicable Interest Period. Upon any such conversion, the Borrower shall also pay accrued interest on the amount so converted, together with any additional amounts required pursuant to <u>Section 2.18</u>. Subject to <u>Section 2.14(b)</u>, if the Disbursing Agent or the Required Lenders determine (which determination shall be conclusive and binding absent manifest error) that "Term SOFR" cannot be determined pursuant to the definition thereof on any given day, the interest rate on Base Rate Loans shall be determined by the Disbursing Agent without reference to clause (c) of the definition of "Base Rate" until the Disbursing Agent or the Required Lenders, as applicable, revoke such determination.

(b)    <u>Benchmark Replacement Setting</u>.

(i)    <u>Benchmark Replacement</u>. Notwithstanding anything to the contrary herein or in any other Loan Document, if a Benchmark Transition Event and its related Benchmark Replacement Date have occurred prior to any setting of the then-current Benchmark, then (x) if a Benchmark Replacement is determined in accordance with clause (a) of the definition of "Benchmark Replacement" for such Benchmark Replacement Date, such Benchmark Replacement will replace such Benchmark for all purposes hereunder and under any Loan Document in respect of such Benchmark setting and subsequent Benchmark settings without any amendment to, or further action or consent of any party to, this Agreement or any other Loan Document and (y) if a Benchmark Replacement is determined in accordance with clause (b) of the definition of "Benchmark Replacement" for such Benchmark Replacement Date, such Benchmark Replacement will replace such Benchmark for all purposes hereunder and under any Loan Document in respect of any Benchmark setting at or after 5:00 p.m. on the first Business Day after the date notice of such Benchmark Replacement is provided to each of the other parties hereto without any amendment to, or further action or consent of any other party to, this Agreement or any other Loan Document. If the Benchmark Replacement is Daily Simple SOFR, all interest payments will be payable on a monthly basis.

(ii)    <u>Benchmark Replacement Conforming Changes</u>. In connection with the use, administration, adoption or implementation of a Benchmark Replacement, the Required Lenders (in consultation with the Disbursing Agent and the Borrower) will have the right to make Conforming Changes from time to time and, notwithstanding anything to the contrary herein or in any other Loan Document, any amendments implementing such Conforming Changes will become effective without any further action or consent of any other party to this Agreement; *provided* that the Disbursing Agent shall not be bound to follow or agree to any amendment or supplement to this Agreement (including, without limitation, any Conforming Changes) that would increase or materially change or affect the duties, obligations or liabilities of the Disbursing Agent (including without limitation the imposition or expansion of discretionary authority), or reduce, eliminate, limit or otherwise change any right, privilege or protection of the

Disbursing Agent, or would otherwise materially and adversely affect the Disbursing Agent, in each case in its reasonable judgment, without the Disbursing Agent's express written consent.

(iii)    Notices; Standards for Decisions and Determinations. The Required Lenders will promptly notify the Borrower, the Disbursing Agent and the Lenders in writing of (A) the implementation of any Benchmark Replacement, (B) the effectiveness of any Conforming Changes in connection with the use, administration, adoption or implementation of a Benchmark Replacement, (C) the removal or reinstatement of any tenor of a Benchmark pursuant to Section 2.14(b)(iv) below and (D) the commencement of any Benchmark Unavailability Period. Any determination, decision or election that may be made by the Disbursing Agent or Lenders pursuant to this Section 2.14(b), including any determination with respect to a tenor, rate or adjustment or of the occurrence or non-occurrence of an event, circumstance or date and any decision to take or refrain from taking any action or any selection, will be conclusive and binding absent manifest error and may be made in its or their sole discretion and without consent from any other party hereto, except, in each case, as expressly required pursuant to this Section 2.14(b).

(iv)    Unavailability of Tenor of Benchmark. Notwithstanding anything to the contrary herein or in any other Loan Document, at any time (including in connection with the implementation of a Benchmark Replacement), (A) if the then-current Benchmark is a term rate (including the Term SOFR Reference Rate) and either (x) any tenor for such Benchmark is not displayed on a screen or other information service that publishes such rate from time to time as selected by the Required Lenders or utilized by the Disbursing Agent in their reasonable discretion or (y) the regulatory supervisor for the administrator of such Benchmark has provided a public statement or publication of information announcing that any tenor for such Benchmark is not or will not be representative, then the Required Lenders may modify the definition of "Interest Period" (or any similar or analogous definition) for any Benchmark settings at or after such time to remove such unavailable or non-representative tenor and (B) if a tenor that was removed pursuant to clause (A) above either (x) is subsequently displayed on a screen or information service for a Benchmark (including a Benchmark Replacement) that is available to the Disbursing Agent or (y) is not, or is no longer, subject to an announcement that it is not or will not be representative for a Benchmark (including a Benchmark Replacement), then the Required Lenders may modify the definition of "Interest Period" (or any similar or analogous definition) for all Benchmark settings at or after such time to reinstate such previously removed tenor.

(v)    Benchmark Unavailability Period. Upon the Borrower's receipt of notice of the commencement of a Benchmark Unavailability Period, the Borrower may revoke any pending request for a SOFR Borrowing of, conversion to or continuation of SOFR Loans to be made, converted or continued during any Benchmark Unavailability Period and, failing that, the Borrower will be deemed to have converted any such request into a request for a Borrowing of or conversion to Base Rate Loans. During a Benchmark Unavailability Period or at any time that a tenor for the then-current Benchmark is not an Available Tenor, the component of the Base Rate based upon the then-current Benchmark or such tenor for such Benchmark, as applicable, will not be used in any determination of the Base Rate.

Section 2.15    Payments Generally.

(a)    General. All payments to be made by the Borrower hereunder, whether on account of principal, interest, fees or otherwise, shall be made free and clear of and without condition or deduction for any counterclaim, defense, recoupment or setoff. All payments by the Borrower hereunder shall be made to the Disbursing Agent, for the account of the respective Lenders to which such payment is owed, at the Payment Office, in Dollars and in immediately available funds prior to 1:00 p.m. on the date specified herein. Any payment made by the Borrower hereunder that is received by the Disbursing Agent after 1:00 p.m. on any Business Day may in the Disbursing Agent's discretion be deemed to have been received on the next succeeding Business Day and any applicable interest or fee shall continue to accrue. The Disbursing

Agent shall distribute such payments to the Lenders by wire transfer promptly upon receipt in like funds as received. If any payment hereunder becomes due and payable on a day other than a Business Day, such payment shall be made on the next succeeding Business Day, and such extension of time shall be reflected in computing interest or fees, as the case may be. In the case of any extension of any payment of principal pursuant to the preceding sentence, interest thereon shall be payable at the then applicable rate during such extension.

(b)    Obligations of Lenders Several. The obligations of the Lenders hereunder to make Loans and to make payments pursuant to Section 9.05(c) are several and not joint. The failure of any Lender to make any Loan or to make any payment under Section 9.05(c) on any date required hereunder shall not relieve any other Lender of its corresponding obligation to do so on such date, and no Lender shall be responsible for the failure of any other Lender to so make its Loan or to make its payment under Section 9.05(c).

(c)    Funding Source. Nothing herein shall be deemed to obligate any Lender to obtain the funds for any Loan in any particular place or manner or to constitute a representation by any Lender that it has obtained or will obtain the funds for any Loan in any particular place or manner.

(d)    Insufficient Funds. Subject to Section 7.03, if at any time insufficient funds are received by and available to the Disbursing Agent to pay fully all amounts of principal, interest and fees then due hereunder, such funds shall be applied (i) first, toward payment of interest and fees then due hereunder, ratably among the parties entitled thereto in accordance with the amounts of interest and fees then due to such parties, and (ii) second, toward payment of principal then due hereunder, ratably among the parties entitled thereto in accordance with the amounts of principal then due to such parties.

Section 2.16    Increased Costs; Capital Adequacy.

(a)    If any Change in Law shall:

(i)    impose, modify or deem applicable any reserve (including pursuant to regulations issued from time to time by the Board of Governors for determining the maximum reserve requirement (including any emergency, special, supplemental or other marginal reserve requirement) with respect to eurocurrency funding (currently referred to as "Eurocurrency liabilities" in Regulation D)), special deposit, compulsory loan, insurance charge or similar requirement against assets of, deposits with or for the account of, or credit extended or participated in by, any Lender;

(ii)    subject any Recipient to any Taxes (other than (A) Indemnified Taxes, (B) Taxes described in clauses (b) through (d) of the definition of Excluded Taxes and (C) Connection Income Taxes) on its Loans, Loan principal, DIP Loan Commitments or other Obligations, or its deposits, reserves, other liabilities or capital attributable thereto; or

(iii)    impose on any Lender any other condition, cost or expense (other than Taxes) affecting this Agreement or Loans made by such Lender; and the result of any of the foregoing shall be to increase the cost to such Lender or such other Recipient of making, converting to, continuing or maintaining any Loan, or to increase the cost to such Lender or such other Recipient of participating in, issuing or maintaining any such Loan, or to reduce the amount of any sum received or receivable by such Lender or other Recipient hereunder (whether of principal, interest or any other amount) then, upon the request of such Lender or other Recipient, the Borrower will promptly pay to such Lender or other Recipient, as the case may be, such additional amount or amounts as will compensate such Lender or other Recipient, as the case may be, for such additional costs incurred or reduction suffered.

40

(b)    If any Lender determines that any Change in Law affecting such Lender or any lending office of such Lender or such Lender's holding company, if any, regarding capital or liquidity requirements, has or would have the effect of reducing the rate of return on such Lender's capital or on the capital of such Lender's holding company, if any, as a consequence of this Agreement, the DIP Loan Commitments of such Lender or the Loans made by such Lender to a level below that which such Lender or such Lender's holding company could have achieved but for such Change in Law (taking into consideration such Lender's policies and the policies of such Lender's holding company with respect to capital adequacy), then from time to time after submission by such Lender to the Borrower (with a copy to the Disbursing Agent) of a written request therefor the Borrower will pay to such Lender such additional amount or amounts as will compensate such Lender or such Lender's holding company for any such reduction suffered on an after-tax basis.

(c)    A certificate of a Lender setting forth the amount or amounts necessary to compensate such Lender or its holding company, as the case may be, as specified in Section 2.16(a) or Section 2.16(b) and delivered to the Borrower (with a copy to the Disbursing Agent), shall be conclusive absent manifest error. The Borrower shall pay such Lender the amount shown as due on any such certificate within 10 days after receipt thereof.

(d)    Failure or delay on the part of any Lender to demand compensation pursuant to this Section 2.16 shall not constitute a waiver of such Lender's right to demand such compensation; *provided* that the Borrower shall not be required to compensate a Lender pursuant to this Section 2.16 for any increased costs incurred or reductions suffered more than nine months prior to the date that such Lender notifies the Borrower of the Change in Law giving rise to such increased costs or reductions, and of such Lender's intention to claim compensation therefor (except that, if the Change in Law giving rise to such increased costs or reductions is retroactive, then the nine-month period referred to above shall be extended to include the period of retroactive effect thereof).

(e)    The obligations of the Borrower pursuant to this Section 2.16 shall survive the termination of this Agreement and the payment of the Loans and all other amounts payable hereunder.

Section 2.17    Taxes.

(a)    Defined Terms. For purposes of this Section 2.17, the term "applicable law" includes FATCA.

(b)    Payments Free of Taxes. Any and all payments by or on account of any obligation of any Loan Party under any Loan Document shall be made without deduction or withholding for any Taxes, except as required by applicable law. If any applicable law (as determined in the good faith discretion of an applicable Withholding Agent) requires the deduction or withholding of any Tax from any such payment by a Withholding Agent, then the applicable Withholding Agent shall be entitled to make such deduction or withholding and shall timely pay the full amount deducted or withheld to the relevant Governmental Authority in accordance with applicable law and, if such Tax is an Indemnified Tax, then the sum payable by the applicable Loan Party shall be increased as necessary so that after such deduction or withholding has been made (including such deductions and withholdings applicable to additional sums payable under this Section 2.17) the applicable Recipient receives an amount equal to the sum it would have received had no such deduction or withholding been made.

(c)    Payment of Other Taxes by the Loan Parties. The Loan Parties shall timely pay to the relevant Governmental Authority in accordance with applicable law, or at the option of the Disbursing Agent timely reimburse it for the payment of, any Other Taxes.

41

(d)    <u>Indemnification by the Loan Parties</u>. The Loan Parties shall jointly and severally indemnify each Recipient, within 10 days after demand therefor, for the full amount of any Indemnified Taxes (including Indemnified Taxes imposed or asserted on or attributable to amounts payable under this <u>Section 2.17</u>) payable or paid by such Recipient or required to be withheld or deducted from a payment to such Recipient and any reasonable expenses (including reasonable fees and disbursements of counsel) arising therefrom or with respect thereto, whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate as to the amount of such payment or liability delivered to the Borrower by a Lender or Agent (with a copy to the Disbursing Agent), or by the Disbursing Agent on its own behalf or on behalf of a Lender or Agent, shall be conclusive absent manifest error.

(e)    <u>Indemnification by the Lenders</u>. Each Lender shall severally indemnify the Disbursing Agent, within 30 days after demand therefor, for (i) any Indemnified Taxes attributable to such Lender (but only to the extent that any Loan Party has not already indemnified the Disbursing Agent for such Indemnified Taxes and without limiting the obligation of the Loan Parties to do so), (ii) any Taxes attributable to such Lender's failure to comply with the provisions of <u>Section 9.06(d)</u> relating to the maintenance of a Participant Register and (iii) any Excluded Taxes attributable to such Lender, in each case, that are payable or paid by the Disbursing Agent in connection with any Loan Document, and any reasonable expenses (including reasonable fees and disbursements of counsel) arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate as to the amount of such payment or liability delivered to any Lender by the Disbursing Agent shall be conclusive absent manifest error. Each Lender hereby authorizes the Disbursing Agent to set off and apply any and all amounts at any time owing to such Lender under any Loan Document or otherwise payable by the Disbursing Agent to the Lender from any other source against any amount due to the Disbursing Agent under this <u>Section 2.17(e)</u>.

(f)    <u>Evidence of Payments</u>. As soon as practicable after any payment of Taxes by any Loan Party to a Governmental Authority pursuant to this <u>Section 2.17</u>, such Loan Party shall deliver to the Disbursing Agent the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to the Disbursing Agent.

(g)    <u>Status of Lenders</u>. (i) Any Lender that is entitled to an exemption from or reduction of withholding Tax with respect to payments made under any Loan Document shall deliver to the Borrower and the Disbursing Agent, at the time or times reasonably requested by the Borrower or the Disbursing Agent, such properly completed and executed documentation reasonably requested by the Borrower or the Disbursing Agent as will permit such payments to be made without withholding or at a reduced rate of withholding. In addition, any Lender, if reasonably requested by the Borrower or the Disbursing Agent, shall deliver such other documentation prescribed by applicable law or reasonably requested by the Borrower or the Disbursing Agent as will enable the Borrower or the Disbursing Agent to determine whether or not such Lender is subject to backup withholding or information reporting requirements. Notwithstanding anything to the contrary in the preceding two sentences, the completion, execution and submission of such documentation (other than such documentation set forth in <u>Section 2.17(g)(ii)(A)</u>, <u>Section 2.17(g)(ii)(B)</u> and <u>Section 2.17(g)(ii)(D)</u> below) shall not be required if in the Lender's reasonable judgment such completion, execution or submission would subject such Lender to any material unreimbursed cost or expense or would materially prejudice the legal or commercial position of such Lender.

(i)    Without limiting the generality of the foregoing,

(A)      any Lender that is a U.S. Person shall deliver to the Borrower and the Disbursing Agent on or prior to the date on which such Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Disbursing Agent), executed copies of IRS Form W-9 certifying that such Lender is exempt from U.S. federal backup withholding tax;

(B)      any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to the Borrower and the Disbursing Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Disbursing Agent), whichever of the following is applicable:

(1)      in the case of a Foreign Lender claiming the benefits of an income tax treaty to which the United States is a party (x) with respect to payments of interest under any Loan Document, executed copies of IRS Form W-8BEN or W-8BEN-E establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "interest" article of such tax treaty and (y) with respect to any other applicable payments under any Loan Document, executed copies of IRS Form W-8BEN or W-8BEN-E establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "business profits" or "other income" article of such tax treaty;

(2)      executed copies of IRS Form W-8ECI;

(3)      in the case of a Foreign Lender claiming the benefits of the exemption for portfolio interest under Section 881(c) of the Code, (x) a certificate substantially in the form of Exhibit E-1 to the effect that such Foreign Lender is not a "bank" within the meaning of Section 881(c)(3)(A) of the Code, a "10-percent shareholder" of the Borrower within the meaning of Section 871(h)(3)(B) of the Code or a "controlled foreign corporation" related to the Borrower as described in Section 881(c)(3)(C) of the Code (a "U.S. Tax Compliance Certificate") and (y) executed copies of IRS Form W-8BEN or W-8BEN-E; or

(4)      to the extent a Foreign Lender is not the beneficial owner, executed copies of IRS Form W-8IMY, accompanied by IRS Form W-8ECI, IRS Form W-8BEN or W-8BEN-E, a U.S. Tax Compliance Certificate substantially in the form of Exhibit E-2 or Exhibit E-3, IRS Form W-9 and/or other certification documents from each beneficial owner, as applicable; *provided* that, if the Foreign Lender is a partnership and one or more direct or indirect partners of such Foreign Lender are claiming the portfolio interest exemption, such Foreign Lender may provide a U.S. Tax Compliance Certificate substantially in the form of Exhibit E-4 on behalf of each such direct and indirect partner;

(C)      any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to the Borrower and the Disbursing Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Disbursing Agent), executed copies of any other form prescribed by applicable law as a basis for claiming exemption from or a reduction in U.S. federal withholding Tax, duly completed, together with such supplementary

43

documentation as may be prescribed by applicable law to permit the Borrower or the Disbursing Agent to determine the withholding or deduction required to be made;

(D)      if a payment made to a Lender under any Loan Document would be subject to U.S. federal withholding Tax imposed by FATCA if such Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Lender shall deliver to the Borrower and the Disbursing Agent at the time or times prescribed by law and at such time or times reasonably requested by the Borrower or the Disbursing Agent such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Borrower or the Disbursing Agent as may be necessary for the Borrower and the Disbursing Agent to comply with their obligations under FATCA and to determine that such Lender has complied with such Lender's obligations under FATCA or to determine the amount to deduct and withhold from such payment. Solely for purposes of this Section 2.17(g)(ii)(D), "FATCA" shall include any amendments made to FATCA after the Closing Date; and

(E)      the Disbursing Agent and any successor thereto shall deliver to the Borrower on or prior to the date on which it becomes the Disbursing Agent under this Agreement (and from time to time thereafter upon request of the Borrower) (i) if the Disbursing Agent (or such successor to the Disbursing Agent) is a U.S. Person, two duly executed copies of IRS Form W-9 certifying that it is exempt from U.S. federal backup withholding, or (ii) if the Disbursing Agent (or such successor to the Disbursing Agent) is not a U.S. Person, (A) two duly executed copies of IRS Form W-8ECI (or any successor form) with respect to any amounts payable under any Loan Document to the Disbursing Agent for its own account, and (B) IRS Form W-8IMY (or any successor form) with respect to any amounts payable under any Loan Document to the Disbursing Agent for the account of others, certifying that it is a "U.S. branch" and that the payments it receives for the account of others are not effectively connected with the conduct of its trade or business within the United States and that it is using such form as evidence of its agreement with the Borrower to be treated as a U.S. Person and thus act as the withholding agent with respect to such payments (and the Borrower and the Disbursing Agent agree to so treat the Disbursing Agent as a U.S. Person with respect to such payments as contemplated by Treasury Regulation Section 1.1441-1(b)(2)(iv)(A)). Notwithstanding anything to the contrary in this Section 2.17(g)(ii)(E), the Disbursing Agent shall not be required to deliver any documentation pursuant to this Section 2.17(g)(ii)(E) that it is not legally eligible to deliver.

Each Lender agrees that if any form or certification it previously delivered expires or becomes obsolete or inaccurate in any respect, it shall update such form or certification or promptly notify the Borrower and the Disbursing Agent in writing of its legal inability to do so.

(h)      Treatment of Certain Refunds. If any party determines, in its sole discretion exercised in good faith, that it has received a refund of any Taxes as to which it has been indemnified pursuant to this Section 2.17 (including by the payment of additional amounts pursuant to this Section 2.17), it shall pay to the indemnifying party an amount equal to such refund (but only to the extent of indemnity payments made under this Section 2.17 with respect to the Taxes giving rise to such refund), net of all out-of-pocket expenses (including Taxes) of such indemnified party and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund). Such indemnifying party, upon the request of such indemnified party, shall repay to such indemnified party the amount paid over

44

pursuant to this <u>Section 2.17(h)</u> (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) in the event that such indemnified party is required to repay such refund to such Governmental Authority. Notwithstanding anything to the contrary in this <u>Section 2.17(h)</u> in no event will the indemnified party be required to pay any amount to an indemnifying party pursuant to this <u>Section 2.17(h)</u> the payment of which would place the indemnified party in a less favorable net after-Tax position than the indemnified party would have been in if the Tax subject to indemnification and giving rise to such refund had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts with respect to such Tax had never been paid. This <u>Section 2.17(h)</u> shall not be construed to require any indemnified party to make available its Tax returns (or any other information relating to its Taxes that it deems confidential) to the indemnifying party or any other Person.

(i) <u>Survival</u>. Each party's obligations under this <u>Section 2.17</u> shall survive the resignation or replacement of the Disbursing Agent or any assignment of rights by, or the replacement of, a Lender, the termination of the DIP Loan Commitments and the repayment, satisfaction or discharge of all obligations under any Loan Document.

Section 2.18    <u>Breakage Payments</u>. In the event of (a) the payment of any principal of any SOFR Loan other than on the last day of the Interest Period applicable thereto (including as a result of an Event of Default), (b) the conversion of any SOFR Loan other than on the last day of the Interest Period applicable thereto (including as a result of an Event of Default), (c) the failure to borrow, convert, continue or prepay any SOFR Loan on the date specified in any notice delivered pursuant hereto, or (d) the assignment of any SOFR Loan on a day that is not the last day of the Interest Period applicable thereto as a result of a request by the Borrower pursuant to <u>Section 2.21</u>, then, in any such event, the Borrower shall compensate each Lender for any loss, cost and expense attributable to such event, including any loss, cost or expense arising from the liquidation or redeployment of funds or from any fees payable. A certificate as to any amounts payable pursuant to this <u>Section 2.18</u> submitted to the Borrower (with a copy to the Disbursing Agent) by any Lender shall be conclusive in the absence of manifest error. The Borrower shall pay such Lender the amount shown as due on any such certificate within three Business Days after receipt thereof. This <u>Section 2.18</u> shall survive the termination of this Agreement and the payment of the Loans and all other amounts payable hereunder.

Section 2.19    <u>Pro Rata Treatment</u>.

(a) Each borrowing of DIP Loans by the Borrower, each payment by the Borrower on account of any reduction of the DIP Loan Commitments of the Lenders shall be allocated pro rata among the Lenders in accordance with their respective DIP Loan Commitments (or, if such DIP Loan Commitments shall have expired or been terminated, in accordance with the DIP Loan Commitments as in effect immediately prior to such expiration or termination).

(b) Each repayment by the Borrower in respect of principal or interest on the DIP Loans and each payment in respect of fees or expenses payable hereunder shall be applied to the amounts of such obligations owing to the Lenders entitled thereto pro rata in accordance with the respective amounts then due and owing to such Lenders. Each voluntary prepayment by the Borrower of DIP Loans shall be applied to the amounts of such obligations owing to the Lenders pro rata in accordance with the respective amounts then due and owing to the Lenders. Each mandatory prepayment by the Borrower of the DIP Loans shall be applied pro rata in accordance with the respective principal amounts of the outstanding DIP Loans then held by the Lenders.

(c) Each payment of the Loans shall be accompanied by accrued interest to the date of such payment on the amount paid.

Section 2.20    Defaulting Lenders.

(a)    Defaulting Lender Adjustments. Notwithstanding anything to the contrary contained in this Agreement, if any Lender becomes a Defaulting Lender, then, until such time as such Lender is no longer a Defaulting Lender, to the extent permitted by applicable law:

(i)    Waivers and Amendments. Such Defaulting Lender's right to approve or disapprove any amendment, waiver or consent with respect to this Agreement shall be restricted as set forth in Section 9.01 and the definition of "Required Lenders".

(ii)    Defaulting Lender Waterfall. Any payment of principal, interest, fees or other amounts received by the Disbursing Agent for the account of such Defaulting Lender (whether voluntary or mandatory, at maturity, pursuant to Section 7.02 or otherwise) or received by the Disbursing Agent from a Defaulting Lender pursuant to Section 9.07 shall be applied at such time or times as may be determined by the Disbursing Agent as follows: *first*, to the payment of any amounts owing by such Defaulting Lender to the Disbursing Agent hereunder; *second*, as the Borrower may request (so long as no Default or Event of Default exists), to the funding of any Loan in respect of which such Defaulting Lender has failed to fund its portion thereof as required by this Agreement, as determined by the Disbursing Agent; *third*, if so determined by the Borrower, to be held in a deposit account and released pro rata in order to satisfy such Defaulting Lender's potential future funding obligations with respect to Loans under this Agreement and; *fourth*, to the payment of any amounts owing to the Lenders as a result of any judgment of a court of competent jurisdiction obtained by any Lender against such Defaulting Lender as a result of such Defaulting Lender's breach of its obligations under this Agreement; *fifth*, so long as no Default or Event of Default exists, to the payment of any amounts owing to the Borrower as a result of any judgment of a court of competent jurisdiction obtained by the Borrower against such Defaulting Lender as a result of such Defaulting Lender's breach of its obligations under this Agreement; and *sixth*, to such Defaulting Lender or as otherwise directed by a court of competent jurisdiction; *provided* that if (x) such payment is a payment of the principal amount of any Loans in respect of which such Defaulting Lender has not fully funded its appropriate share, and (y) such Loans were made at a time when the conditions set forth in Section 4.02 were satisfied or waived, such payment shall be applied solely to pay the Loans of all Non-Defaulting Lenders on a pro rata basis prior to being applied to the payment of any Loans of such Defaulting Lender until such time as all Loans are held by the Lenders pro rata in accordance with the amount of DIP Loan Commitments and DIP Loans; *provided, further*, that the Disbursing Agent has received written notice as set forth in the definition of "Defaulting Lender" from such Lender or from the Borrower referring to this Agreement and notifying the Disbursing Agent of the identity and designation of such Lender as a "Defaulting Lender". Any payments, prepayments or other amounts paid or payable to a Defaulting Lender that are applied (or held) to pay amounts owed by a Defaulting Lender pursuant to this Section 2.20(a)(ii) shall be deemed paid to and redirected by such Defaulting Lender, and each Lender irrevocably consents hereto.

(b)    Defaulting Lender Cure. If the Borrower determines that a Lender is no longer a Defaulting Lender, it will so notify the Disbursing Agent who will so notify the parties hereto, whereupon as of the effective date specified in such notice and subject to any conditions set forth therein, that Lender will, to the extent applicable, purchase at par that portion of outstanding Loans of the other Lenders or take such other actions as the Borrower may determine to be necessary to cause the Loans to be held pro rata by the Lenders in accordance with the amount of DIP Loan Commitments and DIP Loans, whereupon such Lender will cease to be a Defaulting Lender; *provided* that no adjustments will be made retroactively with respect to fees accrued or payments made by or on behalf of the Borrower while that Lender was a Defaulting Lender; *provided, further*, that except to the extent otherwise expressly agreed by the affected parties, no change hereunder from Defaulting Lender to Lender will constitute a waiver or release of any claim of any party hereunder arising from that Lender's having been a Defaulting Lender.

Section 2.21        Mitigation Obligations; Replacement of Lenders.

(a)        Designation of a Different Lending Office. If any Lender requests compensation under Section 2.16, or requires the Borrower to pay any Indemnified Taxes or additional amounts to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 2.17, then such Lender shall (at the request of the Borrower) use reasonable efforts (subject to overall policy considerations of such Lender) to designate a different lending office for funding or booking its Loans hereunder or to assign its rights and obligations hereunder to another of its offices, branches or affiliates, if, in the sole judgment of such Lender, such designation or assignment (i) would eliminate or reduce amounts payable pursuant to Section 2.16 or Section 2.17, as the case may be, in the future, and (ii) would not subject such Lender to any unreimbursed cost or expense and would not otherwise be disadvantageous to such Lender. The Borrower hereby agrees to pay all reasonable costs and expenses incurred by any Lender in connection with any such designation or assignment.

(b)        Replacement of Lenders. If any Lender requests compensation under Section 2.16, or if the Borrower is required to pay any Indemnified Taxes or additional amounts to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 2.17 and, in each case, such Lender has declined or is unable to designate a different lending office in accordance with Section 2.21(a), or if any Lender is a Defaulting Lender or a Non-Consenting Lender, then the Borrower may, at its sole expense and effort, upon notice to such Lender and the Disbursing Agent, require such Lender to assign and delegate, without recourse (in accordance with and subject to the restrictions contained in, and consents required by, Section 9.06(b)), all of its interests, rights (other than its existing rights to payments pursuant to Section 2.16 or Section 2.17) and obligations under this Agreement and the related Loan Documents to an Eligible Assignee that shall assume such obligations (which assignee may be another Lender, if a Lender accepts such assignment); *provided* that any Non-Consenting Lender shall be deemed to have consented to the assignment and delegation of its interests, rights and obligations if it does not execute and deliver an Assignment and Assumption to the Disbursing Agent within one Business Day after having received a request therefor; *provided*, *further*, that:

(i)        the Borrower shall have paid to the Disbursing Agent the assignment fee (if any) specified in Section 9.06(b);

(ii)        such Lender shall have received payment of an amount equal to the outstanding principal of its Loans, accrued interest thereon, accrued fees and all other amounts payable to it hereunder and under the other Loan Documents (including any amounts under Section 2.18) from the assignee (to the extent of such outstanding principal and accrued interest and fees) or the Borrower (in the case of all other amounts);

(iii)        in the case of any such assignment resulting from a claim for compensation under Section 2.16 or payments required to be made pursuant to Section 2.17, such assignment will result in a reduction in such compensation or payments thereafter;

(iv)        such assignment does not conflict with applicable law; and

(v)        in the case of any assignment resulting from a Lender becoming a Non-Consenting Lender, the applicable assignee shall have consented to the applicable amendment, waiver or consent.

A Lender shall not be required to make any such assignment or delegation if, prior thereto, as a result of a waiver by such Lender or otherwise, the circumstances entitling the Borrower to require such

47

assignment and delegation cease to apply. This Section 2.21(b) shall only apply if there is a Lender in addition to the Lenders party to this Agreement as of the Closing Date.

Section 2.22    Grant of Lien; Super Priority Nature of Obligations and Lenders' Liens.

(a)    Grant of Lien. Each Loan Party, as collateral security for the prompt and complete payment and performance when due (whether at stated maturity, by acceleration or otherwise) of the Obligations, hereby mortgages, pledges and hypothecates to the Collateral Agent for the benefit of the Secured Parties, and grants to the Collateral Agent, for the benefit of the Secured Parties, a Lien on and security interest in, all of its right, title and interest in, to and under the Collateral of such Loan Party, all as further provided in the DIP Orders.

(b)    Superpriority Claims. Each Loan Party hereby covenants, represents and warrants that, upon entry of the Interim DIP Order (and the Final DIP Order, as applicable), the Obligations will have superpriority administrative expense status to the extent, and subject to the priorities and limitations expressly set forth in the DIP Orders.

Section 2.23    Guaranty. To induce the Lenders to make the DIP Loans and, to the extent applicable, each other Secured Party to make credit available to or for the benefit of the Borrower, each Loan Party hereby, jointly and severally, absolutely, unconditionally and irrevocably guarantees, as primary obligor and not merely as surety, the full and punctual payment when due, whether at stated maturity or earlier, by reason of acceleration, mandatory prepayment or otherwise in accordance with any Loan Document (including the DIP Orders), of all the Obligations of each other Loan Party (including the Borrower) whether existing on the date hereof or hereinafter incurred or created (the "Guaranteed Obligations"). The guaranty by each Loan Party set forth in this Section 2.23 constitutes a guaranty of payment and not of collection and shall in no way contravene or otherwise limit the obligations of such Loan Party pursuant to this Agreement.

Section 2.24    Contribution. To the extent that a Loan Party shall be required hereunder to pay any portion of any Guaranteed Obligation exceeding the greater of (a) the amount of the value actually received by such Loan Party and its Subsidiaries from the DIP Loans and other Obligations and (b) the amount such Loan Party would otherwise have paid if such Loan Party had paid the aggregate amount of the Guaranteed Obligations (excluding the amount thereof repaid by such Loan Party that received the benefit of the funds advanced that constituted Guaranteed Obligations) in the same proportion as such Loan Party's net worth on the date enforcement is sought hereunder bears to the aggregate net worth of all Loan Parties on such date, then such Loan Party shall be reimbursed by such other Loan Parties for the amount of such excess, pro rata, based on the respective net worth of such other Loan Parties on such date.

Section 2.25    Authorization; Other Agreement. The Secured Parties are hereby authorized, without notice to or demand upon any Loan Party and without discharging or otherwise affecting the obligations of any Loan Party hereunder and without incurring any liability hereunder, from time to time, to do each of the following:

(a)    (i) subject to compliance, if applicable, with Section 9.01, modify, amend, supplement or otherwise change, (ii) accelerate or otherwise change the time of payment or (iii) waive or otherwise consent to noncompliance with, any Guaranteed Obligation or any Loan Document;

(b)    apply to the Guaranteed Obligations any sums by whomever paid or however realized to any Guaranteed Obligation in such order as provided in the Loan Documents;

(c)  refund at any time any payment received by any Secured Party in respect of any Guaranteed Obligation;

(d)  (i) sell, exchange, enforce, waive, substitute, liquidate, terminate, release, abandon, fail to perfect, subordinate, accept, substitute, surrender, exchange, affect, impair or otherwise alter or release any Collateral for any Guaranteed Obligation or any other guaranty therefor in any manner, (ii) receive, take and hold additional Collateral to secure any Guaranteed Obligation, (iii) add, release or substitute any one or more other Loan Parties, makers or endorsers of any Guaranteed Obligation or any part thereof and (iv) otherwise deal in any manner with the Borrower, maker or endorser of any Guaranteed Obligation or any part thereof; and

(e)  settle, release, compromise, collect or otherwise liquidate the Guaranteed Obligations.

Section 2.26  <u>Guaranty Absolute and Unconditional</u>. Each Loan Party hereby waives and agrees not to assert any defense, whether arising in connection with or in respect of any of the following or otherwise, and hereby agrees that its guaranty obligations under this Agreement are irrevocable, absolute and unconditional and shall not be discharged as a result of or otherwise affected by any of the following (which may not be pleaded and evidence of which may not be introduced in any proceeding with respect to this Agreement, in each case except as otherwise agreed in writing by the Required Lenders):

(a)  the invalidity or unenforceability of any obligation of any Loan Party under any Loan Document or any other agreement or instrument relating thereto (including any amendment, consent or waiver thereto), or any security for, or other guaranty of, any Guaranteed Obligation or any part thereof, or the lack of perfection or continuing perfection or failure of priority of any security for the Guaranteed Obligations or any part thereof;

(b)  the absence of (i) any attempt to collect any Guaranteed Obligation or any part thereof from any Loan Party or other action to enforce the same or (ii) any action to enforce any Loan Document or any Lien thereunder;

(c)  the failure by any Person to take any steps to perfect and maintain any Lien on, or to preserve any rights with respect to, any Collateral;

(d)  any workout, insolvency, bankruptcy proceeding, reorganization, arrangement, liquidation or dissolution by or against any Loan Party or any Loan Party's other Subsidiaries or any procedure, agreement, order, stipulation, election, action or omission thereunder, including any discharge or disallowance of, or bar or stay against collecting, any Guaranteed Obligation (or any interest thereon) in or as a result of any such proceeding;

(e)  any foreclosure, whether or not through judicial sale, and any other sale or other disposition of any Collateral or any election following the occurrence of an Event of Default by any Secured Party to proceed separately against any Collateral in accordance with such Secured Party's rights under any applicable Requirement of Law; or

(f)  any other defense, setoff, counterclaim or any other circumstance that might otherwise constitute a legal or equitable discharge of a Loan Party or any other Subsidiary of a Loan Party, in each case other than the payment in full of the Guaranteed Obligations.

Section 2.27  <u>Waivers</u>. Each Loan Party hereby unconditionally and irrevocably waives and agrees not to assert any claim, defense, setoff or counterclaim based on diligence, promptness, presentment,

49

requirements for any demand or notice hereunder including any of the following: (a) any demand for payment or performance and protest and notice of protest; (b) any notice of acceptance; (c) any presentment, demand, protest or further notice or other requirements of any kind with respect to any Guaranteed Obligation (including any accrued but unpaid interest thereon) becoming immediately due and payable; and (d) any other notice in respect of any Guaranteed Obligation or any part thereof, and any defense arising by reason of any disability or other defense of the Loan Parties. Each Loan Party further unconditionally and irrevocably agrees not to (x) enforce or otherwise exercise any right of subrogation or any right of reimbursement or contribution or similar right against any other Loan Party by reason of any Loan Document or any payment made thereunder or (y) assert any claim, defense, setoff or counterclaim it may have against any other Loan Party or set off any of its obligations to such other Loan Party against obligations of such Loan Party to such Loan Party. No obligation of any Loan Party hereunder shall be discharged other than by complete performance.

Section 2.28    Reliance. Each Loan Party hereby assumes responsibility for keeping itself informed of the financial condition of each other Loan Party and any other guarantor, maker or endorser of any Guaranteed Obligation or any part thereof, and of all other circumstances bearing upon the risk of nonpayment of any Guaranteed Obligation or any part thereof that diligent inquiry would reveal, and each Loan Party hereby agrees that no Secured Party shall have any duty to advise any Loan Party of information known to it regarding such condition or any such circumstances. In the event any Loan Party, in its sole discretion, undertakes at any time or from time to time to provide any such information to any Loan Party, such Secured Party shall be under no obligation to (a) undertake any investigation not a part of its regular business routine, (b) disclose any information that such Secured Party, pursuant to accepted or reasonable commercial finance or banking practices, wishes to maintain confidential or (c) make any future disclosures of such information or any other information to any Loan Party.

Section 2.29    Roll-Up. (a) Following occurrence of the Interim Roll-Up Effective Time, without any further action by any party to this Agreement, the Bankruptcy Court or any other Person, to the extent set forth in the Interim DIP Order, Prepetition Obligations in an aggregate amount of up to $4,000,000 shall be rolled up into and constitute Obligations hereunder and shall be deemed to be DIP Loans made by the Lenders hereunder on the same terms and on a dollar-for-dollar basis as the DIP Loans made in connection with each Interim Credit Extension and (b) upon the occurrence of the Final Roll-Up Effective Time, without any further action by any party to this Agreement, the Bankruptcy Court or any other Person, to the extent set forth in the Final DIP Order, Prepetition Obligations in an amount equal to (i) $10,000,000 less (ii) the aggregate amount of Prepetition Obligations that were rolled up into the Obligations pursuant to the foregoing clause (a) shall be rolled up into and constitute Obligations hereunder and shall be deemed to be DIP Loans made by the Lenders hereunder on the same terms as the DIP Loans made in connection with such Credit Extension (such amounts in the foregoing clauses (a) and (b), collectively, the "Roll-Up Loans") and shall constitute a portion of the outstanding amount of the Obligations owing to the Secured Parties hereunder. For the avoidance of doubt, the Roll-Up Loans will not be tracked separately from the other DIP Loans in the Register maintained by the Administrative Agent and the Roll-Up Loans are intended to have the same terms as the DIP Loans made in connection with any corresponding Credit Extension and shall be fungible with the other DIP Loans hereunder.

## ARTICLE III
## REPRESENTATIONS AND WARRANTIES

To induce the Agents and the Lenders to enter into this Agreement and to make the Loans, each of Holdings and the Borrower hereby jointly and severally represents and warrants to each Agent and each Lender on the Closing Date and on any other date on which the representations and warranties set forth herein are required to be made pursuant to this Agreement or the other Loan Documents, as applicable, that:

Section 3.01    <u>Existence, Qualification and Power</u>. Each Group Member (a) is duly incorporated or organized, validly existing and, as applicable, in good standing under the laws of the jurisdiction of its incorporation or organization, (b) has all requisite power and authority and all requisite governmental licenses, authorizations, consents and approvals to own or lease its assets and carry on its business as now conducted and (c) is duly qualified and licensed and, as applicable, in good standing under the laws of each jurisdiction where such qualification or license or, if applicable, good standing is required; except, in the case of <u>clauses (b)</u> and <u>(c)</u> above, where such failure could not reasonably be expected to have a Material Adverse Effect.

Section 3.02    <u>Authorization; Enforceability</u>. The Transactions to be entered into by each Loan Party are within such Loan Party's powers and have been duly authorized by all necessary corporate or other organizational action on the part of each such Loan Party. Subject to the entry by the Bankruptcy Court of the Interim DIP Order (or the Final DIP Order) when applicable, this Agreement has been duly executed and delivered by each Loan Party hereto and constitutes, and each other Loan Document to which any Loan Party is to be a party, when executed and delivered by such Loan Party, will constitute, a legal, valid and binding obligation of such Loan Party, enforceable against such Loan Party in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting creditors' rights generally, regardless of whether considered in a proceeding in equity or at law.

Section 3.03    <u>No Conflicts</u>. The Transactions (i) do not require any consent, exemption, authorization or approval of, registration or filing with, or any other action by, any Governmental Authority, except (A) such as have been obtained or made and are in full force and effect, (B) entry by the Bankruptcy Court of the Interim DIP Order (or the Final DIP Order) when applicable and (C) consents, approvals, exemptions, authorizations, registrations, filings, permits or actions the failure of which to obtain or perform could not reasonably be expected to have a Material Adverse Effect, (ii) will not violate the Organizational Documents of any Group Member, (iii) will not violate or result in a default or require any consent or approval under any indenture, instrument, agreement, or other document binding upon any Group Member or its property or to which any Group Member or its property is subject, or give rise to a right thereunder to require any payment to be made by any Group Member, except for violations, defaults or the creation of such rights that could not reasonably be expected to have a Material Adverse Effect or resulting from obligations with respect to which the Bankruptcy Code prohibits the Loan Parties from complying, (iv) will not violate any Requirement of Law in any material respect and (v) will not result in the creation or imposition of any Lien on any property of any Group Member, except Liens created by the Loan Documents.

Section 3.04    <u>Financial Statements; No Material Adverse Effect</u>.

(a)    The Borrower has heretofore delivered to the Agents and the Lenders the consolidated statements of income of Holdings and its Subsidiaries as of and for the 12-month period ended January 31, 2025 and for the comparable period of the preceding fiscal year, in each case, certified by the chief financial officer of Holdings. Such financial statements, and all financial statements delivered pursuant to <u>Section 5.01(c)</u>, have been prepared in accordance with GAAP consistently applied throughout the applicable period covered thereby and present fairly and accurately in all material respects the consolidated financial condition and results of operations and cash flows of Holdings as of the dates and for the periods to which they relate (subject to normal year-end audit adjustments and the absence of footnotes). Except as set forth in such financial statements, there are no material liabilities of Holdings, the Borrower or any of its Subsidiaries of any kind, whether accrued, contingent, absolute, determined, determinable or otherwise, and there is no existing condition, situation or set of circumstances which could reasonably be expected to result in such a liability.

(b)        Since January 1, 2024, to the knowledge of Holdings and its Subsidiaries, there has been no event, change, circumstance, condition, development or occurrence that has had, or would reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect, other than the Chapter 11 Events and Circumstances and any event, change, circumstance, condition, development or occurrence that has been previously disclosed in writing to the Agent and the Lenders.

Section 3.05        Intellectual Property.

(a)        Each Group Member owns or is licensed to use, free and clear of all Liens (other than Permitted Liens), all Intellectual Property, necessary for the conduct of its business as currently conducted, except for those which the failure to own or license, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.

(b)        No claim has been asserted and is pending by any person challenging or questioning the use by any Group Member of any such Intellectual Property referred to in Section 3.05(a) or the validity or effectiveness of any such Intellectual Property, nor does any Loan Party know of any valid basis for any such claim. Except for Incidental Licenses, no Group Member licenses any Intellectual Property owned by such Group Member to any third party, and no Group Member has done anything to authorize or enable any other person to use any such Intellectual Property. Each Group Member has taken commercially reasonable actions to protect the secrecy, confidentiality and value of all material trade secrets used in such Group Member's business.

(c)        No Violations or Proceedings. (i) To the knowledge of Holdings or the Borrower, there is no violation by others of any right of any Group Member with respect to any Intellectual Property, other than such violations that, individually or in the aggregate, could not reasonably be expected to materially adversely affect the value or utility of the Intellectual Property or any portion thereof material to the use and operation of the Collateral, (ii) to the knowledge of Holdings or the Borrower, no Group Member is infringing upon or misappropriating any copyright, patent, trademark, trade secret or other intellectual property right of any other person, except where such infringement or misappropriation, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect, (iii) no Group Member is in breach of, or in default under, any license of Intellectual Property by any other person to such Group Member, except where such breach or default, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect, and (iv) no proceedings have been instituted or are pending against any Group Member or, to the knowledge of Holdings or the Borrower, are threatened, and no claim against any Group Member has been received by any Group Member, alleging any such infringement or misappropriation, except to the extent that such proceedings or claims, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.

(d)        No Impairment. Neither the execution, delivery or performance of this Agreement and the other Loan Documents, nor the consummation of the Transactions and the other transactions contemplated hereby and thereby, will alter, impair or otherwise affect or require the consent, approval or other authorization of any other person in respect of any right of any Group Member in any Intellectual Property, except to the extent that such alteration, impairment, affect, or requirement to obtain any such consent, approval or other authorization, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.

(e)        No Agreement or Order Materially Affecting Intellectual Property. No Group Member is subject to any settlement, covenant not to sue or other instrument, agreement or other document, or any outstanding order, which may materially affect the validity or enforceability or restrict in any manner such Group Member's use, licensing or transfer of any of the Intellectual Property.

Section 3.06    Properties.

(a)    Each Group Member has good and marketable title to, or valid leasehold interests in, all its property material to its business, free and clear of all Liens and irregularities, deficiencies and defects in title, except for Permitted Liens and minor irregularities, deficiencies and defects in title that, individually or in the aggregate, do not, and could not reasonably be expected to, interfere with its ability to conduct its business as currently conducted or to utilize such property for its intended purpose.

(b)    The property of the Group Members, taken as a whole, (i) is in good operating order, condition and repair (ordinary wear and tear excepted), and (ii) constitutes all the property which is required for the business and operations of the Group Members as presently conducted.

(c)    As of the Closing Date, Schedule 3.06 contains a true, accurate and complete, in each case in all material respects, list of each ownership and leasehold interest in Real Property (i) owned by any Group Member and describes the type of interest therein held by such Group Member and (ii) leased, subleased or otherwise occupied or utilized by any Group Member, as lessee, sub-lessee, franchisee or licensee and describes the type of interest therein held by such Group Member and whether such lease, sublease or other instrument requires the consent of the landlord thereunder or other parties thereto to the Transactions.

(d)    Each Group Member owns or has rights to use all of its property and all rights with respect to any of the foregoing which are required for the business and operations of the Group Members as presently conducted. The use by each Group Member of its property and all such rights with respect to the foregoing do not infringe on the rights or other interests of any person, other than any infringement that would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect. No claim has been made and remains outstanding that any Group Member's use of any of its property does or may violate the rights of any third party that, individually or in the aggregate, has had, or could reasonably be expected to result in, a Material Adverse Effect. The Real Property is zoned in all material respects to permit the uses for which such Real Property is currently being used. Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, the present uses of the Real Property and the current operations of each Group Member's business do not violate any provision of any applicable building codes, subdivision regulations, fire regulations, health regulations or building and zoning by-laws.

(e)    Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, there is no pending or threatened condemnation or eminent domain proceeding with respect to, or that could affect, any of the Real Property of any Group Member.

(f)    Each parcel of Real Property is taxed as a separate tax lot and is currently being used in a manner that is consistent with and in compliance in all material respects with the property classification assigned to it for real estate tax assessment purposes.

(g)    No Group Member is obligated under, or a party to, any option, right of first refusal or other contractual right to sell, assign or dispose of any material Real Property or any portion thereof or interest therein.

Section 3.07    Equity Interests and Subsidiaries. Schedule 3.07 sets forth (i) each Group Member and its jurisdiction of incorporation or organization as of the Closing Date and (ii) the number of each class of its Equity Interests authorized, and the number outstanding, on the Closing Date and the number of Equity Interests covered by all outstanding options, warrants, rights of conversion or purchase and similar rights on the Closing Date. All Equity Interests of each Group Member are duly and validly issued and are

53

fully paid and non-assessable, and, other than the Equity Interests of Holdings and the Borrower, are owned by the Borrower, directly or indirectly, through wholly-owned Subsidiaries. All Equity Interests of the Borrower are owned directly by Holdings. Each Loan Party is the record and beneficial owner of, and has good and marketable title to, the Equity Interests pledged by (or purported to be pledged by) it under the Loan Documents, free of any and all Liens, rights or claims of other persons (other than Permitted Equity Liens), and, except as set forth on <u>Schedule 3.07</u>, as of the Closing Date, there are no outstanding warrants, options or other rights (including derivatives) to purchase, or shareholder, voting trust or similar agreements outstanding with respect to, or property that is convertible into, or that requires the issuance or sale of, any such Equity Interests (or any economic or voting interests therein).

Section 3.08    <u>Compliance with Laws and Contracts</u>. Each Group Member:

(a)    holds Permits necessary for the conduct of its business and is in compliance with all applicable laws relating thereto, except where the failure to do so would not have a Material Adverse Effect;

(b)    is in compliance with all Requirements of Law except (i) where the failure to be in compliance would not have a Material Adverse Effect or (ii) arising under any agreement that the Borrower has rejected under Section 365 of the Bankruptcy Code not in prohibition of this Agreement or the DIP Orders; and

(c)    is not in violation of or in default under any agreement to which it is a party or by which its assets are subject or bound (including this Agreement and the other Loan Documents), except with respect to any violation or default that (i) would not have a Material Adverse Effect, (ii) arises from the Chapter 11 Events and Circumstances or (iii) arises from obligations with respect to which the Bankruptcy Code prohibits the Loan Parties from complying.

Section 3.09    <u>Litigation</u>. All actions, suits, claims, disputes or proceedings at law or in equity by or before any Governmental Authority pending or, to the best of the knowledge of Holdings or the Borrower, threatened against or affecting any Group Member or any business, property or rights of any Group Member as of the Closing Date are set forth on <u>Schedule 3.09</u>. Other than the Chapter 11 Cases, there are no actions, suits, claims, disputes or proceedings at law or in equity by or before any Governmental Authority now pending or, to the best of the knowledge of Holdings or the Borrower, threatened against or affecting any Group Member or any business, property or rights of any Group Member (i) that purport to affect or involve any Loan Document, any of the Transactions or any Prepetition Loan Document (other than objections or pleadings that may have been filed in the Chapter 11 Cases with respect to the Loan Parties seeking authorization to enter into the Loan Documents and incur Obligations under this Agreement) or (ii) that have resulted, or as to which there is a reasonable possibility of an adverse determination and that, if adversely determined, could, individually or in the aggregate, reasonably be expected to result, in a Material Adverse Effect.

Section 3.10    <u>Investment Company Act</u>. No Group Member is an "investment company" or a company "controlled" by an "investment company", as defined in, or subject to regulation under, the Investment Company Act of 1940, as amended.

Section 3.11    <u>Federal Reserve Regulations</u>.

(a)    No Group Member is engaged principally, or as one of its important activities, in the business of purchasing or carrying Margin Stock, or extending credit for the purpose of purchasing or carrying Margin Stock.

(b)      No part of the proceeds of any Credit Extension will be used, whether directly or indirectly, and whether immediately, incidentally or ultimately, for purchasing or carrying Margin Stock or to extend credit to others for the purpose of purchasing or carrying Margin Stock or for any other purpose that entails a violation of, or that is inconsistent with, the provisions of the regulations of the Board of Governors, including Regulation T, Regulation U or Regulation X.

Section 3.12      Taxes. Each Group Member has (a) filed or caused to be filed all material Tax returns that are required to be filed by it (or has filed timely extensions with respect to such Tax returns) and (b) paid or caused to be paid all material Taxes required to be paid by it, except (i) Taxes that are being contested in good faith by appropriate proceedings and for which such Group Member has set aside on its books adequate reserves, or (ii) to the extent that the failure to do so could not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

Section 3.13      No Material Misstatements.

(a)      The Borrower has disclosed to the Disbursing Agent and the Lenders all agreements, instruments and corporate or other restrictions to which it or any of its Subsidiaries or Holdings is subject, and all other matters known to it, that, individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect. At the time furnished, the reports, financial statements, certificates or other information furnished (other than any projections, forecasts and other forward-looking information, budgets, estimates and information of a general economic or industry-specific nature) by or on behalf of any Loan Party to the Disbursing Agent or any Lender in connection with the transactions contemplated hereby and the negotiation of this Agreement or delivered hereunder or under any other Loan Document (as modified or supplemented by other information so furnished) are complete and correct in all material respects and do not contain any material misstatement of fact or omit to state any material fact necessary to make the statements therein, in light of the circumstances under which they were made, not misleading.

(b)      As of the Closing Date, the information included in the Beneficial Ownership Certification is true and correct in all material respects.

Section 3.14      Labor Matters.

(a)      There are no strikes, lockouts, stoppages or slowdowns or other labor disputes affecting any Group Member pending or, to the knowledge of Holdings or the Borrower, threatened that have had, or could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(b)      The consummation of the Transactions will not give rise to any right of termination or right of renegotiation on the part of any union under any collective bargaining agreement to which any Group Member is bound.

(c)      All payments due from any Group Member, or for which any claim may be made against any Group Member, on account of wages and employee health and welfare insurance and other benefits, have been paid or accrued as a liability on the books of such Group Member except to the extent that the failure to do so has not had, and could not reasonably be expected to have, a Material Adverse Effect.

(d)      Within the last three (3) years, the hours worked by and payments made to employees of any Group Member have not been in violation of the Fair Labor Standards Act of 1938, as amended.

Section 3.15    ERISA. Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, each Plan and, with respect to each Plan, each of Holdings, the Borrower and their respective ERISA Affiliates are in compliance with the applicable provisions of ERISA and the Code. Each Single Employer Plan which is intended to qualify under Section 401(a) of the Code has received a favorable determination letter from the IRS indicating that such Plan is so qualified in form, or may rely on an IRS opinion or advisory letter, and nothing has occurred subsequent to the issuance of such determination letter which would cause such Plan to lose its qualified status. No liability to the PBGC (other than required premium payments), the IRS, any Single Employer Plan (other than in the ordinary course) or any trust established under Title IV of ERISA has been or is expected to be incurred by Holdings, the Borrower or any of their respective ERISA Affiliates with respect to any Single Employer Plan. Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect and except as a result of the Chapter 11 Events and Circumstances, no ERISA Event has occurred or is reasonably expected to occur. The present value of all accrued benefit obligations under each Single Employer Plan (based on those assumptions used to fund such Single Employer Plans) did not, as of the last annual valuation date prior to the date on which this representation is made or deemed made, exceed the value of the assets of such Single Employer Plan allocable to such accrued benefit obligations by a material amount. As of the most recent valuation date for each Multiemployer Plan, the potential liability of Holdings, the Borrower and each of their respective ERISA Affiliates for a complete withdrawal from such Multiemployer Plan (within the meaning of Section 4203 or Section 4205 of ERISA), when aggregated with such potential liability for a complete withdrawal from all Multiemployer Plans, is zero. Holdings, the Borrower and, solely with respect to plans subject to Title IV of ERISA, each of their respective ERISA Affiliates have complied in all material respects with the requirements of Section 515 of ERISA with respect to each multiemployer plan (within the meaning of Section 3(37) of ERISA) and are not in material "default" (as defined in Section 4219(c)(5) of ERISA) with respect to payments to any such multiemployer plan. Neither Holdings, the Borrower nor any of their respective ERISA Affiliates contributes to, or has any liability with respect to, any Multiemployer Plan subject to Title IV of ERISA. Neither Holdings nor the Borrower has any contingent liability with respect to any broad-based post-retirement welfare benefit under a Plan that is subject to ERISA, other than liability for continuation coverage described in Part 6 of Title I of ERISA. Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, neither Holdings nor the Borrower maintains or contributes to any employee benefit plan that is subject to the laws of any jurisdiction outside the United States of America.

Section 3.16    Environmental Matters. Other than exceptions to any of the following that would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect:

(a)    the Group Members: (i) are, and have been, in compliance with all applicable Environmental Laws including obtaining, maintaining and complying with all Environmental Permits required for their current or intended operations or for any property owned, leased, or otherwise operated by any of them; and (ii) reasonably believe that compliance with any Environmental Law that is or is expected to become applicable to any of them will be timely attained and maintained, without material expense;

(b)    Materials of Environmental Concern have not been Released and are not present at, on, under, in, or about any real property now or formerly owned, leased or operated by any Group Member, to the knowledge of Holdings or the Borrower at any real property formerly owned, leased or operated by any Group Member or at any other location (including, without limitation, any location to which Materials of Environmental Concern have been sent for re-use, recycling, treatment, storage, or disposal);

(c)    there are no pending or, to the knowledge of Holdings or the Borrower, threatened actions, suits, claims, disputes or proceedings at law or in equity, administrative or judicial, by or before any Governmental Authority (including any notice of violation or alleged violation or seeking to revoke, cancel, or amend any Environmental Permit) under or relating to any Environmental Law to which any Group Member is, or to the knowledge of Holdings or the Borrower, will be, named as a party or affecting any Group Member or any business, property or rights of any Group Member;

(d)    no Group Member has received any written request for information, or been otherwise notified that it is a potentially responsible party under or relating to the federal Comprehensive Environmental Response, Compensation, and Liability Act or any similar Environmental Law, or with respect to any Release of Materials of Environmental Concern;

(e)    no real property currently owned or leased by any Group Member is subject to any Lien imposed pursuant to Environmental Law and, to the knowledge of Holdings or the Borrower, there are no existing facts, circumstances or conditions that would reasonably be expected to result in any such Lien attaching to any such property;

(f)    no Group Member has entered into or agreed to any consent decree, order, or settlement or other agreement, or is subject to any judgment, decree, or order or other agreement, in any judicial, administrative, arbitral, or other forum for dispute resolution, relating to compliance with Environmental Law or any Environmental Liability; and

(g)    no Group Member has assumed or retained, by contract or operation of law, any Environmental Liabilities of any kind, whether fixed or contingent, known or unknown.

Section 3.17    Insurance. Schedule 3.17 sets forth a true, complete and accurate description in reasonable detail of all insurance maintained by each Group Member as of the Closing Date. Each Group Member is insured by insurers of recognized financial responsibility against such losses and risks and in such amounts as are prudent and customary in the businesses in which it is engaged. No Group Member has any reason to believe that it will not be able to renew its existing insurance coverage as and when such coverage expires or to obtain similar coverage from similar insurers.

Section 3.18    Security Documents. Upon the issuance and entry of the Interim DIP Order, the provisions of this Agreement and the other Loan Documents create, in favor of the Collateral Agent, for the benefit of the Secured Parties, a legal, valid, binding and enforceable security interest in and Lien on the Collateral (including all Real Property) described therein and proceeds and products thereof. Such Lien shall constitute a fully perfected and continuing Lien with the priority in the DIP Orders on all right, title and interest of the Loan Parties in the Collateral and the proceeds and products thereof, in each case, securing the Obligations, enforceable against the applicable Loan Party and all third parties and having priority over all other Liens on the Collateral (including, effective only upon entry of the Final DIP Order, proceeds of Avoidance Actions), other than with respect to the Carve-Out and the Prepetition Prior Liens as set forth in the DIP Orders.

Section 3.19    Anti-Money Laundering and Anti-Corruption.

(a)    Each Loan Party, each Subsidiary, and each director, officer and employee of any Loan Party or an Affiliate of any Loan Party and, to the knowledge of such Loan Party or Affiliate, each agent of such Loan Party or Affiliate is in compliance with all applicable Anti-Money Laundering Laws and no action, suit or proceeding by or before any court or governmental agency, authority or body or any arbitrator involving any Loan Party or any Affiliate with respect to Anti-Money Laundering Laws is (or

has ever been) pending and to such Loan Party's knowledge, no such actions, suits or proceedings are threatened or contemplated.

(b)    Each Loan Party has instituted and maintains policies and procedures designed to ensure continued compliance with all applicable Anti-Money Laundering Laws.

(c)    Each Loan Party, each Subsidiary, and each director, officer and employee of any Loan Party or an Affiliate of any Loan Party and, to the knowledge of such Loan Party or Affiliate, each agent of such Loan Party or Affiliate has been during the last five years, and continues to be, in compliance with the applicable Anti-Corruption Laws. No part of the proceeds of the Loans will be used, directly or indirectly, for any payment to any governmental official or employee, political party, official of a political party, candidate for political office, or anyone else acting in an official capacity, in order to obtain, retain or direct business or obtain any improper advantage, in violation of the applicable Anti-Corruption Laws.

Section 3.20    International Trade Laws.

(a)    Holdings has implemented and maintains in effect policies and procedures designed to ensure compliance by Holdings, the Borrower, its Subsidiaries and their respective directors, officers, employees and agents with all applicable International Trade Laws. Each Group Member and each of their respective officers, directors, employees and, to the knowledge of the Borrower, the agents and representatives of each Group Member, is in compliance with International Trade Laws in all material respects.

(b)    None of the Loan Parties or any Subsidiary or any of their respective officers, directors or employees or, to the knowledge of the Borrower, the agents or representatives of any Loan Party have, within the past five years, (i) engaged in any activity or transaction, directly or indirectly, with or involving a Sanctioned Country or a Sanctioned Person (including but not limited to services provided by validators), or (ii) engaged in any activity or transaction otherwise prohibited by applicable International Trade Laws.

(c)    None of the Loan Parties or any Subsidiary has or is engaged in or conspires to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions set forth in any International Trade Laws.

(d)    None of the Loan Parties or any Subsidiary or their respective agents acting or benefiting in any capacity in connection with the Loans, the Transactions or the other transactions hereunder, is a Sanctioned Person or located in a Sanctioned Country.

Section 3.21    Use of Proceeds. The Borrower will use the proceeds of the Loans only for the purposes specified in the recitals to this Agreement and Section 5.11. The Borrower will not, directly or indirectly, use the proceeds of the Loans, or lend, contribute or otherwise make available such proceeds to any subsidiary, joint venture partner or other Person, (i) to fund any activities or business of or with any Sanctioned Country or Sanctioned Person, or in any country or territory, that, at the time of such funding, is the subject of Sanctions, or (ii) in any other manner that would result in a violation of Anti-Corruption Laws, Anti-Money Laundering Laws or International Trade Laws by any Person (including any Person participating in the Loans, whether as an Agent, Lender, advisor, investor or otherwise).

Section 3.22    Bankruptcy Matters.

(a)    The Chapter 11 Cases were commenced on the Petition Date in accordance with applicable law and proper notice thereof and the proper notice, to the extent given or required to be given

58

prior to the date hereof, was given for (x) the motions seeking approval of the Loan Documents and the Interim DIP Order and Final DIP Order, (y) the hearings for the approval of the Interim DIP Order, and (z) the hearings for the approval of the Final DIP Order.

(b)    From and after the entry of the Interim DIP Order, and pursuant to and to the extent permitted in the Interim DIP Order and the Final DIP Order, the Obligations will constitute allowed administrative expenses in the Chapter 11 Cases having priority over all administrative expenses and unsecured claims against the Loan Parties to the extent set forth in Section 2.22 and as further set forth in the DIP Orders.

(c)    From and after the entry of the Interim DIP Order and pursuant to and to the extent provided in the Interim DIP Order and the Final DIP Order, the Obligations will be secured by a valid and perfected first priority lien on all of the Collateral (including, effective only upon entry of the Final DIP Order, proceeds of Avoidance Actions), subject, as to priority only, to the Carve-Out and the Prepetition Prior Liens, as set forth in the DIP Orders.

(d)    The Interim DIP Order (with respect to the period prior to entry of the Final DIP Order) or the Final DIP Order (with respect to the period on and after entry of the Final DIP Order), as the case may be, is in full force and effect has not been reversed, stayed, modified or amended without the Required Lenders' consent in their sole discretion.

### ARTICLE IV
### CONDITIONS PRECEDENT

Section 4.01    Conditions to Initial Credit Extension. The obligation of each Lender to make the initial Credit Extension requested to be made by it hereunder on the Closing Date is subject to the satisfaction (or waiver), prior to or concurrently with the making of such Credit Extension on the Closing Date, of each of the following conditions precedent (the making of such initial Credit Extensions by a Lender being conclusively deemed to be its satisfaction or waiver of the conditions precedent):

(a)    Loan Documents. (i) The Disbursing Agent and the Lenders shall have received (x) this Agreement, executed and delivered by a duly authorized officer of Holdings, the Borrower, each Agent and each Lender, (y) each Security Document set forth on Schedule 4.01(a), if any, executed and delivered by a duly authorized officer of each party thereto, (z) the Fee Letter, executed and delivered by a duly authorized officer of each party thereto, and (ii) each Lender that has requested a Note at least two Business Days prior to the Closing Date shall have received a Note, executed and delivered by the Borrower in favor of each such Lender.

(b)    Financial Statements. The Lenders shall have received the financial statements described in Section 3.04(a).

(c)    [Reserved].

(d)    [Reserved].

(e)    Fees and Expenses. The Lenders and the Agents shall have received all fees and other amounts due and payable on or prior to the Closing Date, including, to the extent invoiced at least one Business Day prior to the Closing Date, reimbursement or payment of (i) all out-of-pocket expenses (including reasonable fees, disbursements and other charges of counsel) required to be reimbursed or paid under any Loan Document and (ii) all accrued and past-due fees, costs, expenses and charges payable to any Prepetition Secured Party to the extent, and at the times, payable under the Prepetition Loan Documents.

(f)    [Reserved].

(g)    Closing Certificate. The Disbursing Agent and the Lenders shall have received a certificate of Holdings, dated the Closing Date, confirming satisfaction of the conditions set forth in Section 4.02(a), Section 4.02(b), Section 4.01(k) and Section 4.01(o).

(h)    Secretary's Certificates. The Disbursing Agent and the Lenders shall have received with respect to the Borrower and each other Loan Party:

(i)    copies of the Organizational Documents of such Loan Party (including each amendment thereto) certified as being a true and complete copy thereof by the Secretary of State or other applicable Governmental Authority of the jurisdiction in which each such Loan Party is organized; and

(ii)    a certificate of the secretary or assistant secretary of each Loan Party dated the Closing Date and certifying (A) that the Organizational Documents of such Loan Party provided to the Disbursing Agent and Lenders are in effect on the Closing Date, (B) [reserved], (C) that the certificate or articles of incorporation, formation or organization, as applicable, of such Loan Party have not been amended since the date of the last amendment provided in accordance with the foregoing subclause (A), and (D) as to the incumbency and specimen signature of each Person authorized to execute any Loan Document or any other document delivered in connection herewith on behalf of such Loan Party.

(i)    [Reserved].

(j)    [Reserved].

(k)    No Material Adverse Effect. Since January 1, 2024, no Material Adverse Effect shall have occurred, other than the Chapter 11 Events and Circumstances or as previously disclosed in writing to the Agent and the Lenders.

(l)    Insurance. The Lenders shall have received a copy of, or a certificate as to coverage under, the insurance policies required by Section 5.07 and the applicable provisions of the Loan Documents, each of which shall be endorsed or otherwise amended to include a "standard" or "New York" lender's loss payable or mortgage endorsement (as applicable) and shall name the Collateral Agent, on behalf of the Secured Parties, as additional insured or loss payee, as applicable, in form and substance reasonably satisfactory to the Required Lenders and the Collateral Agent.

(m)    Letter of Direction. The Disbursing Agent and the Lenders shall have received a duly executed letter of direction from the Borrower (which may be included as part of the Borrowing Notice) addressed to the Disbursing Agent, on behalf of itself and the Lenders, directing the disbursement on the Closing Date of the proceeds of the Loans made on such date.

(n)    No Litigation. Other than the Chapter 11 Cases, there shall not exist any action, suit, investigation, litigation, proceeding, injunction, hearing or other legal or regulatory developments, pending or, to the knowledge of the Loan Parties, threatened in any court or before any arbitrator or Governmental Authority that individually or in the aggregate materially impairs the Transactions, the financing thereof or any of the other transactions contemplated by the Loan Documents.

(o)    Unrestricted Cash. After giving effect to the funding of the Initial Credit Extension on the Closing Date and the payment of all Transaction Costs, Unrestricted Cash of the Loan Parties shall equal or exceed $250,000.

60

(p)    <u>Permits and Consents</u>. Each Loan Party shall have obtained all Permits and all consents of other Persons, in each case that are necessary in connection with the financing contemplated by the Loan Documents and are required for the operation of its business as currently conducted.

(q)    <u>Debtor-in-Possession</u>. Each Loan Party shall be a debtor and a debtor-in-possession under Chapter 11 of the Bankruptcy Code.

(r)    <u>Interim DIP Order</u>. The Bankruptcy Court shall have entered the Interim DIP Order, and such Interim DIP Order shall be in full force and effect and shall not have been stayed, vacated, reversed, amended or otherwise modified without the prior written consent of the Required Lenders in their sole discretion.

(s)    <u>No Other Relief</u>. No motion, pleading or application seeking relief affecting the provision of the financing contemplated hereunder shall have been filed in the Bankruptcy Court by any Loan Party without the prior written consent of the Required Lenders in their sole discretion.

(t)    <u>Cash Management Order</u>. The Bankruptcy Court shall have entered a cash management order in form and substance acceptable to the Required Lenders in their sole discretion (such cash management order, the "<u>Cash Management Order</u>"), and such order shall be in full force and effect and shall not have been stayed, vacated, reversed, amended or otherwise modified without the prior written consent of the Required Lenders in their sole discretion.

(u)    <u>Initial Approved Budget</u>. The Lenders shall have received the Initial Approved Budget (as defined in the Interim DIP Order), attached as Exhibit A to the Interim DIP Order (the "<u>Initial Approved Budget</u>"), which shall be in form and substance acceptable to the Required Lenders.

(v)    <u>DIP Order Conditions</u>. All other conditions to borrowing in the Interim DIP Order shall have been satisfied.

Each Lender, by delivering its signature page to this Agreement and funding a Loan on the Closing Date, shall be deemed to have consented to, approved or accepted or to be satisfied with, each Loan Document and each other document required thereunder to be consented to, approved by or acceptable or satisfactory to a Lender.

Section 4.02    <u>Conditions to Each Credit Extension</u>. The obligation of each Lender to make any Credit Extension (other than, for the avoidance of doubt, in connection with an Interest Election Request requesting only a conversion of Loans to the other Type, or a continuation of a SOFR Loan) requested to be made by it hereunder on any date is subject to the satisfaction or waiver of the following conditions precedent:

(a)    <u>Representations and Warranties</u>. Each of the representations and warranties made by any Loan Party in or pursuant to the Loan Documents shall be true and correct in all material respects on and as of the date of such Credit Extension with the same effect as though made on and as of such date, except to the extent such representations and warranties expressly relate to an earlier date (in which case such representations and warranties shall be true and correct in all material respects as of such earlier date); *provided* that any representation and warranty qualified by "materiality", "Material Adverse Effect" or similar language shall be true and correct (after giving effect to any qualification therein) in all respects.

(b)    <u>No Default</u>. No Default or Event of Default shall exist or would result from such Credit Extension or from the application of the proceeds thereof.

(c)    <u>Borrowing Notice</u>. The Disbursing Agent shall have received a fully executed and delivered Borrowing Notice in accordance with the requirements hereof.

(d)    <u>DIP Loan Commitments</u>. The amount of DIP Loans requested for such Credit Extension shall not exceed the DIP Loan Commitments then in effect.

(e)    <u>Orders</u>.

(i)    (A) If such date is on or after the Interim Period Outside Date, the Bankruptcy Court shall have entered the Final DIP Order, (B) if the Interim DIP Order has expired, the Bankruptcy Court shall have entered the Final DIP Order, (C) the Interim DIP Order or the Final DIP Order, as the case may be, shall not have been vacated, stayed, reversed, modified or amended without the Lenders' consent (and the Agents' consent to the extent required pursuant to Section 9.01) or shall otherwise be in full force and effect and (D) the Interim DIP Order or the Final DIP Order, as the case may be, in any respect shall not be the subject of a stay pending either appeal or a motion for reconsideration thereof.

(ii)    For any DIP Loan to be made prior to the entry of the Final DIP Order, the sum of the outstanding principal amount of the DIP Loans (after giving effect to the amount of the requested DIP Loan) shall not exceed the amount permitted by the Interim DIP Order.

Each delivery of a Borrowing Notice and the acceptance by the Borrower of the proceeds of such Credit Extension shall constitute a representation and warranty by Holdings and the Borrower that on the date of such Credit Extension (both immediately before and after giving effect to such Credit Extension and the application of the proceeds thereof) the conditions contained in this <u>Section 4.02</u> have been satisfied. The Borrower shall provide such information as the Required Lenders may reasonably request to confirm that the conditions in this <u>Section 4.02</u> have been satisfied.

**ARTICLE V**
**AFFIRMATIVE COVENANTS**

Each of Holdings and the Borrower hereby jointly and severally agrees that, until Payment in Full, each of Holdings and the Borrower shall, and shall (except in the case of the covenants set forth in <u>Section 5.01</u>, <u>Section 5.02</u> and <u>Section 5.03</u>) cause each of its Subsidiaries to:

Section 5.01    <u>Financial Statements</u>. Deliver to each Lender, in form and detail reasonably satisfactory to the Required Lenders:

(a)    [reserved];

(b)    [reserved];

(c)    as soon as available, but in any event within 30 days after the end of each calendar month, a copy of the unaudited draft consolidated and consolidating statements of income or operations of Holdings and its Subsidiaries for such month and for the portion of the fiscal year through the end of such month;

(d)    [reserved];

(e)    [reserved];

(f)        commencing on April 9, 2025, and on each four-week anniversary thereof, rolling updated 13-week cash flow forecasts in accordance with the DIP Orders; and

(g)        by 11:59 p.m. (New York City time) on Wednesday of each week (or such other time as provided in and required by the DIP Orders), a variance report/reconciliation report (the "Variance Report"), certified by a Financial Officer of the Borrower, in form acceptable to the Required Lenders, setting forth the applicable information required by the DIP Orders.

Any documents required to be delivered pursuant to this Section 5.01 may be delivered by posting such documents electronically with notice of such posting to the Lenders and if so posted, shall be deemed to have been delivered on the date on which such documents are posted on the Borrower's behalf on IntraLinks/IntraAgency or another relevant website to which each Lender has access.

Section 5.02        Certificates; Other Information. Deliver to the Disbursing Agent and each Lender, in form and detail reasonably satisfactory to the Required Lenders:

(a)        [reserved];

(b)        concurrently with the delivery of each Variance Report under Section 5.01(g), (i) a certification as to whether any Default or Event of Default has occurred and, if a Default or Event of Default has occurred, specifying the details thereof and any action taken or proposed to be taken with respect thereto and (ii) reasonably detailed calculations of the Budget Covenants (as defined in the DIP Orders);

(c)        promptly after any reasonable request by the Required Lenders, copies of any detailed audit reports, management letters or recommendations submitted to the board of directors (or the audit committee of the board of directors) of Holdings, the Borrower or any of its Subsidiaries by independent accountants in connection with the accounts or books of Holdings, the Borrower or any of its Subsidiaries or any audit of any of them;

(d)        promptly after the same are available, copies of each annual report, proxy or financial statement or other report or communication sent to the members of Holdings, and copies of all annual, regular, periodic and special reports and registration statements which Holdings may file or be required to file with the SEC under Section 13 or 15(d) of the Exchange Act, or with any national securities exchange, and in any case not otherwise required to be delivered to the Lenders pursuant hereto;

(e)        promptly after the furnishing thereof, copies of any statement or report furnished to any holder of debt securities of Holdings, the Borrower or any of its Subsidiaries pursuant to the terms of any indenture, loan or credit or similar agreement and not otherwise required to be furnished to the Lenders pursuant to Section 5.01 or any other clause of this Section 5.02;

(f)        as soon as available, but in any event within 30 days after the end of each fiscal year of Holdings, a report summarizing the insurance coverage (specifying type, amount and carrier) in effect for Holdings, the Borrower and its Subsidiaries and containing such additional information as the Required Lenders may reasonably specify;

(g)        promptly, and in any event within five Business Days after receipt thereof by Holdings, the Borrower or any of its Subsidiaries, copies of each notice or other correspondence received from the SEC (or any comparable agency in any applicable non-U.S. jurisdiction) concerning any investigation or possible investigation or other inquiry by such agency regarding financial or other operational results of such Loan Party or such Subsidiary;

(h)    [reserved];

(i)    as soon as available, but not later than the date such reports or certificates are required to be delivered pursuant to the terms of the DIP Orders, copies of all other reports and certificates required to be delivered by the Loan Parties pursuant to the terms of the DIP Orders;

(j)    no later than Wednesday of each calendar week (beginning with the calendar week ending on March 28, 2025), a report, in form acceptable to the Required Lenders, setting forth any updates with respect to the potential sale or sale of any of the Borrower's assets and the sale process milestones set forth in the DIP Orders;

(k)    promptly, (i) such additional information regarding the business, financial, legal or corporate affairs of Holdings, the Borrower or any of its Subsidiaries, or compliance with the terms of the Loan Documents, as the Disbursing Agent or any Lender may from time to time reasonably request and (ii) information and documentation reasonably requested by the Disbursing Agent or any Lender for purposes of compliance with applicable "know your customer" requirements under the PATRIOT Act or other applicable anti-money laundering laws.

Section 5.03    Notices. Promptly (and in no event later than three Business Days after becoming aware thereof) give written notice to the Disbursing Agent, the Collateral Agent and each Lender of:

(a)    the occurrence of any Default or Event of Default;

(b)    any development or event that has had, or could reasonably be expected to have, a Material Adverse Effect, including without limitation, any breach or non-performance of, or any default under, a Contractual Obligation of the Borrower or any Subsidiary;

(c)    (i) any dispute, litigation, investigation, proceeding or suspension between any Group Member and any Governmental Authority (1) involving fines, penalties or damages in excess of $100,000 or (2) seeking an injunction or other stay of the performance of this Agreement, any other Loan Document or any Prepetition Loan Document; (ii) the commencement of, or any material development in, any litigation or proceeding affecting the Borrower or any Subsidiary involving damages in excess of $100,000; or (iii) any criminal investigation or proceeding between any Group Member or any officer or director of any Group Member in his or her capacity as such and any Governmental Authority;

(d)    the occurrence of any of the following events, as soon as possible and in any event within 30 days after any Group Member knows or has reason to know thereof: (i) any ERISA Event, (ii) the adoption of any new Single Employer Plan by any Group Member or any of their respective ERISA Affiliates, (iii) the adoption of an amendment to a Single Employer Plan if such amendment results in a material increase in benefits or unfunded liabilities or (iv) the commencement of contributions by any Group Member or any of their respective ERISA Affiliates to a Multiemployer Plan or Single Employer Plan, which, in the case of each of the foregoing clauses (i) through (iv), shall specify the nature thereof, what action such Group Member or any of their respective ERISA Affiliates has taken, is taking or proposes to take with respect thereto and, when known, any action taken or threatened by the IRS, the Department of Labor or the PBGC with respect thereto;

(e)    any material change in accounting policies or financial reporting practices by any Loan Party or any Subsidiary thereof;

(f)    the (i) occurrence of any Disposition of Property or assets for which the Borrower is required to make a mandatory prepayment pursuant to Section 2.09(a), (ii) incurrence or issuance of any

Indebtedness for which the Borrower is required to make a mandatory prepayment pursuant to Section 2.09(d) or (iii) receipt of any Net Cash Proceeds of any Recovery Event for which the Borrower is required to make a mandatory prepayment pursuant to Section 2.09(b);

(g)    promptly after the assertion or occurrence thereof, notice of any action or proceeding against, or of any noncompliance by, Holdings, the Borrower or any of its Subsidiaries in respect of or with any Environmental Law or Environmental Permit that could (i) reasonably be expected to have a Material Adverse Effect or (ii) cause any Real Property to be subject to any material restrictions on ownership, occupancy, use or transferability under any Environmental Law;

(h)    the termination of, or the receipt by any Loan Party of notice of the termination of, or the occurrence of any event or condition which would, with the passage of time or the giving of notice or both, reasonably be expected to permit the termination of, any one or more Material Agreements of any Loan Party; and

(i)    any change in the information provided in the Beneficial Ownership Certification that would result in a change to the list of beneficial owners identified in parts (c) or (d) of such certification.

Each notice pursuant to this Section 5.03 (other than Section 5.03(f)) shall be accompanied by a statement of a Responsible Officer of the Borrower setting forth details of the occurrence referred to therein and stating what action the Borrower has taken or proposes to take with respect thereto. Each notice pursuant to Section 5.03(a) shall describe with particularity any and all provisions of this Agreement and any other Loan Document that have been breached.

Section 5.04    Payment of Tax Obligations. (a) To the extent permitted by the DIP Orders, pay, discharge or otherwise satisfy as the same shall become due and payable in the normal conduct of its business all its obligations and liabilities in respect of Taxes imposed upon it or upon its income or profits or in respect of its property, and (b) timely and accurately file all federal, state and other material Tax returns required to be filed except, in each case, (i) to the extent any such Tax is being contested in good faith and by appropriate proceedings for which appropriate reserves have been established in accordance with GAAP, or (ii) if such failure to do so would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

Section 5.05    Preservation of Existence, Etc. (a) Preserve, renew and maintain in full force and effect its legal existence and good standing under the laws of the jurisdiction of its organization, except in a transaction permitted by Section 6.03 and Section 6.04; (b) take all reasonable action to maintain all rights, privileges, permits, licenses and franchises necessary or desirable in the normal conduct of its business, except to the extent that failure to do so could not reasonably be expected to have a Material Adverse Effect; and (c) preserve or renew all of its registered patents, trademarks, trade names and service marks, the non-preservation of which could reasonably be expected to have a Material Adverse Effect.

Section 5.06    Maintenance of Property. (a) Maintain, preserve and protect all of its material properties and equipment necessary in the operation of its business in good working order and condition, ordinary wear and tear excepted; and (b) make all necessary repairs thereto and renewals and replacements thereof except where the failure to do so could not reasonably be expected to have a Material Adverse Effect.

Section 5.07    Maintenance of Insurance. Maintain with financially sound and reputable insurance companies not Affiliates of the Borrower insurance with respect to its properties and business against loss or damage of the kinds customarily insured against by Persons engaged in the same or a similar business of such types and in such amounts as are customarily carried under similar circumstances by such

other Persons, and all such insurance shall (A) provide for not less than 30 days' (10 days' in the case of failure to pay premium) prior notice to the Collateral Agent of termination, lapse or cancellation of such insurance, (B) name the Collateral Agent as loss payee (in the case of property insurance) or additional insured on behalf of the Secured Parties (in the case of liability insurance) and (C) be reasonably satisfactory in all other respects to the Required Lenders. The Borrower shall deliver to the Collateral Agent and the Lenders no later than ten days after the expiration of any then current insurance policies, insurance certificates evidencing renewal of all insurance policies required under this Section 5.07 or, if any such insurance policies are replaced rather than renewed, insurance certificates and any necessary endorsements with respect to such new policies.

Section 5.08    Books and Records; Inspection Rights.

(a)    (i) Maintain proper books of record and account, in which full, true and correct in all material respects entries in conformity with GAAP consistently applied shall be made of all financial transactions and matters involving the assets and business of the Borrower or such Subsidiary, as the case may be; and (ii) maintain such books of record and account in material conformity with all applicable requirements of any Governmental Authority having regulatory jurisdiction over the Borrower or such Subsidiary, as the case may be.

(b)    Permit any Lender or Agent (and any of their respective representatives and independent contractors) to visit and inspect any of its properties, to examine its corporate, financial and operating records, and make copies thereof or abstracts therefrom, and to discuss its affairs, finances and accounts with its directors, officers, and independent public accountants, all at the expense of the Borrower and at such reasonable times during normal business hours as often as may be desired and without advance notice to the Borrower or any other Loan Party.

Section 5.09    Compliance with Laws. Comply with all applicable Requirements of Law and all orders, writs, injunctions and decrees applicable to it or to its business or property, except in such instances in which (a) such Requirement of Law or order, writ, injunction or decree is being contested in good faith by appropriate proceedings diligently conducted or (b) the failure to comply therewith could not reasonably be expected to have a Material Adverse Effect.

Section 5.10    Compliance with Environmental Laws; Preparation of Environmental Reports.

(a)    (i) Comply, and cause all lessees and other Persons operating or occupying its properties to comply, with all applicable Environmental Laws and Environmental Permits; (ii) obtain and renew all Environmental Permits necessary for its operations and properties; (iii) conduct any investigation, study, sampling and testing, and undertake any cleanup, response or other corrective action necessary to address any Releases of Materials of Environmental Concern at, on, under or emanating from any property owned, leased or operated by it in accordance with the requirements of all Environmental Laws, and (iv) make an appropriate response to any investigation, notice, demand, claim, suit or other proceeding asserting Environmental Liability against the Borrower or any of its Subsidiaries and discharge any obligations it may have to any Person thereunder, except in the case of each of clauses (i) through (iv), where the failure to do so could not reasonably be expected to have a Material Adverse Effect; *provided* that neither the Borrower nor any of its Subsidiaries shall be required to undertake any such cleanup, removal, remedial or other responsive action to the extent that its obligation to do so is being contested in good faith and by proper proceedings and appropriate reserves are being maintained with respect to such circumstances in accordance with GAAP.

(b)    At the reasonable request of the Required Lenders from time to time, based upon a reasonable belief that the Borrower or any of its Subsidiaries is in breach of its obligations under this

Section 5.10 or at any other time if an Event of Default has occurred and is continuing provide to the Lenders within 60 days after such request, at the expense of the Borrower, an environmental assessment report for any properties owned, leased or operated by it described in such request, prepared by an environmental consulting firm acceptable to the Required Lenders, indicating the presence or absence of Materials of Environmental Concern or noncompliance with Environmental Law and the estimated cost of any compliance, response or other corrective action to address any Materials of Environmental Concern on such properties; without limiting the generality of the foregoing, if the Required Lenders determine at any time that a material risk exists that any such report will not be provided within the time referred to above, the Lenders may retain an environmental consulting firm to prepare such report at the expense of the Borrower, and the Borrower hereby grants and agrees to cause any Subsidiary that owns or leases any property described in such request to grant the Lenders, such firm and any agents or representatives thereof an irrevocable non-exclusive license, subject to the rights of tenants or necessary consent of landlords, to enter onto their respective properties to undertake such an assessment.

Section 5.11    Use of Proceeds. Use the proceeds of the Loans and the Collateral only for : (i) transaction costs, fees and expenses incurred in connection with the Credit Facilities, (ii) working capital (excluding capital expenditures) and general corporate purposes to the extent set forth in, and in accordance with, the Approved Budget and the DIP Orders, (iii) maintenance capital expenditures to the extent set forth in, and in accordance with, the Approved Budget and the DIP Orders, (iv) payment of costs of administration of the Chapter 11 Cases to the extent set forth in, and in accordance with, the Approved Budget and the DIP Orders, (v) Permitted Expenses, (vi) the unpaid fees, costs, and disbursements of professionals in the Chapter 11 Cases as set forth in the definition of the term "Carve-Out" in the DIP Orders, (vii) fees, costs, expenses and claims required to confirm a plan of reorganization or liquidation, (viii) such Prepetition Obligations as the Required Lenders consent to and the Bankruptcy Court approves, in each case in a manner consistent with the terms and conditions contained herein and in the DIP Orders, and to the extent set forth, and in accordance with, the Approved Budget, or as otherwise expressly permitted under this Agreement and (ix) the roll-up of the Prepetition Obligations upon entry of the Final DIP Order as contemplated herein and in the DIP Orders.

The Borrower will not request any Credit Extension, and the Borrower shall not use, and shall procure that its Subsidiaries and its or their respective directors, officers, employees and agents shall not use, the proceeds of any Credit Extension (a) in furtherance of an offer, payment, promise to pay, or authorization of the payment or giving of money, or anything else of value, to any Person in violation of any Anti-Corruption Laws, (b) for the purpose of funding, financing or facilitating any activities, business or transaction of or with any Sanctioned Person, or in any Sanctioned Country, (c) in any manner that would result in the violation of any Sanctions applicable to any party hereto, (d) to purchase or carry Margin Stock or to extend credit to others for the purpose of purchasing or carrying Margin Stock, (e) in violation of the DIP Orders, (f) in a manner that does not comply with the terms of the Approved Budget or (g) to challenge the scope, priority or perfection of any claims or Liens arising pursuant to the Loan Documents.

Section 5.12    Covenant to Guarantee Obligations and Give Security.

(a)    Execute any and all further documents, financing statements, agreements and instruments, and take all further action (including filing Uniform Commercial Code and other financing statements, mortgages and deeds of trust) that may be required under applicable Requirements of Law, or that the Required Lenders or the Collateral Agent may reasonably request, in order to effectuate the Transactions contemplated by the Loan Documents and in order to grant, preserve, protect and perfect the validity and priority of the security interests created or intended to be created by the Loan Documents.

(b)    In the event that any Person becomes a Subsidiary of the Borrower or any other Loan Party, each of Holdings and the Borrower shall, and shall cause each other such Person to (a) promptly

following (and, in any event, within 10 days after) such Person becoming a Subsidiary (or such longer period of time reasonably acceptable to the Required Lenders), cause such Person to become a Guarantor and a Grantor hereunder by executing and delivering to the Collateral Agent a counterpart agreement or supplement to this Agreement in accordance with its terms and (b) take all such actions and execute and deliver, or cause to be executed and delivered, all such documents, instruments, agreements, and certificates reasonably requested by Collateral Agent or the Required Lenders in order to cause the Collateral Agent, for the benefit on the Secured Parties, to have a Lien on all assets of such Person, which Lien shall be perfected and shall be of first priority (subject to (i) in the case of all such assets constituting Equity Interests, Permitted Equity Liens and (ii) in the case of all such other assets, Permitted Liens) and shall deliver or cause to be delivered to the Collateral Agent, items as are similar to those described in Section 4.01(d), Section 4.01(f), Section 4.01(h) and Section 4.01(i) hereof and as otherwise reasonably requested by the Collateral Agent and the Required Lenders. With respect to each such Subsidiary of the Borrower or any other Loan Party, the Borrower shall, within 30 days of such event (or such longer period of time reasonably acceptable to the Required Lenders), send to the Lenders and the Collateral Agent written notice setting forth with respect to such Person (i) the date on which such Person became a Subsidiary of the Borrower or any other Loan Party and (ii) all of the data required to be set forth in Schedule 3.18(a) with respect to all Subsidiaries of the Borrower, and such written notice shall be deemed to supplement Schedule 3.18(a) for all purposes hereof.

Section 5.13    Further Assurances. Promptly upon request by any Agent, or any Lender:

(a)    Each Loan Party shall deliver to the Collateral Agent:

(i)    a completed Perfection Certificate, dated as of the Closing Date, executed by a duly authorized officer of each Loan Party, together with all attachments contemplated thereby;

(ii)    evidence that each Loan Party shall have taken or caused to be taken any other action, executed and delivered or caused to be executed and delivered any other agreement, document and instrument (including any amendments to the articles of incorporation or other constitutional documents or agreements of such Loan Party pursuant to which any restrictions or inhibitions relating to the enforcement of any Lien created by the Loan Documents are removed) and authorized, made or caused to be made any other filing and recording required under the Loan Documents, and each UCC financing statement shall have been filed, registered or recorded; and

(iii)    (1) the certificates representing the shares of certificated Equity Interests pledged pursuant to this Agreement, together with an undated stock power or other instrument of transfer for each such certificate executed in blank by a duly authorized officer of the pledgor thereof, (2) an acknowledgement and consent, in a form reasonably acceptable to the Collateral Agent and the Required Lenders, duly executed by any issuer of Equity Interests pledged pursuant to this Agreement that is not itself a party to this Agreement, (3) each promissory note pledged pursuant to this Agreement duly executed (without recourse) in blank (or accompanied by an undated instrument of transfer executed in blank and satisfactory to the Collateral Agent and the Required Lenders) by the pledgor thereof and (4) an intercompany note, if any, executed by the parties thereto accompanied by an undated instrument of transfer duly executed in blank and satisfactory to the Collateral Agent and the Required Lenders (including with respect to any subordination provisions contained therein).

(b)    correct any material defect or error that may be discovered in any Loan Document or in the execution, acknowledgment, filing or recordation thereof; and

(c)    do, execute, acknowledge, deliver, record, re-record, file, re-file, register and re-register any and all such further acts, deeds, certificates, assurances and other instruments as the

Disbursing Agent, the Collateral Agent or any Lender may reasonably require from time to time in order to (i) carry out more effectively the purposes of the Loan Documents, (ii) to the fullest extent permitted by applicable law, subject any Loan Party's properties, assets, rights or interests to the Liens now or hereafter intended to be covered by any of the Loan Documents, (iii) perfect and maintain the validity, effectiveness and priority of any of the Loan Documents and any of the Liens intended to be created thereunder and (iv) assure, convey, grant, assign, transfer, preserve, protect and confirm more effectively unto the Secured Parties the rights granted or now or hereafter intended to be granted to the Secured Parties under any Loan Document or under any other instrument executed in connection with any Loan Document to which any Loan Party or any of its Subsidiaries is or is to be a party.

Section 5.14    <u>Lender Calls</u>. Participate in conference calls with the Lenders (which shall be on a bi-weekly basis or as frequently as reasonably requested by the Lenders), such calls to be held at such time as may be agreed to by the Borrower and the Required Lenders and to include, if so requested by the Lenders, professional advisors of the Borrower.

Section 5.15    <u>Board Observer</u>. Grant to the Lenders, collectively, the right to appoint a single representative (the "<u>Board Observer</u>") who shall: (a) receive written notice of all meetings (both regular and special) of the Board of Directors of Holdings or the Borrower and each committee of any such Board of Directors (such notice to be delivered or mailed as specified in Section 9.02 at the same time as notice is given to the members of any such Board of Directors and/or committee); (b) be entitled to attend (or in the case of telephone meetings, monitor) all such meetings and (c) receive all notices, information, materials, reports or other information (including minutes of prior meetings of such Board of Directors) which are furnished to the members of such Board of Directors and/or committee at the same time, and in the same manner as the same is furnished to such members. If any action is proposed to be taken by such Board of Directors or committee by written consent in lieu of a meeting, Holdings or the Borrower will give written notice thereof to such Board Observer, at the same time as notice is given to the members of such Board of Directors or committee. Such Board Observer shall not constitute a member of any such Board of Directors or any committee thereof and shall not be entitled to vote on any matter presented at meetings of any of the foregoing or to consent to any matter as to which the consent of any of the foregoing shall have been requested. Promptly upon receipt of an invoice therefor, the Borrower shall reimburse the designated representative (or the employer of such representative) for the reasonable and documented out-of-pocket costs and expenses of such Board Observer in attending such meeting. Notwithstanding the foregoing, Holdings or the Borrower may exclude the Board Observer from the relevant part of a meeting or exclude such board materials from the materials sent to the Board Observer, or both, if (i) the Borrower or Holdings receives advice from legal counsel that (x) there is a substantial risk that discussing a specified matter in the presence of a person who is not a member of its Board of Directors, or sending specified board materials to such person, would result in such Loan Party's loss of attorney-client or work product privilege with respect to a specified matter or create a conflict of interest under applicable Requirements of Law, (y) the Board Observer's attendance at all or part of a meeting of the Board of Directors or committee could present a conflict of interest relating to any Lender's status as a Lender hereunder or (z) such Loan Party is otherwise required to avoid any disclosure that is restricted by any agreement with another Person (*provided,* that such Loan Party will use commercially reasonable efforts to obtain the consent of such other Person to such disclosure to the extent practicable), or (ii)(A) any Lender, the Loan Documents or the Obligations are the subject matter under discussion or (B) when such board materials or discussion relate directly to any Loan Party's relationship, contractual or otherwise, with the any Lender or any of its Affiliates, or any actual or potential transactions between or involving any Loan Party and any Lender or any of its Affiliates. As of the Closing Date, the Lenders are not currently exercising the right to appoint a Board Observer (but reserve the right to do so in the future).

Section 5.16    <u>Bankruptcy Court Filings</u>. As soon as practicable in advance of filing with the Bankruptcy Court, the Loan Parties shall provide the Lenders and the Agents with copies of (i) the motion

seeking approval of and proposed forms of the Interim DIP Order and the Final DIP Order, which motion shall be in form and substance reasonably satisfactory to the Required Lenders, the Disbursing Agent and the Collateral Agent, (ii) the motion(s) seeking approval of approval of the sale(s) of all or substantially all of the Borrower's assets (the "Sale Procedures Motion"), which motion shall be in form and substance satisfactory to the Required Lenders (and to the extent the Sales Procedures Motion shall by its terms amend, modify or otherwise affect the rights or duties of the Disbursing Agent or the Collateral Agent under this Agreement or the other Loan Documents, the Agents), in their sole discretion, and the proposed form of the order(s) approving the sale of all or substantially all of the Borrower's assets (the "Sale Procedures Order"), which order shall be in form and substance satisfactory to the Required Lenders (and to the extent the Sales Procedures Order shall by its terms amend, modify or otherwise affect the rights or duties of the Disbursing Agent or the Collateral Agent under this Agreement or the other Loan Documents, the Agents) in their sole discretion, (iii) all other proposed orders and pleadings related to the financing contemplated hereunder, which orders and pleadings shall be in form and substance satisfactory to the Required Lenders (and to the extent such order or pleading shall by its terms amend, modify or otherwise affect the rights or duties of the Disbursing Agent or the Collateral Agent under this Agreement or the other Loan Documents, the Agents) in their sole discretion, (iv) any plan of reorganization or liquidation, and/or any disclosure statement related to such plan (which plan or disclosure statement shall comply with the requirements set forth herein), which plan of reorganization or liquidation and any related disclosure statement shall be in form and substance satisfactory to the Required Lenders, the Disbursing Agent and the Collateral Agent in their sole discretion, (v) any motion, and proposed form of order, seeking to extend or otherwise modify the Loan Parties' exclusive periods set forth in section 1121 of the Bankruptcy Code, which motion and proposed order shall be in form and substance satisfactory to the Required Lenders in their sole discretion, (vi) any motion, other than the Sale Procedures Motion, seeking approval of any sale of any Loan Party's assets, which motion shall be in form and substance acceptable to the Required Lenders in their sole discretion and any proposed form of a bidding procedures order and sale order, which orders shall be in form and substance satisfactory to the Required Lenders in their sole discretion and (vii) any motion and proposed form of order filed with the Bankruptcy Court relating to the assumption, rejection, modification or amendment of any employment agreement, or the assumption, rejection, modification or amendment of any material contract, each of which motions and orders must be in form and substance satisfactory to the Required Lenders in their sole discretion.

Section 5.17    Bankruptcy Covenants. Notwithstanding anything in the Loan Documents to the contrary, the Loan Parties shall comply with all covenants, terms and conditions and otherwise perform all obligations set forth in the DIP Orders.

Section 5.18    Chapter 11 Cases. In connection with the Chapter 11 Cases, the Loan Parties shall give the proper notice for (v) the motions seeking approval of the Loan Documents and the Interim DIP Order and Final DIP Order, (w) the hearings for the approval of the Interim DIP Order, (x) the hearings for the approval of the Final DIP Order, (y) the motions seeking approval of the sale of all or substantially all of the assets or the Equity Interests of the Loan Parties and (z) the hearings for the approval of the sale of all or substantially all of the assets or the Equity Interests of the Loan Parties. The Loan Parties shall give, on a timely basis as specified in the Interim DIP Order or the Final DIP Order, as applicable, all notices required to be given to all parties specified in the Interim DIP Order or Final DIP Order, as applicable. The Loan Parties hereby acknowledge and agree that any plan of reorganization or liquidation filed in the Chapter 11 Cases shall be in form and substance acceptable to the Required Lenders, the Disbursing Agent and the Collateral Agent in their sole discretion.

Section 5.19    Sales Process Timeline. The Loan Parties shall timely comply with the sale process milestones set forth in the DIP Orders and shall incorporate such milestones into the Sale Procedures Motion and Sale Procedures Order. Promptly upon receipt by any Loan Party, such Loan Party shall deliver to the Lenders copies of all written indications of interest in the sale (by proposal, letter of intent or

otherwise), term sheets, asset purchase agreements and other documents from prospective bidders, other interested parties or their representatives, and such other information and documents as the Lenders may from time to time request.

Section 5.20    Budget Compliance. Subject to the terms and conditions set forth herein and in the DIP Orders, the proceeds of Collateral and the proceeds of DIP Loans made under this Agreement and any other Collateral shall be used in accordance with this Agreement and the DIP Orders and the Loan Parties shall at all times be in compliance with the covenants set forth herein and in the DIP Orders. The Disbursing Agent and Lenders (i) may assume that the Loan Parties will comply with the Approved Budget to the extent required by this Section 5.20 and shall have no duty to monitor such compliance and (ii) shall not be obligated to pay (directly or indirectly from the Collateral) any unpaid expenses incurred or authorized to be incurred (or otherwise) pursuant to the Approved Budget. The line items in the Approved Budget for payment of interest, expenses and other amounts to Agents and Lenders are estimates only, and the Loan Parties remain obligated to pay any and all Obligations in accordance with the terms of the Loan Documents, the Interim DIP Order and the Final DIP Order. Nothing in the Approved Budget shall constitute an amendment or other modification of this Agreement or any of such restrictions or other lending limits set forth therein.

Section 5.21    Cash Management. The Borrower shall maintain, or shall cause to be maintained, the Funding Account in accordance with the Cash Management Order.

Section 5.22    Post-Closing Covenant. Holdings and the Borrower shall work in good faith to cause each of Air Pros Dallas, L.L.C. and Air Pros Texas, LLC to be in good standing with the State of Texas and to deliver reasonably satisfactory evidence thereof to the Collateral Agent.

## ARTICLE VI
## NEGATIVE COVENANTS

Each of Holdings and the Borrower hereby jointly and severally agrees that, until Payment in Full, each of Holdings and the Borrower shall not, and shall not permit any Subsidiary to, directly or indirectly:

Section 6.01    Limitation on Indebtedness. Create, incur, assume or suffer to exist any Indebtedness, except, to the extent permitted by the DIP Orders:

(a)    Indebtedness of any Loan Party created hereunder and under the other Loan Documents;

(b)    unsecured Indebtedness of the Borrower owing to any Loan Party, and of any Loan Party owing to the Borrower or any other Loan Party, to the extent constituting an Investment permitted by Section 6.06(c); provided that (i) any such Indebtedness owed to a Loan Party shall be evidenced by a promissory note that shall be pledged to the Collateral Agent in accordance with the terms of this Agreement and the other Loan Documents and (ii) all such Indebtedness of any Loan Party owed to any Subsidiary that is not a Loan Party shall be subordinated to the Obligations on terms reasonably acceptable to the Collateral Agent and the Required Lenders;

(c)    [reserved];

(d)    Indebtedness outstanding on the Closing Date (including under the Prepetition Loan Documents);

(e)      Guarantee Obligations by the Borrower or any Subsidiary in respect of any Indebtedness of the Borrower or any Subsidiary otherwise permitted to be incurred by the Borrower or such Subsidiary hereunder; *provided* that (A) no Guarantee Obligations in respect of any Junior Indebtedness shall be permitted unless the guaranteeing party shall have also provided a guarantee of the Obligations on the terms set forth in this Agreement and the other Loan Documents and (B) if the Indebtedness being guaranteed is subordinated to the Obligations, such guarantee shall be subordinated to the guarantee of the Obligations on terms at least as favorable to the Lenders as those contained in the subordination of such Indebtedness;

(f)      [reserved];

(g)      [reserved];

(h)      [reserved];

(i)      Indebtedness of the Borrower or any of its Subsidiaries in respect of letters of credit, bank guarantees, bankers' acceptances, warehouse receipts or similar instruments created or issued in the ordinary course of business in connection with workers' compensation claims, health, disability or other employee benefits or property, casualty or liability insurance or self-insurance or other Indebtedness with respect to reimbursement-type obligations regarding workers' compensation claims; *provided* that any reimbursement obligations in respect thereof are reimbursed within 30 days following the incurrence thereof (or within such longer period as is permitted without interest or other charges under the benefit plan under which reimbursement is to be made);

(j)      obligations in respect of performance, bid, customs, government, appeal and surety bonds, performance and completion guaranties and similar obligations provided by the Borrower or any of its Subsidiaries, in each case in the ordinary course of business;

(k)      Indebtedness owing to any insurance company in connection with the financing of any insurance premiums permitted by such insurance company in the ordinary course of business;

(l)      [reserved];

(m)      Indebtedness representing deferred compensation or stock-based compensation to employees of the Borrower or any Subsidiary incurred in the ordinary course of business;

(n)      [reserved];

(o)      to the extent constituting Indebtedness, take-or-pay obligations contained in supply arrangements;

(p)      unsecured Indebtedness of the Borrower or any of its Subsidiaries in an aggregate principal amount not to exceed $250,000 at any one time outstanding;

(q)      [reserved]; and

(r)      Indebtedness in respect of netting services, overdraft protections, p-cards, employee credit card programs, automatic clearinghouse arrangements and similar arrangements in connection with deposit accounts.

Section 6.02    <u>Limitation on Liens</u>. Create, incur, assume or suffer to exist any Lien upon any of its Property, whether now owned or hereafter acquired, except for, to the extent permitted by the DIP Orders:

(a)    Liens pursuant to any Loan Document and any Prepetition Loan Document;

(b)    Liens in existence on the Closing Date; *provided* that any such Lien (i) does not secure an aggregate amount of Indebtedness or other obligations, if any, greater than that secured on the Closing Date (*minus* the aggregate amount of any permanent repayments and prepayments thereof since the Closing Date but only to the extent that such repayments and prepayments by their terms cannot be reborrowed or redrawn) and (ii) does not encumber any Property other than the Property subject thereto on the Closing Date (*plus* improvements and accessions to such Property);

(c)    Liens for Taxes not yet due or that are being contested in good faith by appropriate proceedings diligently conducted; *provided* that adequate reserves with respect thereto are maintained on the books of the Borrower or the applicable Subsidiary, in conformity with GAAP;

(d)    statutory or common law Liens of landlords, carriers, warehousemen, mechanics, materialmen, repairmen, construction contractors or other like Liens arising in the ordinary course of business that secure amounts not overdue for a period of more than 30 days (or, if more than 30 days overdue, that are unfiled and no other action has been taken to enforce such Lien) or that are being contested in good faith by appropriate proceedings diligently conducted; *provided* that adequate reserves with respect thereto are maintained on the books of the Borrower or the applicable Subsidiary, in conformity with GAAP;

(e)    (i) pledges or deposits in the ordinary course of business in connection with workers' compensation, unemployment insurance and other social security legislation and (ii) pledges and deposits in the ordinary course of business securing liability for reimbursement or indemnification obligations of (including obligations in respect of letters of credit or bank guarantees for the benefit of) insurance carriers providing property, casualty or liability insurance to the Borrower or any of its Subsidiaries;

(f)    deposits and other Liens to secure the performance of bids, trade contracts, governmental contracts and other similar contracts (other than Indebtedness for borrowed money), leases (other than Capital Leases), subleases, statutory obligations, surety, stay, judgment and appeal bonds, performance bonds and other obligations of a like nature incurred in the ordinary course of business;

(g)    encumbrances shown as exceptions in the title insurance policies insuring the mortgages, easements, zoning restrictions, rights-of-way, restrictions, encroachments, protrusions and other similar encumbrances incurred in the ordinary course of business that, in the aggregate, do not materially detract from the value, or materially interfere with the use, of the Property subject thereto or materially interfere with the ordinary conduct of the business of the Borrower or any of its Subsidiaries, taken as a whole;

(h)    [reserved];

(i)    Liens on insurance policies and proceeds thereof securing the financing of the premiums with respect thereto;

(j)    [reserved];

73

(k)     any interest or title of a lessor, sublessor, licensor or sublicensor under any lease, sublease, license or sublicense entered into by the Borrower or any of its Subsidiaries in the ordinary course of its business and covering only the assets so leased or licensed;

(l)     Liens on equipment arising from precautionary UCC financing statements regarding operating leases of equipment;

(m)     [reserved];

(n)     (i) Liens in favor of customs and revenue authorities arising as a matter of law to secure the payment of customs duties in connection with the importation of goods in the ordinary course of business and (ii) Liens on specific items of inventory or other goods and proceeds thereof of any Person securing such Person's obligations in respect of bankers' acceptances or letters of credit permitted under Section 6.01 issued or created for the account of such Person to facilitate the purchase, shipment or storage of such inventory or other goods in the ordinary course of business;

(o)     Liens arising out of conditional sale, title retention, consignment or similar arrangements for the sale of goods entered into by the Borrower and its Subsidiaries in the ordinary course of business permitted by this Agreement;

(p)     [reserved];

(q)     Liens encumbering reasonable customary initial deposits and margin deposits and similar Liens attaching to commodity trading accounts or other brokerage accounts incurred in the ordinary course of business and not for speculative purposes;

(r)     (i) Liens that are contractual or common law rights of set-off relating to (A) the establishment of depository relations in the ordinary course of business with banks not given in connection with the issuance of Indebtedness or (B) pooled deposit or sweep accounts of the Borrower and any Subsidiary to permit satisfaction of overdraft or similar obligations incurred in the ordinary course of business of the Borrower and its Subsidiaries and (ii) other Liens securing cash management obligations (that do not constitute Indebtedness) in the ordinary course of business; and

(s)     Liens of a collection bank arising under Section 4-208 or Section 4-210 of the UCC on items in the course of collection.

Section 6.03    Limitation on Fundamental Changes. Enter into any merger, acquisition, consolidation or amalgamation, or liquidate, wind up or dissolve itself (or suffer any liquidation or dissolution), or Dispose of (whether in one transaction or in a series of transactions) all or substantially all of its Property or business (whether now owned or hereafter acquired) or less than all of the Equity Interests of any Subsidiary (except to qualified directors if required by law), except (a) with the consent of the Required Lenders or (b) to the extent expressly permitted by the DIP Orders.

Section 6.04    Limitation on Dispositions. Dispose of any of its Property (including, without limitation, receivables and leasehold interests), whether now owned or hereafter acquired, or, in the case of any Subsidiary, issue or sell any Equity Interests of such Subsidiary to any Person, except, to the extent permitted by the DIP Orders:

(a)     Dispositions of surplus, obsolete or worn out Property and Property no longer used or useful in the conduct of the business of the Borrower or any of its Subsidiaries in the ordinary course of business;

74

(b)      the lapse, abandonment, cancellation or non-exclusive license of any immaterial Intellectual Property in the ordinary course of business;

(c)      Dispositions of inventory or goods held for sale in the ordinary course of business;

(d)      approved by an order of the Bankruptcy Court that is in a form and substance acceptable to the Required Lenders;

(e)      Dispositions pursuant to any assert purchase agreement in form and substance acceptable to the Required Lenders entered into in accordance with bidding procedures approved by the Bankruptcy Court;

(f)      transfers of condemned Property as a result of the exercise of "eminent domain" or other similar policies to the respective Governmental Authority or agency that has condemned the same (whether by deed in lieu of condemnation or otherwise), and transfers of properties that have been subject to a casualty to the respective insurer of such Property as part of an insurance settlement;

(g)      Dispositions of Investments in joint ventures to the extent required by, or made pursuant to, customary buy/sell arrangements between the joint venture parties set forth in joint venture agreements and similar binding agreements in effect on the Closing Date; *provided* that the requirements of Section 2.09(a), to the extent applicable, are complied with in connection therewith;

(h)      transfers of Property by (i) the Borrower to any Subsidiary Guarantor or (ii) any Subsidiary Guarantor to the Borrower or any other Subsidiary Guarantor;

(i)      dispositions and/or terminations of leases, subleases, licenses and sublicenses in the ordinary course of business and which do not materially interfere with the business of the Borrower or any of its Subsidiaries;

(j)      Dispositions of Cash Equivalents in the ordinary course of business and consistent with past practice;

(k)      the unwinding of any Swap Contract in accordance with its terms; and

(l)      to the extent constituting Dispositions, (i) Liens permitted by Section 6.02, (ii) Restricted Payments permitted by Section 6.05 (excluding Section 6.05(c)), (iii) Investments permitted by Section 6.06 and (iv) changes permitted by Section 6.03.

To the extent any Collateral is Disposed of as expressly permitted by this Section 6.04 to any Person that is not a Loan Party, such Collateral shall be sold free and clear of the Liens created by the Loan Documents, and the Collateral Agent shall be authorized to take any actions deemed appropriate in order to effectuate the foregoing.

Section 6.05      Limitation on Restricted Payments. Declare or make, directly or indirectly, any Restricted Payment, or incur any obligation (contingent or otherwise) to do so, except that so long as no Default or Event of Default shall have occurred and be continuing at the time of any action described below or would result therefrom, to the extent permitted by the DIP Orders:

(a)      the Borrower or any Subsidiary may make Restricted Payments to any Loan Party, in each case, as part of intercompany cash management in the ordinary course of business and consistent with past practice and a cash management order entered by the Bankruptcy Court; or

(b)    the Borrower or any Subsidiary may make Restricted Payments (x) expressly included in the Approved Budget (including permitted variances thereto) or (y) with the written consent of the Required Lenders, which may be by email; and

(c)    to the extent constituting Restricted Payments, the Borrower or any Subsidiary may enter into and consummate transactions expressly permitted by any provision of Section 6.03, Section 6.04 (other than Section 6.04(o)) and Section 6.08 (other than Section 6.08(b)).

Section 6.06    Limitation on Investments. Make or hold, directly or indirectly, any Investments, except, to the extent permitted by the DIP Orders:

(a)    Investments consisting of extensions of credit in the nature of accounts receivable or notes receivable arising from the grant of trade credit in the ordinary course of business, and Investments received in satisfaction or partial satisfaction thereof from financially troubled account debtors and other credits to suppliers in the ordinary course of business;

(b)    Investments by the Borrower or any of its Subsidiaries in cash and Cash Equivalents and Investments in assets that were Cash Equivalents when such Investment was made;

(c)    Investments by the Borrower or any of its Subsidiaries in any Loan Party;

(d)    guarantees by the Borrower or any of its Subsidiaries of leases (other than Capital Leases) or of other obligations of the Borrower or any of its Subsidiaries that do not constitute Indebtedness, in each case entered into in the ordinary course of business;

(e)    Investments (including debt obligations and Equity Interests) received in the ordinary course of business by the Borrower or any Subsidiary in connection with the bankruptcy or reorganization of suppliers and customers and in settlement of delinquent obligations of, and other disputes with, suppliers and customers arising out of the ordinary course of business or upon the foreclosure with respect to any secured Investment or other transfer of title with respect to any secured Investment;

(f)    Investments of any Person in existence at the time such Person becomes a Subsidiary (other than in Subsidiaries of any such Person); *provided* that such Investment was not made in connection with or in anticipation of such Person becoming a Subsidiary;

(g)    Investments arising as a result of payments permitted by Section 6.07(a);

(h)    consummation of the Transactions pursuant to and in accordance with the Transaction Documents;

(i)    Investments in the ordinary course of business consisting of UCC Article 3 endorsements for collection or deposit and UCC Article 4 customary trade arrangements with customers consistent with past practices;

(j)    to the extent constituting Investments, purchases and acquisitions of inventory, supplies, materials and equipment or purchases of contract rights or licenses or leases of Intellectual Property, in each case in the ordinary course of business;

(k)    advances of payroll payments to employees in the ordinary course of business; and

(l)      loans or advances by the Borrower to Holdings or any Parent Company in an aggregate amount not to exceed the amount of Restricted Payments permitted to be made to Holdings or such Parent Company in accordance with Section 6.05.

Section 6.07      Limitation on Prepayments; Modifications of Certain Documents.

(a)      Make or offer to make (or give any notice in respect thereof) any payment, prepayment, repurchase or redemption of, or voluntarily or optionally defease, or otherwise satisfy prior to the scheduled maturity thereof in any manner, any Junior Indebtedness or any Prepetition Indebtedness, or segregate funds for any such payment, prepayment, repurchase, redemption or defeasance, except, to the extent permitted by the DIP Orders:

(i)      with the consent of the Required Lenders or consistent with the Approved Budget (including any permitted variances thereto) and any applicable order of the Bankruptcy Court;

(ii)      payments of obligations under the Prepetition Loan Documents (including, to the extent constituting a payment, pursuant to the roll up of Indebtedness contemplated by Section 2.29 hereof);

(iii)      [reserved]; and

(iv)      payments in respect of Junior Indebtedness permitted under Section 6.01(r).

(b)      Amend, modify, waive or otherwise change, or consent or agree to any amendment, modification, waiver or other change to, any of the terms of any Junior Indebtedness, Material Agreement or Prepetition Loan Document, other than, in each case, any such amendment, modification, waiver, change or consent which is not, and would not reasonably be expected to be, materially adverse to the interests of the Lenders and is otherwise permitted by the DIP Orders; or

(c)      Amend, restate, supplement or otherwise modify any of its Organizational Documents or any agreement to which it is a party with respect to its Equity Interests (including any stockholders' agreement), or enter into any new agreement with respect to its Equity Interests, other than any such amendments, modifications or changes or such new agreements which are not, and would not reasonably be expected to be, materially adverse to the interests of the Lenders and is otherwise permitted by the DIP Orders.

Section 6.08      Limitation on Transactions with Affiliates.

Enter into, directly or indirectly, any transaction or series of related transactions, whether or not in the ordinary course of business, with any Affiliate of Holdings, the Borrower or any Subsidiary (other than between or among Loan Parties), unless such transaction is (i) otherwise not prohibited under this Agreement and (ii) upon fair and reasonable terms no less favorable to Holdings, the Borrower or such Subsidiary, as the case may be, than it would obtain in a comparable arm's length transaction with a Person that is not an Affiliate, except that the following shall be permitted, to the extent permitted by the DIP Orders:

(a)      the Transactions as contemplated by, and in accordance with, the Transaction Documents;

(b)      Restricted Payments permitted under Section 6.05 (other than Section 6.05(c));

(c)    Investments permitted under Section 6.06;

(d)    employment and severance arrangements between Holdings, the Borrower and its Subsidiaries and their respective officers and employees in the ordinary course of business and transactions pursuant to stock option plans, stock incentive plans and employee benefit plans and arrangements in the ordinary course of business;

(e)    payment of reasonable and customary director, officer and employee compensation (including bonuses) and other benefits (including retirement, health, stock option and other benefit plans) and indemnification arrangements, in each case approved by the board of managers (or equivalent governing body) of Holdings, the Borrower or any Subsidiary, as applicable; and

(f)    transactions pursuant to agreements, instruments or arrangements in existence on the Closing Date and set forth in Schedule 6.08.

For the avoidance of doubt, this Section 6.08 shall not apply to employment, bonus, retention and severance arrangements with, and payments of compensation or benefits to or for the benefit of, current or former employees, consultants, officers or directors of the Group Members in the ordinary course of business, consistent with past practice and otherwise permitted pursuant to the DIP Orders or other order of the Bankruptcy Court. For purposes of this Section 6.08, any transaction with any Affiliate shall be deemed to have satisfied the standard set forth in clause (ii) of the first sentence of this Section 6.08 if such transaction is approved by a majority of the Disinterested Managers of the board of managers (or equivalent governing body) of the Borrower or such Subsidiary, as applicable. "Disinterested Manager" shall mean, with respect to any Person and transaction, a member of the board of managers (or equivalent governing body) of such Person who does not have any material direct or indirect financial interest in or with respect to such transaction.

Section 6.09    Limitation on Sale and Leasebacks.

Enter into any arrangement, directly or indirectly, with any Person whereby it shall Dispose of any Property used or useful in its business, whether now owned or hereafter acquired, and thereafter rent or lease such Property or other Property which it intends to use for substantially the same purpose or purposes as the Property being sold or transferred (any such transaction, a "Sale and Leaseback").

Section 6.10    Limitation on Changes in Fiscal Periods.

Permit the fiscal year of Holdings to end on a day other than December 31 or change Holdings' method of determining fiscal quarters.

Section 6.11    Limitation on Burdensome Agreements. Enter into or suffer to exist or become effective any agreement or other arrangement that prohibits, restricts or imposes any condition upon (a) the ability of any Loan Party to create, incur, assume or suffer to exist any Lien upon any of its properties or revenues, whether now owned or hereafter acquired, to secure the Obligations or (b) the ability of any Subsidiary to (i) make Restricted Payments in respect of any Equity Interests of such Subsidiary held by, or pay any Indebtedness owed to, the Borrower or any other Subsidiary, (ii) make loans or advances to, or other Investments in, Holdings, the Borrower or any other Subsidiary or (iii) transfer any of its properties to Holdings, the Borrower or any other Subsidiary, except for any such restrictions that, to the extent permitted by the DIP Orders:

(a)    exist under this Agreement and the other Loan Documents and any Prepetition Loan Document;

78

(b)    exist on the Closing Date and (to the extent not otherwise permitted by this Section 6.11) are listed on Schedule 6.11 hereto;

(c)    are binding on a Subsidiary at the time such Subsidiary first becomes a Subsidiary, so long as such restrictions were not entered into solely in contemplation of such Person becoming a Subsidiary;

(d)    are customary restrictions and conditions contained in any agreement relating to any Disposition permitted by Section 6.04 pending the consummation of such Disposition; *provided* that such restrictions and conditions apply only to the property that is the subject of such Disposition and not to the proceeds to be received by the Group Members in connection with such Disposition;

(e)    are customary provisions in joint venture agreements and other similar agreements applicable to joint ventures permitted under Section 6.06 and applicable solely to such joint venture;

(f)    [reserved];

(g)    are customary restrictions in leases, subleases, licenses or asset sale agreements otherwise permitted hereby so long as such restrictions relate solely to the assets subject thereto;

(h)    are customary provisions restricting subletting or assignment of any lease governing a leasehold interest of the Borrower or any Subsidiary;

(i)    are customary provisions restricting assignment or transfer of any agreement entered into in the ordinary course of business; and

(j)    are amendments, modifications, restatements, refinancings or renewals of the agreements, contracts or instruments referred to in Section 6.11(a) through Section 6.11(i) above; *provided* that such amendments, modifications, restatements, refinancings or renewals, taken as a whole, are not materially more restrictive with respect to such encumbrances and restrictions than those contained in such predecessor agreements, contracts or instruments.

Section 6.12    Limitation on Lines of Business. Enter into any material line of business, except for those lines of business in which the Borrower and its Subsidiaries are engaged on the Closing Date or that are reasonably related thereto or are reasonable extensions thereof.

Section 6.13    Limitation on Activities of Holdings. In the case of Holdings, notwithstanding anything to the contrary in this Agreement or any other Loan Document (but only to the extent permitted by the DIP Orders):

(a)    conduct, transact or otherwise engage in, or commit to conduct, transact or otherwise engage in, any business or operations or own any assets other than (i) its ownership of the Equity Interests of the Borrower and its Subsidiaries and activities incidental thereto and Investments by or in Holdings permitted hereunder and activities incidental thereto, (ii) activities incidental to the maintenance of its existence and compliance with applicable laws and legal, tax and accounting matters related thereto and activities relating to its employees, (iii) activities relating to the performance of obligations under the Loan Documents and the documentation governing other permitted Indebtedness to which it is a party, (iv) the making of Restricted Payments permitted to be made by Holdings pursuant to Section 6.05, (v) the receipt of Restricted Payments permitted to be made to Holdings under Section 6.05 and (vi) activities related to the Transactions and in connection with the Loan Documents; or

(b)    incur, create, assume or suffer to exist any Indebtedness or other liabilities or financial obligations, except (i) the Obligations, (ii) Guarantee Obligations in respect of Indebtedness incurred under Section 6.01(d), (iii) obligations with respect to its Equity Interests and (iv) non-consensual obligations imposed by operation of law.

Section 6.14    KEIP Plan. Enter into any key employee incentive or retention plan, or other similar plan or agreement, unless such plan or agreement has been approved in writing by the Required Lenders.

Section 6.15    Chapter 11 Claims. Incur, create, assume, suffer to exist or permit (other than those existing, and disclosed to the Lenders, on the Closing Date) any administrative expense, unsecured claim, or other super-priority claim or lien (except for the Carve-Out and Prepetition Prior Liens to the extent such liens had priority over the liens granted under the Prepetition Loan Documents) that are pari passu with or senior to the administrative expenses or the claims of the Secured Parties against the Loan Parties hereunder, or apply to the Bankruptcy Court for authority to do so.

Section 6.16    The DIP Orders. Make or permit to be made any change, amendment or modification, or any application or motion for any change, amendment or modification, to the Interim DIP Order or the Final DIP Order, other than as approved by the Required Lenders, the Disbursing Agent and the Collateral Agent.

Section 6.17    Critical Vendor and Other Payments. Make (i) any prepetition "critical vendor" payments or other payments on account of any creditor's prepetition unsecured claims, (ii) payments on account of claims or expenses arising under section 503(b)(9) of the Bankruptcy Code, (iii) payments in respect of a reclamation program or (iv) payments under any management incentive plan or on account of claims or expenses arising under Section 503(c) of the Bankruptcy Code, except, in each case, in amounts and on terms and conditions that are permitted by the Approved Budget and subject to permitted variances, as set forth in the DIP Orders.

## ARTICLE VII
## EVENTS OF DEFAULT AND REMEDIES

Section 7.01    Events of Default. Each of the following events shall constitute an Event of Default:

(a)    the Borrower or any other Loan Party shall fail to pay (i) any principal of any Loan with respect thereto when due in accordance with the terms hereof, whether at the due date thereof or at a fixed date for payment thereof or by acceleration thereof or otherwise or (ii) any interest on any Loan or any fee or other amount (other than an amount referred to in clause (i)) payable hereunder or under any other Loan Document within three Business Days after any such interest or other amount becomes due in accordance with the terms hereof or thereof; or

(b)    any representation, warranty, certification or statement of fact made or deemed made by or on behalf of the Borrower or any other Loan Party herein, in any other Loan Document or in any document or certificate delivered in connection herewith or therewith shall be incorrect in any material respect when made or deemed made; or

(c)    any Loan Party shall fail to observe or perform any covenant, condition or agreement contained in (i) Section 5.01(c), Section 5.01(f), Section 5.01(g), Section 5.03(a), Section 5.05(a), Section 5.11, Section 5.22 or ARTICLE VI or (ii) Section 5.20 and, in the case of this clause (ii), such failure continues unremedied or unwaived for a period of two days; or

(d)        any Loan Party shall fail to observe or perform any other covenant, condition or agreement contained in this Agreement or any other Loan Document (other than pursuant to any Prepetition Loan Document, so long as the exercise of remedies as a result of such defaults are stayed under the Bankruptcy Code or such Prepetition Loan Documents are voided or invalidated by the Bankruptcy Court or as provided in Section 7.01(a), Section 7.01(b) or Section 7.01(c)), and such failure continues unremedied or unwaived for a period of 10 days after the earlier of (i) the date an officer of such Loan Party becomes aware of such default and (ii) receipt by the Borrower of notice from the Disbursing Agent or the Required Lenders of such default; or

(e)        Except for defaults occasioned by the filing of the Chapter 11 Cases and defaults resulting from obligations with respect to which the Bankruptcy Code prohibits the Loan Parties from complying, (i) any Group Member shall (A) fail to pay any principal or interest, regardless of amount, due in respect of any Material Indebtedness, when and as the same shall become due and payable beyond any applicable grace period in respect thereof; or (B) fail to observe or perform any other term, covenant, agreement or condition relating to any Material Indebtedness or contained in any instrument or agreement evidencing, securing or relating thereto, or any other event shall occur or condition exist, the effect of which default or other event or condition is to cause, or to permit the holders or beneficiaries of such Material Indebtedness (or a trustee or agent on behalf of such holders or beneficiaries) to cause, with or without the giving of notice, the lapse of time or both, such Material Indebtedness to become due prior to its stated maturity or become subject to a mandatory offer to purchase by the obligor; or (ii) there occurs under any Swap Contract an Early Termination Date (as defined, or as such comparable term may be used and defined, in such Swap Contract) resulting from (A) any event of default under such Swap Contract as to which any Group Member is the "Defaulting Party" (as defined, or as such comparable term may be used and defined, in such Swap Contract) or (B) any "Termination Event" (as defined, or as such comparable term may be used and defined, in such Swap Contract) under such Swap Contract as to which any Group Member is an Affected Party (as defined, or as such comparable term may be used and defined, in such Swap Contract); or

(f)        any Change of Control shall occur, except as may occur or have occurred as a result of the Chapter 11 Cases with the consent of the Required Lenders in their sole discretion; or

(g)        The occurrence of any of the following in the Chapter 11 Cases:

(i)        the payment by the Loan Parties of expenses (A) in excess of the amounts permitted by Section 5.20, or (B) otherwise in violation of the terms and condition of Section 5.20 and permitted variances set forth in the DIP Orders;

(ii)        obtaining, after the Petition Date, credit or incurring Indebtedness that is (A) secured by a security interest, mortgage or other lien on all or any portion of Collateral which is equal or senior to any security interest, mortgage or other lien of the Collateral Agent, or (B) entitled to priority administrative status which is equal or senior to that granted to the Collateral Agent in the DIP Orders, unless used to indefeasibly repay the Obligations in full in cash;

(iii)        the bringing of a motion, taking of any action or the filing of any plan of reorganization or disclosure statement attendant thereto by the Loan Parties in the Chapter 11 Cases, or the entry of an order (A) to obtain additional financing under Section 364(c) or Section 364(d) of the Bankruptcy Code from any Person other than the Lenders not otherwise permitted by this Agreement, or (B) to authorize any Person to recover from any portions of the Collateral any costs or expenses of preserving or disposing of such Collateral under Section 506(c) of the Bankruptcy Code, or (C) except as provided in the

DIP Orders, to use Cash Collateral without the Required Lender's prior written consent under Section 363(c) of the Bankruptcy Code or (D) except as provided in the DIP Orders, to grant any lien other than Permitted Liens upon or affecting any Collateral;

(iv)    the dismissal of any of the Chapter 11 Cases or the conversion of any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code;

(v)    any failure by the Loan Parties to make adequate protection payments or other payments to the Prepetition Agents or Prepetition Secured Parties as set forth in the DIP Orders when due;

(vi)    any failure by the Loan Parties to perform, in any respect and subject to any applicable cure periods, any of the terms, provisions, conditions, covenants, or obligations under any DIP Order or a Termination Event under any DIP Order shall occur;

(vii)    the entry of an order which has not been withdrawn, dismissed or reversed (A) appointing an interim or permanent trustee in the Chapter 11 Cases or the appointment of an examiner or other responsible person with expanded powers in the Chapter 11 Cases, (B) granting relief from or modifying the automatic stay of Section 362 of the Bankruptcy Code (x) to allow any creditor to execute upon or enforce a lien on or security interest in any Collateral in excess of $10,000 or (y) with respect to any lien of or the granting of any lien on any Collateral to any state or local environmental or regulatory agency or authority, (in each case with a value in excess of $25,000), (C) amending, supplementing, staying, reversing, vacating or otherwise modifying any of the Interim DIP Order, the Final DIP Order, this Agreement or any other Loan Document, or any Agent's or other Secured Party's or any Prepetition Agent's or other Prepetition Secured Party's rights, benefits, privileges or remedies under the Interim DIP Order, the Final DIP Order, this Agreement, any other Loan Document or any Prepetition Loan Document or (D) approving a sale of any assets of any Loan Party pursuant to Section 363 of the Bankruptcy Code or approving bidding procedures therefor other than, in each case, as required in the DIP Orders, or other orders of the Court to which the Required Lenders have consented;

(viii)    the Loan Parties consolidating or combining with any other Person except pursuant to a confirmed plan of reorganization with the prior written consent of the Required Lenders;

(ix)    the reversal, vacatur, or modification (without the express prior written consent of the Required Lenders, in their sole discretion) of any DIP Order or any provision thereof, or reversal, vacatur, or modification (without the express prior written consent of the Prepetition Agents and the Prepetition Lenders in their sole discretion) of any provision of any DIP Order directly and adversely affecting the rights of the Prepetition Secured Parties;

(x)    the challenge by the Loan Parties (or the support by the Loan Parties of the challenge by any other Person) to any Agent's, any Secured Party's, any Prepetition Agent's or any other Prepetition Secured Party's claim or the validity, extent, perfection, priority or characterization of any obligations incurred or liens granted under or in connection with the Prepetition Credit Agreement;

(xi)    the challenge by the Loan Parties (or the support by the Loan Parties of the challenge by any other Person) to (a) disallow in whole or in part the claim of the

Prepetition Agents or any other Prepetition Secured Parties under the Prepetition Credit Agreement or the claim of the Agents or any Secured Party in respect of Obligations or to challenge the validity, perfection and enforceability of any of the liens in favor of any of them, or (b) equitably subordinate or re-characterize in whole or in part the claim of the Agents or any Secured Party in respect of the Obligations or the Prepetition Agents or any other Prepetition Secured Parties in respect of the Prepetition Indebtedness, or, in each case, the entry of an order by the Bankruptcy Court granting the relief described above;

(xii)    the entry of any adverse Final DIP Order in any lawsuit, adversary proceeding or on account of any claim or counterclaim related to the Loan Parties or Collateral or prepetition collateral against the Agents, any Secured Party, any Prepetition Agents or any other Prepetition Secured Party by the Loan Parties;

(xiii)    the application by the Loan Parties for authority to make any prepetition Payment not contemplated by the Approved Budget without the Required Lenders prior written consent;

(xiv)    the entry of a Final DIP Order in the Chapter 11 Cases avoiding or requiring disgorgement of any portion of the Prepetition Obligations;

(xv)    the use, remittance or the application of Collateral or proceeds of Collateral in contravention of the terms of the Loan Documents or the DIP Orders;

(xvi)    the entry of a Final DIP Order in the Chapter 11 Cases authorizing procedures for interim compensation of professionals that is not in form and substance customary for the Northern District of Georgia or otherwise not in form and substance acceptable to the Required Lenders;

(xvii)    without the prior written consent of the Required Lenders, the Loan Parties incurring, creating, assuming, suffering to exist or permitting any superpriority claim in the Chapter 11 Cases that is pari passu with or senior to the claims of the Secured Parties and Agents, other than the Carve-Out;

(xviii)    the Bankruptcy Court entering a Final DIP Order (a) resulting in the marshaling of any Collateral, or (b) precluding the attachment of liens to Post-Petition property based on the "equities of the case" under Section 552(b) of the Bankruptcy Code;

(xix)    the Loan Parties requesting or seeking authority for or entry of an order that approves or provides authority to take any other action or actions adverse to any Agent or any Secured Party or its rights and remedies under the Loan Documents or its interest in the Collateral;

(xx)    the termination or modification of any Loan Party's exclusivity as to the proposal of any plan or reorganization or liquidation; or

(xxi)    the change of venue of any of the Chapter 11 Cases from the Bankruptcy Court to any other court without the prior written consent of the Required Lenders; or

(h)    (i) there exists any fact or circumstance that reasonably could be expected to result in the imposition of a Lien or security interest on any property or any Group Member pursuant to Section 430(k) of the Code or Section 303(k) of ERISA or a violation of Section 436 of the Code; or (ii)

83

there occurs one or more other ERISA Events which has resulted or could reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect; or

(i)     one or more Post-Petition judgments shall be rendered against any Group Member and the same shall remain undischarged for a period of 60 consecutive days during which execution shall not be effectively stayed, or any action shall be legally taken by a judgment creditor to levy upon assets or properties of any Group Member to enforce any such judgment and such judgment either (i) is for the payment of money in an aggregate amount in excess of $250,000 (to the extent not adequately covered by insurance as to which a solvent and unaffiliated insurance company has not disputed coverage) or (ii) is for injunctive relief and would reasonably be expected to result in a Material Adverse Effect; or

(j)     at any time after the execution and delivery thereof, (i) the guarantee contained in Section 2.23 of this Agreement for any reason other than Payment in Full shall cease to be in full force and effect (other than in accordance with its terms) or shall be declared to be null and void or any Guarantor shall repudiate its obligations thereunder, (ii) this Agreement or any other Loan Document ceases to be in full force and effect (other than by reason of a release of Collateral in accordance with the terms hereof or thereof or Payment in Full) or shall be declared null and void, or the Collateral Agent shall not have or shall cease to have a valid and perfected Lien on any material portion of the Collateral purported to be covered by the Loan Documents with the priority required by the relevant Loan Document, in each case, for any reason other than (x) as a result of the sale or other disposition of the applicable Collateral in a transaction permitted under the Loan Documents or (y) as a result of the Collateral Agent's failure to maintain possession of any stock certificates or other instruments delivered to it under the Loan Documents, or (iii) any Loan Party shall contest the validity or enforceability of any Loan Document in writing or deny in writing that it has any further liability, including with respect to future advances by Lenders, under any Loan Document to which it is a party or shall contest the validity or perfection of any Lien on any Collateral purported to be covered by the Loan Documents; or

(k)     any Junior Indebtedness or any guarantees thereof shall cease for any reason to be validly subordinated to the Obligations as provided in the documentation governing such Junior Indebtedness or any Loan Party shall contest the subordination of any Junior Indebtedness or any guarantees thereof; or

(l)     at any time after the execution and delivery thereof, any intercreditor agreement shall cease to be in full force and effect (other than in accordance with its terms) or shall be declared null and void; or

(m)     there is any actual indictment of or commencement of criminal proceedings against any Loan Party or any Loan Party's officers (relating to such officer's actions in conducting the applicable Loan Party's business affairs) under any criminal statute.

Section 7.02    Remedies Upon Event of Default. If any Event of Default occurs and is continuing, subject to the DIP Orders, the Disbursing Agent and/or the Collateral Agent, as applicable, shall, at the direction of the Required Lenders (who shall provide written notice thereof to the Loan Parties, any statutorily appointed committee and the United States Trustee for the Northern District of Georgia) (the earliest date to occur of any such notice (excluding any notice period), the "Termination Declaration Date"), take any or all of the following actions, provided such Event(s) of Default are not cured by the Loan Parties pursuant to the terms of this Agreement:

(a)     declare a termination, reduction or restriction on the ability of the Loan Parties to use any Cash Collateral;

(b)    declare the commitment of each Lender to make Loans to be terminated, whereupon such commitments and obligation shall be terminated;

(c)    declare the unpaid principal amount of all outstanding Loans, all interest accrued and unpaid thereon, and all other amounts owing or payable hereunder or under any other Loan Document to be immediately due and payable, without presentment, demand, protest or other notice of any kind, all of which are hereby expressly waived by the Borrower; and

(d)    exercise on behalf of itself and the Lenders all rights and remedies available to it and the Lenders under the Loan Documents or at law or in equity, without further order of or application or motion to the Bankruptcy Court, and without restriction or restraint by any stay under Sections 362 or 105 of the Bankruptcy Code or otherwise;

*provided*, *however*, that the Collateral Agent shall not credit bid any portion of the Obligations without the direction of the Required Lenders.

In addition, five Business Days following the Termination Declaration Date (such five Business Day period, the "Remedies Notice Period"), absent the Loan Parties curing all such existing Events of Default during such Remedies Notice Period, the Collateral Agent shall have automatic relief from the automatic stay and may, at the direction of the Required Lenders, foreclose on all or any portion of the Collateral, collect accounts receivable and apply the proceeds thereof to the Obligations, occupy the Loan Parties' premises to sell or otherwise dispose of the Collateral or otherwise exercise remedies against the Collateral permitted by applicable non-bankruptcy law. During the Remedies Notice Period, the Loan Parties and any statutory committee shall be entitled to an emergency hearing before the Bankruptcy Court for the sole purpose of contesting whether an Event of Default has occurred and is continuing. Unless during such period the Bankruptcy Court determines that an Event of Default has not occurred and/or is not continuing, (i) the automatic stay, as to the Lenders and the Agents, shall automatically terminate at the end of the Remedies Notice Period, without further notice, hearing or order; (ii) neither Section 105 nor any other provision of the Bankruptcy Code shall be used to preclude or restrict the Collateral Agent from exercising its default-related rights and remedies; and (iii) the Loan Parties shall cooperate with the Collateral Agent to effect an orderly liquidation of the Collateral on terms and conditions acceptable to the Collateral Agent (acting at the direction of the Required Lenders). During the Remedies Notice Period, the Loan Parties may not use the proceeds of DIP Loans hereunder, Cash Collateral or other Collateral proceeds except to the limited extent permitted by the DIP Orders.

Without limiting the foregoing, upon the request of the Collateral Agent (acting at the direction of the Required Lenders) following the occurrence and during the continuance of an Event of Default, the Loan Parties shall use commercially reasonable efforts to sell all or such portion of the Collateral as the Collateral Agent (at the direction of the Required Lenders) shall specify and on such terms and conditions and pursuant to such bidding procedures as acceptable to the Collateral Agent (acting at the direction of the Required Lenders), and remit the proceeds therefrom to the Collateral Agent for application to the Obligations. In connection with the foregoing, the Loan Parties shall file and use commercially reasonable efforts to pursue one or more motions under Section 363 of the Bankruptcy Code, in form and substance satisfactory to the Collateral Agent and the Required Lenders, for the entry of one or more orders of the Bankruptcy Court (in form and substance satisfactory to the Collateral Agent and the Required Lenders) approving bidding procedures (acceptable to the Collateral Agent and the Required Lenders) governing each such sale of Collateral and approving each such sale of Collateral that has been approved by the Collateral Agent (acting at the direction of the Required Lenders).

Section 7.03    Application of Funds. After the exercise of remedies provided for in Section 7.02 (or after the Loans have automatically become immediately due and payable as set forth in the proviso to

Section 7.02), any amounts received on account of the Obligations shall be applied by the Disbursing Agent or the Collateral Agent, as the case may be, in the following order:

*first*, to payment of that portion of the Obligations constituting fees, indemnities, expenses and other amounts (including fees, charges and disbursements of counsel to the Disbursing Agent and Collateral Agent) payable to the Disbursing Agent and the Collateral Agent in their capacities as such;

*second*, to payment of that portion of the Obligations constituting fees, indemnities and other amounts (other than principal and interest) payable to the Lenders (including fees, charges and disbursements of counsel to the respective Lenders) arising under the Loan Documents, ratably among them in proportion to the respective amounts described in this clause Second payable to them;

*third*, to payment of that portion of the Obligations constituting accrued and unpaid interest on the Loans and other Obligations arising under the Loan Documents, ratably among the Lenders in proportion to the respective amounts described in this clause Third payable to them;

*fourth*, to payment of that portion of the Obligations constituting unpaid principal of the Loans, ratably among the Lenders in proportion to the respective amounts described in this clause Fourth payable by them; and

*last*, the balance, if any, after Payment in Full, to the Borrower or as otherwise required by Requirements of Law.

## ARTICLE VIII
## THE DISBURSING AGENT AND THE COLLATERAL AGENT

Section 8.01    Appointment and Authority.

(a)    Each Lender hereby designates and appoints Alter Domus (US) LLC to act as Disbursing Agent and Collateral Agent for such Lender under this Agreement and the other Loan Documents, and Alter Domus (US) LLC hereby accepts such appointment on the Closing Date subject to the terms hereof. Each Lender hereby irrevocably authorizes the Disbursing Agent and the Collateral Agent in such capacities, through their agents or employees, to take such actions on its behalf under the provisions of this Agreement and the other Loan Documents and to exercise such powers and perform such duties as are delegated to the Disbursing Agent and the Collateral Agent by the terms of this Agreement and the other Loan Documents, together with such actions and powers as are reasonably incidental thereto. Concurrently herewith, each Lender directs the Disbursing Agent and the Collateral Agent and the Disbursing Agent and the Collateral Agent are authorized to enter into this Agreement and the other Loan Documents and any other related agreements in the forms presented to such Agent. For the avoidance of doubt, each Lender agrees that it will be subject to and bound by the terms of this Agreement and the other Loan Documents. The provisions of this Section 8.01(a) are solely for the benefit of the Agents and the Lenders, and no Loan Party shall have rights as a third party beneficiary of any such provisions (other than with respect to the Borrower's consent rights under Section 8.06).

(b)    Each Lender agrees that in any instance in which this Agreement provides that an Agent's consent may not be unreasonably withheld, provides for the exercise of an Agent's reasonable discretion, or provides to a similar effect, it shall not in its instructions (or, by refusing to provide instruction) to such Agent withhold its consent or exercise its discretion in an unreasonable manner. It is expressly agreed and acknowledged that each Agent is not guaranteeing performance of or assuming any liability for the obligations of the other parties hereto or any parties to the Loan Documents. No Agent shall have liability for any failure, inability or unwillingness on the part of any party to provide accurate and

86

complete information on a timely basis to such Agent, or otherwise on the part of any such party to comply with the terms of this Agreement or any other Loan Document, and shall have no liability for any inaccuracy or error in the performance or observance on any Agent's part of any of its duties hereunder or under any other Loan Document that is caused by or results from any such inaccurate, incomplete or untimely information received by it, or other failure on the part of any such other party to comply with the terms hereof.

(c)     For purposes of clarity, and without limiting any rights, protections, immunities or indemnities afforded to either Agent hereunder (including without limitation this ARTICLE VIII), phrases such as "satisfactory to the [Disbursing] [Collateral] Agent", "approved by the [Disbursing] [Collateral] Agent", "acceptable to the [Disbursing] [Collateral] Agent", "as determined by the [Disbursing] [Collateral] Agent", "in the [Disbursing] [Collateral] Agent's discretion", "selected by the [Disbursing] [Collateral] Agent", "elected by the [Disbursing] [Collateral] Agent", "requested by the [Disbursing] [Collateral] Agent" and phrases of similar import that authorize and permit an Agent to approve, disapprove, determine, act or decline to act in its discretion shall be subject to such Agent receiving written direction from the Lenders or Required Lenders, as applicable, to take such action or to exercise such rights. Nothing contained in this Agreement shall require any Agent to exercise any discretionary acts.

Section 8.02     Rights as a Lender. Any Person serving as the Disbursing Agent or the Collateral Agent hereunder shall have the same rights and powers in its capacity as a Lender as any other Lender and may exercise the same as though it were not the Disbursing Agent or the Collateral Agent, and the term "Lender" or "Lenders" shall, unless otherwise expressly indicated or unless the context otherwise requires, include any Person serving as the Disbursing Agent or the Collateral Agent hereunder in its capacity as a Lender. Such Person and its Affiliates may accept deposits from, lend money to, own securities of, act as the financial advisor or in any other advisory capacity for, and generally engage in any kind of business with, the Borrower or any of its Subsidiaries or other Affiliate thereof as if such Person were not the Disbursing Agent or the Collateral Agent hereunder and without any duty to account therefor to the Lenders.

Section 8.03     Exculpatory Provisions.

(a)     Neither the Disbursing Agent nor the Collateral Agent shall have any duties or obligations except those expressly set forth herein and in the other Loan Documents to which it is a party, and no implied covenants, duties, obligations or liabilities shall be read into this Agreement or any other Loan Documents on the part of either Agent. The duties of the Disbursing Agent and the Collateral Agent hereunder and in each other Loan Document shall be administrative in nature. Without limiting the generality of the foregoing, the Disbursing Agent and the Collateral Agent:

(i)     shall not be subject to any fiduciary or other implied duties, regardless of whether a Default or Event of Default has occurred and is continuing;

(ii)     except as to any matters not expressly provided for in this Agreement (including collection of any promissory notes) or any matter that would require the Disbursing Agent or the Collateral Agent to exercise any discretion hereunder or under any other Loan Document, shall not have any duty to take any discretionary action or exercise any discretionary powers, and shall not be required to exercise any discretion or take any action, but shall be required to act or refrain from acting (and shall be fully protected in so acting or refraining from acting) upon the written instructions of the Required Lenders (or such other number or percentage of the Lenders as shall be expressly provided for herein or in the other Loan Documents), and such instructions shall be binding; provided that neither the Disbursing Agent nor the Collateral Agent shall be required to take any action (i) unless it is furnished with an indemnification satisfactory to such Agent with respect thereto or (ii) that, in its opinion or the opinion of its counsel, may expose the Disbursing Agent or the Collateral Agent to liability or that is contrary to any Loan Document

87

or applicable Requirements of Law, including for the avoidance of doubt any action that may be in violation of the automatic stay under any Debtor Relief Law or that may effect a forfeiture, modification or termination of property of a Defaulting Lender in violation of any Debtor Relief Law; and

(iii)     shall not, except as expressly set forth herein and in the other Loan Documents, have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to the Borrower or any of its Affiliates that is communicated to or obtained by any Person serving as the Disbursing Agent or the Collateral Agent or any of its Affiliates in any capacity.

(b)     Neither the Disbursing Agent nor the Collateral Agent shall be liable for any action taken or not taken by it (i) with the consent or at the request of the Required Lenders (or such other number or percentage of the Lenders as shall be necessary, or as the Disbursing Agent or the Collateral Agent shall believe in good faith shall be necessary, under the circumstances as provided herein or under the other Loan Documents), or (ii) in the absence of its own gross negligence or willful misconduct (as determined by a final non-appealable judgment issued by a court of competent jurisdiction); *provided* that no action taken or not taken in accordance with the direction of the Required Lenders (or such other number or percentage of the Lenders as shall be necessary, or as the Disbursing Agent or the Collateral Agent shall believe in good faith shall be necessary, under the circumstances as provided herein or under the other Loan Documents) shall be deemed to constitute gross negligence or willful misconduct of the Disbursing Agent or the Collateral Agent. The Disbursing Agent and the Collateral Agent shall be deemed not to have knowledge of any Default unless and until notice describing such Default is given to an officer of the Disbursing Agent and the Collateral Agent with direct responsibility for administration of this Agreement in writing by the Borrower or a Lender and such notice is conspicuously labelled "notice of default".

(c)     The Disbursing Agent and the Collateral Agent shall not be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation made in or in connection with this Agreement or any other Loan Document, (ii) the contents of any certificate, report or other document delivered hereunder or thereunder or in connection herewith or therewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth herein or therein or the occurrence of any Default or Event of Default, (iv) the validity, enforceability, effectiveness or genuineness of this Agreement, any other Loan Document or any other agreement, instrument or document, or (v) the satisfaction of any condition set forth in ARTICLE IV or elsewhere herein or in any other Loan Document.

(d)     Without limiting the generality of the foregoing, the use of the term "agent" in this Agreement with reference to the Disbursing Agent and the Collateral Agent is not intended to connote any fiduciary or other implied (or express) obligations arising under agency doctrine of any Requirements of Law. Instead, such term is used merely as a matter of market custom and is intended to create or reflect only an administrative relationship between independent contracting parties.

(e)     Each party to this Agreement acknowledges and agrees that the Collateral Agent may from time to time use one or more outside service providers for the tracking of all UCC financing statements (and/or other collateral related filings and registrations from time to time) required to be filed or recorded pursuant to this Agreement or the other Loan Documents and the notification to the Collateral Agent, of, among other things, the upcoming lapse or expiration thereof, and that each of such service providers will be deemed to be acting at the request and on behalf of the Borrower. The Collateral Agent shall not be liable for any action taken or not taken by any such service provider.

(f)     Neither the Disbursing Agent nor the Collateral Agent shall be liable for any action taken in good faith and reasonably believed by it to be within the powers conferred upon it, or taken by it pursuant to any direction or instruction by which it is governed, or omitted to be taken by it by reason of

88

the lack of direction or instruction required hereby for such action (including without limitation for refusing to exercise discretion or for withholding its consent in the absence of its receipt of, or resulting from a failure, delay or refusal on the part of any Lender to provide, written instruction to exercise such discretion or grant such consent from any such Lender, as applicable). Neither the Disbursing Agent nor the Collateral Agent shall be liable for any error of judgment made by it in good faith (or by any officer or other employee of such Agent) unless it shall be determined pursuant to a final non-appealable judgment of a court of competent jurisdiction that such Agent was grossly negligent in ascertaining the relevant facts. Nothing herein or in any other Loan Document or related documents shall obligate any Agent to advance, expend or risk its own funds, or to take any action within its reasonable judgment may cause it to incur any expense or financial or other liability for which it is not indemnified to its satisfaction.

(g)    Neither the Disbursing Agent nor the Collateral Agent shall be liable for any indirect, special, punitive or consequential damages (including but not limited to lost profits) whatsoever, even if it has been informed of the likelihood thereof and regardless of the form of action. Any permissive grant of power to any Agent hereunder shall not be construed to be a duty to act. Before acting hereunder, the Disbursing Agent and the Collateral Agent shall be entitled to request, receive and rely upon such certificates and opinions as either of them may reasonably determine appropriate with respect to the satisfaction of any specified circumstances or conditions precedent to such action. In no event shall the Disbursing Agent or the Collateral Agent be responsible or liable for: (i) delays or failures in performance resulting from acts beyond its control, including but not limited to, acts of God, strikes, lockouts, riots, acts of war, epidemics, governmental regulations superimposed after the fact, fire, communication line failures, computer viruses, power failures, earthquakes or other disasters, the unavailability of communications or computer facilities, the failure of equipment or interruption of communications or computer facilities, or the unavailability of the Federal Reserve Bank wire or telex or other wire or communication facility, (ii) any delay, error omission or default of any mail, telegraph, cable or wireless agency or operator, or (iii) the acts or edicts of any government or governmental agency or other group or entity exercising governmental powers. Neither the Disbursing Agent nor the Collateral Agent shall be liable for interest on any money received by it. For the avoidance of doubt, the Disbursing Agent's and the Collateral Agent's rights, protections, indemnities and immunities provided herein shall apply to such Agent for any actions taken or omitted to be taken under this Agreement or any other Loan Documents and any other related agreements in any of their respective capacities. The Disbursing Agent and the Collateral Agent shall not be required to take any action under this Agreement, the other Loan Documents or any related document if taking such action (A) would subject the Disbursing Agent and the Collateral Agent to a tax in any jurisdiction where it is not then subject to a tax, or (B) would require the Disbursing Agent and the Collateral Agent to qualify to do business in any jurisdiction where it is not then so qualified.

(h)    Neither the Disbursing Agent nor the Collateral Agent shall have any liability for any failure, inability or unwillingness on the part of any Lender or Loan Party to provide accurate and complete information on a timely basis to such Agent, or otherwise on the part of any such party to comply with the terms of this Agreement, and shall not have any liability for any inaccuracy or error in the performance or observance on such Agent's part of any of its duties hereunder that is caused by or results from any such inaccurate, incomplete or untimely information received by it, or other failure on the part of any such other party to comply with the terms hereof.

(i)    The Disbursing Agent and the Collateral Agent may at any time request instructions from the Lenders with respect to any actions or approvals which by the terms of this Agreement or of any of the other Loan Documents such Agent is permitted or required to take or to grant. Without limiting Section 8.03(a)(ii), if the Disbursing Agent or the Collateral Agent shall request any such instructions, such Agent shall be entitled to refrain from such act or taking such action unless and until such Agent shall have received instructions from the Required Lenders (or such other number or percentage of the Lenders as shall be expressly provided for herein or in the other Loan Documents), and such Agent

shall not incur liability to any Person by reason of so refraining. Without limiting the foregoing, the Lenders shall not have any right of action whatsoever against the Disbursing Agent or the Collateral Agent as a result of its acting or refraining from acting hereunder in accordance with the instructions of the Required Lenders (or such other number or percentage of the Lenders as shall be expressly provided for herein or in the other Loan Documents).

(j)     The Disbursing Agent shall not be under any obligation (i) to monitor, determine or verify the unavailability or cessation of the Term SOFR Reference Rate (or other applicable Benchmark), or whether or when there has occurred, or to give notice to any other transaction party of the occurrence of, any Benchmark Transition Event or Benchmark Replacement Date, (ii) to select, determine or designate any Benchmark Replacement, or other successor or replacement benchmark index, or whether any conditions to the designation of such a rate have been satisfied, or (iii) to select, determine or designate any Benchmark Replacement Adjustment, or other modifier to any replacement or successor index, or (iv) to determine whether or what Conforming Changes are necessary or advisable, if any, in connection with any of the foregoing. The Disbursing Agent shall not be liable for any inability, failure or delay on its part to perform any of its duties set forth in this Agreement as a result of the unavailability of the Term SOFR Reference Rate (or other applicable Benchmark) and absence of a designated replacement Benchmark, including as a result of any inability, delay, error or inaccuracy on the part of any other transaction party, including without limitation the Required Lenders and the Borrower, in providing any direction, instruction, notice or information required or contemplated by the terms of this Agreement and reasonably required for the performance of such duties. The Disbursing Agent shall not have any liability for any interest rate published by any publication that is the source for determining the interest rates of the Loans, including but not limited to the Bloomberg Screen (or any successor source), or for any rates compiled by the CME Group Benchmark Administration Limited or any successor thereto, or for any rates published on any publicly available source, or in any of the foregoing cases for any delay, error or inaccuracy in the publication of any such rates, or for any subsequent correction or adjustment thereto.

(k)     The Disbursing Agent shall not be responsible or have any liability for, or have any duty to ascertain, inquire into, monitor or enforce compliance with, the provisions hereof relating to Defaulting Lenders. Without limiting the generality of the foregoing, the Disbursing Agent shall not (i) be obligated to ascertain, monitor or inquire as to whether any Lender or Participant or prospective Lender or Participant is a Defaulting Lender or (ii) have any liability with respect to or arising out of any assignment or participation of Loans, or disclosure of confidential information to, any Defaulting Lender.

Section 8.04     Reliance by Agents. Each of the Disbursing Agent and the Collateral Agent shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing (including any electronic message, Internet or intranet website posting or other distribution) believed by it to be genuine and to have been signed, sent or otherwise authenticated by the proper Person. In determining compliance with any condition hereunder to the making of a Loan that by its terms must be fulfilled to the satisfaction of a Lender, the Disbursing Agent may presume that such condition is satisfactory to such Lender unless the Disbursing Agent shall have received written notice to the contrary from such Lender prior to the making of such Loan. Each of the Disbursing Agent and the Collateral Agent may consult, at the expense of the Borrower, with legal counsel of its own choosing (who may, but need not, be counsel for the Borrower or any Lender), independent accountants and other experts and advisors selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants, advisors or experts. The Disbursing Agent shall not be responsible for and shall have no duty to ascertain or inquire into the conditions for replacement of any Lender pursuant to Section 2.21(b) hereof, and shall be entitled to conclusively rely upon, shall not incur any liability for relying upon, and shall not be liable for acting or refraining to act in reliance upon any notice, request, certificate, document or other writing received by it in connection therewith. Neither Agent nor any of their respective directors, officers, agents or employees

90

shall be liable for any action taken or omitted to be taken by it or them under or in connection with this Agreement or any of the other Loan Documents, except for its or their own gross negligence or willful misconduct (as determined by a final judgment issued by a court of competent jurisdiction no longer subject to appeal). Without limiting the generality of the foregoing, each Agent: (i) makes no warranty or representation to any Lender or any other Person and shall not be responsible to any Lender or any other Person for any statements, warranties or representations (whether written or oral) made in or in connection with this Agreement or the other Loan Documents; (ii) shall not have any duty to ascertain or to inquire as to the performance or observance of any of the terms, covenants or conditions of this Agreement, the other Loan Documents or any related documents on the part of the Loan Parties or any other Person or to inspect the property (including the books and records) of the Loan Parties; (iii) shall not be responsible to any Lender or any other Person for the due execution, legality, validity, enforceability, genuineness, sufficiency, ownership, transferability, perfection, priority or value of any Collateral, this Agreement, the other Loan Documents, any related document or any other instrument or document furnished pursuant hereto or thereto; and (iv) shall incur no liability under or in respect of this Agreement or any other Loan Document by relying on, acting upon (or by refraining from action in reliance on) any notice, consent, certificate, instruction or waiver, report, statement, opinion, direction or other instrument or writing (which may be delivered by telecopier, email, cable or telex, if acceptable to it) believed by it to be genuine and believed by it to be signed or sent by the proper party or parties. Neither Agent shall have any liability to any of the Loan Parties or any Lender or any other Person for any of the Loan Parties' or any Lender's, as the case may be, performance of, or failure to perform, any of their respective obligations and duties under this Agreement or any other Loan Document. Each of the Disbursing Agent and the Collateral Agent shall be afforded all of the rights, powers, immunities and indemnities set forth in this Agreement in all of the other Loan Documents to which it is a signatory as if such rights, powers, immunities and indemnities were specifically set out in each such other Loan Document.

Section 8.05    Delegation of Duties. Each of the Disbursing Agent and the Collateral Agent may perform any and all of its duties and exercise its rights and powers hereunder or under any other Loan Document by or through, or delegate any and all such rights and powers to, any one or more sub-agents appointed by the Disbursing Agent or the Collateral Agent, as applicable; *provided* that in no event shall any such sub-agent be a Defaulting Lender. The Disbursing Agent and the Collateral Agent and any such sub-agent may perform any and all of its duties and exercise its rights and powers by or through their respective Related Parties. The exculpatory provisions of this ARTICLE VIII shall apply to any such sub-agent and to the Related Parties of the Disbursing Agent and the Collateral Agent and any such sub-agent, and shall apply, without limiting the foregoing, to their respective activities as the Disbursing Agent and the Collateral Agent. The Disbursing Agent and the Collateral Agent shall not be responsible for the negligence or misconduct of any sub-agents except to the extent that the Disbursing Agent or the Collateral Agent acted with gross negligence or willful misconduct in the selection of such sub-agents or attorneys-in-fact as determined by a court of competent jurisdiction in a final and non-appealable judgment.

Section 8.06    Resignation of the Disbursing Agent or the Collateral Agent.

(a)    The Disbursing Agent or the Collateral Agent may at any time give notice of its resignation to the Lenders and the Borrower. Upon receipt of any such notice of resignation, the Required Lenders shall have the right, in consultation with the Borrower, to appoint a successor, which shall be a financial institution with an office in New York, or an Affiliate of any such financial institution with an office in New York. If no such successor shall have been so appointed by the Required Lenders and shall have accepted such appointment within 30 days after the retiring Disbursing Agent or Collateral Agent gives notice of its resignation (or such earlier day as shall be agreed by the Required Lenders) (the "Resignation Effective Date"), then the retiring Disbursing Agent or Collateral Agent may (but shall not be obligated to), on behalf of the Lenders, appoint a successor Disbursing Agent or Collateral Agent meeting the qualifications set forth above; *provided* that in no event shall any such successor Disbursing Agent or

Collateral Agent be a Defaulting Lender. Whether or not a successor has been appointed, such resignation shall become effective in accordance with such notice on the Resignation Effective Date.

(b)    With effect from the Resignation Effective Date (i) the retiring Disbursing Agent or Collateral Agent shall be discharged from its duties and obligations hereunder and under the other Loan Documents (except that in the case of any collateral security held by the Collateral Agent on behalf of the Lenders under any of the Loan Documents, the retiring Collateral Agent shall continue to hold such collateral security until such time as a successor Collateral Agent is appointed) and (ii) except for any accrued but unpaid fees, unreimbursed expenses or any indemnity payments owed to the retiring Disbursing Agent or Collateral Agent, all payments, communications and determinations provided to be made by, to or through the Disbursing Agent shall instead be made by or to each Lender directly, until such time, if any, as the Required Lenders appoint a successor Disbursing Agent or Collateral Agent as provided for above. Upon the acceptance of a successor's appointment as Disbursing Agent or Collateral Agent hereunder, such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring Disbursing Agent or Collateral Agent (other than any rights to accrued but unpaid fees, unreimbursed expenses or any indemnity payments owed to the retiring Disbursing Agent or Collateral Agent), and the retiring Disbursing Agent or Collateral Agent shall be discharged from all of its duties and obligations hereunder and under the other Loan Documents. The fees payable by the Borrower to a successor Disbursing Agent or Collateral Agent shall be the same as those payable to its predecessor unless otherwise agreed between the Borrower and such successor. After the retiring Disbursing Agent's or Collateral Agent's resignation hereunder and under the other Loan Documents, the provisions of this ARTICLE VIII and Section 9.05 shall continue in effect for the benefit of such retiring Disbursing Agent or Collateral Agent, its sub-agents and their respective Related Parties in respect of any actions taken or omitted to be taken by any of them while the retiring Disbursing Agent or Collateral Agent was acting as Disbursing Agent or Collateral Agent, as applicable.

(c)    Any resignation by Alter Domus (US) LLC, as Disbursing Agent, shall also constitute its resignation as Collateral Agent.

Section 8.07    Non-Reliance on Disbursing Agent and Other Lenders. Each Lender acknowledges that it has, independently and without reliance upon the Disbursing Agent, the Collateral Agent or any other Lender or any of their Related Parties and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement. Each Lender also acknowledges that it will, independently and without reliance upon the Disbursing Agent, the Collateral Agent or any other Lender or any of their Related Parties and based on such documents and information as it shall from time to time deem appropriate, continue to make its own decisions in taking or not taking action under or based upon this Agreement, any other Loan Document or any related agreement or any document furnished hereunder or thereunder. Neither Agent shall be responsible to any Lender for any recitals, statements, information, representations or warranties herein or in any agreement, document, certificate or statement delivered in connection herewith or for the execution, effectiveness, genuineness, validity, enforceability, collectability, sufficiency or value of this Agreement or any other Loan Document or any other instrument or document furnished pursuant hereto or thereto, or of the financial condition of any Loan Party, or be required to make any inquiry concerning either the performance or observance of any of the terms, provisions or conditions of this Agreement, the other Loan Documents or the financial condition of any Loan Party, or the existence of any Event of Default or any Default.

Section 8.08    No Other Duties, Etc. Anything herein to the contrary notwithstanding, neither Agent shall have any powers, duties or responsibilities under this Agreement or any of the other Loan Documents, except in its capacity, as applicable, as the Disbursing Agent, the Collateral Agent or a Lender hereunder or thereunder.

Section 8.09    <u>Disbursing Agent May File Proofs of Claim</u>. In case of the pendency of any proceeding under any Debtor Relief Law or any other judicial proceeding relative to any Loan Party, the Disbursing Agent (irrespective of whether the principal of any Loan shall then be due and payable as herein expressed or by declaration or otherwise and irrespective of whether the Disbursing Agent shall have made any demand on the Borrower) shall be entitled and empowered (but not obligated) by intervention in such proceeding or otherwise:

(a)    to file and prove a claim for the whole amount of the principal and interest owing and unpaid in respect of the Loans and all other Obligations that are owing and unpaid and to file such other documents as may be necessary or advisable in order to have the claims of the Lenders and the Agents (including any claim for the reasonable compensation, expenses, disbursements and advances of the Lenders and the Agents and their respective agents and counsel and all other amounts due the Lenders and the Agents under <u>Section 2.07</u> and <u>Section 9.05</u>) allowed in such judicial proceeding; and

(b)    to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same; and any custodian, receiver, assignee, trustee, liquidator, sequestrator or other similar official in any such judicial proceeding is hereby authorized by each Lender to make such payments to the Disbursing Agent and, in the event that the Disbursing Agent shall consent to the making of such payments directly to the Lenders, to pay to the Disbursing Agent and the Collateral Agent any amount due for the reasonable compensation, expenses, disbursements and advances of the Disbursing Agent and the Collateral Agent and their respective agents and counsel, and any other amounts due to the Disbursing Agent and the Collateral Agent under this Agreement and the other Loan Documents, including <u>Section 2.07</u> and <u>Section 9.05</u>.

Section 8.10    <u>Collateral and Guaranty Matters</u>.

(a)    Each of the Lenders irrevocably authorizes the Disbursing Agent and the Collateral Agent to:

(i)    release any Lien on any property granted to or held by the Collateral Agent under any Loan Document (x) upon Payment in Full, (y) that is sold or otherwise disposed of as part of or in connection with any sale or other Disposition permitted under the Loan Documents or (z) subject to <u>Section 9.01</u>, if approved, authorized or ratified in writing by the Required Lenders or such other number or percentage of Lenders required hereby;

(ii)    [reserved]; and

(iii)    release any Guarantor from its obligations under this Agreement and/or any of the other Loan Documents (x) upon Payment in Full or (y) solely in the case of any Subsidiary Guarantor, if such Guarantor ceases to be a Subsidiary as a result of a transaction permitted under and in accordance with the Loan Documents.

Any such release of guarantee obligations or security interests shall be deemed subject to the provision that such guarantee obligations shall be reinstated if after such release any portion of any payment in respect of the Obligations shall be rescinded or must otherwise be restored or returned upon the insolvency, bankruptcy, dissolution, liquidation or reorganization of the Borrower or any Guarantor, or upon or as a result of the appointment of a receiver, intervenor or conservator of, or trustee or similar officer for, the Borrower or any Guarantor or any substantial part of its property, or otherwise, all as though such payment had not been made.

Any such release of Liens shall not in any manner discharge, affect, or impair the Obligations or any Liens (other than those expressly being released) upon (or obligations of the Loan Parties in respect of) all interests retained by the Loan Parties, including the proceeds of any sale, all of which shall continue to constitute part of the Collateral. In no event shall the Disbursing Agent or the Collateral Agent be obligated to execute or deliver any document evidencing any release, subordination or re-conveyance without receipt of a certificate executed by a Responsible Officer of the Loan Party or Loan Parties disposing of such property certifying that such release, subordination or re-conveyance, as applicable, complies with this Agreement and the other Loan Documents, and that all conditions precedent to such release, subordination or re-conveyance have been complied with. Upon request by the Disbursing Agent or the Collateral Agent at any time, the Required Lenders will confirm in writing the Disbursing Agent's or the Collateral Agent's authority to release, subordinate or re-convey its interest in particular types or items of property, or to release any Guarantor from its obligations under this Agreement and/or any of the other Loan Documents pursuant to this Section 8.10.

(b)    The Disbursing Agent and the Collateral Agent hereby disclaim any representation or warranty to the Lenders concerning, and shall not be responsible for or have a duty to ascertain or inquire into the existence, value or collectability of the Collateral, the existence, priority or perfection of the Collateral Agent's Lien thereon, or any certificate prepared by any Loan Party in connection therewith, nor shall the Disbursing Agent or the Collateral Agent be responsible or liable to the Lenders or any other Secured Party for any failure to monitor or maintain any portion of the Collateral. Neither Agent makes any representation as to the value, sufficiency or condition of the Collateral or any part thereof, as to the title of the Loan Parties to the Collateral, or as to the security afforded by this Agreement or any other Loan Document. Neither Agent shall be responsible for insuring the Collateral or for the payment of Taxes, charges, assessments or liens upon the Collateral. Neither Agent shall be responsible for the maintenance of the Collateral, except as expressly provided in the immediately following sentence when the Collateral Agent has possession of the Collateral. Neither Agent shall have any duty to the Lenders as to any Collateral in its possession or in the possession of someone under its control or in the possession or control of any agent or nominee of such Agent or any income thereon or as to the preservation of rights against prior parties or any other rights pertaining thereto, except the duty to accord such of the Collateral as may be in its possession substantially the same care as it accords similar assets held for the benefit of third parties and the duty to account for monies received by it. Neither Agent shall be under an obligation independently to request or examine insurance coverage with respect to any Collateral. Neither Agent shall be liable for the acts or omissions of any bank, depositary bank, custodian, independent counsel of any Loan Party or any other party selected by such Agent with reasonable care or selected by any other party hereto that may hold or possess Collateral or documents related to Collateral, and neither Agent shall be required to monitor the performance of any such Persons holding Collateral. For the avoidance of doubt, neither Agent shall be responsible to the Lenders for the perfection of any Lien or for the filing, form, content or renewal of any UCC financing statements, fixture filings, mortgages, deeds of trust and such other documents or instruments. The Lenders shall be solely responsible for, and shall arrange for the filing and continuation of financing statements or other filing or recording documents or instruments for the perfection of security interests in the Collateral.    The Collateral Agent shall not be responsible for the preparation, form, content, sufficiency or adequacy of any such financing statements.

(c)    In connection with the exercise of any rights or remedies in respect of, or foreclosure or realization upon, any material Real Property pursuant to this Agreement or any other Loan Document, the Collateral Agent shall not be obligated to take title to or possession of Real Property in its own name, or otherwise in a form or manner that may, in its reasonable judgment, expose it to liability. In the event that the Collateral Agent deems that it may be considered an "owner or operator" under any environmental laws or otherwise cause the Collateral Agent to incur, or be exposed to, any environmental liability or any liability under any other federal, state or local law, the Collateral Agent reserves the right, instead of taking such action, either to resign as the Collateral Agent subject to the terms and conditions of

94

<u>Section 8.06</u> or to arrange for the transfer of the title or control of the asset to a court appointed receiver. The Collateral Agent will not be liable to any Person for any environmental liability or any environmental claims or contribution actions under any federal, state or local law, rule or regulation by reason of the Collateral Agent's actions and conduct as authorized, empowered and directed hereunder or relating to any kind of discharge or release or threatened discharge or release of any Materials of Environmental Concern into the environment.

(d)     In connection with any tax affidavit or similar instrument required to be filed or delivered by the Collateral Agent in connection with any mortgage, the Collateral Agent shall complete such tax affidavit or similar instrument pursuant to the information provided to it in a certificate executed by a Responsible Officer of the Borrower. The Collateral Agent shall be entitled to conclusively rely on the information provided to it in such certificate and shall not be liable to the Loan Parties, the Lenders or any other Person for its acting in reliance thereon. The Borrower shall indemnify the Collateral Agent for any losses the Collateral Agent may incur as a result of its reliance on such certificate of the Borrower, including without limitation, any losses relating to any incorrect or misleading information provided in any tax affidavit based upon information contained in the certificate of the Borrower.

(e)     Anything contained in any of the Loan Documents to the contrary notwithstanding, the Borrower, the Disbursing Agent, the Collateral Agent and each Lender hereby agree that (i) no Lender shall have any right individually to realize upon any of the Collateral or to enforce this Agreement or any other Loan Document, it being understood and agreed that all powers, rights and remedies under any of the Loan Documents may be exercised solely by the Collateral Agent for the benefit of the Secured Parties in accordance with the terms thereof, and (ii) in the event of a foreclosure or similar enforcement action by the Collateral Agent on any of the Collateral pursuant to a public or private sale or other Disposition (including, without limitation, pursuant to Section 363(k), Section 1129(b)(2)(A)(ii) or otherwise of the Bankruptcy Code), the Collateral Agent (or any Lender, except with respect to a "credit bid" pursuant to Section 363(k), Section 1129(b)(2)(A)(ii) or otherwise of the Bankruptcy Code) may be the purchaser or licensor of any or all of such Collateral at any such sale or other Disposition and the Collateral Agent, as agent for and representative of the Secured Parties (but not any Lender or Lenders in its or their respective individual capacities) shall be entitled (either directly or through one or more acquisition vehicles), upon instructions from the Required Lenders, for the purpose of bidding and making settlement or payment of the purchase price for all or any portion of the Collateral sold at any such sale or Disposition, to use and apply any or all of the Obligations (other than Obligations owing to the Disbursing Agent or the Collateral Agent) as a credit on account of the purchase price for any collateral payable by the Collateral Agent (or such acquisition vehicle) at such sale or other Disposition.

Section 8.11     <u>Withholding Tax</u>. To the extent required by any Requirement of Law, the Disbursing Agent and the Collateral Agent may deduct or withhold from any payment to any Lender an amount equivalent to any applicable withholding Tax. If the IRS or any other Governmental Authority asserts a claim that the Disbursing Agent or the Collateral Agent, as the case may be, did not properly withhold Tax from amounts paid to or for the account of any Lender for any reason (including because the appropriate form was not delivered or was not properly executed or because such Lender failed to notify the Disbursing Agent of a change in circumstance that rendered the exemption from, or reduction of, withholding Tax ineffective), such Lender shall indemnify and hold harmless the Disbursing Agent and the Collateral Agent fully for all amounts paid, directly or indirectly, by such Agent as Tax or otherwise, including any penalties, additions to Tax or interest and together with all expenses (including legal expenses, allocated internal costs and out-of-pocket expenses) incurred, whether or not such Tax was correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate as to the amount of such payment or liability delivered to any Lender by the Disbursing Agent or the Collateral Agent, as the case may be, shall be conclusive absent manifest error. Each Lender hereby authorizes the Disbursing Agent and the Collateral Agent to set off and apply any and all amounts at any time owing to

such Lender under this Agreement or any other Loan Document against any amount due to such Agent under this Section 8.11. The agreements in this Section 8.11 shall survive the resignation and/or replacement of the Disbursing Agent and the Collateral Agent, any assignment of rights by, or the replacement of, a Lender, the termination of this Agreement and the repayment, satisfaction or discharge of all other Obligations.

Section 8.12    No Reliance on Agents' Customer Identification Program. Each Lender acknowledges and agrees that neither such Lender, nor any of its Affiliates, participants or assignees, may rely on either Agent to carry out such Lender's or its Affiliate's, participant's or assignee's customer identification program, or other obligations required or imposed under or pursuant to the PATRIOT Act or the regulations thereunder, including the regulations contained in 31 CFR 103.121 (as hereafter amended or replaced, the "CIP Regulations"), or any other anti-terrorism law, including any programs involving any of the following items relating to or in connection with the Borrower, its Affiliates or agents, the Loan Documents or the transactions hereunder: (a) any identity verification procedures, (b) any record keeping, (c) any comparisons with government lists, (d) any customer notices or (e) any other procedures required under the CIP Regulations or such other laws.

Section 8.13    Erroneous Payments.

(a)    Each Lender hereby agrees that (i) if the Disbursing Agent notifies such Lender that the Disbursing Agent has determined in its sole discretion that any funds received by such Lender from the Disbursing Agent or any of its Affiliates were erroneously or mistakenly transmitted to, or otherwise erroneously or mistakenly received by, such Lender (whether or not known to such Lender) (whether as a payment, prepayment or repayment of principal, interest, fees or otherwise; individually and collectively, an "Erroneous Payment") and demands the return of such Erroneous Payment (or a portion thereof), such Lender shall promptly, but in no event later than one Business Day thereafter, return to the Disbursing Agent the amount of any such Erroneous Payment (or portion thereof) as to which such a demand was made, in same day funds (in the currency so received), together with interest thereon in respect of each day from and including the date such Erroneous Payment (or portion thereof) was received by such Lender to the date such amount is repaid to the Disbursing Agent in same day funds at the greater of the Federal Funds Effective Rate and a rate determined by the Disbursing Agent in accordance with banking industry rules on interbank compensation from time to time in effect and (ii) to the extent permitted by applicable law, such Lender shall not assert any right or claim to the Erroneous Payment, and hereby waives any claim, counterclaim, defense or right of set-off or recoupment with respect to any demand, claim or counterclaim by the Disbursing Agent for the return of any Erroneous Payments received, including, without limitation, waiver of any defense based on "discharge for value" or any similar theory or doctrine. A notice of the Disbursing Agent to any Lender under this clause (a) shall be conclusive, absent manifest error.

(b)    Without limiting the immediately preceding clause (a), each Lender hereby further agrees that if it receives a payment from the Disbursing Agent (or any of its Affiliates) (x) that is in a different amount than, or on a different date from, that specified in a notice of payment sent by the Disbursing Agent, (y) that was not preceded or accompanied by notice of payment, or (z) that such Lender otherwise becomes aware was transmitted, or received, in error or by mistake (in whole or in part), then in each case, if an error has been made each such Lender is deemed to have knowledge of such error at the time of receipt of such Erroneous Payment, and to the extent permitted by applicable law, such Lender shall not assert any right or claim to the Erroneous Payment and hereby waives any claim, counterclaim, defense or right of set-off or recoupment with respect to any demand, claim or counterclaim by the Disbursing Agent for the return of any Erroneous Payments received, including without limitation waiver of any defense based on "discharge for value" or any similar theory or doctrine. Each Lender agrees that, in each such case, it shall promptly (and, in all events, within one Business Day of its knowledge (or deemed knowledge) of such error) notify the Disbursing Agent of such occurrence and, upon demand from the

Disbursing Agent, it shall promptly, but in all events no later than one Business Day thereafter, return to the Disbursing Agent the amount of any such Erroneous Payment (or portion thereof) as to which such a demand was made in same day funds (in the currency so received), together with interest thereon in respect of each day from and including the date such Erroneous Payment (or portion thereof) was received by such Lender to the date such amount is repaid to the Disbursing Agent in same day funds at the greater of the Federal Funds Effective Rate and a rate determined by the Disbursing Agent in accordance with banking industry rules on interbank compensation from time to time in effect.

(c)        The Borrower and each other Loan Party hereby agrees that (x) in the event an Erroneous Payment (or portion thereof) is not recovered from any Lender that has received such Erroneous Payment (or portion thereof) for any reason (and without limiting the Disbursing Agent's rights and remedies under this Section 8.13), the Disbursing Agent shall be subrogated to all the rights of such Lender with respect to such amount and (y) an Erroneous Payment shall not pay, prepay, repay, discharge or otherwise satisfy any Obligations owed by the Borrower or any other Loan Party.

(d)        In addition to any rights and remedies of the Disbursing Agent provided by law, the Disbursing Agent shall have the right, without prior notice to any Lender, any such notice being expressly waived by such Lender to the extent permitted by applicable law, with respect to any Erroneous Payment for which a demand has been made in accordance with this Section 8.13 and which has not been returned to the Disbursing Agent, to set off and appropriate and apply against such amount any and all deposits (general or special, time or demand, provisional or final but excluding trust accounts), in any currency, and any other credits, indebtedness or claims, in any currency, in each case whether direct or indirect, absolute or contingent, matured or unmatured, at any time held or owing by the Disbursing Agent or any of its Affiliates, branches or agencies thereof to or for the credit or the account of such Lender. The Disbursing Agent agrees promptly to notify the Lender after any such setoff and application made by the Disbursing Agent; *provided* that the failure to give such notice shall not affect the validity of such setoff and application.

(e)        Each party's obligations under this Section 8.13 shall survive the resignation or replacement of the Disbursing Agent, the termination of the DIP Loan Commitments and the repayment, satisfaction or discharge of all Obligations (or any portion thereof) under any Loan Document.

## ARTICLE IX
## MISCELLANEOUS

Section 9.01    Amendments and Waivers. None of the terms or provisions of this Agreement or any other Loan Document may be waived, supplemented or otherwise modified except in accordance with the provisions of this Section 9.01. The Required Lenders and each Loan Party to the relevant Loan Document may, from time to time, (x) enter into written amendments, supplements or modifications hereto and to the other Loan Documents (including amendments and restatements hereof or thereof) for the purpose of adding any provisions to this Agreement or the other Loan Documents or changing in any manner the rights of the Lenders or of the Loan Parties hereunder or thereunder or (y) waive, on such terms and conditions as may be specified in the instrument of waiver, any of the requirements of this Agreement or the other Loan Documents or any Default or Event of Default and its consequences; *provided*, *however*, that, in addition to such Required Lender consent (except as otherwise set forth below), no such waiver, amendment, supplement or modification shall:

(i)        forgive the principal amount of any Loan, postpone, extend or delay any date fixed for, or reduce or waive the stated rate of, any interest, premium, fee or other amounts (other than principal) due to the Lenders and payable hereunder or under any other Loan Document (except that, for the avoidance of doubt, mandatory prepayments pursuant to Section 2.09 may be postponed, extended,

delayed, reduced, waived or modified and the Maturity Date may be postponed, extended or delayed, in each case, with the consent of the Required Lenders), or increase the amount or extend the expiration date of any DIP Loan Commitment of any Lender, in each case without the written consent of each Lender directly affected thereby;

(ii)    amend, modify or waive any provision of this Section 9.01 or reduce any percentage specified in the definition of "Required Lenders", consent to the assignment or transfer by the Borrower of any of its rights or obligations under this Agreement or the other Loan Documents, release all or substantially all of the Collateral or release all or substantially all of the Guarantee Obligations of Holdings or the value of the Guarantee Obligations of the Subsidiary Guarantors under this Agreement and the other Loan Documents other than in accordance with the provisions of the Loan Documents, in each case, without the consent of all Lenders;

(iii)    [reserved];

(iv)    [reserved];

(v)    amend, modify or waive any provision of ARTICLE VIII or any other provision affecting the rights, duties or obligations of the Disbursing Agent (including, without limitation, in connection with the adoption of any Conforming Changes) without the consent of the Disbursing Agent;

(vi)    amend, modify or waive any provision of ARTICLE VIII or any other provision affecting the rights, duties or obligations of the Collateral Agent (including, without limitation, in connection with the adoption of any Conforming Changes) without the consent of the Collateral Agent;

(vii)    amend, modify or waive the pro rata sharing provisions of Section 2.15, Section 2.19 or Section 9.07(a) without the consent of each Lender directly and adversely affected thereby; or

(viii)    impose modifications or restrictions on assignments and participations that are more restrictive than, or additional to, those set forth in Section 9.06(b) without the consent of each Lender.

Any such waiver and any such amendment, supplement or modification shall apply equally to each of the Lenders and shall be binding upon the Loan Parties, the Lenders, the Disbursing Agent, the Collateral Agent, and all future holders of the Loans. In the case of any waiver, the Loan Parties, the Lenders, the Disbursing Agent and the Collateral Agent shall be restored to their former position and rights hereunder and under the other Loan Documents, and any Default or Event of Default waived shall be deemed to be cured and not continuing; but no such waiver shall extend to any subsequent or other Default or Event of Default, or impair any right consequent thereon. Any such waiver, amendment, supplement or modification shall be effected by a written instrument signed by the parties required to sign pursuant to the foregoing provisions of this Section 9.01. Notwithstanding anything to the contrary herein, no Defaulting Lender shall have any right to approve or disapprove any amendment, waiver or consent hereunder (and any amendment, waiver or consent which by its terms requires the consent of all Lenders or each affected Lender may be effected with the consent of the applicable Lenders other than Defaulting Lenders), except that (x) the DIP Loan Commitment of any Defaulting Lender may not be increased or extended without the consent of such Lender and (y) any waiver, amendment or modification requiring the consent of all Lenders or each affected Lender that by its terms affects any Defaulting Lender disproportionately adversely relative to other affected Lenders shall require the consent of such Defaulting Lender. Notwithstanding the foregoing, with respect to any amendment, waiver, supplement or modification to which the Agents' consent is not required, the Borrower agrees to deliver to the Agents a copy of each such amendment, waiver, supplement or

modification; *provided* that each Agent shall not be bound by such amendment, waiver, supplement or modification unless and until it has received a copy thereof.

Section 9.02    Notices.

(a)    Notices Generally. Except in the case of notices and other communications expressly permitted to be given by telephone (and except as provided in Section 9.02(b)), all notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by facsimile as follows:

(i)    if to the Borrower or any other Loan Party, to Air Pros Solutions, LLC c/o Accordion Partners LLC at One Vanderbilt Avenue, 24th Floor, New York, NY 10017, Attention: Andrew Hede (Telephone No. (646) 491-0540; Email: ahede@accordion.com), with a copy (which does not constitute notice) to Greenberg Traurig, LLP, 3333 Piedmont Road, N.E., Terminus 200, Suite 2500, Atlanta, Georgia 30305, Attention: David B. Kurzweil (Telephone No. (678) 553-2680, Email: kurzweild@gtlaw.com);

(ii)    if to the Disbursing Agent or the Collateral Agent, to Alter Domus (US) LLC at 225 W. Washington Street, 9th Floor, Chicago, Illinois 60606, Attention: Legal Department and Rick Ledenbach (Facsimile No. (312) 376-0751; Telephone No. (312) 564-5100; Email: rick.ledenbach@alterdomus.com and legal_agency@alterdomus.com), with a copy (which does not constitute notice) to Seward & Kissel LLP, One Battery Park Plaza, New York, New York 10004, Attention: Gregg Bateman (Facsimile No. (212) 480-8421, Telephone No. (212) 574-1436, Email: bateman@sewkis.com); and

(iii)    if to a Lender, to it at its address (or facsimile number) set forth on the signature pages hereof, in a separate notice provided to the Disbursing Agent and the Borrower or in its Administrative Questionnaire.

Notices sent by hand or overnight courier service, or mailed by certified or registered mail, shall be deemed to have been given when received. Notices sent by facsimile shall be deemed to have been given when sent (except that, if not given during normal business hours for the recipient, shall be deemed to have been given at the opening of business on the next Business Day for the recipient). Notices delivered through electronic communications, to the extent provided in Section 9.02(b), shall be effective as provided in Section 9.02(b).

(b)    Electronic Communications.

(i)    Notices and other communications to the Lenders hereunder may be delivered or furnished by electronic communication (including email and internet or intranet websites) pursuant to procedures approved by the Disbursing Agent and the Required Lenders; *provided* that the foregoing shall not apply to notices to any Lender pursuant to ARTICLE II if such Lender has notified the Disbursing Agent that it is incapable of receiving notices under such Section by electronic communication. The Disbursing Agent, any Lender or the Borrower may, in its discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it; *provided* that approval of such procedures may be limited to particular notices or communications.

(ii)    Unless the Disbursing Agent, the Collateral Agent or the Lenders otherwise prescribe, (i) notices and other communications sent to an email address shall be deemed received upon the sender's receipt of an acknowledgement from the intended recipient (such as by the "return receipt requested" function, as available, return email or other written acknowledgement) and (ii) notices or communications posted to an internet or intranet website shall be deemed received upon the deemed receipt

by the intended recipient, at its email address as described in the foregoing <u>clause (i)</u>, of notification that such notice or communication is available and identifying the website address therefor; *provided* that, in the case of each of the foregoing <u>clauses (i)</u> and <u>(ii)</u>, if such notice or other communication is not sent during the normal business hours of the recipient, such notice or communication shall be deemed to have been sent at the opening of business on the next Business Day for the recipient.

(c)    <u>Change of Address, etc</u>. Any party hereto may change its address or facsimile number for notices and other communications hereunder by notice to the Borrower and the Disbursing Agent.

(d)    <u>Platform</u>.

(i)    The Borrower agrees that the Disbursing Agent may, but shall not be obligated to, make any Approved Electronic Communications available to the Lenders by posting such Approved Electronic Communications on the Platform.

(ii)    The Platform and any Approved Electronic Communications are provided "as is" and "as available". None of the Agents nor any of their respective Related Parties warrants the accuracy, adequacy or completeness of the Platform or any Approved Electronic Communications and each expressly disclaims liability for errors or omissions in the Approved Electronic Communications. No warranty of any kind, express, implied or statutory, including, without limitation, any warranty of merchantability, fitness for a particular purpose, non-infringement of third-party rights or freedom from viruses or other code defects, is made by any Agent or any of their respective Related Parties in connection with the Platform or the Approved Electronic Communications. Each party hereto agrees that no Agent has any responsibility for maintaining or providing any equipment, software, services or any testing required in connection with any Approved Electronic Communication or otherwise required for the Platform. In no event shall any Agent or any of its Related Parties have any liability to any Loan Party, any Lender or any other Person or entity for damages of any kind, whether or not based on strict liability and including, without limitation, (A) direct damages, losses or expenses (whether in tort, contract or otherwise) arising out of any Loan Party's or any Agent's transmission of communications through the Platform, except to the extent the same resulted primarily from the gross negligence or willful misconduct of such Agent or its Related Parties, in each case as determined by a court of competent jurisdiction in a final and non-appealable judgment or (B) indirect, special, incidental or consequential damages, losses or expenses (whether in tort, contract or otherwise) arising out of any Loan Party's or any Agent's transmission of communications through the Platform. In no event shall any Agent or any of its Related Parties have any liability for any damages arising from the use by others of any information or other materials obtained through internet, electronic, telecommunications or other information transmission systems, except to the extent the same resulted primarily from the gross negligence or willful misconduct of such Agent or its Related Parties, in each case as determined by a court of competent jurisdiction in a final and non-appealable judgment.

(iii)    Each Loan Party, each Lender and each Agent agrees that the Disbursing Agent may, but shall not be obligated to, store any Approved Electronic Communications on the Platform in accordance with the Disbursing Agent's customary document retention procedures and policies.

(iv)    All uses of the Platform shall be governed by and subject to, in addition to this <u>Section 9.02</u>, separate terms and conditions posted or referenced in such Platform and related agreements executed by the Lenders and their Affiliates in connection with the use of such Platform.

(v)    Each Loan Party understands that the distribution of material through an electronic medium is not necessarily secure and that there are confidentiality and other risks associated with such distribution and agrees and assumes the risks associated with such electronic distribution, except to

the extent caused by the willful misconduct or gross negligence of the Disbursing Agent, in each case as determined by a court of competent jurisdiction in a final and non-appealable judgment.

(vi)    The Borrower and each Lender acknowledge that certain of the Lenders may be Public Lenders and, if documents or notices required to be delivered pursuant to Section 5.02 or otherwise are being distributed through the Platform, any document or notice that the Borrower has indicated contains Non-Public Information shall not be posted on that portion of the Platform designated for Public Lenders. The Borrower agrees to clearly designate all information provided to the Disbursing Agent by or on behalf of the Loan Parties which is suitable to make available to Public Lenders. If the Borrower has not indicated whether a document or notice delivered pursuant to Section 5.02 or otherwise contains Non-Public Information, the Disbursing Agent reserves the right to post such document or notice solely on that portion of the Platform designated for Lenders who wish to receive material non-public information with respect to Holdings, the Borrower, its Subsidiaries and their respective securities.

(e)    Public Side Information Contacts. Each Public Lender agrees to cause at least one individual at or on behalf of such Public Lender to have selected the "Private Side Information" or similar designation on the content declaration screen of the Platform in order to enable such Public Lender or its delegate, in accordance with such Public Lender's compliance procedures and applicable Requirements of Law, including the U.S. Federal and state securities Requirements of Law, to make reference to Approved Electronic Communications that are not made available through the "Public Side Information" portion of the Platform and that may contain material non-public information with respect to the Borrower or its securities for purposes of the U.S. Federal or state securities Requirements of Law. In the event that any Public Lender has elected for itself to not access any information disclosed through the Platform or otherwise, such Public Lender acknowledges that (i) the Agents and other Lenders may have access to such information and (ii) neither the Borrower nor any Agent or other Lender with access to such information shall have (x) any responsibility for such Public Lender's decision to limit the scope of information it has obtained in connection with this Agreement and the other Loan Documents or (y) any duty to disclose such information to such electing Lender or to use such information on behalf of such electing Lender, and shall not be liable for the failure to so disclose or use such information.

Section 9.03    No Waiver by Course of Conduct; Cumulative Remedies. None of the Agents or the Lenders shall by any act (except by a written instrument pursuant to Section 9.01), delay, indulgence, omission or otherwise be deemed to have waived any right or remedy hereunder or to have acquiesced in any Default or Event of Default. No failure to exercise, nor any delay in exercising, on the part of any Agent or Lender, any right, power or privilege hereunder shall operate as a waiver thereof. No single or partial exercise of any right, power or privilege hereunder shall preclude any other or further exercise thereof or the exercise of any other right, power or privilege. A waiver by any Agent or Lender of any right or remedy hereunder on any one occasion shall not be construed as a bar to any right or remedy which such Agent or Lender would otherwise have on any future occasion. The rights and remedies herein provided are cumulative, may be exercised singly or concurrently and are not exclusive of any other rights or remedies provided by law.

Section 9.04    Survival of Representations, Warranties, Covenants and Agreements. All representations, warranties, covenants and agreements made herein, in the other Loan Documents and in any document, certificate or statement delivered pursuant hereto or in connection herewith shall be considered to have been relied upon by the other parties hereto and shall survive the execution and delivery hereof and thereof and the making of the Loans and other extensions of credit hereunder, regardless of any investigation made by any such other party or on its behalf and notwithstanding that the Disbursing Agent or any Lender may have had notice or knowledge of any Default at the time of any Credit Extension hereunder, and shall continue in full force and effect as long as any Loan or any other Obligation hereunder shall remain unpaid or unsatisfied and so long as the DIP Loan Commitments have not expired or been

terminated. The provisions of Section 2.16, Section 2.17, Section 2.18, Section 9.05, Section 9.19, Section 9.21 and ARTICLE VIII shall survive and remain in full force and effect regardless of the consummation of the transactions contemplated hereby, the Payment in Full, the expiration or termination of the DIP Loan Commitments, the resignation or removal of either Agent or the termination of this Agreement or any provision hereof.

Section 9.05    Payment of Expenses; Indemnity.

(a)    Costs and Expenses. The Borrower shall pay (i) all reasonable costs and expenses incurred by the Disbursing Agent, the Collateral Agent, the Lenders and their respective Affiliates in connection with the preparation, negotiation, execution, delivery and administration of this Agreement and the other Loan Documents, and any amendments, modifications or waivers of the provisions hereof or thereof (whether or not the transactions contemplated hereby or thereby shall be consummated), including the reasonable fees, charges and disbursements of counsel (it being acknowledged and agreed that each Lender and Agent shall be entitled to select its own counsel), financial advisor fees and other similar fees and (ii) all reasonable costs and expenses incurred by the Disbursing Agent, the Collateral Agent and each Lender (including the reasonable and documented fees, charges and disbursements of any counsel for the Agents or any Lender, financial advisor fees and other similar fees) in connection with the enforcement or protection of any rights and remedies under this Agreement and the other Loan Documents, including (x) the exercise of any discretionary rights, (w) all such costs and expenses incurred during any legal proceeding, including any proceeding under any Debtor Relief Law (including the Chapter 11 Cases), and (z) in connection with any workout, restructuring or negotiations in respect of the Loans and the Loan Documents, including the reasonable and documented fees, charges and disbursements of counsel.

(b)    Indemnification by the Borrower. The Borrower shall indemnify the Disbursing Agent (and any sub-agent thereof), the Collateral Agent (and any sub-agent thereof), each Lender, and each Related Party of any of the foregoing Persons (each such Person being called an "Indemnitee") against, and defend and hold each Indemnitee harmless from, any and all liabilities, obligations, losses, damages, penalties, claims, demands, actions, causes of action, judgments, suits, costs (including settlement payments and costs and the costs of enforcing this indemnity), disbursements and out-of-pocket fees and expenses (including the fees, charges and disbursements of any counsel for any Indemnitee (it being acknowledged and agreed that each Indemnitee shall be entitled to select its own counsel)) and other reasonable costs and expenses, joint or several, of any kind or nature whatsoever which may at any time be imposed on, incurred, suffered or sustained or required to be paid by or asserted or awarded against any Indemnitee in any way relating to or arising out of or in connection with or by reason of (i) any actual or prospective claim, litigation, investigation or proceeding in any way relating to, arising out of, in connection with or by reason of any of the following, whether based on contract, tort or any other theory (including any investigation of, preparation for, or defense of any pending or threatened claim, litigation or proceeding (including responding to any subpoenas (third-party or otherwise))): (x) the execution, delivery, enforcement, performance or administration of (including the exercise of any discretionary rights) any Loan Document, any Prepetition Loan Document or any other document delivered in connection with the transactions contemplated hereby or thereby or any amendments, modifications or waivers of the provisions hereof or thereof (whether or not the transactions contemplated hereby or thereby shall be consummated) or the consummation of the transactions contemplated hereby or thereby or (y) any DIP Loan Commitment, any Credit Extension or the use or proposed use of the proceeds thereof; *provided* that such indemnity shall not, as to any Indemnitee, be available to the extent that such liabilities, obligations, losses, damages, penalties, claims, demands, actions, judgments, suits, costs, fees and expenses (x) are determined by a court of competent jurisdiction by final and nonappealable judgment to have resulted from the gross negligence or willful misconduct of such Indemnitee or (y) arise out of any dispute solely among Indemnitees (other than any claims against an Indemnitee in its capacity or in fulfilling its role as an agent or arranger or any similar role hereunder or under any Loan Document and other than any claim arising out of any act or omission of

the Borrower or any of its Affiliates); (ii) any actual or alleged presence or release of Materials of Environmental Concern on or from any property currently or formerly owned or operated by the Borrower or any of its Subsidiaries, or any Environmental Liability related in any way to the Borrower or any of its Subsidiaries; or (iii) the Credit Facilities, the Loan Documents, any preliminary documentation in relation thereto (including any term sheets) and any transactions contemplated hereby or thereby (<u>clauses (i)</u> through (<u>iii</u>), collectively, the "<u>Indemnified Liabilities</u>"), in all cases, whether or not caused by or arising, in whole or in part, out of the negligence of such Indemnitee and regardless of whether such Indemnitee is a party thereto, and whether or not any such claim, litigation, investigation or proceeding is brought by the Borrower, its equity holders, its affiliates, its creditors or any other Person. This <u>Section 9.05(b)</u> shall not apply with respect to Taxes other than any Taxes that represent losses, claims, damages, etc. arising from any non-Tax claim.

(c)    <u>Reimbursement by the Lenders</u>. To the extent that the Borrower for any reason fails to indefeasibly indemnify the Disbursing Agent or the Collateral Agent or pay any amount required under <u>Section 9.05(a)</u> or <u>Section 9.05(b)</u> to be paid by it to the Disbursing Agent or Collateral Agent (or any sub-agent thereof) or any Related Party of any of the foregoing, each Lender severally agrees to indemnify, defend and hold the Disbursing Agent and the Collateral Agent harmless from and against any all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind or nature, including, without limitation, the fees and expenses of its agents and attorneys, whatsoever which may be imposed on, incurred by or asserted against the Disbursing Agent or the Collateral Agent in performing their respective duties hereunder, or in any way relating to or arising out of this Agreement or any other Loan Document and pay to the Disbursing Agent or Collateral Agent (or any such sub-agent) or such Related Party, as the case may be, such Lender's pro rata share (determined as of the time that the applicable unreimbursed expense or indemnity payment is sought based on each Lender's share of the Total Credit Exposure at such time; *provided* that, if the Loans have been paid in full prior to such determination, then such Total Credit Exposure share shall be determined as of the last date that any Loan was outstanding) of such unpaid amount (including any such unpaid amount in respect of a claim asserted by such Lender); *provided* that the unreimbursed expense or indemnified loss, claim, damage, liability or related expense, as the case may be, was incurred by or asserted against the Disbursing Agent or Collateral Agent (or any such sub-agent) in its capacity as such, or against any Related Party of any of the foregoing acting for the Disbursing Agent or Collateral Agent (or any such sub-agent) in connection with such capacity. The obligations of the Lenders under this <u>Section 9.05(c)</u> are several and not joint.

(d)    <u>Waiver of Consequential Damages, Etc</u>. To the fullest extent permitted by applicable Requirements of Law, Holdings and the Borrower shall not assert (and each shall cause its Subsidiaries not to assert), and hereby waives (and agrees to cause its Subsidiaries to waive), any claim against any Indemnitee, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement, any other Loan Document or any other document contemplated hereby, the transactions contemplated hereby or thereby, any DIP Loan Commitment or any Credit Extension, or the use of the proceeds thereof or such Indemnitee's activities in connection therewith (whether before or after the Closing Date); *provided* that such waiver of special, indirect, consequential or punitive damages shall not limit the indemnification obligations of the Borrower under this <u>Section 9.05</u>. No Indemnitee shall be liable for any damages arising from the use by others of any information or other materials distributed by such Indemnitee through telecommunications, electronic or other information transmission systems in connection with this Agreement, the other Loan Documents or the transactions contemplated hereby or thereby, other than as a result of the gross negligence or willful misconduct of such Indemnitee as determined by a court of competent jurisdiction in a final and non-appealable judgment.

(e)    <u>Payments</u>. All amounts due under this <u>Section 9.05</u> shall be payable promptly after demand therefor.

(f)    <u>Survival</u>. Each party's obligations under this <u>Section 9.05</u> shall survive the termination of the DIP Loan Commitments and the repayment, satisfaction or discharge of all Obligations under any Loan Document and the resignation or removal of the Disbursing Agent or the Collateral Agent.

Section 9.06    <u>Successors and Assigns; Participations and Assignments</u>.

(a)    <u>Successors and Assigns Generally</u>. The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that the Borrower may not assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of each Lender (and any such assignment without such consent shall be null and void), and no Lender may assign or otherwise transfer any of its rights or obligations hereunder except (i) to an assignee in accordance with the provisions of <u>Section 9.06(b)</u>, (ii) by way of participation in accordance with the provisions of <u>Section 9.06(d)</u>, or (iii) by way of pledge or assignment of a security interest subject to the restrictions of <u>Section 9.06(e)</u>. Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby, Participants to the extent provided in <u>Section 9.06(d)</u> and, to the extent expressly contemplated hereby, Indemnitees and the Related Parties of each of the Disbursing Agent, the Collateral Agent and the Lenders) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b)    <u>Assignments by Lenders</u>. (1) Any Lender, upon notice to the Disbursing Agent, may at any time assign to one or more assignees all or a portion of its rights and obligations under this Agreement (including all or a portion of its DIP Loan Commitment and the Loans at the time owing to it); *provided* that (in each case with respect to any Credit Facility) any such assignment shall be subject to the following conditions:

(i)    <u>Minimum Amounts</u>.

(A)    In the case of an assignment of the entire remaining amount of the assigning Lender's DIP Loan Commitment and/or the Loans at the time owing to it (in each case with respect to any Credit Facility) or contemporaneous assignments to related Approved Funds (determined after giving effect to such assignments) that equal at least the amount specified in <u>Section 9.06(b)(1)(i)(B)</u> in the aggregate or in the case of an assignment to a Lender, an Affiliate of a Lender or an Approved Fund, no minimum amount need be assigned.

(B)    In any case not described in <u>Section 9.06(b)(1)(i)(A)</u>, the aggregate amount of the DIP Loan Commitment (which for this purpose includes Loans outstanding under the Credit Facility) or, if the applicable DIP Loan Commitment is not then in effect, the principal outstanding balance of the Loans of the assigning Lender subject to each such assignment (determined as of the date the Assignment and Assumption with respect to such assignment is delivered to the Disbursing Agent) shall not be less than $100,000 unless, so long as no Event of Default has occurred and is continuing, the Borrower otherwise consents (each such consent not to be unreasonably withheld or delayed).

(ii)    <u>Proportionate Amounts</u>. Each partial assignment shall be made as an assignment of a proportionate part of all the assigning Lender's rights and obligations under this Agreement

with respect to the Loan or the DIP Loan Commitment assigned, except that this <u>Section 9.06(b)(1)(ii)</u> shall not prohibit any Lender from assigning all or a portion of its rights and obligations among separate Credit Facilities on a non-pro rata basis.

(iii)    <u>Required Consents</u>. No consent (by any Loan Party or any other Person) shall be required for any assignment except to the extent required by <u>Section 9.06(b)(1)(i)(B)</u>.

(iv)    <u>Processing Fee; Administrative Questionnaire</u>. The parties to each assignment shall execute and deliver to the Disbursing Agent an Assignment and Assumption, together with a processing and recordation fee of $3,500; *provided* that the Disbursing Agent may, in its sole discretion, elect to waive such processing and recordation fee in the case of any assignment. The assignee, if it is not a Lender, shall deliver to the Disbursing Agent an Administrative Questionnaire, a duly executed IRS Form W-9 (or other applicable tax form) and all "know your customer" documents requested by the Disbursing Agent pursuant to anti-money laundering rules and regulations.

(v)    <u>No Assignment to Certain Persons</u>. No such assignment shall be made to (A) the Borrower or any of the Borrower's Affiliates or Subsidiaries or (B) to any Defaulting Lender or any of its Subsidiaries, or any Person who, upon becoming a Lender hereunder, would constitute a Defaulting Lender or a Subsidiary thereof.

(vi)    <u>No Assignment to Natural Persons</u>. No such assignment shall be made to a natural Person (or a holding company, investment vehicle or trust for, or owned and operated for the primary benefit of, a natural Person).

(vii)    <u>Certain Additional Payments</u>. In connection with any assignment of rights and obligations of any Defaulting Lender hereunder, no such assignment shall be effective unless and until, in addition to the other conditions thereto set forth herein, the parties to the assignment shall make such additional payments to the Disbursing Agent in an aggregate amount sufficient, upon distribution thereof as appropriate (which may be outright payment, purchases by the assignee of participations or subparticipations, or other compensating actions, including funding, with the consent of the Borrower and the Disbursing Agent, the applicable pro rata share of Loans previously requested but not funded by the Defaulting Lender, to each of which the applicable assignee and assignor hereby irrevocably consent), to (x) pay and satisfy in full all payment liabilities then owed by such Defaulting Lender to the Disbursing Agent and each other Lender hereunder (and interest accrued thereon), and (y) acquire (and fund as appropriate) its full pro rata share of all Loans proportionally in accordance with the percentage of DIP Loan Commitments held by such Lender. Notwithstanding the foregoing, in the event that any assignment of rights and obligations of any Defaulting Lender hereunder shall become effective under applicable Requirements of Law without compliance with the provisions of this <u>clause (vii)</u>, then the assignee of such interest shall be deemed to be a Defaulting Lender for all purposes of this Agreement until such compliance occurs.

(2) Subject to acknowledgment and recording thereof by the Disbursing Agent pursuant to <u>Section 9.06(c)</u>, from and after the recordation date specified in each Assignment and Assumption, the assignee thereunder shall be a party to this Agreement and, to the extent of the interest assigned by such Assignment and Assumption, have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Assumption, be released from its obligations under this Agreement (and, in the case of an Assignment and Assumption covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto) but shall continue to be entitled to the benefits of <u>Section 2.16</u>, <u>Section 2.17</u> and <u>Section 9.05</u> with respect to facts and

circumstances occurring prior to the effective date of such assignment; *provided* that, except to the extent otherwise expressly agreed by the affected parties, no assignment by a Defaulting Lender will constitute a waiver or release of any claim of any party hereunder arising from that Lender's having been a Defaulting Lender. Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this Section 9.06(b) shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with Section 9.06(d).

(c)    Register. The Disbursing Agent, acting solely for this purpose as a non-fiduciary agent of the Borrower, shall maintain at one of its offices in the United States a copy of each Assignment and Assumption delivered to it and a register for the recordation of the names and addresses of the Lenders, and the DIP Loan Commitments of, and principal amounts (and stated interest) of the Loans owing to, each Lender pursuant to the terms hereof from time to time (the "Register"). The entries in the Register shall be conclusive absent manifest error, and the Borrower, the Disbursing Agent and the Lenders shall treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement. The Register shall be available for inspection by the Borrower and any Lender during business hours of the Disbursing Agent at any reasonable time and from time to time upon reasonable prior written notice.

(d)    Participations. Any Lender may at any time, without the consent of, or notice to, the Borrower or the Disbursing Agent, sell participations to any Person (other than a natural Person, or a holding company, investment vehicle or trust for, or owned and operated for the primary benefit of, a natural Person, a Defaulting Lender or the Borrower or any of the Borrower's Affiliates or Subsidiaries) (each, a "Participant") in all or a portion of such Lender's rights and/or obligations under this Agreement (including all or a portion of its DIP Loan Commitment and/or the Loans owing to it); *provided* that (i) such Lender's obligations under this Agreement shall remain unchanged, (ii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations and (iii) the Borrower, the Agents and the Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement. For the avoidance of doubt, each Lender shall be responsible for the indemnity under Section 9.05(c) with respect to any payments made by such Lender to its Participants.

Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and to approve any amendment, modification or waiver of any provision of this Agreement; *provided* that such agreement or instrument may provide that such Lender will not, without the consent of the Participant, agree to any amendment, modification or waiver described in clauses (i), (ii), (iii) and (vii) of the proviso to Section 9.01 that affects such Participant. The Borrower agrees that each Participant shall be entitled to the benefits of Section 2.16, Section 2.17 and Section 2.18 (subject to the requirements and limitations therein, including the requirements in Section 2.17(g) (it being understood that the documentation required under Section 2.17(g) shall be delivered to the participating Lender)) to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to Section 9.06(b); *provided* that such Participant (A) agrees to be subject to the provisions of Section 2.20 as if it were an assignee under Section 9.06(b); and (B) shall not be entitled to receive any greater payment under Section 2.16 or Section 2.17 with respect to any participation than its participating Lender would have been entitled to receive, except to the extent such entitlement to receive a greater payment results from a Change in Law that occurs after the Participant acquired the applicable participation. Each Lender that sells a participation agrees, at the Borrower's request and expense, to use reasonable efforts to cooperate with the Borrower to effectuate the provisions of Section 2.21(a) with respect to any Participant. To the extent permitted by law, each Participant also shall be entitled to the benefits of Section 9.07(b) as though it were a Lender; *provided* that such Participant agrees to be subject to Section 9.07(a) as though it were a Lender. Each Lender that sells a participation

106

shall, acting solely for this purpose as a non-fiduciary agent of the Borrower, maintain a register on which it enters the name and address of each Participant and the principal amounts (and stated interest) of each Participant's interest in the Loans or other obligations under the Loan Documents (the "Participant Register"); *provided* that no Lender shall have any obligation to disclose all or any portion of the Participant Register (including the identity of any Participant or any information relating to a Participant's interest in any commitments, loans, letters of credit or its other obligations under any Loan Document) to any Person except to the extent that such disclosure is necessary to establish that such commitment, loan, letter of credit or other obligation is in registered form under Section 5f.103-1(c) and proposed Section 1.163-5(b) of the United States Treasury Regulations. The entries in the Participant Register shall be conclusive absent manifest error, and such Lender shall treat each Person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary. For the avoidance of doubt, the Disbursing Agent (in its capacity as Disbursing Agent) shall have no responsibility for maintaining a Participant Register.

(e)    Certain Pledges. Any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement to secure obligations of such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank or other central bank having jurisdiction over such Lender; *provided* that no such pledge or assignment shall release such Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.

Section 9.07    Sharing of Payments by Lenders; Set-off.

(a)    If any Lender shall, by exercising any right of setoff or counterclaim or otherwise, obtain payment in respect of any principal of or interest on any of its Loans or other obligations hereunder resulting in such Lender receiving payment of a proportion of the aggregate amount of its Loans and accrued interest thereon or other such obligations greater than its pro rata share thereof as provided herein, then the Lender receiving such greater proportion shall (a) notify the Disbursing Agent of such fact, and (b) purchase (for cash at face value) participations in the Loans and such other obligations of the other Lenders, or make such other adjustments as shall be equitable, so that the benefit of all such payments shall be shared by the Lenders ratably in accordance with the aggregate amount of principal of and accrued interest on their respective Loans and other amounts owing them; *provided* that:

(i)    if any such participations are purchased and all or any portion of the payment giving rise thereto is recovered, such participations shall be rescinded and the purchase price restored to the extent of such recovery, without interest; and

(ii)    the provisions of this Section 9.07(a) shall not be construed to apply to (x) any payment made by the Borrower pursuant to and in accordance with the express terms of this Agreement (including the application of funds arising from the existence of a Defaulting Lender), or (y) any payment obtained by a Lender as consideration for the assignment of or sale of a participation in any of its Loans to any assignee or participant, other than to the Borrower or any of its Affiliates, as to which the provision of this Section 9.07(a) shall apply.

The Borrower consents to the foregoing and agrees, to the extent it may effectively do so under applicable Requirements of Law, that any Lender acquiring a participation pursuant to the foregoing arrangements may exercise against the Borrower rights of setoff and counterclaim with respect to such participation as fully as if such Lender were a direct creditor of the Borrower in the amount of such participation.

(b)    Each of Holdings and the Borrower hereby irrevocably authorizes each Lender at any time and from time to time while an Event of Default shall have occurred and be continuing, without

107

notice to Holdings or the Borrower, any such notice being expressly waived by each of Holdings and the Borrower, to set-off and appropriate and apply any and all deposits (general or special, time or demand, provisional or final), in any currency, and any other credits, indebtedness or claims, in any currency, in each case whether direct or indirect, absolute or contingent, matured or unmatured, at any time held or owing by such party to or for the credit or the account of Holdings and the Borrower, or any part thereof in such amounts as such Lender may elect, against and on account of the obligations and liabilities of Holdings and the Borrower to such Lender hereunder and claims of every nature and description of such Lender against Holdings and the Borrower, in any currency, whether arising hereunder, under any other Loan Document or otherwise, as such Lender may elect, whether or not any Lender has made any demand for payment and although such obligations, liabilities and claims may be contingent or unmatured; *provided* that such Lender complies with <u>Section 9.07(a)</u>. Each Lender exercising any right of set-off shall notify Holdings and the Borrower promptly of any such set-off and the application made by such Lender of the proceeds thereof; *provided* that the failure to give such notice shall not affect the validity of such set-off and application. The rights of each Lender under this <u>Section 9.07</u> are in addition to other rights and remedies (including, without limitation, other rights of set-off) which such Lender may have.

Section 9.08      <u>Counterparts; Electronic Signatures</u>.

(a)      This Agreement may be executed by one or more of the parties to this Agreement on any number of separate counterparts (including by facsimile or other electronic imaging means), and all of said counterparts taken together shall be deemed to constitute one and the same instrument. In proving this Agreement or any Loan Document in any judicial proceedings, it shall not be necessary to produce or account for more than one such counterpart signed by the party against whom such enforcement is sought. Any signatures delivered by a party hereto by facsimile transmission or by e-mail transmission shall be deemed an original signature hereto.

(b)      The Agents are authorized and permitted to accept directions, certificates, requisitions, statements, notices, approvals, consents, requests, instructions, and any other communications (collectively, "<u>Communications</u>") including but not limited to investment, account transfer, and payment instructions, via e-mail from an authorized corporate e-mail address as listed on an incumbency certificate provided by the applicable party to the Agents. The Borrower, any other Loan Party or any Lender may deliver any Communications, including but not limited to investment, account transfer, and payment instructions, to the Agents via e-mail; *provided* that such comes from one of the persons authorized on the incumbency certificate delivered pursuant to this section and from the respective authorized e-mail address. Any Communication via e-mail from the persons authorized on such incumbency certificate shall be considered signed by the person or persons designated by the applicable party. The Agents are authorized and permitted to accept Communications, including but not limited to investment, account transfer, and payment instructions, provided via electronic signature. The Borrower, any other Loan Party or any Lender may authorize or sign any Communications, including but not limited to investment, account transfer, and payment instructions, for the Collateral Agent using electronic signatures. Any electronic signature document delivered via email from a person authorized on the incumbency certificate delivered pursuant to this section shall be considered signed or executed by such person on behalf of the applicable party.

(c)      Each of the parties hereto agrees on behalf of itself, and any Person acting or claiming by, under or through such party, that any written instrument delivered in connection with this Agreement or any other Loan Document or any related document, including without limitation any amendments or supplements to such documents, may be executed by electronic methods (whether by .pdf scan or utilization of an electronic signature platform or application). Any electronic signature document delivered via email from a person authorized on an incumbency certificate provided by any party to the Agents shall be considered signed or executed by such person on behalf of such party. Each of the Borrower and Holdings, on behalf of itself and the other Loan Parties, and each of the Lenders agrees to assume all

108

risks arising out of the use of electronic methods for all purposes including the authorization, execution, delivery, or submission of documents, instruments, notices, directions, instructions, reports, opinions and certificates to the Agents, including without limitation the risk of either Agent acting on unauthorized instructions, and the risk of interception and misuse by third parties.

Section 9.09    <u>Severability</u>. Any provision of this Agreement which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction. The parties hereto shall endeavor in good-faith negotiations to replace any invalid, illegal or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the invalid, illegal or unenforceable provisions.

Section 9.10    <u>Section Headings</u>. The Section headings and Table of Contents used in this Agreement are for convenience of reference only and are not to affect the construction hereof or be taken into consideration in the interpretation hereof.

Section 9.11    <u>Integration</u>. This Agreement and the other Loan Documents represent the entire agreement of the parties hereto with respect to the subject matter hereof and thereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof and thereof. There are no promises, undertakings, representations or warranties by any Agent or any Lender relative to the subject matter hereof not expressly set forth or referred to herein or in the other Loan Documents.

Section 9.12    <u>Governing Law</u>. THIS AGREEMENT AND ANY DISPUTE, CLAIM OR CONTROVERSY ARISING OUT OF OR RELATING TO THIS AGREEMENT (WHETHER ARISING IN CONTRACT, TORT OR OTHERWISE) SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK WITHOUT REGARD TO CONFLICTS OF LAW RULES THAT WOULD RESULT IN THE APPLICATION OF A DIFFERENT GOVERNING LAW.

Section 9.13    <u>Submission to Jurisdiction; Waivers</u>. Each party hereto hereby irrevocably and unconditionally:

(a)    submits for itself and its property in any legal action or proceeding relating to this Agreement and the other Loan Documents (whether arising in contract, tort or otherwise) to which it is a party, or for recognition and enforcement of any judgment in respect thereof, to the exclusive (subject to <u>Section 9.13(c)</u>) general jurisdiction of the courts of the State of New York sitting in the Borough of Manhattan, the courts of the United States for the Southern District of New York sitting in the Borough of Manhattan, and appellate courts from any thereof;

(b)    agrees that all claims in respect of any such action or proceeding shall be heard and determined in such New York state court or, to the fullest extent permitted by applicable Requirements of Law, in such federal court;

(c)    agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law and that nothing in this Agreement or any other Loan Document shall affect any right that the Agents or the Lenders may otherwise have to bring any action or proceeding relating to this Agreement or any other Loan Document against it or any of its assets in the courts of any jurisdiction;

(d)        waives, to the fullest extent permitted by applicable Requirements of Law, any objection that it may now or hereafter have to the laying of venue of any action or proceeding arising out of or relating to this Agreement or any other Loan Document in any court referred to in this <u>Section 9.13</u> (and irrevocably waives to the fullest extent permitted by applicable Requirements of Law the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court);

(e)        consents to service of process in the manner provided in <u>Section 9.02</u> (and agrees that nothing in this Agreement will affect the right of any party hereto to serve process in any other manner permitted by applicable Requirements of Law);

(f)        agrees that service of process as provided in <u>Section 9.02</u> is sufficient to confer personal jurisdiction over the applicable party in any such proceeding in any court, and otherwise constitutes effective and binding service in every respect; and

(g)        waives, to the maximum extent not prohibited by law, any right it may have to claim or recover any special, exemplary, punitive or consequential damages.

Section 9.14        <u>Acknowledgments</u>. Each of Holdings and the Borrower hereby acknowledges and agrees that:

(a)        it was represented by counsel in connection with the negotiation, execution and delivery of this Agreement and the other Loan Documents to which it is a party, that it and its counsel reviewed and participated in the preparation and negotiation hereof and thereof and that any rule of construction to the effect that ambiguities are to be resolved against the drafting party shall not be employed in the interpretation hereof or thereof; and

(b)        no joint venture is created hereby or by the other Loan Documents or otherwise exists by virtue of the transactions contemplated hereby among the Agents and the Lenders or among the Group Members, the Agents and the Lenders.

Section 9.15        <u>Confidentiality</u>. Each of the Agents and the Lenders agrees to maintain the confidentiality of the Information (as defined below), except that Information may be disclosed (a) to its Related Parties and actual and potential financing sources (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential in accordance with customary practices); (b) to the extent required or requested by any regulatory or similar authority (including any self-regulatory authority, such as the National Association of Insurance Commissioners or any other similar organization) purporting to have jurisdiction over such Person or its Related Parties (in which case such Person shall, except with respect to any audit or examination conducted by bank accountants or any Governmental Authority or regulatory or self-regulatory authority exercising examination or regulatory authority, notify the Borrower as soon as practicable in the event of any such disclosure by such Person unless such notification is prohibited by law, rule or regulation); (c) to the extent required by applicable Requirements of Law or regulations or by any subpoena or similar legal process (in which case such Person shall, except with respect to any audit or examination conducted by bank accountants or any Governmental Authority or regulatory or self-regulatory authority exercising examination or regulatory authority, notify the Borrower as soon as practicable in the event of any such disclosure by such Person unless such notification is prohibited by law, rule or regulation); (d) to any other party hereto; (e) in connection with the exercise of any remedies hereunder or under any other Loan Document or any action or proceeding relating to this Agreement or any other Loan Document or the enforcement of rights hereunder or thereunder; (f) subject to an agreement containing provisions substantially the same (or at least as restrictive) as those of this <u>Section 9.15</u> (or as may otherwise be reasonably acceptable to the Borrower), to (i) any assignee of or Participant in, or any prospective assignee

of or Participant in, any of its rights and obligations under this Agreement, or (ii) any actual or prospective party (or its Related Parties) to any swap, derivative other transaction under which payments are to be made by reference to the Borrower and its obligations, this Agreement or payments hereunder; (g) on a confidential basis to the CUSIP Service Bureau or any similar agency in connection with the issuance and monitoring of CUSIP numbers with respect to the Loans; (h) with the consent of the Borrower; or (i) to the extent that such Information (x) becomes publicly available other than as a result of a breach of this Section 9.15, (y) becomes available to any Agent, any Lender or any of their respective Affiliates on a non-confidential basis from a source other than the Borrower other than as a result of a breach of this Section 9.15 or (z) was independently developed by any Agent, any Lender or any of their respective Affiliates. In addition, each of the Agents and the Lenders may disclose the existence of this Agreement and information about this Agreement to market data collectors, similar service providers to the lending industry and service providers to the Agents and the Lenders in connection with the administration of this Agreement, the other Loan Documents and the Credit Extensions. Notwithstanding anything herein to the contrary, the information subject to this Section 9.15 shall not include, and each of the Agents and the Lenders may disclose without limitation of any kind, any information with respect to the "tax treatment" and "tax structure" (in each case, within the meaning of Treasury Regulation Section 1.6011-4) of the Loans, the Transactions and the other transactions contemplated hereby and all materials of any kind (including opinions or other tax analyses) that are provided to the Agents or the Lenders relating to such tax treatment and tax structure; *provided* that, with respect to any document or similar item that in either case contains information concerning such "tax treatment" or "tax structure" as well as other information, this sentence shall only apply to such portions of the document or similar item that relate to such "tax treatment" or "tax structure".

For purposes of this Section 9.15, "Information" shall mean all information received from Holdings, the Borrower or any of its Subsidiaries relating to Holdings, the Borrower or any of its Subsidiaries or any of their respective businesses, other than any such information that is available to any Agent or any Lender on a non-confidential basis prior to disclosure by Holdings, the Borrower or any of its Subsidiaries; *provided* that, in the case of information received from Holdings, the Borrower or any of its Subsidiaries after the Closing Date, such information is clearly identified at the time of delivery as confidential. Any Person required to maintain the confidentiality of Information as provided in this Section 9.15 shall be considered to have complied with its obligation to do so if such Person has exercised the same degree of care to maintain the confidentiality of such Information as such Person would accord to its own confidential information.

Section 9.16    Waiver of Jury Trial. EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE REQUIREMENTS OF LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY (WHETHER BASED ON CONTRACT, TORT, BREACH OF DUTY, COMMON LAW, STATUTE OR ANY OTHER THEORY). EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PERSON HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PERSON WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS Section 9.16. EACH PARTY HERETO FURTHER REPRESENTS AND WARRANTS THAT IT HAS REVIEWED THIS WAIVER WITH ITS LEGAL COUNSEL AND THAT IT KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS FOLLOWING CONSULTATION WITH LEGAL COUNSEL.

Section 9.17    PATRIOT Act Notice. Each Lender, the Disbursing Agent (for itself and not on behalf of any Lender) and the Collateral Agent hereby notifies each Loan Party that pursuant to the requirements of the PATRIOT Act, it is required to obtain, verify and record information that identifies the Loan Parties, which information includes the name, address and taxpayer information number of each Loan Party and other information that will allow such Lender, the Disbursing Agent or the Collateral Agent, as applicable, to identify such Loan Party in accordance with the PATRIOT Act. The Borrower shall, promptly following a request by any Lender, the Disbursing Agent or the Collateral Agent, provide all documentation and other information that such Lender, the Disbursing Agent or the Collateral Agent, as applicable, requests in order to comply with its ongoing obligations under applicable "know your customer" and anti-money-laundering rules and regulations, including the PATRIOT Act.

Section 9.18    Usury Savings Clause. Notwithstanding any other provision herein, the aggregate interest rate charged with respect to any of the Obligations, including all charges or fees in connection therewith deemed in the nature of interest under applicable Requirements of Law, shall not exceed the Highest Lawful Rate. If the rate of interest (determined without regard to the preceding sentence) under this Agreement at any time exceeds the Highest Lawful Rate, the outstanding amount of the Loans made hereunder shall bear interest at the Highest Lawful Rate until the total amount of interest due hereunder equals the amount of interest which would have been due hereunder if the stated rates of interest set forth in this Agreement had at all times been in effect. In addition, if when the Loans made hereunder are repaid in full the total interest due hereunder (taking into account the increase provided for above) is less than the total amount of interest which would have been due hereunder if the stated rates of interest set forth in this Agreement had at all times been in effect, then to the extent permitted by law, the Borrower shall pay to Disbursing Agent an amount equal to the difference between the amount of interest paid and the amount of interest which would have been paid if the Highest Lawful Rate had at all times been in effect. Notwithstanding the foregoing, it is the intention of the Lenders and the Borrower to conform strictly to any applicable usury laws. Accordingly, if any Lender contracts for, charges, or receives any consideration which constitutes interest in excess of the Highest Lawful Rate, then any such excess shall be cancelled automatically and, if previously paid, shall at such Lender's option be applied to the outstanding amount of the Loans made hereunder or be refunded to the Borrower.

Section 9.19    Payments Set Aside. To the extent that any payment by or on behalf of the Borrower is made to the Disbursing Agent, the Collateral Agent or any Lender, or the Disbursing Agent, the Collateral Agent or any Lender exercises its right of setoff, and such payment or the proceeds of such setoff or any part thereof is subsequently invalidated, declared to be fraudulent or preferential, set aside or required (including pursuant to any settlement entered into by the Disbursing Agent, the Collateral Agent or such Lender in its discretion) to be repaid to a trustee, receiver or any other party, in connection with any proceeding under any Debtor Relief Law or otherwise, then (a) to the extent of such recovery, the obligation or part thereof originally intended to be satisfied shall be revived and continued in full force and effect as if such payment had not been made or such setoff had not occurred, and (b) each Lender severally agrees to pay to the Disbursing Agent or the Collateral Agent, as applicable, upon demand its applicable share (without duplication) of any amount so recovered from or repaid by the Disbursing Agent or the Collateral Agent (as applicable), plus interest thereon from the date of such demand to the date such payment is made at a rate per annum equal to the Federal Funds Effective Rate from time to time in effect.

Section 9.20    No Advisory or Fiduciary Responsibility. In connection with all aspects of each transaction contemplated hereby (including in connection with any amendment, waiver or other modification hereof or of any other Loan Document), each of Holdings and the Borrower acknowledges and agrees, and acknowledges its Affiliates' understanding, that: (a) (i) no fiduciary, advisory or agency relationship between the Group Members and any Agent or any Lender is intended to be or has been created in respect of the transactions contemplated hereby or by the other Loan Documents, irrespective of whether any Agent or any Lender has advised or is advising the Borrower or any Subsidiary on other matters, (ii)

the arranging and other services regarding this Agreement provided by the Agents and the Lenders are arm's-length commercial transactions between the Borrower and its Affiliates, on the one hand, and the Agents and the Lenders, on the other hand, (iii) the Borrower has consulted its own legal, accounting, regulatory and tax advisors to the extent that it has deemed appropriate and (iv) the Borrower is capable of evaluating, and understands and accepts, the terms, risks and conditions of the transactions contemplated hereby and by the other Loan Documents; and (b) (i) the Agents and the Lenders each is and has been acting solely as a principal and, except as expressly agreed in writing by the relevant parties, has not been, is not, and will not be acting as an advisor, agent or fiduciary for the Borrower or any of its Affiliates or any other Person; (ii) none of the Agents and the Lenders has any obligation to the Borrower or any of its Affiliates with respect to the transactions contemplated hereby except those obligations expressly set forth herein and in the other Loan Documents; and (iii) the Agents and the Lenders and their respective Affiliates may be engaged, for their own accounts or the accounts of customers, in a broad range of transactions that involve interests that differ from those of the Borrower and its Affiliates, and none of the Agents and the Lenders has any obligation to disclose any of such interests to the Borrower or its Affiliates. To the fullest extent permitted by law, the Borrower hereby waives and releases any claims that it may have against the Agents and the Lenders with respect to any breach or alleged breach of agency or fiduciary duty in connection with any aspect of any transaction contemplated hereby.

Section 9.21    No Publicity. Except as otherwise permitted herein, each of Holdings and the Borrower agrees not to disclose to third parties (other than Persons who have a "need to know" in connection with the Transactions), the existence or terms and conditions of this Agreement or the other Loan Documents or the identities of the Lenders, unless required by law or with the written permission of the Lenders. The Borrower shall direct its Related Parties to comply with the terms of this section, and the Borrower will be responsible for any breach of the terms of this paragraph by its Related Parties. This provision shall survive any termination of this Agreement. Each of Holdings and the Borrower agrees that legal remedies available at law or in equity to the Lenders, including injunctive relief, may be appropriate in the event of a breach of this provision by Holdings or the Borrower.

Section 9.22    Acknowledgement and Consent to Bail-In of Affected Financial Institutions. Notwithstanding anything to the contrary in any Loan Document or in any other agreement, arrangement or understanding among any such parties, each party hereto acknowledges that any liability of any Affected Financial Institution arising under any Loan Document, to the extent such liability is unsecured, may be subject to the write-down and conversion powers of the applicable Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by:

(a)    the application of any Write-Down and Conversion Powers by the applicable Resolution Authority to any such liabilities arising hereunder that may be payable to it by any party hereto that is an Affected Financial Institution; and

(b)    the effects of any Bail-In Action on any such liability, including, if applicable:

(i)    a reduction in full or in part or cancellation of any such liability;

(ii)    a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such Affected Financial Institution, its parent undertaking, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any other Loan Document; or

(iii)    the variation of the terms of such liability in connection with the exercise of the write-down and conversion powers of the applicable Resolution Authority.

Section 9.23    <u>Parties Including Trustees; Bankruptcy Court Proceedings</u>. This Agreement, the other Loan Documents, and all Liens and other rights and privileges created hereby or pursuant hereto or to any other Loan Document shall be binding upon the Loan Parties, the estate of each Loan Party, and any trustee, other estate representative or any successor in interest of each Loan Party in the Chapter 11 Cases or any subsequent case commenced under Chapter 7 of the Bankruptcy Code. This Agreement and the other Loan Documents shall be binding upon, and inure to the benefit of, the successors of the Agents and the Secured Parties and their respective assigns, transferees and endorsees. The Liens created by this Agreement and the other Loan Documents shall be and remain valid and perfected in the event of the substantive consolidation or conversion of the Chapter 11 Cases or any other bankruptcy case of the Loan Parties to a case under Chapter 7 of the Bankruptcy Code or in the event of dismissal of the Chapter 11 Cases or the release of any Collateral from the jurisdiction of the Bankruptcy Court for any reason, without the necessity that the Collateral Agent file financing statements or otherwise perfect its Liens under applicable law. The terms and provisions of this Agreement are for the purpose of defining the relative rights and obligations of the Loan Parties, the Agents and Secured Parties with respect to the transactions contemplated hereby and no Person shall be a third party beneficiary of any of the terms and provisions of this Agreement or any of the other Loan Documents.

Section 9.24    <u>Inconsistency</u>. In the event of any inconsistency between the terms and conditions of this Agreement and of the DIP Orders, the provisions of the DIP Orders shall govern and control such inconsistency.

Section 9.25    <u>Lender Consent to Credit Bid</u>. The Collateral Agent (directly or via one or more acquisition vehicles) may, at the direction of the Required Lenders credit bid all or any portion of the Obligations in connection with any proposed sale of all or any portion of the assets of any or all of the Loan Parties, including, without limitation, any sale thereof conducted under the provisions of the Bankruptcy Code (including Section 363 of the Bankruptcy Code) or pursuant to any reorganization plan, or any other sale or foreclosure conducted by the Collateral Agent in accordance with applicable laws (a "<u>Credit Bid Transaction</u>"). In connection with any Credit Bid Transaction, each Lender consents to the assignment and delegation to a Qualified Purchaser of such rights and obligations under this Agreement and the other Loan Documents, in each case as the Required Lenders determine in order to consummate such Credit Bid Transaction (and each such Lender shall execute and deliver such documents as the Agents or the Required Lenders reasonably request to evidence such assignment and delegation). In connection with any Credit Bid Transaction, the Obligations owed to the Lenders and the other Secured Parties shall be entitled to be, and shall be, credit bid on a ratable basis at such sale or other disposition of the Collateral and the Lenders and the other Secured Parties whose Obligations are credit bid shall be entitled to receive interests (ratably based upon the proportion of their Obligations credit bid in relation to the aggregate amount of Obligations so credit bid) in the asset or assets so purchased (or in the Equity Interests of the acquisition vehicle or vehicles that are used to consummate such purchase). The Collateral Agent (at the direction of the Required Lenders) shall have the absolute right to assign, transfer, sell or otherwise dispose of its rights to credit bid.

[*Signature Pages Follow.*]

114

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed and delivered by their proper and duly authorized officers as of the day and year first above written.

AIR PROS SOLUTIONS HOLDINGS, LLC, as Holdings

By: _____
    Name: Andrew Hede
    Title: Chief Restructuring Officer

AIR PROS SOLUTIONS, LLC, as the Borrower

By: _____
    Name: Andrew Hede
    Title: Chief Restructuring Officer

AIR PROS, LLC
AIR PROS ONE SOURCE LLC
AIR PROS ATLANTA LLC
AIR PROS DALLAS L.L.C.
AIR PROS TEXAS LLC
AIR PROS WEST LLC
AIR PROS WASHINGTON, LLP
AIR PROS COLORADO LLC
AIR PROS BOCA LLC
AIR PROS BLUE STAR, LLC
HANSEN AIR PROS, LLC
DALLAS PLUMBING AIR PROS, LLC
DOUG'S SERVICE AIR PROS, LLC
DREAM TEAM AIR PROS, LLC
AFH AIR PROS, LLC
CM AIR PROS, LLC
MAUZY AIR PROS, LLC
EAST COAST MECHANICAL, LLC, each as a Subsidiary Guarantor

By: _____
    Name: Andrew Hede
    Title: Chief Restructuring Officer

ALTER DOMUS (US) LLC, solely in its capacities as Disbursing Agent and Collateral Agent and not in its individual capacity


By: _____
    Name:
    Title:

*[Signature Page to Credit Agreement]*

OC III LVS LXI LP, as a Lender

By: OC III GP LLC, its general partner

By: _____
    Name:
    Title: Authorized Person

[*Signature Page to Credit Agreement*]