**IN THE UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF GEORGIA
NEWNAN DIVISION**

| | |
|---|---|
| In re:<br><br>AFH AIR PROS, LLC., *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 25-10356 (PMB)<br><br>(Jointly Administered) |

**DECLARATION OF JEFFREY FINGER IN SUPPORT OF THE EMERGENCY
MOTION OF THE DEBTORS FOR ENTRY OF INTERIM AND FINAL ORDERS
(A) AUTHORIZING THE DEBTORS TO OBTAIN POSTPETITION FINANCING
AND TO USE CASH COLLATERAL, (B) GRANTING LIENS AND
SUPERPRIORITY CLAIMS, (C) GRANTING ADEQUATE PROTECTION,
(D) MODIFYING THE AUTOMATIC STAY, (E) SCHEDULING
<u>FINAL HEARING, AND (F) GRANTING RELATED RELIEF</u>**

Pursuant to 28 U.S.C. § 1746, I, Jeffrey Finger, hereby declare under penalty of perjury that, to the best of my knowledge, information and belief, and after reasonable inquiry, the following is true and correct:

1. I am a Managing Director and U.S. Co-Head of the Debt Advisory & Restructuring Group at Jefferies LLC ("<u>Jefferies</u>"), a global investment banking and financial advisory firm with its principal office located at 520 Madison Avenue, New York, New York 10022. Jefferies is the proposed investment banker to the debtors and debtors in possession (collectively, the "<u>Debtors</u>") in the above-referenced chapter 11 cases (the "<u>Chapter 11 Cases</u>"). I am duly authorized to execute this declaration (the "<u>Declaration</u>") on behalf of Jefferies. Unless otherwise stated, the facts set forth in this Declaration are based on my personal knowledge, information provided to me by other

---

[1] The last four digits of AFH Air Pros, LLC's tax identification number are 1228. Due to the large number of debtor entities in these chapter 11 cases, a complete list of the debtor entities and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the proposed claims and noticing agent at https://www.veritaglobal.net/AirPros. The mailing address for the debtor entities for purposes of these chapter 11 cases is: 150 S. Pine Island Road, Plantation, Florida 33020.

ACTIVE 707772072

employees of Jefferies and records kept in the ordinary course of business by Jefferies, information provided to me or to Jefferies employees working under my supervision by or on behalf of the Debtors, including directors, officers, and other advisors to the Debtors, and records kept in the ordinary course of business by the Debtors and provided by the Debtors or their representatives to Jefferies, or my views and beliefs, including as based upon my experience and knowledge of the Debtors' business and financial condition. I am not being compensated specifically for this testimony other than through payments received by Jefferies in its capacity as a proposed professional to the Debtors in these chapter 11 cases. If I were called to testify, I would testify competently to the facts discussed herein on that basis.

2. I submit this Declaration in connection with the *Emergency Motion of the Debtors for Entry of Interim and Final Orders (A) Authorizing the Debtors to Obtain Postpetition Financing and to Use Cash Collateral, (B) Granting Liens and Superpriority Claims, (C) Granting Adequate Protection, (D) Modifying the Automatic Stay, (E) Scheduling Final Hearing, and (F) Granting Related Relief* (the "DIP Motion"),[2] which seeks, among other things, approval of (i) a proposed $20 million senior secured postpetition financing on a priming and superpriority basis (the "DIP Facility") and (ii) the postpetition use of Cash Collateral.[3]

3. In particular, I submit this Declaration in support of my view that the DIP Facility: (i) is the best available postpetition financing option for the Debtors in light of the marketing

---

[2] Capitalized terms used but not defined herein have the meanings given to such terms in the DIP Motion or the DIP Credit Agreement, as applicable.

[3] The material terms of the proposed DIP Facility are set forth in detail in the DIP Motion. For the avoidance of doubt, any description of the proposed terms of the DIP Facility herein or in the DIP Motion is qualified in its entirety by reference to the Interim Order and the DIP Credit Agreement, as applicable.

process described below and under the circumstances and (ii) is the product of an arm's-length, good-faith negotiation process.

## Background and Qualifications

4.     Jefferies is a full-service, global investment banking and financial advisory firm with thousands of employees around the world, which provides a broad range of services to its clients including, without limitation, services relating to: (i) general financial advice; (ii) mergers, acquisitions, and divestitures; (iii) special committee assignments; (iv) capital raising; and (v) corporate restructurings.  Jefferies has advised debtors, creditors, equity constituencies, and purchasers in connection with many reorganizations. Jefferies and its senior professionals have extensive experience in the reorganization and restructuring of troubled companies, both out-of-court and in chapter 11 proceedings.  Jefferies and its professionals are providing or have provided investment banking, financial advisory and other services in connection with the following recent cases, among others:  *In re Steward Health Care System LLC, et al.,* Case No. 24-90213 (CML) (Bankr. S.D. Tex. July 12, 2024); *In re WOM, S.A.*, Case No. 24-10628 (KBO) (Bankr. D. Del. June 20, 2024); *In re GOL Linhas Aéreas Inteligentes S.A.*, Case No. 24-10118 (MG) (Bankr. S.D.N.Y. April 10, 2024); *In re Number Holdings, Inc.*, Case No. 24-10719 (JKS) (Bankr. D. Del. May 6, 2024); *In re Ebix,* Case No. 24-80004 (SWE) (Bankr. N.D. Tex. Feb. 6, 2024); *In re Barretts Minerals Inc.*, Case No. 23-90794 (MI) (Bankr. S.D. Tex. Nov. 21, 2023); *In re Unconditional Love Inc.*, Case No. 23-11759 (MFW) (Bankr. D. Del. Nov. 18, 2023); *In re Aerotech Miami Inc. d/b/a iAero Tech*, Case No. 23-17503 (RAM) (Bankr. S.D. Fla. Oct. 16, 2023); *In re AppHarvest Products, LLC*, Case No. 23-90745 (DRJ) (Bankr. S.D. Tex. Sept. 12, 2023); *In re Qualtek Services, Inc.*, Case No. 23-90584 (CML) (Bankr. S.D. Tex. Aug. 4, 2023); *In re Benefytt Technologies, Inc.*, Case No. 23-90566 (CML) (Bankr. S.D. Tex. July 24, 2023); *In re Pipeline Health System, LLC*, Case No. 22-90291 (MI) (Bankr. S.D. Tex. Nov. 21, 2022); *In re*

*Mining Project Wind Down Holdings, Inc.* (*f/k/a Compute North Holdings, Inc.*), Case No. 22-90273 (MI) (Bankr. S.D. Tex. Oct. 24, 2022); *In re SAS AB*, Case No. 22-10925 (MEW) (Bankr. S.D.N.Y. Sept. 19, 2022).

5.  I have over twenty-five (25) years of experience advising companies, boards of directors, financial sponsors and creditors across a range of industries in restructuring, recapitalization, liability management, financing and M&A transactions. Prior to joining Jefferies in 2016, I was a partner in the Debt Advisory and Restructuring Group at Centerview Partners and, earlier in my career, I was a Managing Director at Miller Buckfire & Co., a former member of the financial restructuring group of its predecessor, Dresdner Kleinwort Wasserstein, and worked in the investment banking division of Wasserstein Perella. I hold an MBA from the University of Chicago Booth School of Business and a BA in economics from the University of Michigan.

### Jefferies Retention

6.  Jefferies has been advising the Debtors for over 18 months. Jefferies was initially engaged by the Debtors under an engagement letter, dated July 26, 2023, to serve as investment banker to assist the Debtors with exploring potential sale opportunities, including by marketing the Company (as defined in the First Day Declaration) for sale as a going concern enterprise. In January 2024, Jefferies role was expanded to include pursuing and evaluating financing alternatives for the Debtors and, in October 2024, Jefferies' role was further expanded to assist the Debtors in pursuing and evaluating other value maximizing transactions.

7.  Through its prepetition services to the Debtors, Jefferies has developed institutional knowledge regarding the Debtors' operations and capital structure. In providing these prepetition services, Jefferies' professionals have worked closely with the Debtors' management and other professionals and have become well acquainted with the Debtors' businesses, debt structure, creditors, and related matters, including (i) reviewing the Debtors' business plan and operating

assumptions; (ii) reviewing the Debtors' debt and capital structure; (iii) discussing with outside financing sources options for potential debtor-in-possession financing; and (iv) marketing the Debtors' assets for sale both prepetition and in contemplation of a postpetition sale process. Accordingly, Jefferies has developed relevant experience and expertise regarding the Debtors' businesses and has developed an understanding of the liquidity needs of the Debtors.

### The Debtors' Capital Structure

8. The Debtors' prepetition capital structure is set forth in the *Declaration of Andrew D.J. Hede in Support of Chapter 11 Petitions and First Day Motions* (the "First Day Declaration"). The First Day Declaration provides, among other things, that (i) the Debtors have prepetition secured indebtedness in the aggregate amount not less than $250 million including principal, accrued and unpaid interest, and certain fees owing under the Prepetition Credit Facility pursuant to the Prepetition Loan Documents and (ii) the Prepetition Obligations are secured by a first priority lien on substantially all of the Debtors' assets.

### The Debtors' DIP Marketing Efforts

9. The availability of postpetition financing to fund the Debtors' anticipated cash shortfalls during the Chapter 11 Cases is critical to the Debtors' ability to pursue a postpetition sale process and maximize value in these cases.

10. The Debtors' effort to obtain such postpetition financing began in earnest in February 2025. Specifically, Jefferies reached out to 11 parties, all of whom are active in the market for assessing financing opportunities and providing capital solutions, to evaluate their willingness to provide financing to the Debtors during these Chapter 11 Cases. Each of these potential financing sources contacted by Jefferies declined the opportunity to provide an alternative postpetition financing facility, whether on a priming or junior basis. Such parties informed Jefferies that they would not be willing to provide postpetition financing or otherwise

pursue the matter further: (i) in the absence of meaningful unencumbered assets; (ii) because a priming debtor-in-possession facility could require extensive and costly litigation with the Debtors' Prepetition Lenders, who have represented that they would not consent to the Debtors' incurrence of financing by any other party having priming or *pari passu* liens on the Prepetition Collateral; and (iii) because a junior debtor-in-possession facility would likely require speculating on sale process outcomes. Additionally, one party indicated that it would require economics in excess of the current terms proposed under the proposed DIP Facility, but only in the event that the Prepetition Secured Parties agreed to be consensually primed or if there were significant unencumbered assets.

11. Further, I believe that attempting to prime the Prepetition Secured Parties in connection with a third-party financing source would be (i) unlikely to succeed and (ii) unnecessarily disruptive to the Debtors' cases, including with respect to incurring incremental costs and potentially impacting the timing of any sales, as compared to the alternative financing terms that may be obtained.

12. Accordingly, the prepetition debtor-in-possession financing marketing process strongly supports the Debtors' conclusion that the DIP Facility is the best source of postpetition financing available under the circumstances.

**The Proposed DIP Facility Was Negotiated in Good Faith and at Arms' Length**

13. I have personally reviewed the various iterations of proposed financial terms provided by the Debtors and the DIP Lenders in connection with the negotiations. I believe that the terms of the DIP Facility, and the agreements related thereto, were negotiated in good faith and at arm's-length between the Debtors and the DIP Lenders, and are designed to permit the Debtors to maximize the value of their assets. The DIP Facility will provide critically needed liquidity to the Debtors to complete the postpetition marketing and sale processes in these Chapter 11 Cases

that the Debtors and their advisors believe will maximize value on the best available terms and conditions given the circumstances of these cases.

14. In addition, under the DIP Facility, the Debtors have agreed, subject to Court approval, to pay all of the DIP Lenders' reasonable fees and expenses, including attorneys' fees and costs, incurred in connection with the DIP Credit Agreement and the DIP Loans. I believe that payment of such fees and costs is customary and reasonable under the circumstances. I believe that the fees under the DIP Facility are within the range of reasonableness to fees agreed upon in similar debtor-in-possession financings. Based on information made available to me, these fees were subject to negotiation between the Debtors and the DIP Lenders, are an integral component of the overall terms of the DIP Facility and were required by the DIP Lenders as consideration for the extension of postpetition financing.

15. I believe that, without the risk of unnecessary disruption and incurring incremental cost to the Debtors' Chapter 11 Cases, the Debtors are unable to obtain financing from sources other than the DIP Lenders on terms more favorable than those provided under the DIP Facility and the DIP Loan Documents.

### The Proposed DIP Financing and the Debtors' Need for Immediate Access to Financing and the Use of Cash Collateral

16. The proposed DIP Facility, more fully described in the DIP Motion, will provide the Debtors with up to approximately $10 million of "new money" loans to support their operations and liquidity needs in these Chapter 11 Cases. I believe the DIP Facility represents the best source of financing available to the Debtors under the circumstances and should provide sufficient liquidity to fund these Chapter 11 Cases.

17. Specifically, the proposed DIP Facility is a senior secured priming debtor-in-possession term loan facility in the aggregate principal amount of $20,000,000, composed of (a) a

"new money" multiple delayed draw term loan facility in an aggregate principal amount of $10,000,000 (the "New Money Loans"), of which (x) $4,000,000 (the "Initial DIP Loans") will be made available to be drawn upon entry of this Interim Order, and (y) an additional amount of up to $6,000,000 (the "Final DIP Loans") will be made available upon entry of the Final Order, and (b) a "rollup" (or conversion) of $10,000,000 of Prepetition Obligations (as defined below) (the "Rollup Loans" and, together with the New Money Loans, the "DIP Loans"), of which (x) up to $4,000,000 will be rolled up on a dollar-for-dollar basis immediately upon each funding of the Initial DIP Loans following entry of the Interim Order and (y) $the remainder will be rolled up immediately upon the first funding of Final DIP Loans following entry of the Final Order.

18. As set forth in the First Day Declaration and as evidenced by the budget attached to the DIP Motion, the Debtors have an urgent and necessary need to use Cash Collateral on an interim basis and to obtain the DIP Loans pursuant to the DIP Facility on an interim basis to avoid immediate and irreparable harm to the Debtors, their estates, their creditors, and other parties-in-interest, and to enable the Debtors to administer the Chapter 11 Cases and preserve the value of their estates. It is my understanding that the ability of the Debtors to maintain business relationships with their vendors and customers, pay their employees, and otherwise finance their operations (as well as the value-maximizing sale transactions that are detailed in the First Day Declaration) at this stage of these Chapter 11 Cases requires access to the DIP Loans and Cash Collateral. It is my understanding that without the DIP Facility and authority to use Cash Collateral, the Debtors will not have sufficient available sources of funds to administer the Chapter 11 Cases, operate their businesses in the ordinary course, and consummate the proposed sales of the Debtors' business units.

19. Accordingly, I believe that without immediate access to the DIP Facility or Cash Collateral, the Debtors could suffer substantial and irreparable harm and that the Debtors' need for access to additional liquidity is, therefore, urgent.

20. In connection with all of the foregoing, the Debtors determined that, in light of the Debtors' circumstances, the terms offered by the DIP Lenders, the amount of secured debt already encumbering the Debtors' assets, the terms generally required in the market for loans of the size and nature of the DIP Facility, and considering the expense, time and risks associated with finding and obtaining court approval of alternative financing, the DIP Lenders' final terms contained in the DIP Facility are the best terms currently available to the Debtors for such financing.

21. For all of these reasons, I believe the DIP Facility is the only viable source of postpetition financing reasonably attainable under the circumstances, is in the best interests of the Debtors' estates, and is necessary to avoid irreparable harm to the Debtors and their estates.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Dated: March 16, 2025                    */s/ Jeffrey Finger*
                                          Jeffrey Finger, Managing Director
                                          JEFFERIES, LLC