# Exhibit B

# Engagement Letter

ACTIVE 707953488

Strictly Confidential

# Engagement Letter

March 10, 2025

**Air Pros Solutions Holdings, LLC**
2801 Evans Street
Hollywood, FL 33020

**Air Pros Solutions, LLC**
2801 Evans Street
Hollywood, FL 33020

Attention:    Lawrence Hirsh
              Independent Director

Re: <u>Advisory Services</u>

      This letter agreement (this "<u>Agreement</u>") will confirm the arrangements under which Jefferies LLC ("<u>Jefferies</u>") has been engaged by Air Pros Solutions Holding, LLC, a Delaware limited liability company, and Air Pros Solutions, LLC, a Delaware limited liability company, and their respective subsidiaries and any entity used thereby to facilitate the transactions contemplated hereby (collectively, the "<u>Company</u>"), to act as the Company's exclusive investment banker in connection with a possible Transaction (as defined below). The Parties (as defined below) acknowledge and agree that this Agreement amends, restates, and replaces in its entirety all prior investment banking engagement letters between the Parties with respect to the Transactions contemplated hereby, including, but not limited to, those certain engagement letters between Jefferies and Air Pros Solutions, LLC dated July 26, 2023, January 2, 2024 and February 24, 2025; <u>provided</u> that, for the avoidance of doubt, the Company acknowledges that Jefferies services hereunder are a continuation of Jefferies' services under such prior engagement letters.

1.    <u>Retention</u>.

    (a)    <u>Restructuring</u>. During the Term (as defined below), and as mutually agreed upon by Jefferies and the Company and as appropriate, Jefferies will:

        (i)    provide advice and assistance to the Company in connection with analyzing, structuring, negotiating and effecting, and acting as exclusive investment banker to the Company in connection with, any restructuring, reorganization, recapitalization, repayment or material modification of the Company's outstanding indebtedness or obligations (including, without limitation, any preferred equity), however achieved, including, without limitation, through any offer by the Company with respect to any outstanding Company indebtedness or obligations, a solicitation of votes, approvals, or consents giving effect thereto (including with respect to a prepackaged or pre-negotiated plan of reorganization or other plan pursuant to chapter 11, Title 11 of the United States Code (the "<u>Bankruptcy Code</u>")), the execution of any agreement giving effect to the same, an offer by any third party to convert, exchange or acquire any outstanding Company

**Air Pros Solutions Holdings, LLC**
**Air Pros Solutions, LLC**
March 10, 2025
Page 2

indebtedness or obligations, or any similar balance sheet restructuring involving the Company (any of the foregoing, a "Restructuring"); and

(ii) perform the following investment banking services, among others, for the Company in connection with a Restructuring: (A) becoming familiar with, to the extent Jefferies deems appropriate, and analyzing, the business, operations, properties, financial condition and prospects of the Company; (B) advising the Company on the current state of the "restructuring market"; (C) assisting and advising the Company in developing a general strategy for accomplishing a Restructuring; (D) assisting and advising the Company in implementing a Restructuring; (E) assisting and advising the Company in evaluating and analyzing a Restructuring, including the value of the securities or debt instruments, if any, that may be issued in any such Restructuring; and (F) rendering such other investment banking services as may from time to time be agreed upon by the Company and Jefferies.

(b) M&A Transaction.

(i) During the Term, and as mutually agreed upon by Jefferies and the Company, Jefferies will provide the Company with financial advice and assistance in connection with a possible sale, disposition or other business transaction or series of transactions involving all or a portion of the equity interests or assets of one or more entities comprising the Company, a Delaware limited liability company and parent of the Company, to one or more unaffiliated third parties whether directly or indirectly and through any form of transaction, including, without limitation, merger, reverse merger, liquidation, stock sale, asset sale, asset swap, recapitalization, reorganization, consolidation, amalgamation, spin-off, split-off, a sale under section 363 of the Bankruptcy Code (including any "credit bid" made pursuant to section 363(k) of the Bankruptcy Code and including under a prepackaged or pre-negotiated plan of reorganization or other plan pursuant to the Bankruptcy Code) or other transaction (any of the foregoing, an "M&A Transaction").

(ii) Jefferies' services hereunder shall include, as requested by the Company and reasonably appropriate, assisting the Company in: (i) the preparation of certain marketing materials (the "Marketing Materials") to be distributed by Jefferies on behalf of the Company to prospective purchasers; and (ii) the preparation and maintenance of a list of prospective Transaction counterparties, including those that have been sent the Market Materials, and Jefferies shall provide such list of prospective M&A Transaction counterparties to the Company upon request. Jefferies agrees that the contact of potential M&A Transaction counterparties hereunder and the dissemination of Marketing Materials shall be coordinated with the Company.

(c) Financing.

(i) The Company hereby retains and authorizes Jefferies, during the term of this engagement, to act as sole and exclusive financial advisor in connection with

**Air Pros Solutions Holdings, LLC**
**Air Pros Solutions, LLC**
March 10, 2025
Page 3

any of the following (each, a "Financing", and a Financing, a Restructuring and an M&A Transaction, each and together, a "Transaction"): (A) the sale and/or placement, whether in one or more public or private transactions, of (i) common equity, preferred equity, and/or equity-linked securities of the Company (regardless of whether sold by the Company or its securityholders), including, without limitation, convertible debt securities (individually and collectively, "Equity Securities"), and/or (ii) notes, bonds, debentures and/or other debt securities of the Company, including, without limitation, mezzanine and asset-backed securities (individually and collectively, "Debt Securities"), and/or (B) the arrangement and/or placement of any bank debt and/or other credit facility of the Company including debtor-in-possession financing (individually and collectively, "Bank Debt," and any or a combination of Bank Debt, Equity Securities and/or Debt Securities, "Instruments"). For the avoidance of doubt, if a Financing is executed in more than one issuance or tranche, each shall be deemed to be a Financing for the purposes of this Agreement.

(ii)    It is understood and agreed that the Company's engagement of Jefferies pursuant to this Agreement is not an express or implied commitment by, nor shall this Agreement otherwise create any obligation on, Jefferies to underwrite, place or purchase any Instruments or otherwise provide or arrange any financing.

2.    Cooperation.

(a)    The Company shall furnish Jefferies with such current and historical materials and information regarding the business and financial condition of the Company relevant to the Transaction, and all such other information and data, and access to such of the Company's officers, directors, employees and professional advisors, which Jefferies reasonably requests in connection with Jefferies' activities hereunder. All such materials, information and data shall be complete and accurate in all material respects and not misleading. The Company agrees to promptly advise Jefferies of all developments materially affecting the Company, any proposed Transaction or the completeness or accuracy of the information previously furnished to Jefferies and agrees to notify Jefferies of any material initiatives taken or proposed to be taken by the Company relating to a proposed Transaction; provided that the Company shall provide Jefferies with notice prior to commencing any proceedings under the Bankruptcy Code. If the Company or, to the Company's knowledge, any of its securityholders, affiliates or other advisors or representatives are contacted by any third party concerning a potential Transaction during the Term, the Company will promptly inform Jefferies of such inquiry, and all relevant details thereof.

(b)    The Company further acknowledges that, except to the extent Jefferies, in its sole discretion, deems necessary to establish applicable "due diligence" defenses, Jefferies (i) will be relying on information and data provided to Jefferies (including, without limitation, information provided by or on behalf of the Company or other parties to a Transaction) and available from generally recognized public sources, without having independently verified the accuracy or completeness thereof, (ii) does not assume responsibility for the accuracy or completeness of any such information and data, (iii) has

**Air Pros Solutions Holdings, LLC**
**Air Pros Solutions, LLC**
March 10, 2025
Page 4

not made, and will not make, any physical inspection or appraisal of the properties, assets or liabilities (contingent or otherwise) of the Company or any other party to a Transaction and (iv) in relying on any financial forecasts that may be furnished to or discussed with Jefferies, will assume that such forecasts have been reasonably prepared on bases reflecting the best currently available estimates and good faith judgments of the Company's management team as to the future financial performance of the Company or other party to a Transaction, as the case may be (and if such forecasts no longer reflect such estimates and judgments in all material respects, then the Company will promptly inform, and provide updated forecasts to, Jefferies).

(c) The Company agrees that any teaser, confidential information memorandum or other disclosure materials used in connection with a Transaction shall not contain any untrue statement of material fact or omit to state a material fact necessary to make the statements contained therein, in light of the circumstances in which they were made, not misleading.

(d) The Company shall comply, and shall assist Jefferies in complying, with all federal and state securities laws and regulations applicable to the Financing.

3.  Use of Name, Advice, Agreement, etc.

(a) No information or advice provided (other than any information or advice relating to the U.S. tax treatment and U.S. tax structure of any Transaction) or materials prepared by Jefferies may be disclosed, in whole or in part, or summarized, excerpted from or otherwise referred to without Jefferies' prior written consent. The Company shall not disseminate any materials bearing the Jefferies name or logo outside of the Company without Jefferies' knowledge and consent; provided, however, that the Marketing Materials shall belong to and be the property of the Company. In addition, the Company agrees that any reference to Jefferies in any release, communication or other material is subject to Jefferies' prior written consent for each such reference. The Company agrees not to disclose this Agreement, the contents hereof or the activities of Jefferies pursuant hereto to any third party without the prior written consent of Jefferies; provided, however, if the Company becomes a debtor in a proceeding under the Bankruptcy Code, the Company shall be permitted to disclose the fact that the Company has retained Jefferies as its investment banker.

(b) Jefferies' advice is solely for the confidential use and information of the Company's management and board of directors or appropriate committee thereof (solely in their capacities as such), and is only to be used in considering the matters to which this Agreement relates. Such advice may not be relied upon by any other party (including, without limitation, securityholders, affiliates, creditors or employees of the Company).

4.  Compensation. The Company agrees to pay Jefferies each of the following:

ACTIVE 703044262

**Air Pros Solutions Holdings, LLC**
**Air Pros Solutions, LLC**
March 10, 2025
Page 5

(a) A monthly fee (the "Monthly Fee") equal to $100,000 per month accruing and payable as of and with effect as of the date on which proceedings under chapter 11 of the Bankruptcy Code involving the Company commence and in advance of each monthly anniversary thereafter until the termination of this Agreement. An amount equal to 100% of the Monthly Fees actually paid to Jefferies shall be credited once, without duplication, against any Restructuring Fee or M&A Transaction Fees (each as defined below) that subsequently becomes payable to Jefferies under this Agreement following the consummation of a Restructuring or M&A Transaction, as applicable.

(b) Promptly upon the consummation of a Restructuring, a fee (a "Restructuring Fee") in an amount equal to $1.75 million; provided, however, that no Restructuring Fee shall be payable to Jefferies with respect to any liquidating plan under chapter 11 of the Bankruptcy Code that provides for the orderly wind down and dissolution of the remaining assets or business of the Company following one or more M&A Transactions in connection with which Jefferies has received an M&A Transaction Fee that is not subject to avoidance under the Bankruptcy Code or applicable law.

(c) At the closing of an M&A Transaction solely involving PIMCO or an existing affiliate of PIMCO as of the date hereof as the M&A Transaction counterparty (a "PIMCO M&A Transaction"), a fee equal to the lesser of (i) $250,000 and (ii) 2.0% of the aggregate gross proceeds received or to be received in connection with a PIMCO M&A Transaction, including, for the avoidance of doubt, any and all amounts that are credit bid in such PIMCO M&A Transaction (the "PIMCO M&A Transaction Fee"); provided that the portion of the PIMCO M&A Transaction Fee attributable to any gross proceeds not paid at the closing thereof shall be paid when and to the extent such contingent consideration is actually paid to the Company or its direct or indirect securityholders.

(d) At the closing of an M&A Transaction (other than a PIMCO M&A Transaction), an amount to be determined according to the following schedule (together with the PIMCO M&A Transaction Fee, the "M&A Transaction Fee"):

(i) 2.0% of Transaction Value (as defined below) less than or equal to $175.0 million; *plus*

(ii) 5.0% of that portion of Transaction Value greater than $175.0 million but less than or equal to $200.0 million; *plus*

(iii) 10.0% of that portion of Transaction Value greater than $200.0 million.

Notwithstanding anything to the contrary, the minimum M&A Transaction Fee paid at the first closing of an M&A Transaction (including, for the avoidance of doubt, a PIMCO M&A Transaction) shall be $1.75 million (and shall only be payable once) (the "Minimum M&A Fee") and in the event of multiple M&A Transactions, the M&A Transaction Fee payable at closing of each M&A Transaction subsequent to the initial M&A Transaction

ACTIVE 703044262

Docusign Envelope ID: 9BDC4B44-B34E-4ADF-B5A5-9EA8BCAB0D52

**Air Pros Solutions Holdings, LLC**
**Air Pros Solutions, LLC**
March 10, 2025
Page 6

shall equal the aggregate M&A Transaction Fees calculated for all M&A Transactions less the M&A Transaction Fees actually paid to Jefferies; provided, however, if the Minimum M&A Transaction Fee becomes payable in connection with a PIMCO M&A Transaction involving less than $1.75 million in gross proceeds (including any and all amounts credit bid), (i) the Company shall pay to Jefferies an amount equal to the gross proceeds paid (including any and all amounts credit bid) in such PIMCO M&A Transaction and (ii) the remaining portion of the Minimum M&A Transaction Fee shall be paid by the Company upon the earliest of (a) the closing of a subsequent M&A Transaction, (b) the date that is three months from the closing of such PIMCO M&A Transaction and (c) the confirmation of any chapter 11 plan involving the Company.

"Transaction Value" shall mean, without duplication, (A) the aggregate amount of cash and the fair market value (determined as set forth below) of any securities or other property or consideration directly or indirectly paid or payable to the Company or their equity holders in connection with an M&A Transaction, including, without limitation, (1) any dividends or distributions or any stock redemptions or repurchases outside of the normal course of business, (2) all amounts payable in relation to, or other value ascribed in the M&A Transaction (including the form of "rollover" options or warrants) in respect of, warrants, options or other convertible securities, (3) the full amount of any consideration placed in escrow or otherwise withheld to support the Company's (or its securityholders') indemnification, purchase price adjustment or similar obligations under the definitive documents with respect to the M&A Transaction, (4) the full amount of any contingent consideration to be paid in the future, including, without limitation, any earn-outs or other similar payments contingent on future performance and (5) the full amount of any payments in installments (the amounts set forth in clauses (3), (4), and (5) above, "Future Consideration"); provided that the portion of the M&A Transaction Fee attributable to Future Consideration shall be paid when and to the extent such Future Consideration is actually paid to the Company or its securityholders; provided, further, that any agreement relating to the payment of Future Consideration shall expressly provide, to the reasonable satisfaction of Jefferies, that Jefferies be paid the portion of the M&A Transaction Fee attributed to Future Consideration simultaneous with the Company's or its former or current shareholders' receipt of such Future Consideration; plus (B) all indebtedness for borrowed money, capitalized leases and other debt-like items treated as indebtedness in the definitive documentation for the M&A Transaction and preferred stock directly or indirectly assumed, refinanced, retired or extinguished (and all payments made and expenses incurred in connection therewith, including, without limitation, prepayment premiums and defeasance costs) in connection with the M&A Transaction (including, in the case of the sale, exchange or purchase of equity securities, any such liabilities outstanding at the closing of the M&A Transaction); plus (C) in the case of an M&A Transaction structured as a sale, transfer, exchange or purchase of equity securities, if less than 100% of the equity of the Company's businesses subject to the M&A Transaction are transferred in the M&A Transaction, the value of any retained interest in such businesses based on the value paid for or ascribed to the equity interests transferred in the M&A Transaction. Amounts paid in respect of cash and cash equivalents held by the Company

**Air Pros Solutions Holdings, LLC**
**Air Pros Solutions, LLC**
March 10, 2025
Page 7

or any of its subsidiaries or affiliates at closing that are excluded from a working capital or similar threshold calculation under the definitive M&A Transaction documents shall not be included in the calculation of Transaction Value.

For the avoidance of doubt and notwithstanding anything to the contrary contained herein, the Company's and/or the Transaction counterparty's Transaction-related expenses (including, but not limited to, the fees and expenses owed to Jefferies and the Company's legal counsel) shall not be deducted from Transaction Value or otherwise taken into account when calculating Transaction Value hereunder.

For purposes of computing the M&A Transaction Fee, any non-cash consideration shall be valued as set forth in the definitive agreements for the M&A Transaction or, if such agreements do not set forth a value, (x) publicly-traded securities shall be valued at the average of their 4:00 p.m. closing prices (as reported in The Wall Street Journal) for the five trading days prior to the date that is two business days prior to the date of announcement of the M&A Transaction and (y) any other non-cash consideration shall be valued at the fair market value thereof as determined in good faith by the Company and Jefferies.

　　　　(e)　　Promptly upon consummation of a Financing, a fee (a "Financing Fee") equal to an amount to be determined according to the following schedule:

　　　　　　(i)　　2.0% of the aggregate principal amount of any secured Bank Debt or secured Debt Securities of any Financing;

　　　　　　(ii)　　3.5% of the aggregate principal amount of any Bank Debt or Debt Securities of any Financing not covered by subsection (d)(i) immediately above; and

　　　　　　(iii)　　5.0% of the aggregate gross proceeds received or to be received from the sale of Equity Securities, including, without limitation, aggregate amounts committed by investors to purchase Equity Securities in connection with any Financing (the "Equity Financing Fee");

provided that the portion of the Financing Fee attributable to gross proceeds that have been committed but not yet paid shall be paid when and to the extent such gross proceeds are actually paid to the Company or its direct or indirect securityholders; provided, further, no Financing Fee shall be payable to Jefferies with respect to any portion of a Financing provided by PIMCO or any affiliate of PIMCO.

　　　　(f)　　To the extent a Transaction qualifies as both a Restructuring and an M&A Transaction, Jefferies shall only be entitled to the higher of the Restructuring Fee and the M&A Transaction Fee payable on account of such Transaction and not both such fees. To the extent a Transaction qualifies as both a Financing involving Equity Securities and an M&A Transaction, Jefferies shall only be entitled to the higher of the Equity Financing Fee

ACTIVE 703044262

**Air Pros Solutions Holdings, LLC**
**Air Pros Solutions, LLC**
March 10, 2025
Page 8

and the M&A Transaction Fee payable on account of such Transaction and not both such fees.

(g) If, following or in connection with the termination, abandonment or failure to occur of any proposed M&A Transaction in respect of which the Company entered into an agreement (i) during the Term or (ii) during the 12-month period following the Term, and the Company or any affiliate is entitled to receive a break-up, termination, "topping," expense reimbursement, earnest money payment or similar fee or payment (including, without limitation, any judgment for damages or amount in settlement of any dispute as a result of such termination, abandonment or failure to occur) (each and together, "Termination Payments"), Jefferies shall be entitled to a cash fee (the "Break-Up Fee"), payable promptly following the Company's or such affiliate's receipt of such amount, equal to 25% of the aggregate amount of all Termination Payments paid to the Company or such affiliate (net of out-of-pocket, unreimbursed expenses of the Company paid or owing to third parties (other than any amounts owed or paid to Jefferies)); provided, however, that the Break-Up Fee shall not be greater than the M&A Transaction Fee that would have been payable had the proposed M&A Transaction been consummated.

5. Expenses. In addition to any fees that may be paid to Jefferies hereunder, whether or not any Transaction occurs, the Company will reimburse Jefferies, promptly upon receipt of an invoice therefor, for all reasonable out-of-pocket expenses (including fees and expenses of its counsel, ancillary expenses and the fees and expenses of any other independent experts retained by Jefferies) incurred by Jefferies and its designated affiliates in connection with the engagement contemplated hereunder; provided that the amount of such fees and expenses for which Jefferies shall seek reimbursement from the Company under this Section 5 (other than fees and expenses of Willkie Farr & Gallagher LLP, Jefferies' counsel, incurred in connection with the Transaction or any bankruptcy case involving the Company) shall not exceed $100,000 in the aggregate without the Company's consent (not to be unreasonably withheld).

6. Indemnification. The terms and provisions of Schedule A are incorporated by reference herein, constitute a part hereof and shall survive any termination or expiration of this Agreement.

7. Termination. Jefferies' engagement hereunder will commence upon the execution of this Agreement by both the Company and Jefferies, and the Agreement will remain in full force and effect (and will not be deemed completed) until terminated by either Party on five days' written notice to the other Party (the "Term"). Upon any termination of this Agreement, the Company shall promptly pay Jefferies any accrued and unpaid fees as of the date of such termination and reimburse Jefferies for any unreimbursed expenses owed pursuant to Section 5. In the event of any termination of this Agreement, Jefferies shall be entitled to the applicable fee or fees set forth in Section 4 if, on or prior to the date that is 12 months from the effective date of termination of this Agreement, the Company consummates a Transaction, or enters into an agreement with a party (or its affiliates) identified to the Company or its affiliates by Jefferies or as to which contact was initiated,

**Air Pros Solutions Holdings, LLC**
**Air Pros Solutions, LLC**
March 10, 2025
Page 9

developed or pursued, directly or indirectly, by Jefferies, the Company, the Company's affiliates or such party (or its affiliates) prior to such termination and such agreement subsequently results in a Transaction (each, a "Tail Party"). Upon any termination of this Agreement, the rights and obligations of the parties hereunder shall terminate, except for the obligations set forth in Sections 3-7, 10-16, and Schedule A, which shall survive such termination (subject to, with respect to Section 4, the provisions of this Section 7).

8.  Exclusivity. During the Term, the Company will not, and will not permit any securityholder, affiliate, advisor or representative of the Company to, engage any third party to perform any services or act in any capacity for which Jefferies has been engaged pursuant to this Agreement with respect to any potential Transaction without the prior written consent of Jefferies. For the avoidance of doubt, (a) Jefferies' rights (including with respect to fee entitlement) and the Company's obligations hereunder shall not be affected by any prior retention of an investment banker that, as of the date hereof, has been terminated ("Prior Advisor") and (b) Jefferies shall not be liable or responsible for any acts or omissions of such Prior Advisor, including, for the avoidance of doubt, with respect to any act or omission of such Prior Advisor that would constitute gross negligence or willful misconduct.

9.  Bankruptcy Retention. If the Company becomes a debtor under chapter 11 of the Bankruptcy Code, the Company agrees promptly to retain Jefferies as its exclusive investment banker in the Company's bankruptcy cases, and to apply to the bankruptcy court having jurisdiction over such cases (the "Bankruptcy Court") for the approval of such retention pursuant to section 328(a) of the Bankruptcy Code, and not subject to any other standard of review under section 330 of the Bankruptcy Code. The Company shall supply Jefferies with a draft of any application and proposed order authorizing Jefferies' retention sufficiently in advance of its filing to enable Jefferies to review and approve any such application or order prior to its filing. Jefferies shall have no obligation to provide any services under this Agreement if the Company becomes a debtor under the Bankruptcy Code unless Jefferies' retention is approved under section 328(a) of the Bankruptcy Code by a final order of the Bankruptcy Court no longer subject to appeal, rehearing, reconsideration or petition for certiorari, which order is acceptable to Jefferies in its sole discretion. Prior to commencing a bankruptcy case, the Company shall pay to Jefferies in cash all amounts due and payable to Jefferies under this or any other Agreement.

10. Other Transactions; Disclaimer.

    (a) If the Company requests that Jefferies or one of its affiliates make available acquisition financing to prospective counterparties to a Transaction, upon such request, the Company will be deemed to have waived any and all actual and/or potential conflicts of interest in connection therewith. In any such event, if Jefferies proceeds with such financing, the Company and Jefferies will discuss appropriate procedures to put in place to prevent the inappropriate disclosure of the Company's confidential information under such circumstances, subject to compliance with applicable securities laws. For the avoidance of doubt, any fees payable to Jefferies in connection with a financing described in this

**Air Pros Solutions Holdings, LLC**
**Air Pros Solutions, LLC**
March 10, 2025
Page 10

paragraph shall not be the responsibility of the Company, and no fee payable to Jefferies in connection with any such financing shall reduce the fees payable by the Company hereunder.

(b)  The Company acknowledges that Jefferies' parent, Jefferies Financial Group Inc. (collectively with its subsidiaries and affiliates, "Jefferies Financial Group"), is a leading global, full-service investment banking and capital markets firm that offers a full range of investment banking, equities, fixed income, asset and wealth management products and services (including, without limitation, investment management, corporate finance, securities underwriting, trading and research and brokerage activities), and which owns a legacy portfolio of, and may make certain investments in or acquisitions of, other businesses and companies, in each case from which conflicting interests, or duties, may arise, and that Jefferies Financial Group maintains certain officers, directors and employees who also perform the same or similar roles for Jefferies. Information that is held elsewhere within Jefferies Financial Group, but of which none of the individuals in Jefferies' investment banking department involved in providing the services contemplated by this Agreement actually has (or without breach of internal procedures can properly obtain) knowledge, will not for any purpose be taken into account in determining Jefferies' responsibilities to the Company under this Agreement. Neither Jefferies nor any other part of Jefferies Financial Group has or will have any duty to disclose to the Company or use for the Company's benefit any non-public information acquired in the course of providing services to any other party, engaging in any transaction (on its own account or otherwise) or otherwise carrying on its business.  In addition, in the ordinary course of business, Jefferies Financial Group may trade the securities of the Company and of potential participants in a Transaction for its own account and for the accounts of customers, and may at any time hold a long or short position in such securities.  Jefferies recognizes its responsibility for compliance with federal securities laws and regulations in connection with such activities.  Further, the Company acknowledges that from time-to-time Jefferies' research department may publish research reports or other materials, the substance and/or timing of which may conflict with the views or advice of the members of Jefferies' investment banking department, and may have an adverse effect on the Company's interests in connection with a Transaction or otherwise.  Jefferies' investment banking department is managed separately from its research department and does not have the ability to prevent such occurrences.  Jefferies Financial Group and its directors, officers and employees may also at any time invest on a principal basis or manage or advise funds that invest on a principal basis in any company that may be involved in the transactions contemplated hereby.

(c)  The Company acknowledges and agrees that (i) Jefferies will act as an independent contractor hereunder, its responsibility is solely owed to the Company and contractual in nature, and Jefferies does not owe the Company, or any other person or entity (including, without limitation, any securityholders, affiliates, creditors or employees of the Company), any fiduciary or similar duty as a result of its engagement hereunder or otherwise, (ii) Jefferies and its affiliates will not be liable for any losses, claims, damages

ACTIVE 703044262

**Air Pros Solutions Holdings, LLC**
**Air Pros Solutions, LLC**
March 10, 2025
Page 11

or liabilities arising out of the actions taken, omissions of or advice given by other parties who are providing services to the Company, (iii) Jefferies may provide tools or online document repository spaces to facilitate a Transaction, that such products or services are provided by third party vendors and that the Company uses those products or services at its own risk, (iv) Jefferies is not an advisor as to legal, tax, accounting or regulatory matters in any jurisdiction, (v) the Company has consulted, and will consult, as appropriate, with its own advisors concerning such matters and shall be responsible for making its own independent investigation and appraisal of this Agreement and the transactions contemplated hereby, and that Jefferies and its affiliates shall have no responsibility or liability with respect thereto, and (vi) the Company is capable of evaluating the merits and risks of such transactions and the fees payable in connection therewith and that it understands and accepts the terms, conditions, and risks of such transactions and fees.

(d)   In connection with any Transaction involving the offer and sale by the Company of any securities: (i) such sale, including the determination of the price of such securities, shall be an arm's-length commercial transaction between the Company and the other parties to a Transaction (including Jefferies in the event that it acts as an underwriter or initial purchaser); (ii) Jefferies will not be the agent or fiduciary of the Company or its securityholders, affiliates, creditors, employees or any other party; (iii) Jefferies shall not assume fiduciary responsibility in favor of the Company (irrespective of whether Jefferies has advised or is currently advising the Company on other matters) and Jefferies shall have no obligation to the Company with respect to the Transaction except as may be set forth in this Agreement or in a definitive agreement (as applicable); and (iv) in the event that a Transaction is not successfully consummated, the Company agrees that it will not hold Jefferies liable or responsible for the same (including but not limited to, as a result of an adverse change in the financial or securities markets, insufficient demand for instruments similar to the Instruments or lack of interest by investors in the Transaction).

11.   <u>Governing Law</u>.   This Agreement shall be governed by, and construed in accordance with, the internal laws of the State of New York, applicable to contracts made and to be performed therein, without regard to conflict of laws provisions.

12.   <u>Exclusive Jurisdiction</u>.   Except as set forth below, the Parties agree that any dispute, claim or controversy directly or indirectly relating to or arising out of this Agreement, the termination or validity of this Agreement, any alleged breach of this Agreement, the engagement contemplated by this Agreement or the determination of the scope of applicability of this Agreement to this <u>Section 12</u> (any of the foregoing, a "<u>Claim</u>") shall be commenced in the Commercial Division of the Supreme Court of the State of New York located in the City and County of New York or in the United States District Court for the Southern District of New York, which courts shall have exclusive jurisdiction over the adjudication of such matters and shall decide the merits of each Claim on the basis of the internal laws of the State of New York without regard to principles of conflicts of law; <u>provided</u> if the Company becomes a debtor under chapter 11 of the Bankruptcy Code, the Bankruptcy Court shall have exclusive jurisdiction over the adjudication of all Claims

ACTIVE 703044262

Docusign Envelope ID: 9BDC4B44-B34E-4ADF-B5A5-9EA8BCAB0D52

**Air Pros Solutions Holdings, LLC**
**Air Pros Solutions, LLC**
March 10, 2025
Page 12

under this Agreement.  The Company and Jefferies agree and consent to personal jurisdiction, service of process and venue of such courts, waive all right to trial by jury for any Claim and agree not to assert the defense of forum non-conveniens.  The Company and Jefferies also agree that service of process may be effected through next-day delivery using a nationally-recognized overnight courier or personally delivered to the addresses set forth or referred to in Section 15.  In any such Claim, all of the costs and the reasonable attorneys' fees of the prevailing party (it being understood that the determination as to which party prevailed shall be made by the court in such Claim) shall be borne by the party who did not prevail.  The Company and Jefferies further agree that a final, non-appealable judgment in respect of any Claim brought in any such court shall be binding and may be enforced in any other court having jurisdiction over the Party against whom the judgment is sought to be enforced.  Neither Jefferies or any of the Indemnified Persons (as defined in Schedule A), nor the Company or its affiliates, shall be responsible or have any liability for any indirect, special, consequential or punitive damages arising out of or in connection with this Agreement or the transactions contemplated hereby, even if advised of the possibility thereof; provided that the foregoing shall not place any limitation on the Company's indemnification obligations under Section 6 and Schedule A in connection with third-party claims.  In addition, the Company agrees that irreparable harm to Jefferies may result in the event the Company fails, within 10 days of the receipt of a written demand from Jefferies, to pay any of the fees payable pursuant to Section 4 hereof, and in such event the Company agrees that Jefferies may seek to obtain, at its discretion, and in addition to any other remedies available to it, at law or in equity, either specific performance or summary judgment in lieu of complaint from any such court.

13. Payments.

    (a)    All payments to be made to Jefferies hereunder shall be non-refundable and made in cash by wire transfer of immediately available U.S. funds.  If the fees to be paid to Jefferies are denominated in a currency other than U.S. dollars, such fees shall be converted into U.S. dollars at the closing mid-market exchange rate in New York on the business day prior to that on which payment of the fees is to be made.  Except as expressly set forth herein, no fee payable to Jefferies hereunder shall be credited against any other fee due to Jefferies.  The Company's obligation to pay any fee or expense set forth herein shall be absolute and unconditional and shall not be subject to reduction by way of setoff, recoupment or counterclaim.  The Company agrees that the funds-flow memorandum for a Transaction shall be provided to Jefferies at a reasonable time prior to the closing of such Transaction and shall provide for the transfer to Jefferies at such closing of a cash amount sufficient to pay in full, in accordance with Sections 4 and 5, Jefferies' fees and expenses to the extent not previously paid or reimbursed.

    (b)    All amounts payable to Jefferies or any other Indemnified Person under the terms of the Agreement shall be paid to Jefferies or such Indemnified Person in U.S. dollars, free and clear of all deductions or withholdings.

ACTIVE 703044262

Docusign Envelope ID: 9BDC4B14-B34E-4ADF-B5A5-9EA8BCAB0D52

**Air Pros Solutions Holdings, LLC**
**Air Pros Solutions, LLC**
March 10, 2025
Page 13

(c)     All fees and expenses payable under the provisions of the Agreement are subject to any applicable value added, sales, turnover, consumption or similar tax, which will be payable by or charged to the Company.

14.    <u>Announcements, etc</u>.  The Company agrees that Jefferies may, following the announcement or disclosure of a Transaction, describe such Transaction in any form of media or in Jefferies' marketing materials, stating Jefferies' role and other material terms of such Transaction and using the Company's name and logo in connection therewith; <u>provided</u> that Jefferies shall not use in any such description any material terms of a Transaction, which have not been publicly disclosed by or on behalf of the Company or its affiliates or the Transaction counterparty or its affiliates, without the Company's prior approval for the first such use.  The Company agrees that any press release it may issue announcing a Transaction will, at Jefferies' request, contain a reference to Jefferies' role as exclusive financial advisor to the Company in connection with such Transaction in form and substance reasonably satisfactory to Jefferies.

15.    <u>Notices</u>.  Notice required to be given in writing pursuant to any of the provisions of this Agreement shall be mailed by next-day delivery using a nationally-recognized overnight courier or hand-delivered (a) if to the Company, at the address set forth above, and (b) if to Jefferies, at 520 Madison Avenue, New York, New York 10022, Attention: General Counsel.

16.    <u>Miscellaneous</u>.  This Agreement constitutes the entire agreement between the Parties with respect to the subject matter hereof, and may not be amended or modified except in writing signed by each Party.  This Agreement may not be assigned by either Party without the prior written consent of the other Party, to be given in the sole discretion of the Party from whom such consent is being requested.  Any attempted assignment of this Agreement made without such consent shall be void and of no effect, at the option of the non-assigning Party.  This Agreement is binding upon each Party's successors and permitted assigns.  This Agreement is solely for the benefit of the Company, Jefferies and, to the extent expressly set forth herein, the Indemnified Persons and no other party shall be a third party beneficiary to, or otherwise acquire or have any rights under or by virtue of, this Agreement; <u>provided</u> that Jefferies may, in the performance of its services hereunder, procure the services of other members of Jefferies Financial Group, which members shall be entitled to the benefits and subject to the terms of this Agreement.  If any provision hereof shall be held by a court of competent jurisdiction to be invalid, void or unenforceable in any respect, or against public policy, such determination shall not affect such provision in any other respect nor any other provision hereof.  Headings used herein are for convenience of reference only and shall not affect the interpretation or construction of this Agreement.  All references to "$" or "dollars" herein shall be references to U.S. dollars.  Each of the Company and Jefferies are referred to herein as a "Party" and together, the "Parties." "Third party" as used herein shall mean any party other than the Parties. Any reference herein to a statute shall mean the statute in force as at the date of this Agreement (together with all regulations promulgated thereunder), as the same may be amended, re-

**Air Pros Solutions Holdings, LLC**
**Air Pros Solutions, LLC**
March 10, 2025
Page 14

enacted, consolidated or replaced from time to time, and any successor statute thereto, unless otherwise expressly provided. No failure or delay by Jefferies in exercising any right, power or remedy hereunder or pursuant hereto, or any failure to give notice of any breach of or to require compliance with any term of this Agreement, shall operate as a waiver thereof. This Agreement may be executed in facsimile or other electronic counterparts, each of which will be deemed to be an original and all of which together will be deemed to be one and the same document. Counterparts may be delivered via facsimile, electronic mail (including any electronic signature covered by the U.S. federal ESIGN Act of 2000, Uniform Electronic Transactions Act, the Electronic Signatures and Records Act or other applicable law, e.g., www.docusign.com) or other transmission method and any counterpart so delivered shall be deemed to have been duly and validly delivered and be valid and effective for all purposes. This Agreement has been reviewed by each of the signatories hereto and its counsel. There shall be no construction of any provision against Jefferies because this Agreement was initially drafted by Jefferies and the Parties waive any statute or rule of law to such effect.

17.     Patriot Act. Jefferies hereby notifies the Company that pursuant to the requirements of the USA PATRIOT Improvement and Reauthorization Act. Pub. L. N 109-177 (Mar. 9, 2006) (the "Patriot Act"), it is required to obtain, verify and record information that identifies the Company in a manner that satisfies the requirements of the Patriot Act. This notice is given in accordance with the requirements of the Patriot Act.

[*Remainder of Page Intentionally Left Blank*]

ACTIVE 703044262

Air Pros Solutions Holdings, LLC
Air Pros Solutions, LLC
March 10, 2025
Page 15

Please sign below and return to Jefferies to indicate the Company's acceptance of the terms set forth herein, and once executed by each of Jefferies and the Company, this Agreement shall constitute a binding agreement among the Company and Jefferies as of the date first written above.

Sincerely,

**JEFFERIES LLC**

*John Saulitis*

Name: John Saulitis
Title: Managing Director

Accepted and Agreed:

**AIR PROS SOLUTIONS HOLDINGS, LLC**
On behalf of itself and its
subsidiaries and any entity used thereby to facilitate
the transactions contemplated hereby

*Lawrence Hirsh*

Name: Lawrence Hirsh
Title: Sole Manager

**AIR PROS SOLUTIONS, LLC**
On behalf of itself and its
subsidiaries and any entity used thereby to facilitate
the transactions contemplated hereby

*Lawrence Hirsh*

Name: Lawrence Hirsh
Title: Sole Manager

ACTIVE 703044262

## SCHEDULE A

Reference is made to the Agreement between Jefferies and the Company to which this Schedule A is attached. Unless otherwise noted, all capitalized terms used herein shall have the meanings set forth in the Agreement.

As further consideration under the Agreement, the Company agrees to indemnify and hold harmless Jefferies and its affiliates, and each of their respective officers, directors, managers, members, partners, employees and agents, and any other persons controlling Jefferies or any of its affiliates and their successors and permitted assigns (collectively, the "<u>Indemnified Persons</u>"), to the fullest extent lawful, from and against any and all claims, liabilities, losses, actions, suits, proceedings, third party subpoenas, damages, costs and expenses (each, an "<u>Action</u>") (including, without limitation, full reimbursement of all fees and expenses of counsel incurred in investigating, preparing or defending against any such Action and in enforcing the terms of this Schedule A), as incurred, (a) related to or arising out of or in connection with any untrue or alleged untrue statement of material fact contained in the Materials or other information provided by or on behalf of the Company to Jefferies, investors or parties to a Transaction, or omission or alleged omission to state a material fact necessary to make the statements contained therein, in light of the circumstances in which they were made, not misleading or (b) related to or arising out of or in connection with Jefferies' services (whether occurring before, at or after the date hereof) under the Agreement, or a Transaction or any proposed transaction contemplated by the Agreement or any Indemnified Person's role in connection therewith, whether or not resulting from an Indemnified Person's negligence ("<u>Losses</u>"); <u>provided</u>, <u>however</u>, that, in the case of the foregoing clause (b), the Company shall not be responsible for any Excluded Losses. "<u>Excluded Losses</u>" shall mean Losses that arise out of or are based on any action of or failure to act by Jefferies to the extent such Losses are determined by a final, non-appealable judgment by a court to have resulted solely from Jefferies' gross negligence or willful misconduct (other than an action or failure to act undertaken at the request or with the consent of the Company).

The Company agrees that no Indemnified Person shall have any liability to the Company or its owners, parents, affiliates, securityholders or creditors for any Losses, except for Excluded Losses.

The Company agrees that it will not settle, facilitate any settlement of, compromise or consent to the entry of any judgment in, or otherwise seek to terminate, any pending or threatened Action in respect of which indemnification or contribution may be sought hereunder (whether or not any Indemnified Person is a party to such Action) unless Jefferies has given its prior written consent or the settlement, compromise, consent or termination (i) includes an express unconditional release of such Indemnified Person from all Losses arising out of such Action and (ii) does not include any admission or assumption of fault on the part of any Indemnified Person.

If, for any reason (other than by reason of a final, non-appealable judgment by a court as to the gross negligence or willful misconduct of Jefferies as provided above), the foregoing indemnity is judicially determined to be unavailable to an Indemnified Person for any reason or insufficient to hold any Indemnified Person harmless, then the Company agrees to contribute to any such Losses in such proportion as is appropriate to reflect the relative benefits received or proposed to be received by the Company and its securityholders, on the one hand, and by Jefferies, on the other, from a Transaction or proposed transaction under the Agreement or, if allocation on that basis is not permitted under applicable law, in such proportion as is appropriate to reflect not only the relative benefits received by the Company and its securityholders, on the one hand, and Jefferies, on the other, but also the relative fault of the Company and its securityholders on the one hand, and Jefferies, on the other, as well as any relevant equitable considerations. Notwithstanding the provisions hereof, the aggregate contribution of all Indemnified Persons to all Losses shall not exceed the amount of fees actually received by Jefferies with respect to the services rendered pursuant to the Agreement. Relative benefits to the Company and its securityholders, on the one hand, and to Jefferies, on the other hand, shall be deemed to be in the same proportion as (i) the total transaction value of a Transaction or the proposed transaction under the Agreement bears to (ii) all fees actually received by Jefferies in connection with the Agreement.

The indemnity, contribution and expense reimbursement obligations set forth herein (i) shall be in addition to any liability the Company may have to any Indemnified Person at common law or otherwise, (ii) shall survive the termination of the Agreement, (iii) shall apply to any modification of Jefferies' engagement, (iv) shall remain operative and in full force and effect regardless of any investigation made by or on behalf of Jefferies or any other Indemnified Person, (v) shall be binding on any successor to or assign of the Company and successors to or assigns to the Company's business and assets and (vi) shall inure to the benefit of any successor or assign of any Indemnified Person. For a period beginning on the date hereof and ending on that date which is two years from termination of this Agreement, prior to entering into any agreement or arrangement with respect to, or effecting, any proposed sale, exchange, dividend or other distribution or liquidation of all or a significant portion of its assets in one or a series of transactions or any significant recapitalization or reclassification of its outstanding securities that does not directly or indirectly provide for the assumption of the obligations of the Company set forth in this <u>Schedule A</u>, the Company will notify Jefferies in writing thereof (if not previously notified) and, if requested by Jefferies, shall arrange in connection therewith alternative means of providing for the obligations of the Company set forth in this <u>Schedule A</u>, including the assumption of such obligations by another party, insurance, surety bonds or the creation of an escrow, in each case in an amount and upon terms and conditions satisfactory to Jefferies; <u>provided</u>, <u>however</u>,

ACTIVE 703044262

SCHEDULE A

that if any action, proceeding or investigation is pending at the end of such two-year period for which a claim for indemnification, contribution or reimbursement under this Schedule A has been made, the Company's obligations hereunder shall continue until such action, proceeding or investigation has been ultimately resolved.

ACTIVE 703044262